Kyle C. Bisceglie, Esq.
Ellen V. Holloman, Esq.
Renee M. Zaytsev, Esq.
OLSHAN FROME WOLOSKY LLP
*Attorneys for Plaintiff*
Park Avenue Tower
65 East 55th Street
New York, New York 10022

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SIGNATURE APPAREL GROUP LLC,<br><br>        Debtor. | Chapter 11<br>Case No.  09-15378 (REG) |
| SIGNATURE APPAREL GROUP LLC,<br><br>        Plaintiff,<br><br>        vs.<br><br>JOSEPH LAURITA, CHRISTOPHER LAURITA, NEW STAR GROUP, LLC, ROC FASHIONS, LLC, RVC ENTERPRISES, LLC, RUBEN AZRAK, VICTOR AZRAK AND CHARLES AZRAK, ICONIX BRAND GROUP, INC., STUDIO IP HOLDINGS, LLC,<br><br>        Defendants. | Adv. Pro. No. 11-02800 (REG)<br><br><br>**PLAINTIFF SIGNATURE APPAREL GROUP LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| ROC FASHIONS, LLC,<br><br>        Third-Party Plaintiff,<br><br>        vs.<br><br>STUDIO IP HOLDINGS, LLC<br><br>        Third-Party Defendant. | |

## Table of Contents

Page

Key of Defined Terms and Abbreviations ................................................................................. xii

PRELIMINARY STATEMENT ..................................................................................................1

ARGUMENT ...............................................................................................................................4

I.    STANDARD OF REVIEW ................................................................................4

II.    THERE IS NO EVIDENCE OF A REPUDIATION OF THE
SIGNATURE ROCAWEAR LICENSE AGREEMENT. .....................................5

    A.    The Record Evidence Contradicts Any Pre-Petition "Repudiation"
of the Signature Rocawear License Agreement. ...........................................6

    B.    The Record Confirms that the Iconix Defendants Engineered the
Wrongful Post-Petition Termination. .........................................................11

    C.    The Iconix Defendants and Christopher Laurita Offer Possibilities
in Place of Evidence. ..................................................................................14

    D.    Section 303(f) Does Not Permit Debtors to Ignore the Automatic
Stay. ..........................................................................................................15

III.    SIGNATURE'S CAUSES OF ACTION AGAINST DEFENDANTS ARE
RIPE FOR SUMMARY JUDGMENT. .............................................................20

    A.    The Defendants Have Conceded All the Facts Permitting Summary
Judgment on Signature's Breach of Contract Claim. ..................................20

    B.    There Are No Genuine or Material Factual Disputes Regarding
Christopher Laurita's Breaches of Fiduciary Duty. ...................................27

    C.    Signature Is Entitled to Summary Judgment on its Claims for
Aiding and Abetting Breach of Fiduciary Duty. ........................................34

    D.    Signature Is Entitled to Summary Judgment on its Claims for
Fraud and Negligent Misrepresentation. ....................................................36

    E.    Signature Is Entitled to Summary Judgment on its Tortious
Interference with Contract Claim. ..............................................................42

i

Table of Contents
(continued)

Page

IV.   THE DEFENDANTS OFFER NO ADMISSIBLE EVIDENCE
NEGATING THE VALUE FOR THE SIGNATURE ROCAWEAR
LICENSE AGREEMENT AND THE ROCAWEAR RIGHTS
ESTABLISHED IN THE POST-PETITION TRANSACTION. .........................45

V.    THE *WAGONER* RULE AND THE DOCTRINE OF *IN PARI DELICTO*
DO NOT APPLY TO POST-PETITION CONDUCT. ........................................48

VI.   SIGNATURE'S REMEDIES AGAINST DEFENDANTS ARE NOT
LIMITED TO AVOIDANCE UNDER THE BANKRUPTCY CODE. ...............53

      A.    Section 549 of the Bankruptcy Code Does Not Provide the
            Exclusive Remedy for Post-Petition Misconduct Against the
            Defendants. ...............................................................................................54

      B.    The Court May Punish Defendants  for Violations of the
            Automatic Stay...........................................................................................57

Table of Authorities

Page

CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970).................................................................................4

*Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*,
60 A.D.2d 568 (2d Dep't 1977)..............................................................23

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986).................................................................................4

*Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.*,
No. 96 Civ. 1967(MBM), 1996 WL 617335
(S.D.N.Y. Oct. 25, 1996) ......................................................................15

*Astra Aktiebolag v. Andrx Pharm., Inc.*,
222 F. Supp. 2d 423 (S.D.N.Y.2002)....................................................47

*Ayers v. Ayers*
92 A.D. 3d 623 (2d Dep't 2012)............................................................22

*Bank of N.Y. v. Kravis*,
189 A.D.2d 741 (1st Dept. 1993)...........................................................23

*Barnes v. Hirsch*,
215 A.D. 10 (N.Y. App. Div. 1st Dep't 1925).......................................50

*Beeche Sys. Corp. v. D.A. Elia Constr. Corp.*,
164 B.R. 12 (Bankr. N.D.N.Y. 1994) .....................................................7

*Bensen v. American Ultramar Ltd.*,
No. 92-CIV-4420 (KMW) (NRB),
1997 WL 66780 (S.D.N.Y. Feb. 14, 1997)............................................25

*BP RE, L.P. v. RML Waxahache Dodge, LLC*,
735 F.3d 279 (5th Cir. 2013) ................................................................58

*Cada v. Baxter Healthcare Corp.*,
920 F.2d 446 (7th Cir. 1990)).................................................................44

*Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*,
CIV.A. H-06-1330, 2008 WL 1999234
(S.D. Tex. May 8, 2008) ........................................................................12

Table of Authorities
(continued)

Page

*Celotex v. Catrett*,
477 U.S. 317 (1986)............................................................................................4

*Center v. Hampton Affiliates*,
66 N.Y.2d 782 (1985) ........................................................................................51

*Cerbone v. International Ladies' Garment Workers' Union*,
768 F.2d 45 (2d Cir. 1985)................................................................................44

*Claica v. Reisman, Peirez & Reisman*,
296 A.D.2d 367 (2d Dep't 2002) ......................................................................26

*Club Haven Investment Company, LLC v. Capital Company of America, LLC*,
160 F. Supp. 2d 590 (S.D.N.Y. 2001)...............................................................26

*Cobalt Multifamily Investors, LLC v. Arden*,
No. 06-CV-6172, 2014 WL 4548552
(S.D.N.Y. Sept. 12, 2014)..................................................................................51

*Consolidated Partners Invest. Co. v. Lake*,
156 B.R. 982 (Bankr. N.D. Ohio 1993)............................................................55

*Congress Factors v. Malden Mills Inc.*,
332 F. Supp. 1384 (D. N.J. 1971).....................................................................26

*Crysen/Montenay Energy Co. v. Esselen Assoc., Inc.*,
902 F.2d 1098 (2d Cir. 1990)............................................................................57

*D.A. Elia Construction Corp. v. United States Fidelity and Guaranty Co.*,
No. 94-CV-0190E(h), 1997 WL 215526
(W.D.N.Y. Apr. 16, 1997) .................................................................................26

*Daubert v. Merrell Dow Pharm.*,
509 U.S. 579, 589 (1993)..................................................................................47

*DeLorenzo v. BAC Agency Inc.*,
256 A.D.2d 906 (3d Dep't 1998) ........................................................................5

*Echevarria v. 158th Riverside Dr. Housing Co., Inc.*,
113 A.D.3d 500 (1st Dep't 2014) ......................................................................26

*Fabiyi v. McDonald's Corp.*,
Civ. No. 11 CV 8085, 2014 WL 985415
(N.D. Ill. Mar. 13, 2014).....................................................................................8

iv

Table of Authorities
(continued)

Page

*Ficus Investments, Inc. v. Private Capital Management, LLC,*
    61 A.D.3d 1 (1st Dep't 2009) ...................................................26

*Filmline (Cross-Country) Prods., Inc. v. United Artists Corp,*
    865 F.2d 513 (2d Cir. 1989)....................................................20

*Gallo v. Swan Optical Corp.,*
    79 A.D.2d 697 (2d Dep't 1980)...............................................26

*Grandonico v. Consortium Comms Int'l, Inc.,*
    566 F. Supp. 1288 (S.D.N.Y. 1983).........................................26

*Greenberg v. Frey,*
    190 A.D.2d 546 (1st Dep't 1993) ...........................................26

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.,*
    50 N.Y.2d 183 (1980) .............................................................45

*Hornstein v. Podwitz,*
    254 N.Y. 443 (1930) ...............................................................45

*In re Adelphia Comms. Corp.,*
    336 B.R. 610 (S.D.N.Y. 2006).........................................28, 31

*In re Albion Disposal, Inc.,*
    152 B.R. 794 (Bankr. W.D.N.Y. 1993) .............................33, 39

*In re Ambac Financial Group,*
    457 B.R. 299 (Bankr. S.D.N.Y. 2011) ...................................58

*In re Ampal-Am. Irs Corp.,*
    502 B.R. 361 (Bankr. S.D.N.Y 2013) .....................................55

*In re Anderson,*
    511 B.R. 481 (Bankr. S.D. Ohio 2013).....................................56

*In re Asia Global Crossing, Ltd.,*
    326 B.R. 240 (Bankr. S.D.N.Y. 2005) ......................................6

*In re Bernard L. Madoff Investment Securities LLC,*
    721 F.3d 54 (2d Cir. 2013)......................................................50

*In re Bohack Corp.,*
    607 F.2d 258 (2d Cir. 1979)....................................................39

v

Table of Authorities
(continued)

Page

*In re The Brooklyn Hospital Center*,
　341 B.R. 405 (Bankr. E.D.N.Y. 2006) ................................................................... 19

*In re Chateaugay*,
　920 F.2d 183 (2d Cir. 1990) ................................................................................... 57

*In re E.D. Wilkins Grain Company*
　235 B.R. 647, 649-50 (Bankr. E.D. Cal. 1999) ............................................... 16-17

*In re Extended Stay*,
　466 B.R. 188 (S.D.N.Y. 2011) ............................................................................... 58

*In re First RepublicBank Corp.*,
　113 B.R. 277 (Bankr. N.D. Tex. 1989) .................................................................. 57

*In re Food Management Group*,
　380 B.R. 677, 694 (Bankr. S.D.N.Y. 2008) ........................................... 49, 50, 51, 53

*In re Genco Shipping & Trading, Ltd.*,
　509 B.R. 455 (Bankr. S.D.N.Y 2014) ............................................................... 19, 33

*In re Global Crossing Ltd.*,
　295 B.R. 726 (Bankr. S.D.N.Y. 2003) ................................................................... 19

*In re Hampton Hotel Investors, L.P.*,
　270 B.R. 346 (Bankr. S.D.N.Y. 2001) ............................................................... 31, 32

*In re Ionosphere Clubs, Inc.*,
　922 F.2d 984 (2d Cir. 1990)
　*cert. denied*, 502 U.S. 808 (1991) ......................................................................... 58

*In re Lemington Home for the Aged*,
　659 F.3d 282 (3d Cir. 2011) ................................................................................... 18

*In re Lionel Corp.*,
　722 F.2d 1063 (2d Cir. 1983) ................................................................................. 19

*In re Macrose Indus. Corp.*,
　186 B.R. 789 (E.D.N.Y. 1995) ............................................................................... 25

*In re Mediators, Inc.*,
　105 F.3d 822 (2d Cir. 1997) ........................................................................ 50, 51, 52

*In re Old Carco, LLC*,
　406 B.R. 180 (Bankr. S.D.N.Y. 2009) ................................................................... 19

vi

Table of Authorities
(continued)

Page

*In re Orchard Enterprises,Inc.*,
    CIV.A. 7840-VCL, 2014 WL 811579
    (Del. Ch. Feb. 28, 2014) ......................................................................48

*In re Orion Pictures Corp.*,
    4 F.3d 1095 (2d Cir. 1993)....................................................................19

*In re Pali Holdings*,
    488 B.R. 841 (Bankr. S.D.N.Y. 2013)....................................................58

*In re Penn Traffic Co.*,
    524 F.3d 373 (2d Cir. 2008)..................................................................19

*In re Residential Capital, LLC*,
    480 B.R. 550 (Bankr. S.D.N.Y. 2012) ...................................................39

*In re Rothenberg*,
    173 B.R. 4 (Bankr. D.D.C. 1994) .........................................................17

*In re Sia*,
    349 B.R. 640 (Bankr. D. Haw. 2006) ....................................................51

*In re Sweports, Ltd.*,
    476 B.R. 540 (Bankr. N.D. Ill. 2012) ....................................................17

*In re Texas Rangers Baseball Partners*,
    434 B.R. 393 (Bankr. N.D. Tex. 2010)...................................................19

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.*,
    98 F. Supp. 2d 498 (S.D.N.Y. 2000).....................................................20

*Inter–Power of New York, Inc. v. Niagara Mohawk Power Corp.*,
    686 N.Y.S.2d 911 (3d Dep't 1999),
    *leave to appeal denied,*
    93 N.Y.2d 812 (1999) ....................................................................10, 11

*Jackson v. Smith*,
    254 U.S. 586 (1921)..............................................................................34

*Jaffe v. Paramount Comm'ns*,
    222 A.D. 2d 17 (1st Dep't 1996) .....................................................21, 25

*Joseph P. Carrara & Sons, Inc. v. A.R. Mack Const. Co., Inc.*,
    89 A.D.3d 1190 (3d Dep't 2011) ......................................................6, 7, 9

Table of Authorities
(continued)

*Kahn v. Roberts*,
  679 A.2d 460 (Del. 1996) ...........................................................................................18

*Kerzer v. Kingly Mfg.*,
  156 F.3d 396 (2d Cir.1998)..........................................................................................4

*Kirchner v. Grant Thornton LLP*,
  No. 07 Civ. 11604 (GEL), 2009 WL 1286326
  (S.D.N.Y. Apr. 14, 2009)............................................................................................50

*Kirschner v. KPMG LLP*,
  15 N.Y.3d 446 (N.Y. 2010) .........................................................................................51

*Korea Life Ins. Co. Ltd. v. Morgan Guaranty Trust Co. of New York*,
  No. 99 Civ. 1217 (AKH), 2004 WL 1858314
  (S.D.N.Y. Aug. 20, 2004)............................................................................................22

*Lerner v. Fleet Bank, N.A.*,
  459 F.3d 273 (2d Cir. 2006).........................................................................................34

*Lucente v. IBM Corp.*,
  310 F.3d 243 (2d Cir. 2002).....................................................................................6, 9

*Lumbard v. Maglia, Inc.*,
  621 F. Supp. 1529 (S.D.N.Y. 1985).............................................................................35

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).....................................................................................................4

*MDC Corp., Inc. v. John H. Harland Co.*,
  228 F. Supp. 2d 387 (S.D.N.Y. 2002).........................................................................44

*Melini v. 71st Lexington Corp.*,
  07–CV–0701, 2009 WL 413608
  (S.D.N.Y. Feb. 13, 2009).............................................................................................47

*Pearl v. City of Long Beach*,
  296 F.3d 76 (2d Cir. 2002)...........................................................................................44

*Penberg v. HealthBridge Mgmt.*,
  823 F. Supp. 2d 166 (E.D.N.Y. 2011) .........................................................................12

*People v. Grasso*,
  13 Misc. 3d 1227(a), 2006 WL 3016952
  (N.Y. Sup. 2006)..........................................................................................................22

2840557-2

Table of Authorities
(continued)

Page

*Pitcher v. Benderson-Wainberg Associates II, Ltd.*
277 A.D. 2d 586 (3d Dep't 2000) ........................................................................24

*Rachmani Corp. v. 9 East 96th Street Apartment Corp.*,
211 A.D.2d 262 (1st Dep't 1995) .................................................................5, 6, 8

*Record Club of America, Inc. v. United Artists Records, Inc.*,
890 F.2d 1264 (2d Cir. 1989)................................................................................6

*Rose v. Spa Realty Assoc.*,
42 N.Y. 2d 338 (1977) ................................................................................25, 26

*Schonfeld v. Hilliard*
218 F.3d 164 (2d Cir. 2000)................................................................................46

*Shearson Lehman Hutton, Inc. v. Wagoner*,
944 F.2d 114 (2d Cir. 1991)..........................................................................49, 50

*Shimer v. Fugazy*,
124 B.R. 426 (S.D.N.Y. 1991)............................................................................57

*Stern v. Marshall*,
131 S. Ct. 2594 (2011) .......................................................................................58

*Strasbourger v. Leerburger*,
233 N.Y. 55, 57 (1922) ..................................................................................9, 10

*Tenavision, Inc. v. Neuman*,
45 N.Y.2d 145 (1978) ........................................................................................15

*Thomas America Corp. v.* Fitzgerald
968 F. Supp. 154 (S.D.N.Y. 1997)......................................................................54

*Tower Charter & Marine Corp. v. Cadillac Ins. Co.*,
849 F.2d 516 (2d Cir. 1990)...............................................................................26

*Utility Garage Corp. v. National Biscuit Co.*,
71 A.D. 2d 578 (1st Dep't 1979) ..................................................................24, 25

*Vermont Teddy Bear Co. v. Madison Realty Co.*,
1 N.Y.3d 470 (2004) ..........................................................................................22

*Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*,
373 F.3d 241 (2d Cir. 2004)................................................................................4

ix

Table of Authorities
(continued)

Page

*W.W.W. Associates, Inc. v. Giancontieri,*
  77 N.Y.2d 157 (1990) ........................................................................................................20

*Waldman v. Stone,*
  698 F.3d 910 (6th Cir. 2012) ..........................................................................................58

*White Plains Coat & Apron Co., Inc. v. Cintas Corp.,*
  460 F.3d 281 (2d Cir. 2006)............................................................................................43

*Wight v. BankAmerica Corp.,*
  219 F.3d 79 (2d Cir. 2000)........................................................................................50, 51

*William Penn P'ship v. Saliba,*
  13 A.3d 749 (Del. 2011) ..................................................................................................30

*Wolf v. Weinstein,*
  372 U.S. 633 (1963)..........................................................................................................39

*Wolff & Munier, Inc. v. Whiting-Turner Contracting Co.,*
  946 F.2d 1003 (2d Cir. 1991)..........................................................................................24

*Woods v. City National Bank & Trust Co.,*
  312 U.S. 262 (1941)..........................................................................................................39

*Zaremba v. Gen Motors Corp.,*
  360 F.3d 355 (2d Cir. 2004)............................................................................................47

*Zimmerman v. Crothall*
  62 A. 3d 676 (Del. Ch. 2013)..........................................................................................29

STATUTES

11 U.S.C. § 105....................................................................................................................57

11 U.S.C. § 303............................................................................................................15, 17

11 U.S.C. § 323....................................................................................................................39

11 U.S.C. § 362.......................................................................................................... passim

11 U.S.C. § 363............................................................................................................43, 53

11 U.S.C. § 365....................................................................................................................46

11 U.S.C. § 549............................................................................................53, 54, 55, 56

x

Table of Authorities
(continued)

Page

11 U.S.C. § 1101(a) ................................................................................................39

11 U.S.C. § 1107 ...............................................................................................31, 39

28 U.S.C. § 157(a) ................................................................................................58

Fed. R. Civ. P. 56(e) ..............................................................................................8

Fed. R. Bankr. P. 4001 ..........................................................................................17

Fed. R. Bankr. P. 7056(a) .......................................................................................4

Fed. R. Bankr. P. 8013 ..........................................................................................59

Red. R. Bankr. P. 9001 ..........................................................................................39

Fed. R. Evid. 104(a) ..............................................................................................47

Fed. R. Evid. 602 ...................................................................................................8

Fed .R. Evid. 702 ..................................................................................................47

Fed. R. Evid. 801 ..................................................................................................12

Gen. Oblig. Law § 15-301(4) ........................................................................ passim

OTHER AUTHORITIES

*In re: Standing Order of Reference re: title 11,*
   12 Misc. 00032 ..................................................................................................58

Local Bankruptcy Rule 7056-1 ...............................................................................4, 13

| KEY OF DEFINED TERMS AND ABBREVIATIONS | | |
|---|---|---|
| **TERM** | | **DEFINITION** |
| ACA | | Anchin Capital Advisors, LLC, advisors to Signature |
| Artful Dodger Notice of Default | | Letter from GC Tarshis to Christopher Laurita, dated August 14, 2009 advising of defaults in the Artful Dodger License Agreement |
| Artful Dodger License Agreement | | The license agreement between Signature and Iconix to design, manufacture, market, and sell men's, young men's, junior's, and women's sportswear apparel bearing the "Artful Dodger" trademark, dated as of November 7, 2007 |
| Artful Dodger Rights | | The rights under the Artful Dodger License Agreement |
| Attorney Goldsmith | | Michael Goldsmith of Sills Cummis, attorneys to the ROC Defendants |
| Attorney Schwartz | | Joseph Schwartz of Riker Danzig, bankruptcy counsel to Signature |
| Attorney Silverberg | | Jay Silverberg of Sills Cummis, attorneys to the ROC Defendants |
| Attorney Stamelman | | Andrew Stamelman of Riker Danzig, corporate counsel to Signature |
| CEO Cole | | Neil Cole, Chief Executive Officer, Iconix |
| Changing Lanes | | Changing Lanes, LLC, a Delaware limited liability company associated with the Laurita Brothers |
| Creditors' Committee | | The Official Committee of Unsecured Creditors, consisting of Iconix, Harvestway and Talful, with Hitch & Trail *ex officio* |
| EVP Shmidman | | Yehuda Shmidman, Executive Vice President, Operations, Iconix (former) |
| GC Tarshis | | Andrew Tarshis, General Counsel and Executive Vice President, Iconix (former) |
| HSD Blumberg | | David Blumberg, Head of Strategic Development at Iconix |
| Iconix | | Defendant Iconix Brand Group, Inc. |
| Involuntary Petition | | The Involuntary Petition filed against Signature on September 4, 2009 at 11:38 a.m. EST |
| Jacques Moret | | Principal of the Moret Group, a clothing retailer |
| Laurita Brothers | | Defendants Joseph Laurita and Christopher Laurita |
| Li & Fung Ltd. | | Signature's factor |
| New Star | | New Star Group, LLC, a Delaware Limited Liability Company associated with Defendant Christopher Laurita |
| Petition Date | | September 4, 2009 at 11:38 a.m. EST |
| Petitioning Creditors | | Harvestway (China) Limited, Talful Ltd., and Hitch and Trail, Inc. |
| The Plan | | Signature's First Amended Plan of Liquidation |

2840557-2

| KEY OF DEFINED TERMS AND ABBREVIATIONS | | |
|---|---|---|
| **TERM** | | **DEFINITION** |
| Post-Petition License Agreement | | The license agreement between Studio IP and ROC Fashions concerning the Rocawear Rights, dated September 15, 2009 |
| Post-Petition Transaction | | The transaction pursuant to which Studio IP entered into the Post-Petition License Agreement with ROC Fashions, and in which ROC Fashions agreed to pay a total of $18,837,500 for the Rocawear Rights, comprised of (1) $6,000,000 to Iconix and Studio IP as an "Additional Royalty" (later re-characterized as an "Additional Fee"); (2) $10,037,500 to Studio IP in guaranteed minimum royalties for 2009-2011 and (3) $2,800,000 to New Star for "consulting" services |
| Purported Termination | | Defendants' post-Petition deeming of the Signature Rocawear License Agreement as "terminated" |
| Rick Darling | | President of Li & Fung USA |
| Riker Danzig | | Riker, Danzig, Scherer, Hyland & Perretti LLP, bankruptcy counsel to Signature |
| Rocawear Licensing | | Rocawear Licensing, LLC |
| Rocawear Rights | | The rights under the Rocawear License, including the exclusive license/right to use the trademark 'ROCAWEAR' in connection with the manufacture, distribution, promotion and sale of junior sportswear apparel within the United States and its territories and possessions |
| Rocawear Notice of Default | | Letter from GC Tarshis to Christopher Laurita, dated August 14, 2009 advising of defaults in the Signature Rocawear License Agreement |
| ROC Defendants | | RVC, ROC Fashions, Ruben Azrak, Victor Azrak, and Charles Azrak (released as of June 17, 2014) |
| ROC Fashions | | Released Defendant ROC Fashions, LLC |
| ROC Fashions Rocawear License Agreement | | The new license agreement between Iconix and ROC Fashions concerning the Rocawear Rights, dated September 15, 2009 |
| RVC | | Released Defendant RVC Enterprises, LLC |
| Signature | | Debtor and Plaintiff Signature Apparel Group LLC |
| Signature Rocawear License Agreement | | The license agreement between Signature and Iconix to design, manufacture, and distribute junior's apparel bearing the "Rocawear" trademark, dated as of June 1, 2004, as amended |
| Sills Cummis | | Sills Cummis & Gross P.C., counsel to the released ROC Defendants. |
| Sol Lipshitz | | ACA advisor to Signature and the Laurita Brothers |
| Studio IP | | Defendant Studio IP Holdings, LLC (subsidiary of Iconix) |
| Tom Nastos | | Iconix licensee |

2840557-2

Plaintiff and Debtor Signature Apparel Group LLC, by its Responsible Person Anthony Labrosciano, and through its attorneys Olshan Frome Wolosky LLP ("Olshan"), respectfully submits this reply memorandum of law in further support of its Motion for Summary Judgment, and in response to *Defendant Iconix Brand Group, Inc.'s and Defendant Studio IP Holdings LLC's Memorandum of Law in Opposition to Signature Apparel Group LLC's Motion for Summary Judgment* (cited as "Iconix Opp. Mem.") and the *Memorandum of Law of Defendants Christopher Laurita and New Star Group, LLC in Opposition to Debtor's Motion for Summary Judgment* (cited as "Laurita Opp. Mem.").

## PRELIMINARY STATEMENT

1.      The Defendants' constantly shifting and evolving theories concerning the circumstances of the termination of the Signature Rocawear License Agreement confirm that that there is no genuine contest over the materials facts relevant to Signature's summary judgment motion.  When Iconix was a member of the Creditors' Committee, it said that it and Signature agreed to terminate the licenses prior to the filing of the Involuntary Petition.   During confirmation proceedings for the Plan, the Defendants expanded their misrepresentations, stating that the Signature Rocawear License Agreement had not only been terminated prior to the Petition Date, but also had been terminated pursuant to its express terms, which call for a written notice of termination and provide for no oral modifications to the Agreement.  There was no disclosure supporting the Defendants' current litigation theories, namely that Signature had committed an anticipatory repudiation or breach that the Iconix Defendants subsequently accepted, or that Signature had abandoned the Agreement, or that the Agreement was properly and effectively terminated by an oral agreement after the Involuntary Petition had been filed. There was no hint of pre- or post-Petition misconduct.

2.     When discovery in the related adversary proceeding against the Laurita Brothers revealed that, during and after confirmation proceedings, Christopher Laurita had been paid millions of dollars by the ROC Defendants, the subsequent licensees of the Rocawear Rights, Signature initiated the present adversary proceeding against the Laurita Brothers and the ROC Defendants.  Discovery of third parties revealed that the Signature Rocawear License Agreement had not been terminated pre-Petition and pursuant to its terms, but rather was in default and in an extended cure period when the Involuntary Petition was filed.  When Signature confronted the Iconix Defendants, they responded by moving to disqualify its counsel.  At that time, the Iconix Defendants even accused counsel, who then represented the Petitioning Creditors, of filing the Involuntary Petition before the expiration of the cure period "with intent to try to prevent the termination of the Signature Rocawear License."  (Holloman Decl. Ex. 111.)

3.     As set forth in Signature's submissions supporting its motion for summary judgment, New York law is clear that the Signature Rocawear License Agreement could not be terminated by an oral agreement.  Moreover, the automatic stay cannot be waived by debtors or creditors without Court oversight.  The basic, essential facts—that no written notice was sent as required, and that the Agreement was in a cure period when the estate was created—are not disputed.  The Court can find as a matter of law that Defendants' illegal and improper conduct— which deprived the estate of the opportunity to assume the agreement, or seek to assign it for value to the estate, or even to simply conduct an orderly liquidation of its assets—constitutes breaches of contract and of their respective fiduciaries duties, and grant to Signature judgment on each of the counts in its Amended Complaint.

2840557-2

**CITING REFERENCES**

4.     As factual support for its motion for summary judgment, and for its reply to the Iconix Defendants' and Christopher Laurita's oppositions to its motion for summary judgment, Signature respectfully incorporates and relies upon Signature's Statement of Uncontested Material Facts Pursuant to Local Rule 7056-1, submitted in support of Signature's motion for summary judgment (*see* Docket No. 142-1, cited as the "Signature SF" and supported by the Holloman Declaration, and the exhibits attached thereto, at Docket No. 142-3).

5.     Signature also respectfully refers the Court to Iconix Brand Group, Inc.'s and Studio IP Holdings, LLC's Statement of Undisputed Materials Facts at Docket No. 140-2 (cited as the "Iconix UMF"), supported by the Declaration of Harris N. Cogan at Docket No. 140-3 (cited as the "Cogan Decl."), and to Signature's Response to the Iconix Defendants' Statement of Undisputed Material Facts at Docket No. 162-2 (cited as "Signature Response-UMF"), supported by the Holloman Declaration and the Declaration of Ellen V. Holloman in Opposition to Iconix Brand Group, Inc.'s and Studio IP Holdings, LLC's Motion for Summary Judgment, and the exhibits attached thereto, at Docket No. 162-1 (cited as the "Holloman Opp. Decl."). The Iconix Defendants' Response to Signature's Statement of Uncontested Material Facts, at Docket No. 161, is cited as "Iconix Response-SF". Christopher Laurita's Response to Signature's Statement of Uncontested Material Facts, at Docket No. 170-1, is cited as the "Laurita Response-SF".

6.     Finally, Signature respectfully refers the court to the Reply Declaration of Ellen V. Holloman in further support of Signature's summary judgment, and the exhibits attached thereto (sworn to on October 28, 2014, and cited as the "Holloman Reply Decl.").

# ARGUMENT

## I.    STANDARD OF REVIEW

7.      A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Bankr. P. 7056(a). In determining whether a genuine dispute as to a material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).  In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact."  *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). When the moving party has met this initial responsibility, the nonmoving party must identify evidence in the record that creates a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).

8.      A dispute of fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.  A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.*   Accordingly, unsupported allegations and claims, including "[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir.1998).  The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986).  Pursuant to Local

Bankruptcy Rule 7056-1, statements controverting a material fact offered by an opposing party must be supported by a citation to evidence that would be admissible.

## II.    THERE IS NO EVIDENCE OF A REPUDIATION OF THE SIGNATURE ROCAWEAR LICENSE AGREEMENT.

9.    The Iconix Defendants concede, as they must, that Studio IP could not terminate the Signature Rocawear License Agreement without seeking relief from the automatic stay (Iconix Opp. Mem. 8, 10), which the Iconix Defendants did not do.  Having conceded the applicable law, the Iconix Defendants attempt to avoid summary judgment by concocting a fact issue.  The Iconix Defendants now claim that Signature "repudiated" the Signature Rocawear License Agreement pre-Petition, and then, "[b]ecause Signature had repudiated its license," it subsequently "voluntarily agreed to give up the license," in an oral agreement, after the Involuntary Petition was filed (Iconix Opp. Mem. 8-9; see also Laurita Opp. Mem. 8-9).  In the Iconix Defendants' formulation, the alleged post-Petition oral termination agreement is premised on a pre-Petition "repudiation."

10.    There is no evidence, much less uncontested evidence, constituting or providing the "definite and final communication" of an intention not to perform under the Signature Rocawear License Agreement, which is required to invoke the doctrine of anticipatory breach. *Rachmani Corp. v. 9 East 96th Street Apartment Corp.*, 211 A.D.2d 262, 266-67 (1st Dep't 1995); *see also DeLorenzo v. BAC Agency Inc.*, 256 A.D.2d 906, 907-908 (3d Dep't 1998) ("The doctrine of anticipatory repudiation [provides remedies] where there is a renunciation of the contract in which the repudiating party has indicated an unqualified and clear refusal to perform with respect to the entire contract.").  To the contrary, the record shows that there was partial performance by Signature throughout 2009, expressions of intent and efforts and offers to cure, and the Defendants' observation of the provisions of the Signature Rocawear License Agreement

5

right up until the filing of the Involuntary Petition.   The Defendants have provided no evidence otherwise, and their attempts to create fact issues fail.

11.     Further, the Iconix Defendants' latest termination theory fails as a matter of law. A party claiming anticipatory repudiation or breach has two mutually exclusive options:  to terminate the agreement immediately and sue for damages, or continue to treat the agreement as valid.  *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).   As detailed below, the undisputed facts show that the Iconix Defendants continued to treat the contract as valid and in effect.  The Iconix Defendants cannot now claim that they accepted an anticipatory repudiation or breach, or that an anticipatory repudiation or breach terminated the agreement.

**A.     The Record Evidence Contradicts Any Pre-Petition "Repudiation" of the Signature Rocawear License Agreement.**

12.     New York law is clear that contractual repudiation "must be supported by evidence of an unqualified and clear refusal to perform with respect to the entire contract." *Joseph P. Carrara & Sons, Inc. v. A.R. Mack Const. Co., Inc.*, 89 A.D.3d 1190, 1991 (3d Dep't 2011).   The party asserting an anticipatory repudiation has the burden of proving it.   *Record Club of America, Inc. v. United Artists Records, Inc.,* 890 F.2d 1264, 1275 (2d Cir. 1989).  The Iconix Defendants do not and cannot meet this standard.

13.     The Iconix Defendants offer two possible scenarios for an anticipatory repudiation or breach of the Signature Rocawear License Agreement.  First, they contend that "[i]n early 2009, Signature made it clear to the Iconix Defendants that without an investor it could not pay its bills and was going out of business."  (*See* Signature-Response UMF ¶ 20.) This does not support the contention that there was an anticipatory breach by Signature, as "mere expression of difficulty in tendering the required performance [] is not tantamount to a renunciation of the contract." *Rachmani Corp.*, 211 A.D.2d at 267; *see also In re Asia Global*

*Crossing, Ltd.*, 326 B.R. 240, 253 (Bankr. S.D.N.Y. 2005) ("'A bankruptcy filing is not itself an anticipatory repudiation by the debtor of an executory contract.'") (citation omitted); *Beeche Sys. Corp. v. D.A. Elia Constr. Corp.*, 164 B.R. 12, 16 (Bankr. N.D.N.Y. 1994 (same)). Additionally, there was no "unqualified refusal" to perform expressed by Signature in "early 2009," required to support a claim or finding of anticipatory breach or repudiation. *Joseph P. Carrara & Sons, Inc.*, 89 A.D.3d at 1991. Indeed, the record confirms that the Laurita Brothers were attempting to stay in business during this time frame, including by looking for an investor or partner, negotiating with its factor and negotiating for an investment from Iconix. (*See* Signature SF ¶¶ 24-26 & Holloman Decl. Exs. 7, 9, 11-17, 20; Signature Response-UMF ¶¶ 21, 22.) Between January 2009 and May 2009, Signature made at least $755,000.00 in payments to the Iconix Defendants, which the Iconix Defendants accepted. (Holloman Reply Decl. ¶ 1& Ex. 1.) Christopher Laurita, GC Cole, CFO Clamen and EVP Blumberg, among others at Signature and Iconix, had several communications concerning Signature's payments and the possibility of Iconix investing with Signature. (Holloman Decl. Exs. 12, 19, 21-28.) As set forth below, evidence of partial performance, and acceptance of that performance, firmly refutes the Iconix Defendants' claims of anticipatory repudiation or breach.

14.    Next, the Iconix Defendants contend that "[b]y August 2009, the parties all knew that Signature could not continue with the [Signature Rocawear License Agreement]," and "in or around mid-August 2009, 'it was understood that the license had really been terminated in everyone's mind in the sense that the Lauritas had basically notified [the Iconix Defendants] that they were no longer fulfilling their obligations, or they were not in a position to fulfill their obligations under the license and were looking to find a replacement.'" (*See* Signature-Response UMF ¶¶ 29-30.) Again, the Iconix Defendants can point to no evidence of a "definite and final

7

communication" not to perform, which is required to determine that an agreement has been "repudiated" or anticipatorily breached. *Rachmani Corp.*, 211 A.D.2d at 266-67. Instead, the primary support for those statements comes from a single witness, GC Tarshis, whose speculations in 2012 about what was "understood . . . in everyone's mind" in 2009 (Iconix UMF ¶¶ 30, 29, 20) are not only inadmissible,[1] but also are contradicted by the contemporaneous documents and course of dealing between the Iconix Defendants and the Laurita Brothers. (*See* Signature-Response UMF ¶ 30 (detailing GC Tarshis' contemporaneous statements).) After receiving the Rocawear Notice of Default from GC Tarshis (which was preceded by an e-mail confirming that the Iconix Defendants were <u>not</u> terminating the Signature Rocawear License Agreement or the Artful Dodger License Agreement (*see* Signature SF ¶¶ 31-32 & Holloman Decl. Exs. 36, 38)), the Laurita Brothers caused Signature to hire attorneys and advisors (*id.* ¶¶ 38-40 & Exs. 44, 51, 65), met with Li & Fung, the ROC Defendants and CEO Cole (*id.* ¶¶ 41-42, 50, 51, 53 & Exs. 7, 46, 47, 51, 54, 65), sought and received an extension of the cure period (*id.* ¶¶ 45, 46 & Exs. 49, 56, 52, 59), negotiated for a compromise of the default amount (*id.* ¶¶ 43, 44, 48-50, 52, 55, 58-60 & Exs. 48, 50, 53-55, 62-63, 66-67, 69; *see also* Laurita Opp. Mem. 6 ("Iconix required ROC Fashions to pay a large portion of the debt that had been owed by the Debtor: $6 million.")), drafted and exchanged term sheets (*id.* ¶¶ 43, 44, 48, 49, 51-55, 58-59 & Exs. 48, 50, 53, 55, 60, 62-63, 65-66, 69) and presented a proposal for a cure to CEO Cole that was premised on a partnership with or financing from the ROC Defendants (*id.* ¶¶ 63-65 & Exs. 62, 69-72). Evidence concerning Christopher Laurita's search for a partner or investor does

---

[1] *See, e.g., Fabiyi v. McDonald's Corp.*, Civ. No. 11 CV 8085, 2014 WL 985415, at *11 (N.D. Ill. Mar. 13, 2014) ("Because Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 602 disallow testimony that is not derived from personal knowledge, Fabiyi's speculations or hunches about Piasecki's state of mind are insufficient to thwart summary judgment").

8

not evince a clear and unequivocal intention to abandon the Signature Rocawear License Agreement (*see* Iconix Opp. Mem. 19), but rather establishes that Signature and the Laurita Brothers were attempting to stay in business and find a solution to address their debts and obligations. A clear intent not to perform necessarily would entail Signature and the Laurita Brothers *not* seeking a solution or attempting to forge a compromise. Further, the Iconix Defendants' argument that Signature failed to locate a potential new licensee (*see* Iconix Opp. Mem. 19) completely ignores Signature's negotiations with the ROC Defendants and their presentation of proposed terms for an agreement with them on several occasions prior to the expiration of the cure period and the filing of the Involuntary Petition (*see* Signature SF ¶¶ 43, 48-49, 58-59).

15.    Ultimately, the inadmissible "evidence" upon which the Iconix Defendants primarily seek to rely in support of its version of events—that the Signature Rocawear License Agreement had been "terminated in everyone's mind" or that the termination of the Agreement was "clear" to "everyone"—is squarely rejected by New York courts considering claims of anticipatory repudiation and breach. *Joseph P. Carrara & Sons, Inc.*, 89 A.D. 3d at 1191. The intention and subjective perceptions of the parties to the Agreement do not matter—the repudiating statement or voluntary act must be clear and unequivocal, and moreover, as set forth below, cannot subsequently be waived by the non-breaching party.

16.    When an anticipatory repudiation or breach occurs, the non-breaching party has "two mutually exclusive options": she may elect to treat the contract as terminated and exercise her remedies, or she may elect to continue to treat the contract as valid. *Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir. 2002). This has long been the rule in New York. In *Strasbourger v. Leerburger*, the Court of Appeals considered the case of two counterparties who had entered into

a contract for the importation and sale of quinine from Java.  233 N.Y. 55, 57 (1922).  By the

time the quinine arrived in New York, the purchaser was in bankruptcy proceedings, and the

defendant importer, after confirming with the purchaser's trustee that he did intend to continue

with the contract, presented the bill for the goods to the trustee and set a time for payment.

When the time for payment passed without payment being made, the defendant sent a letter to

the trustee "stating that the contract was broken" and rescinded.  *Id*. at 57-58.  The Court

explained that:

> The plaintiff might therefore, when he received the letter stating
> that the contract was rescinded, have treated that letter as an
> anticipatory breach, and have sued for his damages. *He was
> required, however, to make an election.  He could not at the same
> time treat the contract as broken and as subsisting.  One course of
> action excludes the other.*

*Id*. at 58 (emphasis added); *see also Inter–Power of New York, Inc. v. Niagara Mohawk Power*

*Corp.,* 686 N.Y.S.2d 911, 913 (3d Dep't 1999), *leave to appeal denied,* 93 N.Y.2d 812 (1999)

("It is well settled that when one party breaches an executory contract, the adverse party has a

choice—to treat the entire contract as broken and sue immediately for the breach or reject the

proposed breach and continue to treat the contract as valid.").

17.    The Iconix Defendants assert that the alleged repudiation took place pre-Petition

(Iconix Opp. Mem. 8) and moreover, that such repudiation relieved them of the requirements of

the Agreement's termination provision (providing a written notice of default, observation of a

cure period, and a written notice of termination) (*see* Holloman Decl. Ex. 1 at § 20(a); Iconix

Opp. Mem. 29-30).  However, the Iconix Defendants also concede that they continued to treat

the Signature Rocawear License Agreement as valid in the pre-Petition time frame, precisely by

following the Agreement's provisions and issuing the Rocawear Notice of Default, extending the

cure period (with GC Tarshis advising that the Iconix Defendants could prior to the extension

"terminate anytime upon notice") rather than immediately terminating the Agreement and suing

for breach  (*see* Signature Response-UMF ¶¶ 31, 32, 45, 46 & Holloman Decl. Exs. 36, 38, 49,

56).  CEO Cole testified at great length that the decision not to terminate the Signature Rocawear

License Agreement in the pre-Petition time frame, and to continue to treat the Agreement as

valid, was considered and deliberate on his part.  (*See* Signature SF ¶ 69.)   Although the Iconix

Defendants and Christopher Laurita now assert that the Iconix Defendants' issuance of the

Rocawear Notice of Default and extension of the cure period does not exclude the possibility that

the Signature Rocawear License Agreement had been repudiated and then terminated by a post-

Petition agreement (*see, e.g.,* Iconix Response-SF ¶¶  20-21, 31-32, 68-69, 71-73, 79, 85-86,

108-111, 113; Laurita Response-SF ¶¶ 20-21, 31-32,  68-69, 71-74, 79-82, 84-86, 108-113), in

fact, New York provides that these remedies are mutually exclusive, *Inter–Power of New York,

Inc.*, 686 N.Y.S.2d at 913, making those disputes neither material nor genuine for the purpose of

this motion.  Once the Involuntary Petition was filed, the Iconix Defendants no longer had the

option of terminating the executory Signature Rocawear License Agreement, by oral agreement

or otherwise, based on a supposed "repudiation" upon which they chose not to act.  *Id.* (granting

summary judgment on the basis that party asserting anticipatory breach waived alleged breach).

      **B.**     **The Record Confirms that the Iconix Defendants
Engineered the Wrongful Post-Petition Termination.**

18.    The Iconix Defendants then assert that "[b]ecause Signature had repudiated its

license, it then voluntarily agreed to give up the license" post-Petition (Iconix Opp. Mem. 9).

The Iconix Defendants offer no evidence of any such voluntary agreement by Signature (*see id.*

(citing Iconix UMF ¶¶ 29-39) *see also* Signature Response-UMF ¶¶ 29-39).  To the contrary, the

testimony offered by the Laurita Brothers and Signature's bankruptcy counsel during discovery

describes unilateral action by the Iconix Defendants and their clear exercise of control over the

Signature Rocawear License Agreement, which was property of the estate and the termination of which violated the automatic stay, as well as the Agreement's terms and New York law.  Both of the Laurita Brothers testified that, during the post-Petition timeframe, they were told that the Signature Rocawear License Agreement had been terminated—not that they offered, negotiated or agreed to the termination.[2]  (*See* Signature Response-UMF ¶¶ 38; Joseph Laurita (1/30/2014) Tr. 348:7—364:2; C. Laurita (12/5/2013) Tr. 399:11—407:18).   Similarly, Signature's bankruptcy counsel Attorney Schwartz confirmed that he was told that the Signature Rocawear License Agreement was in default (and not repudiated by Signature) prior to the Involuntary Petition, and that GC Tarshis subsequently told him that the Iconix Defendants were taking the position that the Agreement was terminated.   (Schwartz Tr. 30:11-31:15; 123:15-124:3.) Attorney Stamelman's and Attorney Schwartz's contemporaneous communications amongst themselves, and with Signature and the Laurita Brothers, concerning these discussions with GC Tarshis confirm Attorney Schwartz's subsequent testimony.  (*See* Holloman Decl. Exs. 74-78, 82-84.)[3]

---

[2] In his Opposition Memorandum, Christopher Laurita asserts that a "seamless transition to a new licensee was imperative" from the Iconix Defendants' perspective (Laurita Opp. Mem. 7 (citing testimony of CEO Cole)).   Although the filing of the Involuntary Petition "interrupted" the negotiations between the Laurita Brothers, the Iconix Defendants and the ROC Defendants (*id.* 5), he states that the Iconix Defendants subsequently "took the position" that the Signature Rocawear License Agreement "had been terminated in fact" (*id.* 7 (citing testimony of Attorney Schwartz)).   According to Christopher Laurita, Signature as the debtor then "made the determination to acquiesce and agree to deem the [Signature Rocawear] License Agreement" terminated (*id.* 8).   However, there is not a single citation to the record in support of this statement, and Christopher Laurita has submitted no affidavits or other statements of personal knowledge.

[3] Additionally, those communications are admissible as opposing party statements (as GC Tarshis is an agent of Iconix), business records and present sense impressions. Fed. R. Evid. 801(d)(2)(D); Fed. R. Evid. 803(6); Fed. R. Evid. 803(1); *Penberg v. HealthBridge Mgmt.*, 823 F. Supp. 2d 166, 187-89 (E.D.N.Y. 2011) (finding an email summarizing a phone conversation was admissible as a business record where such emails were sent in the ordinary course of business); *Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*, CIV.A. H-06-1330, 2008 WL

12

19.    The Iconix Defendants' claim that Signature's agreement to "give up" the
Signature Rocawear License Agreement was part of a post-Petition deal "struck by all interested
parties" (Iconix Opp. Mem. 9)[4] ignores the contemporaneous documents.  After the September 8-
10, 2009 communications that are described at paragraphs 75-82 of Signature's Rule 7056-1
Statement concerning the "risk" associated with Iconix's "termination position" and efforts for
them "to mitigate their damages" (*see* Holloman Decl. Ex. 83; *see also* Holloman Decl. Exs. 74-
78, 82- 84), Attorney Schwartz contacted the Petitioning Creditors' counsel on September 11,
2009 to solicit what Attorney Schwartz characterized as a "wish list" that would facilitate the
"structured dismissal" of the Involuntary Petition.  (Cogan Decl. Ex. 20 at pgs. 2-3.)  By then,
the Iconix Defendants had already made their decision to proceed with the wrongful post-

---

1999234 (S.D. Tex. May 8, 2008) (admitting an email summarizing a phone conversation as both
a business record and a present sense impression).

[4] The Iconix Defendants' references to the Petitioning Creditors are a red herring (*see* Iconix
Opp. Mem. 9 n.5), as there is no evidence that the Petitioning Creditors were involved in the
wrongful post-Petition oral termination (or even could be, given that were non-parties to the
Agreement).  It is also incorrect that that Petitioning Creditors "were paid for all their Rocawear-
branded goods" by ROC Fashions or RVC (*id*.), or that the Petitioning Creditors were equal
beneficiaries in the Post-Petition Transaction and got the "best deal possible."  (*Id.*)  The
Petitioning Creditors received no payments for millions of dollars of goods that they shipped
during 2008 and 2009 for which Signature failed to pay, (*see* Case No. 09-15378 Claim Nos. 45-
1, 48-1, 49-1), and those relief relating to those claims was not baked into the Post-Petition
Transaction.  By contrast, Studio IP's claim for $7,462,500, as set forth in the Notice of Default,
was compromised to $6,000,000 and assumed by the ROC Defendants as part of the Transaction.
(*See* Signature SF ¶¶ 43, 48-50, 52-55, 58, 60; *see also* Laurita Opp. Mem. 5-6 ("the new entity
was willing to assume the outstanding royalty obligation" owed by Signature"; "Iconix required
ROC Fashions to pay a large portion of the debt that had been owed by [Signature]:  $6
million.")  As compared to all the other creditors of Signature's estate, including the Petitioning
Creditors, Studio IP is the only one with a claim that was compromised and satisfied.  Incredibly,
despite this, the Iconix Defendants have submitted full claims that have not been reduced by the
amount the ROC Defendants agreed to pay (*see* Case No. 09-15378 Claim Nos. 42-1.)  The
Petitioning Creditors were offered no such special benefits or priority.  As this Court previously
explained, the Iconix Defendants' "complaints about Signature's decision not to pursue claims in
this litigation against the Petitioning Creditors amount to little more than suspicions . . . because
the Petitioning Creditors are members of the class that may ultimately share in any recoveries . . .
it is hardly surprising that these creditors were not named as defendants."  *See* Adv. Pro. No. 11-
02800 Dkt. No. 105 at 12.

13

Petition termination and had communicated that to Attorney Schwartz, and already were well underway with negotiating a new agreement with the ROC Defendants (*see* Signature SF ¶¶ 83-86, 90-91-94).  The Defendants have pointed to no facts involving anyone other than themselves in the wrongful post-Petition termination.

### C.   The Iconix Defendants and Christopher Laurita Offer Possibilities in Place of Evidence.

20.   Presuming that New York law permits the oral termination of an agreement with a written notice of termination requirement, which it does not (*see* Section III.A, below), the Iconix Defendants' and Christopher Laurita's arguments regarding repudiation and/or a post-Petition voluntary agreement to terminate the Signature Rocawear License Agreement require them to prove that the Laurita Brothers "voluntarily agree[ed] to give up" the Signature Rocawear License Agreement (Iconix Opp. Mem. 7-12; *see also id*. at 27-32).  There is no evidence of any such agreement in the record, and as set forth above in Section II.A, above, all the evidence is to the contrary.  At best, the Iconix Defendants point to admissions by the Laurita Brothers that the Signature Rocawear License Agreement "could be terminated by agreement of the parties."  (*See* Iconix UMF ¶ 38; Signature-Response UMF ¶ 38.)[5]  "Could have," indicating merely a possibility, is not enough to pass muster here.  There are no facts either cited by the Iconix Defendants or otherwise in the record providing a statement of an unequivocal intent not to perform.  There is no indication of when the supposed repudiation is alleged to have taken place, no identification of who made the repudiating statement and to whom any statement were made.  There are only generalities concerning Signature's failing business and what was "in everybody's mind."  This is insufficient under New York law.  "For a statement to constitute an

---

[5] Notably, the Iconix Defendants do not cite the Laurita Brothers' deposition testimony, or that of Attorney Schwartz, concerning the post-Petition discussions about the wrongful termination.  Both the Laurita Brothers and Attorney Schwartz testified that the post-Petition termination was the Iconix Defendants' decision.  (*See* Signature Response UMF ¶¶ 30, 38.)

anticipatory breach, 'the announcement of an intention not to perform [must be] positive and unequivocal.'" *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.*, No. 96 Civ. 1967(MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996) (quoting *Tenavision, Inc. v. Neuman,* 45 N.Y.2d 145, 408 N.Y.S.2d 36, 379 N.E.2d 1166, 1168 (1978)), *aff'd* 141 F.3d 1151 (2d Cir. 1998)).   There are no such statements here.

21.     The Iconix Defendants also point to a post-Petition representation made in Objections by the Creditors' Committee stating that "[w]hen it became clear that the Debtor could no longer perform its obligations under the Iconix licenses, the Debtor and Iconix *agreed* to terminate the licenses." (*See* Iconix UMF ¶ 39; Signature-Response UMF ¶ 39.)   The Iconix Defendants consistently mischaracterize this statement, which situates such an agreement in the pre-Involuntary Petition time frame, when the automatic stay was not applicable, no estate had been created, and no property of the estate was at issue.  (*See id.*)   Moreover, nothing about that statement is inconsistent with the notion that the agreement referred to proceeded without reference or adherence to the terms of the Signature Rocawear License Agreement and its requirement of a written notice of termination.   There is certainly no mention of any repudiation, abandonment, a post-Petition oral termination, or of the other theories that the Iconix Defendants are offering on these motions.

### D.     Section 303(f) Does Not Permit Debtors to Ignore the Automatic Stay.

22.     Finally, the Iconix Defendants argue that the plain language of Section 303(f) permits a voluntary post-Petition oral termination of the Signature Rocawear License Agreement by Signature, citing the statute's mandate to allow debtors to "continue to use, acquire or dispose of property," prior to the entry of the order of relief as if no involuntary case had been commenced (Iconix Opp. Mem. 11 & 9 n.5 (citing 11 U.S.C. § 303(f))). That mandate is not a

15

license to ignore or violate the automatic stay, nor is it an invitation for debtors, creditors or their advisors to substitute their judgment for that of the Court in determining whether the automatic stay should be lifted, for what purpose and for whose benefit.

23.    The Iconix Defendants' argument is premised on Signature voluntarily agreeing to "give up" the Signature Rocawear License Agreement during the gap period.  They do not dispute that the Agreement was an asset of the estate, was an executory contract, and was in default (as opposed to terminated) at the time the Involuntary Petition was filed (Iconix Opp. Mem. 9).  The Iconix Defendants cite no authority for the proposition that a repudiated or defaulted agreement is not nonetheless property of a bankruptcy estate and subject to the automatic stay or to the appropriate provisions the Bankruptcy Code, generally.  The Laurita Brothers, as principals of a debtor, were not free to waive the automatic stay without supervision—that power is reserved to the bankruptcy courts.  *In re E.D. Wilkins Grain Company*, cited in Signature's Opening Memorandum at pages 31-32 (Dkt. No. 142-21), explains that:

> If, prior to entry of an order for relief, the court were to permit an involuntary debtor to stipulate to relief from the automatic stay, not only would [the creditors' committee, the United States Trustee, and other important constituencies] not receive notice of the motion and the opportunity to oppose it, the administration of the estate by any future trustee would be effectively thwarted.  There is nothing in the Code or the Rules which gives such preemptive authority to an involuntary debtor.
>
> Permitting an involuntary debtor the latitude to simply stipulate away the automatic stay for a future trustee would also frustrate the very purpose of arming creditors with the right to file an involuntary petition.  When a debtor is paying its debts as they come due, creditors may file an involuntary petition to preserve the debtor's assets rather than run the risk that the debtor will financially dismembered by other creditors or its assets dissipated through the debtor's incompetence or dishonesty.

2840557-2

235 B.R. 647, 649-50  (Bankr. E.D. Cal. 1999); *see also In re Sweports, Ltd.,* 476 B.R. 540, 545

(Bankr. N.D. Ill. 2012) (same).  Where "there is no one who can agree on behalf of the estate,

relief from the automatic stay must be requested by an appropriate motion pursuant to 11 U.S.C.

§ 362(d) [and] Fed. R. Bankr. P. 4001(a)."  *Wilkins*, 235 B.R. at 651; *see also In re Rothenberg*,

173 B.R. 4, 13 (Bankr. D.D.C. 1994) (Section 303(f) did not excuse lender's actions in violation

of automatic stay, "*regardless of whether the debtor consents*.") (emphasis added); Fed. R.

Bankr. P. 4001(d)(1) (requiring any "[a]greement relating to relief from the automatic stay" to be

submitted via motion to the bankruptcy court for approval, and for appropriate notice to be

given).

24.    Moreover, Section 303(f) also plainly provides that such use of the estate's

property is so that "any business of the *debtor may continue to operate*."  *Id.* (emphasis added).

Notably, the legislative history of Section 303(f) provides that a bankruptcy court is permitted to

"control the debtor's powers under this subsection by appropriate orders, such as where there is a

fear that the debtor may attempt to abscond with assets, dispose of them at less than their fair

value, or dismantle his business, all to the detriment of the debtor's creditors."  11 U.S.C.

§ 303(f) (Legislative History, Subsection (f)).  The post-Petition termination of the Signature

Rocawear License Agreement and the Post-Petition Transaction did not enable Signature, as the

debtor, to continue to operate, as contemplated by Section 303(f).  Rather, the Transaction

irrevocably ended Signature's business while producing no liquidation value for the estate, not

even a waiver of the Iconix Defendants or the Laurita Brothers claims against Signature, which

amount to $39,712,328.

25.    In the same vein, Christopher Laurita argues that "practical business

determinations" (Laurita Opp. Mem. 9) made by debtors like Signature are favored by

bankruptcy courts, and that the business judgment rule accordingly should shield his "acquiescence" to the Iconix Defendants' exercise of control over the property of Signature estate (*id.*).   However, Signature's "dire financial circumstances" (*id.* 5) are not substantively different from the circumstances faced by any other debtor.   "Dire financial circumstances" do not empower a debtor or its creditors to disregard state or federal law as a matter of business judgment, which is exactly what the wrongful post-Petition Termination did (*see* Section III A.-B, below).   *Kahn v. Roberts*, 679 A.2d 460, 465 (Del. 1996) (business judgment rule normally protects lawful actions, provided they were taken in good faith, after reasonable deliberative process and in the absence of conflicts of interest).

26.    If the business judgment rule even applies to Christopher Laurita's "acquiescence" to the Iconix Defendants' wrongful post-Petition Termination and its exercise of control over the assets of Signature's estate, it is clear that such a decision is not protected by that rule, and the Court is free to render summary judgment on this issue (*see* Laurita Opp. Mem. 11 (citing *In re Lemington Home for the Aged*, 659 F.3d 282 (3d Cir. 2011) (vacating summary judgment were evidence existed that debtor did not exercise reasonable judgment)).   An oral post-Petition termination not only breached the terms of the Agreement, but also violates (i) Section 15-301(4) of New York's General Obligations Law, providing that the only means to alter a contractual written notice of termination provision is by a subsequent writing, and (ii) the automatic stay of Section 362.

27.    Each of the cases Christopher Laurita cites for the application of the business judgment rule involve debtors seeking court approval of an assumption or a rejection of an executory contract, or to enter into a transaction outside of the ordinary course of business involving the disposition a debtor's assets, which did not happen here.   Mere acquiescence to a

creditor's demands does not constitute the exercise of sound business judgment.  *See* Laurita

Opp. Mem. 10 (citing *In re Penn Traffic Co.*, 524 F.3d 373, 383 (2d Cir. 2008) ("'The

Bankruptcy Code places the option of assuming or rejecting executory contracts with the debtor,

not with its business partners.   To disturb this mechanism would unbalance the Code's

overriding policy favoring debtor reorganization and rehabilitation."); *In re Orion Pictures

Corp.*, 4 F.3d 1095 (2d Cir. 1993) (motion made to assume contract); *In re Old Carco, LLC*, 406

B.R. 180 (Bankr. S.D.N.Y. 2009) (court authorization sought to reject executory contract); *In re

Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (court approval sought for sale

of assets outside of the ordinary course of debtor's business; court noted that "'good business

reason' is not established where only reason advanced is Creditors Committee's insistence on" a

transaction); *In re Genco Shipping & Trading, Ltd.*, 509 B.R. 455, 462 (Bankr. S.D.N.Y 2014)

(granting debtor's motion for leave to assume restructuring agreements forming basis of

prepackaged plan of reorganization, noting that a "successful prepack can cut down the duration

of a bankruptcy case and therefore, the incredible cost associated with a long, drawn out

bankruptcy process"); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983) (creditors

committee's "insistence" on asset sale is insufficient as a matter of fact because it is not a sound

business reason and insufficient as a matter of law because it ignores the equity interests to be

weighed and considered under chapter 11); *In re The Brooklyn Hospital Center*, 341 B.R. 405

(Bankr. E.D.N.Y. 2006) (debtor sought permission from court for out of the ordinary course

transaction); *In re Texas Rangers Baseball Partners*, 434 B.R. 393, 405 (Bankr. N.D. Tex. 2010)

(ordering general partners to manage gap debtor's affairs in a manner consistent with the

fiduciary responsibilities of debtors-in-possession where debtor sought confirmation of

prepackaged plan of reorganization).)

28.     In sum, a debtor does not have the discretion to waive the automatic stay, particularly at the demands of its creditors and any "acquiescence" to a creditor's demands to do so is not protected by business judgment.  The termination of the Signature Rocawear License Agreement was improper and unlawful, and damaged the estate.

## III.   SIGNATURE'S CAUSES OF ACTION AGAINST DEFENDANTS ARE RIPE FOR SUMMARY JUDGMENT.

29.     The Defendants' disputes that Signature "could have" or did terminate the Signature Rocawear License Agreement by an oral post-Petition agreement (*see, e.g.,* Iconix Response-SF ¶¶ 20-21, 31-32, 68-69, 71-73, 79, 85-86, 108-111, 113; Laurita Response-SF ¶¶ 20-21, 31-32, 68-69, 71-74, 79-82, 84-86, 108-113) cannot succeed as a matter of law. Accordingly, such disputes are neither genuine nor material, and the Court can award judgment to Signature as a matter of law.

### A.     The Defendants Have Conceded All the Facts Permitting Summary Judgment on Signature's Breach of Contract Claim.

30.     The Defendants concede that New York law requires that that a contract must be "enforced according to its terms."  *W.W.W. Associates, Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990); *see also Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 98 F. Supp. 2d 498, 503 (S.D.N.Y. 2000) ("New York law … expresses a strong commercial policy for the plain meaning rule of contract interpretation; that which is stated clearly is to be applied clearly") and that this interpretive rule applies with particular force to termination provisions because there is a "clear New York rule requiring termination of a contract in accordance with its terms….", *Filmline (Cross-Country) Prods., Inc. v. United Artists Corp*, 865 F.2d 513, 519 (2d Cir. 1989) (*see also* Signature Opening Mem. 32-34).  The Defendants also do not dispute the fact that no written notice of termination was sent, and that the Signature Rocawear License Agreement was in a

cure period when the Involuntary Petition was filed.  (Iconix UMF ¶¶ 37; Iconix Response-SF ¶¶ 45-46, 66-67; Laurita Response-SF ¶¶ 45-46, 66-67.)

31.    Instead, the Defendants offer a series of legal arguments that strain credulity and ignore those facts.  *First*, the Iconix Defendants argue that Section 20(a) of the Signature Rocawear License Agreement provided that termination by written notice was an "option" rather than a requirement, because the Agreement states that, upon written notice of a default and observation of the appropriate cure period, the Licensor then "may terminate [the] Agreement effective immediately upon giving Licensee a written notice of termination . . .".  (Iconix Opp. Mem. 28).  This is simply an unsustainable and clearly erroneous reading of the termination provision:  the elective aspect of the word "may" applies to the Iconix Defendants' discretion, as the Licensor, to elect to terminate the Agreement at the expiry of the cure period, not to the requirement to do so by written notice.  The Iconix Defendants' argument merely underscores that the Signature Rocawear License Agreement did not terminate automatically at the expiry of the cure period, but rather that an additional act—the transmission of the written notice of termination—was required in order to terminate the Agreement.

32.    The cases cited by the Iconix Defendants firmly refute their novel argument, and reinforce New York's strict requirement of providing a written notice of termination where one is contractually required.  *Jaffe v. Paramount Communications* (*see* Iconix Opp. Mem. 28) dealt with an employment agreement and the right of an executive, Stanley Jaffe, to receive on an accelerated basis certain stock options upon the occurrence of specified events.  222 A.D. 2d 17, 18 (1st Dep't 1996).  The agreement stated that Paramount, his employer, could terminate Jaffe's employment prior to the end of the agreement's term "only by" providing not less than 5 days written notice, and that Jaffe could terminate the agreement for good cause by providing 30 days

advanced written notice.  *Id*. at 19.   Jaffe's replacement as the result of a proxy contest was

orally announced, and Jaffe subsequently sought to access his "golden parachute" and accelerate

his stock options.   After refusing to honor Jaffe's request for the options, Paramount issued a

written notice of his termination, after which the options, now virtually worthless, vested and

became exercisable.   *Id*. at 20.   The Appellate Division held that Jaffe's argument that he could

waive the requirement that his notice of termination be in writing because such provision was for

his sole benefit was without merit.   *Id*. at 22.   The court observed that the complete lack of New

York law supporting Jaffe's argument was "not surprising" given the requirements of Section

15-301(4) of the General Obligations Law, which provides that:

> If a written agreement or other written instrument contains a
> provision for termination or discharge on written notice by one or
> either party, *the requirement that such notice be in writing cannot
> be waived* except by a writing signed by the party against whom
> enforcement of the waiver is sought or by his agent.

*Id*. (emphasis in original).   The court also deemed without merit Jaffe's contention that he did not

issue his contractually-required written notice of termination in reliance on the oral statement

that he was fired.[6]   *Id; see also People v. Grasso,* 13 Misc. 3d 1227(a), 2006 WL 3016952, at *8-

10 (N.Y. Sup. 2006) (in dismissing claims, court found itself "compelled to give meaning to the

terms of the Contract (requiring written notice of termination) and the clear meaning of the

statute (Gen. Oblig. 15-301(4)).   New York law is clear that a contractual requirement of written

notice of termination is enforceable and cannot be waived orally.   *See Korea Life Ins. Co. Ltd. v.*

---

[6]  The other cases cited by the Iconix Defendants also do not support their argument.  *Vermont Teddy Bear Company
v. Madison Realty Company* addressed a lease agreement in which the written notice requirement was found to deal
exclusively with the tenant's liability for rent, not with the landlord having to providing notice of the restoration of
damaged premises.  1 N.Y.3d 470, 475 (2004) (*see* Iconix Opp. Mem. 28).  Here, by contrast, there is no ambiguity
about the applicability of the written notice requirement to termination of the Signature Rocawear  License
Agreement.  Finally, *Ayers v. Ayers* is a matrimonial action providing interpretive guidance for vague or ambiguous
contractual provisions.  92 A.D. 3d 623, 624-625 (2d Dep't 2012).  The Iconix Defendants characterize Section
20(a) as being in "plain language" that is "clear," (Iconix Opp. Mem. 28), making *Ayers* not at all applicable.

*Morgan Guaranty Trust Co. of New York*, No. 99 Civ. 1217 (AKH), 2004 WL 1858314, at *6 (S.D.N.Y. Aug. 20, 2004) ("contract with a no-oral-modification clause is not amenable to oral termination . . . parole evidence cannot be used to vary of contradict the express terms of the writing, and no triable issues of fact are created") (citing *Bank of N.Y. v. Kravis*, 189 A.D.2d 741 (1st Dept. 1993)).

33.     *Second*, the Iconix Defendants assert that Signature's alleged repudiation of the Signature Rocawear License Agreement relieved them of the Agreement's requirement to provide a written notice of termination (*see* Iconix Opp. Mem. 29-30; 7-12).   Signature incorporates here its arguments and proofs set forth above concerning the law governing anticipatory repudiation and breach, and failure of the Defendants to prove that any such repudiation took place (*see* Section II. A-C, above).   Signature has pointed to record evidence concerning the Iconix Defendants' continuing treatment of the Signature Rocawear License as valid, by invoking and following its procedures (and extending its cure period) and of the wrongful post-Petition termination (Section II. A-C, above), whereas Iconix has provided no evidence of an unequivocal repudiation or their acceptance of it (Section II. A-B, above); *see also* Signature SF ¶¶ 31-32, 43-44, 63-67, 69.

34.     Once again, the cases relied upon by the Iconix Defendants are inapposite to the circumstances here.   The court in *Allbrand Discount Liquors, Inc. v. Times Square Stores Corporation* excused the performance of a condition precedent by a leasee—the application for a liquor license—based on the court's determination that the lessor had anticipatorily breached the lease by telling the leasee that it "could not live" with the current lease and would not allow the leasee to take possession of the property without renegotiation.   60 A.D.2d 568 (N.Y. App. Div. 2d Dep't 1977) ("the failure to apply for a liquor license is excusable . . .after [leasee] was told it

23

would not be allowed to take possession under the lease"). There were no acts or statements showing that the parties were continuing to follow or abide by the lease agreement. In *Wolff & Munier, Inc. v. Whiting-Turner Contracting Company*, the Second Circuit confirmed the district court's finding that the plaintiff, a construction subcontractor, abandoned its contract with the defendant by making "high handed demands for arbitration or additional payments as a condition to complete its work, coupled with a sudden, drastic reduction of manpower on the job." 946 F.2d 1003, 1008 (2d Cir. 1991). The court also concluded that the plaintiff waived the cure period in its contract by its "unjustified" demands and total abandonment of the construction worksite, and rejected plaintiff's contention that defendant had breached the agreement by failing to send a termination letter. *Id.* at 1008-1009; *see also Utility Garage Corp. v. National Biscuit Co.*, 71 A.D. 2d 578 (N.Y. App. Div. 1st Dep't 1979) (citing defendants' "entire repudiation" of lease embodied in written notice of exercise of option to terminate lease). Here, the Iconix Defendants has made no claims concerning unjustified demands by Signature, and has submitted no evidence that Signature had shut down its operations and "gone dark." Signature was still operating in its offices with employees at the time of the Involuntary Petition.[7] Finally, in *Pitcher v. Benderson-Wainberg Associates II, Ltd.*, plaintiffs, who operated a sandwich shop in a space leased from defendants, gave written notice of its business' failure and requested a negotiated termination of the lease. 277 A.D. 2d 586 (3d Dep't 2000). When efforts at compromise failed, plaintiffs advertised their equipment and supplies for sale and, on the date of the shop's closure, already had removed "considerable equipment" from the premises, including food and supplies, and disconnected its telephone. *Id.* at 586-87. The court determined that

---

[7]  In their motion to convert the case from chapter 7 to chapter 11, the Laurita Brothers and their counsel stated that Signature continued to operate its business during the gap period and sell merchandise to customers. (*See* Case No. 09-15378 Dkt. No. 22 at ¶ 7; see also Dkt. No 22-2 at ¶ 5 (.) This statement, made in November 2009, also refutes Christopher Laurita's so- called business judgment that Signature could not operate past October 2009 (*see* Laurita Opp. Mem. 3-11).

defendants subsequent lockout of the plaintiffs was justified in light of plaintiff's "unequivocal" conduct. *Id*. at 587-88. Here, the Iconix Defendants made no moves to "lock out" Signature—as noted above, they extended the cure period and discussed ways to keep Christopher Laurita involved in the business. (Signature SF ¶¶ 54-55, 61 & Holloman Decl. Exs. 62, 69.)

35. *Third*, the Iconix Defendants and Christopher Laurita argue that, despite the strict prohibition of Section 15-301(4) of the General Obligations Law on oral modification or waiver of termination provisions requiring written notice, the Laurita Brothers and the Iconix Defendants nonetheless are somehow able to "overcome" both the Signature Rocawear License Agreement's termination provision and no oral modification clause (Iconix Opp. Mem. 30-32) and achieve a post-Petition oral termination (*see also* Laurita Opp. Mem. 11-16). The oral modification and estoppel exceptions do not apply to subdivision 4 of Section 15-301 of the General Obligations Law, precluding oral modifications to contractual provisions requiring written notice of termination. Not surprisingly, none of the cases cited by the Iconix Defendants involve an oral modification of a contractual provision requiring written notice of termination, which would be contrary to New York law (*see id.* 31-32 (citing *In re Macrose Indus. Corp.,* 186 B.R. 789, 800 (E.D.N.Y. 1995) (construction agreement); *Rose v. Spa Realty Assoc.*, 42 N.Y. 2d 338 (1977) (oral modification of land conveyance agreement); *Bensen v. American Ultramar Ltd.*, No. 92-CIV-4420 (KMW) (NRB), 1997 WL 66780 (S.D.N.Y. Feb. 14, 1997) (oral modification of employment agreement permitting early payment of executive). The one case cited by the Iconix Defendants that is on point reinforces that New York law provides that such provisions cannot be waived or modified except by a writing (*see* Iconix Opp. Mem. 28 (citing *Jaffe v. Paramount Communications*)). Christopher Laurita similarly fails to identify any case in

which an oral or conduct modification of a contractual requirement of a written notice of termination was effective.[8]

36.     If anything, this argument highlights that the Defendants' repudiation and/or termination theories are profoundly flawed and contradictory.  The Iconix Defendants do not contest that they sent the Rocawear Notice of Default, referencing the Agreement's termination provision.  They also do not dispute that they subsequently extended the cure period referenced in the termination provision.  (Iconix UMF ¶¶ 32, 34-35.) If the Agreement was either terminated or repudiated in the pre-Petition timeframe, which it was not, there was no reason to continue to observe its terms.  It defies logic that the Iconix Defendants truly came to the conclusion that, once the Involuntary Petition was filed, they were relieved of sending a written notice of termination, but that they were required to send the Rocawear Notice of Default and observe and even extend the Agreement's cure period.[9]

---

[8] *See* Laurita Opp. Mem. 11-16 (citing *Tower Charter & Marine Corp. v. Cadillac Ins. Co.*, 849 F.2d 516 (2d Cir. 1990) (addressing subdivision 1 of Gen. Oblig. Law § 15-301 and alleged oral modification of loan agreement); *Rose v. Spa Realty Assoc.*, 42 N.Y. 2d 338 (1977) (alleged oral modification of land conveyance agreement); *Gallo v. Swan Optical Corp.*, 79 A.D.2d 697 (2d Dep't 1980) (addressing subdivision 1 of Gen. Oblig. Law § 15-301 and alleged oral modification of consultation contract); *Grandonico v. Consortium Comms Int'l, Inc.*, 566 F. Supp. 1288 (S.D.N.Y. 1983) (granting summary judgment against party claiming an oral modification to a contract's written notice of termination provision); *D.A. Elia Construction Corp. v. United States Fidelity and Guaranty Co.*, No. 94-CV-0190E(h), 1997 WL 215526 (W.D.N.Y. Apr. 16, 1997) (addressing subdivision 1 of Gen. Oblig. Law § 15-301 and alleged oral modification to surety agreement); *Ficus Investments, Inc. v. Private Capital Management, LLC*, 61 A.D.3d 1 (1st Dep't 2009) (alleged modification to operating agreements by course of conduct); *Echevarria v. 158th Riverside Dr. Housing Co., Inc.*, 113 A.D.3d 500 (1st Dep't 2014) (alleged modification to construction agreement; summary judgment denied where ambiguity of agreement ensued over whether door was a "partition" subject to the contract at issue); *Claica v. Reisman, Peirez & Reisman*, 296 A.D.2d 367 (2d Dep't 2002) (alleged modification to partnership agreement); *Club Haven Investment Company, LLC v. Capital Company of America, LLC*, 160 F. Supp. 2d 590 (S.D.N.Y. 2001) (alleged oral modification to loan agreement); *Congress Factors v. Malden Mills Inc.*, 332 F. Supp. 1384, 1385 (D. N.J. 1971) (defendant alleging oral termination of contract with written notice of termination requirement also, "presumably out of an abundance of caution, did by letter of April 18, 1969, formally terminate the factoring agreement pursuant to its terms"); *Greenberg v. Frey*, 190 A.D.2d 546 (1st Dep't 1993) (alleged oral modification to agreement containing a merger clause)).

[9] Moreover, if the Iconix Defendants sent the Rocawear Notice of Default and extended the cure period to create an incentive for the Laurita Brothers to cure more quickly or to respond to pressure from CIT (*see* Iconix UMF ¶¶ 33, 36 & Signature Response-UMF ¶¶ 33, 36), then plainly the Signature Rocawear License Agreement was not terminated "in everyone's mind:" if had already been terminated, then neither the Laurita Brothers nor CIT could have been motivated to move faster or hold off from exercising remedies based on the Notice or the cure period.

37.     The Iconix Defendants also argue that the Responsible Person is bound by the alleged "repudiation" and subsequent oral agreement to terminate the Signature Rocawear License Agreement because he "stands in the shoes of Signature and is bound by its prior actions" (Iconix Opp. Mem. 32).  Even if an oral modification to a written notice of termination provision were possible under New York law, which it is not, or if the Iconix Defendants could show they did not waive such  repudiation by continuing to treat the Agreement as valid, which they cannot (*see* Section II. A-C), as explained below in Section V, none of the conduct at issue here can be imputed to the Responsible Person under either the *Wagoner* rule or the defense of *in pari delicto*.

38.     As set forth at pages 67-74 of Signature's Opening Memorandum and at Section IV, below, Signature is entitled to damages by reference to the value of the Rocawear Rights, which were wrongfully conveyed out of its estate by Defendants.  Moreover, because Signature has established a conspiracy (s*ee* Signature Opening Mem. 74-76) to deem the Signature Rocawear License Agreement terminated in disregard of the Agreement's terms, New York law (Gen. Oblig. § 15-301(4)), and the Bankruptcy Code (11 U.S.C. § 362), the Defendants are jointly and severally liable for those damages.

### B.     There Are No Genuine or Material Factual Disputes Regarding Christopher Laurita's Breaches of Fiduciary Duty.

39.     Christopher Laurita has raised no factual issues or legal arguments precluding a finding of summary judgment against him for the breach of his fiduciary duties to Signature as a member and as a principal of a debtor-in-possession.

---

Further, GS Tarshis preceded the Rocawear Notice of Default with an assurance that the Agreement would not be terminated.  (See Signature Response-UMF ¶ 33; Signature SF ¶ 31.)

2840557-2

40.     *First*, Section 3.5 of the Signature Operating Agreement on its face does not apply to the Post-Petition Transaction or Christopher Laurita's conduct with respect to it (*see* Laurita Opp. Mem. 16-19).  Section 3.5 provides that Christopher Laurita could own separate businesses that compete directly or indirectly with Signature.  (*See* Holloman Decl. Ex. 6 at § 3.5.)  Section 3.5 of the Operating Agreement does not exculpate or indemnify Christopher Laurita from engaging in improper or illegal activity; similarly, Section 3.2 of the Agreement provides for Christopher Laurita's personal liability for fraudulent or bad faith acts and willful misconduct.  (*Id.* at § 3.2 & § 3.1(a) (providing for duties of care and good faith)); *see also* Signature Opening Mem. 40 n.13, 42 n.14, 48 n.15.)

41.     Additionally, Christopher Laurita concedes that he owed duties to Signature's estate, while the principal of a debtor-in-possession during the gap period (*see* Signature Opening Mem. 39 (the Laurita Brothers owed fiduciaries duties "to Signature and the estate"); Laurita Opp. Mem. 22 ([the Laurita Brothers] were not liable during the gap period to anyone that they would not owe a duty outside of bankruptcy").  He also does not dispute that he owed duties to Signature's creditors once Signature became a debtor-in-possession in November 2009.  Such duties include duties of loyalty that do not derive from or depend on an LLC operating agreement.  *See In re Adelphia Comms. Corp.*, 336 B.R. 610, 669-70 (S.D.N.Y. 2006) (debtor-in-possession owes fiduciary duties, including loyalty, to estate and creditors).

42.     Christopher Laurita has averred in his Opposition Memorandum that he "acquiesced" to a purported oral termination of the Signature Rocawear License Agreement by the Iconix Defendants (Laurita Opp. Mem. 8) that not only disregarded the Agreement's terms requiring a written notice of termination and prohibiting oral modifications, but also violated both New York law (*see* Section III. A) and the Bankruptcy Code (*see* Section II. D).  The

evidence also is clear that Christopher Laurita received $2,325,000 from the Post-Petition Transaction through a transitioning and consulting arrangement with the ROC Defendants, by abandoning Signature's business, not by competing with it.  (Signature SF ¶¶ 104; Holloman Decl. Exs. 103 & 121 at ¶¶ 10-12.)   These acts do not comport with Christopher Laurita's fiduciary duties as a principal of an LLC and a debtor-in-possession in any sense; rather, they destroyed Signature's business and prevented Signature from receiving the remedies it was entitled to under the Bankruptcy Code, not at least the right to engage in an orderly liquidation.

43.    As set forth in Signature's Opening Memorandum at pages 41-44, Delaware law presumes that a director or officer standing on both sides of a transaction bears the burden of establishing the "entire fairness" of the transaction."   Christopher Laurita has offered no evidence to establish the entire fairness of the Post-Petition Transaction, including his transitioning and consulting agreement (Laurita Opp. Mem. 24-27).[10]  Even if Signature bears the initial burden of establishing entire fairness, it has amply done so.  As set forth in Signature's Opening Memorandum, Christopher Laurita stood on both sides of the Post-Petition Transaction

---

[10] Contrary to Christopher Laurita's argument (*id.* 18-20), the Chancery Court's decision in *Zimmerman v. Crothall* does not change or shift his initial burden to establish entire fairness.  In that case, and in determining that the initial burden to prove the entire fairness of a challenged transaction had shifted from the director to the challenger, the Chancery Court gave great consideration to the terms of the subject LLC's operating agreement, which permitted the directors to engage in competing or self-dealing transactions on the specific condition that the terms of such arrangements would be on par with those that would be entered into with "unrelated third parties" providing the same services or goods to the company.  62 A. 3d 676, 703 (Del. Ch. 2013).  The Chancery Court also gave great weight to the Agreement's terms precluding a self-dealing transaction from subsequently being deemed void or voidable where the transaction is fair at time it was approved or authorized by the members or Board of Directors.  As Christopher Laurita concedes (Laurita Opp. Mem. 18-19), there were no such restrictions on the Laurita Brothers, in the event either one engaged in competing businesses, to do on terms that were "comparable to an unrelated third-party transaction, *i.e.*, are entirely fair." *Zimmerman*, 62 A.3d at 704 (Chancery Court considered that sentence in LLC agreement "to be controlling in this case").  Because there is no comparable language in the Signature Operating Agreement, *Zimmerman v. Crothall* is inapplicable and the burden of establishing entire fairness remains with Christopher Laurita.

(*id.* at 41-42), and did not deal fairly with or on behalf of Signature or, according to his own account now, even attempt to get a fair price from the Iconix Defendants. "Fair dealing involves analyzing how the transaction was structured, the timing, disclosures, and approvals. Fair price relates to the economic and financial considerations of the transaction." *William Penn P'ship v. Saliba,* 13 A.3d 749, 756-57 (Del. 2011). In his memorandum of law, Christopher Laurita states that he acquiesced to and went along with the Iconix Defendants' decision to treat the Signature Rocawear License Agreement as terminated (Laurita Opp. Mem. 8). During discovery, he painted his role as even more removed and passive, testifying that he received news of the Signature Rocawear License Agreement's termination from "attorneys." (C. Laurita (12/5/2013) Tr. 399:11—407:18.) Signature's estate received nothing in exchange for his "acquiescence" to the Iconix Defendants' improper exercise of control over an asset of the estate, not even an agreement from the Iconix Defendants or their affiliate to drop their $31,137,500 in claims against the estate (*see* Claim Nos. 41-42; Christopher Laurita himself maintains that he is owed $3,387,414 by Signature (*see* Claim No. 16)).[11]

44.    Further, Christopher Laurita's negotiation of a transitioning and consulting agreement with the ROC Defendants, worth millions of dollars, was inconsistent with his fiduciary duties as a principal a debtor-in-possession. Christopher Laurita's claim that his consulting agreement could not be related to his role in facilitating the Post-Petition Transaction and the transfer of the Rocawear Rights to the ROC Defendants, because the agreement was not entered into until "months" later, is belied by a review of the evidence. Immediately after the Post-Petition Transaction, on September 21, 2009, the Laurita Brothers instructed their attorneys

---

[11] Christopher Laurita's claims that "Iconix wrote off the entire debt" confuses Iconix's accounting with its claims against the estate, as revealed by a review of the claims register. (*See* Case No. 09-15378 Claim Nos. 41-1, 42-1.)

to form a new LLC.  (Signature SF ¶ 95.)  During October 2009, the Laurita Brothers exchanged draft consulting agreements with the ROC Defendants with respect to that LLC and dated to commence as of January 1, 2010, concerning consulting services for the Rocawear Juniors brand. (Signature SF ¶ 96 & Holloman Decl. Exs. 91, 117, 93, 94, 95, 101, 96; *see also* Holloman Decl. Ex. 121 at ¶ 8 (affirming that Christopher Laurita provided transitioning services).)   Joseph Laurita testified that he subsequently decided to move to California.  (Signature SF ¶ 97.)  By the time Christopher Laurita formed New Star in December 2009, which went on to consult for the ROC Defendants pursuant to an oral agreement (Signature SF ¶¶ 98-99), Signature was a debtor-in-possession with fiduciary duties, to both Signature's estate and creditors, including the duty of loyalty and "'obligations to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate.'"  *In re Adelphia Comms. Corp.*, 336 B.R. 610, 669-70 (S.D.N.Y. 2006) (quoting *In re Hampton Hotel Investors, L.P.,* 270 B.R. 346, 362 (Bankr. S.D.N.Y. 2001) ("The United States Supreme Court has made clear that a debtor in possession, like a chapter 11 trustee, owes the estate and its creditors a general duty of loyalty.").)   His end of the Post-Petition Transaction provided no benefit for anyone but himself, at the expense of the estate.

45.     There is also no credible dispute that Christopher Laurita stole one of Signature's last remaining corporate opportunities.   Christopher Laurita provided transitioning and consulting services to the ROC Defendants throughout 2010 (Signature SF ¶ 104), while he was serving as the principal of a Chapter 11 debtor-in-possession, with Section 1107 duties, obligations and responsibilities, including duties of loyalty, to both the estate and its creditors. While Christopher Laurita received hundreds of thousands of dollars prior to the confirmation of the Plan and the subsequent termination of his transitioning and consulting agreement, and

additional millions thereafter as severance (*see id.* ¶ 104; Holloman Decl. Exs. 103, 121 at ¶¶ 10-12), Signature's estate received nothing.  The estate should have been permitted to benefit from any agreement to transition its business to a third party.  Christopher Laurita's arguments to the contrary are unavailing (Laurita Opp. Mem. 27-29).  He has cited no authority to support his claim that an LLC operating agreement can eliminate the duties of a debtor-in-possession (*id.* 27).  He also has conceded that he "acquiesced" to the Iconix Defendants' exercise of control over the property of the estate, and thereby and thereafter facilitated the transfer of the Rocawear Rights to the ROC Defendants (*id.* 8, 37).  *See In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 355-57 (Bankr. S.D.N.Y. 2001) (principal of a debtor-in-possession breached his fiduciary duties to the estate by, *inter alia*, "making agreements with ostensible third parties with respect to bidding on the main asset of the estate, and taking an undisclosed interest in the asset to be acquired," where "this agreement was never disclosed to the Court, nor to anyone else.").

46.     Christopher Laurita has offered no evidence that Signature could not have "exploited any opportunity with respect to the Rocawear Rights" (Laurita Opp. Mem. 28).  By privately conveying the Rocawear Rights out of the estate, the actions of Christopher Laurita and the Iconix Defendants prevented Signature from conducting an orderly liquidation, which is an opportunity to maximize the value of a bankruptcy estate for all of its creditors, not just a select few.  *See*, 11 U.S.C. § 362 (Legislative History, Section 362:  "The purpose of this provision is to prevent dismemberment of the estate.  Liquidation must proceed in an orderly fashion.").  Similarly, there also is no evidence that a "battle over the issue of termination" would have ensued had Christopher Laurita not "acquiesced" to the Iconix Defendants' termination or sought to protect his transitioning and consulting agreement with the ROC Defendants.  Troubled businesses or debtors are afforded many options in the bankruptcy process, including a

32

"prepackaged plan or reorganization," in which acceptance of a restructuring plan is sought prior to the filing of a bankruptcy case, or a "prearranged plan or reorganization," that contains terms negotiated amongst interested parties prior to the filing of a bankruptcy petition and for which approval is sought after a petition is filed.  *See* Laurita Opp. Mem. 10 (citing *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 462-63 (S.D.N.Y. 2014)).  However, it must be noted that had the Defendants sought to proceed with the Post-Petition Transaction through either of these methods, the Court would have reviewed the terms of the agreement, including the consideration provided for the estate and the disinterestedness of any insiders.  *See In re Genco Shipping & Trading*, 509 B.R. at 464 (approving transaction where debtor's board was confirmed to have no economic interest in the transaction).   The Iconix Defendants and Christopher Laurita certainly would not have been permitted to maintain their millions of dollars of claims against the estate had they proceeded with the Post-Petition Transaction through the channels provided in the Bankruptcy Code. *See In re Albion Disposal, Inc.*, 152 B.R. 794, 820 (Bankr. W.D.N.Y. 1993) (debtors' principals usurped corporate opportunity when they "conveyed a leasehold for their own benefit without giving creditors an opportunity to meet their terms or to question the bona fides of their asserted interests.").  Similarly, Christopher Laurita could not have expected to reap the benefits of transitioning Signature's business solely for himself.

47.    In sum, Christopher Laurita's breaches of fiduciary duty are apparent.  His improper agreements to surrender the estate's rights and his self-dealing in transitioning the estate's business to the new licensee produced no benefit for the estate, and millions for himself. As set forth in Signature Opening Memorandum at pages 66-76, Signature should be compensated for the loss of the value of the Rocawear Rights, as established by the post-Petition

33

transaction, jointly and severally from Defendants as co-conspirators, and further that

Christopher Laurita should be ordered to disgorge the $2,325,000 that he received from the ROC

Defendants.

### C.   Signature Is Entitled to Summary Judgment on its Claims for Aiding and Abetting Breach of Fiduciary Duty.

48.     Signature has submitted ample evidence proving that the Iconix Defendants were

aware of the Laurita Brothers' plan to partner with the ROC Defendants.  (Signature SF ¶¶ 27,

43-44, 54-55, 61-64.)   The Iconix Defendants argue that, because they did not exchange drafts

of Christopher Laurita's consulting agreement with ROC Fashions and RVC, they cannot be

liable for aiding and abetting Christopher Laurita's breach of fiduciary duty, but this is not the

standard, and it is also not a genuine dispute. (*See* Iconix Response SF ¶ 99 (not disputing that

Christopher Laurita's agreement with the ROC Defendants was an oral agreement).)

"Substantial assistance" occurs when a defendant "affirmatively assists, helps conceal or fails to

act when required to do so, thereby enabling the breach to occur."  *Lerner v. Fleet Bank, N.A.*,

459 F.3d 273, 294 (2d Cir. 2006) (citation omitted).   Charles Azrak, a ROC Defendants'

principal, testified that he understood that Christopher Laurita's continuing involvement in the

Rocawear business was a requirement of Iconix.  (Holloman Decl. Ex. 121 at ¶¶ 4-7; *see also*

Signature SF ¶ 103.)   That is precisely the "assistance" that Christopher Laurita required to

complete his breach of fiduciary duty.

49.     As set forth at pages 67-74 of Signature's Opening Memorandum, as aiders and

abetters, and co-conspirators, Iconix and Studio IP are jointly and severally liable for the value of

the Rocawear Rights, and also should be ordered to disgorge the $13,552,648 in royalties that

they received from ROC Fashions as a result of their tortious conduct (*see* Holloman Decl. Exs

104 & 121 at ¶ 9).  *See Jackson v. Smith*, 254 U.S. 586, 589 (1921) (defendant should disgorge

34

profits for breach of fiduciary duty and "others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits."); *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1536 (S.D.N.Y. 1985) ("those who aid and abet or conspire in tortious conduct are jointly and severally liable with other participants in the tortious conduct, regardless of the degree of their participation or culpability in the overall scheme" and "notwithstanding the amount of any direct benefit conferred upon them").[12]

---

[12] The Iconix Defendants concede that Signature's conversion and unjust enrichment claims need not be considered in the event that Signature's claim for breach of contract succeeds (Iconix Opp. Mem. 42-45). Accordingly, these claims are still available to Signature in the event that the Court determines that it cannot award summary judgment to Signature on that claim. In that event, and for all of the reasons set forth in Signature's Opening Memorandum at pages 63-65, Signature respectfully submits that its claims for conversion and unjust enrichment are sufficiently supported to permit the Court to award summary judgment to Signature. Signature's claims of conversion against Christopher Laurita do not revolve around his theft of computers from Signature, (Laurita Opp. Mem. 44), so Signature will respond briefly by noting that Signature's main server could not have been turned over "immediately" to the Responsible Person while Christopher Laurita used the remainder of the equipment, because it is undisputed that the Responsible Person was not appointed until August 2010 (*see* Signature SF ¶ 1), and that Christopher Laurita turned over the remainder of the stolen equipment only after his prior attorney made false statements to the Court claiming that the equipment already had been turned over. (Holloman Reply Decl. Ex. 2 at 11.)

Christopher Laurita's arguments in opposition to an award of unjust enrichment are unavailing (Laurita Opp. Mem. 40-42). He does not dispute that he received payments from the ROC Defendants for transitioning Signature's Rocawear business (Laurita Opp. Mem. 37), while he was a fiduciary with duties of loyalty to both Signature's estate and creditors. He also does not dispute that he kept the opportunity to provide transitioning services to himself, so that the estate received no benefit while he received millions (he also has provided no proof that his services were at a market rate (*see* id. 41)). Contrary to his assertions (*id*. 41), Signature had the exact same ability as Christopher Laurita to provide transitioning and consulting services: Christopher Laurita could have provided those services as the President of a liquidating Signature, rather than privately. Again, as set forth in Section III. B, his duty of loyalty to the estate arises from the Bankruptcy Code, and is not limited by the Signature Operating Agreement (*see id*. 42). Disgorgement is an appropriate remedy for his disloyalty and self-dealing.

**D.**     **Signature Is Entitled to Summary Judgment on its**
            **Claims for Fraud and Negligent Misrepresentation.**

50.     The Iconix Defendants and Christopher Laurita argue that they did not falsely represent that the Signature Rocawear License Agreement had been "formally terminated" through a written notice prior to the filing of the Involuntary Petition, that they had no duty to disclose complete and truthful information regarding the termination, and that Signature could not have justifiably relied on their misrepresentations (Iconix Opp. Mem. 32, 32-37).  These arguments have no merit.

51.     The first misrepresentations attributable to the Iconix Defendants appear in objections that the Creditors Committee caused to be filed, and state that Signature and Iconix came to a pre-Petition agreement to terminate the Signature Rocawear License Agreement. (Signature SF ¶¶ 107-108 & Holloman Decl. Exs. 106-107.)  The statement is deceptive because it claims the alleged agreement was struck prior to the filing of the Involuntary Petition when the application of the automatic stay is not in question.  The statement is false because all evidence and the course of conduct shows that the agreement was in default, not terminated, prior to the imposition of the automatic stay.   (*See* Signature SF ¶¶ 31-32, 45-46, 66-67.)

52.     The next misrepresentations, attributable to both the Iconix Defendants and Christopher Laurita, appear in the Disclosure Statement and the Amended Disclosure Statement filed by the Debtor and the Creditors Committee.  Each state that "prior to the Petition Date and pursuant to the terms [of the Signature Rocawear License Agreement]," Iconix terminated the [Agreement] with the Debtor."   (Signature SF ¶ 108; Holloman Decl. Exs. 108-109.) Christopher Laurita subsequently filed a sworn affidavit repeating that "prior to the Petition Date and pursuant to the terms [of the Signature Rocawear License Agreement]," Iconix terminated the [Agreement] with the Debtor."  (Signature SF ¶ 108; Holloman Decl. Ex. 110.)

36

53.     Each of those statements specifically invokes the terms of the Signature Rocawear License Agreement, including the written notice of termination provision and the no oral modification clause.  There is no dispute that no written notice of termination was sent (Iconix UMF ¶ 37; C. Laurita Response-SF ¶ 67), and Defendants now aver to a post-Petition oral termination (Iconix Opp. Mem. ¶ 8-9; C. Laurita Opp. Mem. 8).  Accordingly, the Disclosure Statement, Amended Disclosure Statement and the Laurita Affidavit are false.

54.     The Iconix Defendants claim that there is "no evidence that GC Tarshis or anyone else on behalf of the Iconix Defendants had any role in drafting" the statements (Iconix Opp. Mem. 34).  This is false.  Committee counsel had to rely on documents and input from the committee member with knowledge of the license.  Prior to filing the Objections, Committee counsel sought information concerning the licenses, and was told they were "terminated." (Signature SF ¶ 110; Holloman Decl. Ex. 98.)  No further information was provided, and certainly no detail concerning repudiation, abandonment and post-Petition oral agreements. With respect to the misrepresentations in the Disclosure Statements, on March 31, 2010, as evidenced by the privilege log provided by Olshan during discovery, Committee counsel circulated drafts of the Plan and Disclosure Statement to GC Tarshis and the Iconix Defendants' bankruptcy counsel, who responded with comments; and the Statements were subsequently filed. (Holloman Reply Decl. Ex 3.)[13]

55.     Next, the Defendants pretend that there is a lack of clarity concerning the meaning of the "Petition Date" or "pursuant to [the Agreement's] terms" (Iconix Opp. Mem. 34; Laurita Opp. Mem. 31).[14]  This raises no barrier to a finding that the Defendants made fraudulent

---

[13] Copies of those e-mails can be made available to the Court for an *in camera* inspection.

[14] This contention contradicts the Iconix Defendants' claims, at page 28 of their Opposition Memoradum, that Section 20(a) is in "plain language."

statements.   There is no genuine dispute about the process of the termination of the Signature Rocawear License Agreement "pursuant to its terms."  Section 20(a)(i) states how to terminate— written notice of default, observation of a cure period, and written notice of termination failing a cure.[15]  (*See* Holloman Decl. Ex. 1 ¶ 20(a)(i).)  The Defendants do not genuinely deny that they were aware of that path, given the Iconix Defendants' invocation of the termination provision in the Rocawear Notice of Default, Christopher Laurita's request for an extension of the cure period, and the subsequent extension.[16]  Moreover, regardless of whether "prior to the Petition Date" means either September 4, 2009, the date of the Involuntary Petition, or November 13, 2009, the date that the case was concerted to a chapter 11 case, if the Agreement was terminated pursuant to its terms, there would be in either instance a written notice of termination pursuant to Section 20(a)(i).  The Defendants have conceded that no such notice was sent or exists (Iconix UMF ¶ 37; Laurita Response-SF ¶ 67) and therefore have conceded that the statements are false.[17]

56.    The Iconix Defendants assert that they owed no fiduciary duties to Signature as the debtor, but concede that they did owe fiduciary duties to the creditors of Signature's estate, as a member of the Creditors Committee (Iconix Opp. Mem. 36).   The Iconix Defendants were

---

[15] An example of a termination that was not in accordance with the Signature Rocawear License Agreement's terms would be an oral agreement to terminate the license, which would run afoul of bother Section 20(a) and Section 27.

[16]  In contrast to the matter at hand, the Iconix Defendants terminated the Post-Petition License Agreement with the ROC Defendants in precisely this fashion, in observance of that Agreement's termination provision.  (*See* Iconix UMF ¶ 62 and Cogan Decl. Ex. 26.)

[17] The Iconix Defendants complain that Committee counsel did not perceive an "inconsistency" between the filings (Iconix Opp. Mem. 34), but Olshan's perceptions are not the test; rather, it is the Iconix Defendants' knowledge of the facts and their concealment and failure to disclose the circumstances that is at issue.  Moreover, a pre-Petition agreement to terminate (of which there is no evidence) is not inconsistent with, or excludes the possibility, that the Iconix Defendants complied with the requirement to provide written notice of termination in conjunction with that agreement and in fulfillment of its contractual obligations (which also did not occur).

under a heightened obligation to accurately and completely disclose information concerning the termination of the Signature Rocawear License Agreement precisely because it concerned distribution of the assets of the estate.  As the court explained in *In re Residential Capital, LLC*, "[i]t is well settled that [] creditors' committees owe a fiduciary duty to the entire class of creditors represented [], and are required to place the collective interest of the class they represent above their own personal stake in the bankruptcy case."  480 B.R. 550, 559 (Bankr. S.D.N.Y. 2012); *see also In re Bohack Corp.*, 607 F.2d 258, 262 n.4 (2d Cir. 1979) ("Although the creditors committee represents the interests of all creditors, its main function is to advise the creditors of their rights and the proper course of action in the bankruptcy proceeding . . . the committee owes a fiduciary duty to the creditors, and must guide its actions so as to safeguard as much as possible the rights of minority as well as majority creditors.") (citing *Woods v. City National Bank & Trust Co.*, 312 U.S. 262 (1941)).  The Iconix Defendants did the opposite, providing instead incomplete and misleading information that led to incomplete and misleading disclosures.  Christopher Laurita also owed fiduciary duties as the principal of debtor-in-possession at the time he made false and misleading statements.[18]  *In re Albion Disposal, Inc.*, 152 B.R. 794, 801-02 (Bankr. W.D.N.Y. 1993) (fiduciary duty of principal of corporate debtor "is not just that of a corporate officer or director, it is the duty of high trust imposed on the 'representative of the estate' pursuant to 11 U.S.C. § 323(a), 11 U.S.C. § 1101(a), and Rule 9001(5), of the Rules of Bankruptcy Procedure.").  The Defendants' failure to be forthcoming about the circumstances of the wrongful post-Petition termination prevented Signature's estate,

---

[18] Christopher Laurita's attempt to invoke the exculpatory provision of Signature's Operating Agreement fails because his fiduciary duties as the principal of a debtor-in-possession arise from the Bankruptcy Code, not the Agreement.  *See* 11 U.S.C. § 1107; *Wolf v. Weinstein*, 372 U.S. 633 (1963) (the debtor in possession is bound by a duty of loyalty).

creditors and Responsible Person from full exercise of their rights to object to the Post-Petition

Transaction either before or after the Plan was confirmed.

57.     The Defendants' assertion that the Responsible Person cannot establish reliance

on their misrepresentations is similarly misguided (Iconix Opp. Mem. 36-37; Laurita Opp. Mem.

30-31).  As set forth below in Section V, the post-petition misconduct of a debtor's principals

with third parties is not imputed to the Responsible Person.[19]   Further, inquiries about the

termination were made on multiple occasions, contrary to the Iconix Defendants' arguments, and

never revealed what the Iconix Defendants are now claiming—that the Signature Rocawear

License Agreement had been repudiated, or terminated in "everyone's mind," or that there was

an oral agreement to terminate the Agreement during the gap period.  The Iconix Defendants

admit that it took a subpoena to extract any portion of the facts underlying the termination from

them (Iconix Opp. Mem. 37 n.13).  As set forth in the Responsible Person's Declaration, as a

result of the misrepresentations concerning the Signature Rocawear License Agreement, for

years he did not have the information necessary to determine that the Agreement was property of

the estate and commence an adversary proceeding with respect to the wrongful termination of

Signature's rights under the Agreement.  Adv. Pro. No. 11- 02800 (Dkt. No. 142-2) at ¶¶ 3-6.

Had the Responsible Person not relied on the Defendants' false statements, Signature would have

---

[19] Christopher Laurita also contends that the Petitioning Creditors and the Creditors Committee were "active participants in the global resolution discussions" (Laurita Opp. Mem. 31) but provides no evidentiary support for this claim.  Moreover, it is illogical that the Creditors Committee were involved in "global resolution discussions," assuming that Laurita is referring to discussions concerning the dismissal of the Involuntary Petition, because the Committee did not exist at that time (*see* Signature SF ¶ 107).   Christopher Laurita similarly fails to support his allegation that Olshan had "full knowledge of the transaction" with any evidence.  (Laurita Opp. Mem. 31).

taken action much sooner, and certainly before the ROC Defendants did,[20] to amend its pleadings and add the Iconix Defendants as parties to the litigation.

58.     Finally, Christopher Laurita's malicious and fraudulent intent in making multiple false statements concerning the wrongful post-Petition termination is apparent from his pattern of misconduct (*see* Laurita Opp. Mem. 33).    He avers that he "acquiesced" to the Iconix Defendants' wrongful post-Petition termination, which is contrary to Signature's rights under the Agreement, New York law and the Bankruptcy Code (*see* Sections II.A-B, D & III. A), and which provided no value for the estate.  He also does not genuinely dispute that he bargained for an entered into an agreement with the ROC Defendants worth $2,800,000, while he was the principal of Signature, as a debtor-in-possession, through which he assisted in the transition of Signature's business to ROC Defendants as the new licensee, and for which Signature's estate received nothing.  He does not credibly dispute that he assisted with the transition for less than one year for which he received $2,335,000, for, in his own words, "[coming] to work every day and walk[ing] around the office."  (Signature SF ¶¶ 102; 98-102; 104 & Holloman Decl. Ex. 121 ¶ 10.) He has provided no evidence of the "market rate" for such a payment.

59.     Defendants, who each had fiduciary duties requiring their scrupulous honesty, made and sanctioned statements that the Signature Rocawear License Agreement was terminated pursuant to its terms prior to the Involuntary Petition. (Signature SF ¶¶ 107-108.)   Those statements were made to conceal the non-compliance with the terms of the agreement and the concomitant violations of the automatic stay and New York law, and to obscure the complete circumstances of the Post-Petition Transaction.  Moreover, these statements are firmly at odds

---

[20] Because the ROC Defendants were signatories to the license, Studio IP was sued first by the ROC Defendants, not Signature or the Responsible Person, in part on the basis of misrepresentations about the termination of the Signature Rocawear License Agreement.  *See* Adv. Pro. No. 11-02800 Dkt. No 23.

with the Defendants' current litigation position of "repudiation" or a post-Petition oral agreement to terminate.    Signature is entitled to summary judgment on its fraud and negligent misrepresentations claims.

60.    As set forth at pages 67-74 of Signature's Opening Memorandum, the court should award Signature damages with reference to the value of the Rocawear Rights; Defendants are jointly and severally liable for that amount, and also may award disgorgement of ill gotten gains resulting from the fraud (*see* Section IV), in the amounts of $13,552,648 and $2,325,000 (*see* Signature SF ¶¶ 104-105 & Holloman Decl. Exs 103-104 & 121 at ¶¶ 9-10).

**E.    Signature Is Entitled to Summary Judgment on its Tortious Interference with Contract Claim.**

61.    The Iconix Defendants contend that they joined in a post-Petition oral agreement with the Laurita Brothers to terminate the Signature Rocawear License Agreement, and Christopher Laurita has averred that he acquiesced to this agreement.    This suffices to prove that that Iconix and Christopher Laurita tortiously procured the breach of the Signature Rocawear License Agreement.    Signature has placed before the Court detailed evidence that the Iconix Defendants acted intentionally and with an *illegal* motive, specifically, to avoid any delay or uncertainty that could be occasioned by complying with the automatic stay and proceeding with the Post-Petition Transaction under the Court's supervision, and to ensure that it could achieve priority *vis a vis* the estate's other creditors with respect to Studio IP's claim for outstanding royalties (Signature SF ¶¶ 75-82) (detailing days of post-Petition discussions and Iconix's motive and intent to mitigate damages)).    Moreover, Christopher Laurita's "acquiescence" to the Iconix Defendants' demands and his willingness to enter into a post-Petition oral agreement to convey away Signature's rights without consideration for the estate did not comport with the Signature Rocawear License Agreement's terms, New York law or the Bankruptcy Code.    If not for his

"acquiescence" and his subsequent post-Petition misrepresentations, the estate could have participated in the Post-Petition Transaction.

62.    Signature has submitted detailed evidence demonstrating that Christopher Laurita was angling as early as July 2009 for payment in connection with transitioning the Rocawear Rights and Signature's business to a new company or venture partner, or to a new licensee. (Signature SF ¶¶ 52, 54-55, 61, 63, 103.)  Christopher Laurita points to no credible evidence disputing this and does concede that he was paid for transitioning services in light of his "prior familiarity with the line, manufacturers and distribution systems" (Laurita Opp. Mem. 37).[21] Although Christopher Laurita argues that his employment with a purchaser of Signature's assets, pursuant to a supervised Section 363 sale, is commonplace, (*id.* 38.), no such sale, or judicial review of any sale, occurred here.  As the principal of a debtor-in-possession, Christopher Laurita should have structured his agreement with the ROC Defendants to ensure that the estate would be compensated for the transition of its business.  He failed to do, instead pocking millions of dollars for himself.

63.    The economic interest defense is inapplicable to either Iconix or Christopher Laurita (*see* Signature Opening Mem. 36-38).  Pursuant to this defense, "[p]rocuring the breach of a contract in the exercise of equal or superior right is acting with just cause or excuse and is justification for what would otherwise be an actionable wrong."  *White Plains Coat & Apron Co., Inc. v. Cintas Corp.*, 460 F.3d 281, 286 (2d Cir. 2006) (citation omitted).  However, this defense does not apply where there is "a showing of … fraudulent or illegal means." *Id.* (citation

---

[21] Joseph Laurita's subjective reasons for moving across the country and no longer remaining in business with his brother (Laurita Opp. Mem. 37) have no bearing on the fact issue of Christopher Laurita's negotiation for and receipt of millions of dollars for transitioning Signature's business to the ROC Defendants as the new licensee while he acted as the principle of a debtor-in-possession.

omitted).    Likewise, though typically a parent cannot interfere with its subsidiary's contract, there is an exception where the parent used fraudulent or illegal means.    *See MDC Corp., Inc. v. John H. Harland Co.,* 228 F. Supp. 2d 387, 397 (S.D.N.Y. 2002) (sustaining claim for tortious interference against breaching party's parent; although "parent company … has an economic interest in interfering with [its subsidiary's] contractual relations … [plaintiff] has pleaded that, in procuring [the subsidiary's] alleged breached of contract, [the parent] acted maliciously and used fraudulent or illegal means.").[22]

64.    Here, Iconix and Christopher Laurita engaged in multiple fraudulent and illegal acts to procure Studio IP's breach of the Signature Rocawear License Agreement, including the willful violation of the automatic stay and New York law, and the subsequent dissemination of false and misleading information about the status of the Agreement.[23]    (Signature SF ¶¶ 107-

---

[22] Christopher Laurita's self-serving claims about his purported "efforts to act in the best interests of all parties" (Laurita Opp. Mem. 39) are unsupported by any evidence—there are no citations to the record and no affidavit—and so have no bearing on this motion.    There is significant, credible, admissible evidence showing his malicious intent:  in addition to his "acquiescence" to the Iconix Defendants' wrongful termination of the Signature Rocawear License Agreement, in disregard of Signature's rights under the Agreement, Laurita transitioned Signature's business to the ROC Defendants in exchange for a multi-million dollar agreement that provided no benefit to the estate, while a fiduciary of the estate and its creditors.    Worse, he continues to claim that the estate owes him millions of dollars.  (Claim No. 16.)

[23] Further, those fraudulent statements prevented until July 2012 the discovery of the true state of affairs relating to the wrongful termination of the Signature Rocawear License Agreement. Signature timely sought to amend the complaints in November 2012 (not July 2013, *see* Laurita Opp. Mem. 40).  *See* Adv. Pro. No. 11-2800 Dkt. No. 63.  Where a defendant is responsible for concealing the existence of a plaintiff's cause of action, equitable tolling of the relevant statute of limitations is appropriate. *See Pearl v. City of Long Beach,* 296 F.3d 76, 80 n. 3 (2d Cir. 2002) (collecting cases).    This doctrine is frequently referred to as "fraudulent concealment," but fraudulent conduct is not necessarily required.    "The doctrine has been applied . . . where the facts show that the defendant engaged in conduct, *often* itself fraudulent, that concealed from the plaintiff the existence of the cause of action."    *Cerbone v. International Ladies' Garment Workers' Union,* 768 F.2d 45, 48 (2d Cir. 1985) (emphasis added).  The relevant question for the application underlying this doctrine is not the intention underlying defendants' conduct, but rather whether a reasonable plaintiff in the circumstances would have been aware of the existence of a cause of action. *See Pearl,* 296 F.3d at 82; *Cada v. Baxter Healthcare Corp.,* 920

108).   Thus, they can and should be held liable for tortiously interfering with the Signature

Rocawear License Agreement in the damages incurred as a result of the breach—the value of the

Rocawear Rights as established in the Post-Petition Transaction (*see* Signature Opening

Memorandum at pages 67-74).   Disgorgement of all funds they received through their tortious

conduct is the appropriate remedy.  *See Hornstein v. Podwitz,* 254 N.Y. 443, 449 (1930) ("All of

the parties who induced the breach of the contract are jointly and severally liable for the

[damages] due the plaintiff."); *see Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50

N.Y.2d 183, 197 n. 6 (1980) (parties who tortiously interfered with contract are liable for

damages "recognized under the more liberal rules applicable to tort actions.").

## IV.   THE DEFENDANTS OFFER NO ADMISSIBLE EVIDENCE NEGATING THE VALUE FOR THE SIGNATURE ROCAWEAR LICENSE AGREEMENT AND THE ROCAWEAR RIGHTS ESTABLISHED IN THE POST-PETITION TRANSACTION.

65.   The Post-Petition Transaction, which establishes that the Signature Rocawear

License Agreement, and the Rocawear Rights embedded within it, was not "valueless."  To the

contrary, the ROC Defendants agreed to pay Defendants $18,837,500 for the Rocawear Rights in

the Post-Petition Transaction, and the Iconix Defendants agreed to accept a reduced cure amount

and to reduce the royalties and minimums as compared to the Signature Rocawear License

Agreement.  (*See* Signature SF ¶¶ 60, 87-94 ; *see also* Iconix UMF ¶¶ 56-58 (setting forth

reduced minimums and royalties in Post-Petition License) Laurita Opp. Mem. 6 ("Iconix

required ROC Fashions to pay a large portion of the debt that had been owed by the Debtor:  $6

---

F.2d 446, 451 (7th Cir. 1990) (Posner, J.).    Signature is entitled to equitable tolling.  It has
submitted evidence confirming that the Defendants concealed the complete circumstances of the
wrongful termination of the Signature Rocawear License Agreement for years both in response
to direct requests for information and its misleading and false disclosures about the wrongful
termination.  (Signature SF ¶ 110; Signature Response-UMF ¶ 48; Holloman Decl. Ex. 16-28.)
Signature was also diligent in pursuing discovery of the claims, issuing subpoenas when the
Iconix Defendants would not voluntarily provide the information.  (Holloman Decl.  ¶¶ 16-28.)

million.").)  The Transaction's occurrence vitiates any argument now from the Iconix Defendants that they would not have permitted the same concessions and compromises in a judicially-sanctioned process.

66.     The Defendants (*see* Iconix Opp. Mem. 16-26; Laurita Opp. Mem. 46-50) are silent regarding the Second Circuit's decision in *Schonfeld v. Hilliard*, holding that a recent sale price provides the best evidence of market value.   218 F.3d 164 (2d Cir. 2000).    Under *Schonfeld*, once that evidence is produced, the burden switches to Defendants to "demonstrate special circumstances which would negate the relevance" of the recent sale price.  *Id.* at 178-79. Neither has come forward with such evidence. [24]    Instead, the Iconix Defendants offer the

---

[24] The Defendants' complaints that (i) Signature could not have assumed the Signature Rocawear License Agreement (ii) that the Agreement is "unassignable" and that (iii) the Agreement was "valueless" are of no moment, for all of the reasons set forth in Signature's Opening Memorandum at 71-74 and in its Opposition Memorandum at 21-30.  None of these arguments or opinions provide the basis to ignore the Agreement's terms or New York law, or to violate the automatic stay.  Far from "negating the relevance" of the sales price established in the Post-Petition Transaction, these complaints underscore that the estate could have participated in and benefitted from the Post-Petition Transaction. The Defendants' disputes concerning Signature's ability to assume and continue or assign (Iconix Opp. Mem. 18; Laurita Opp. Mem. 7) ignores the facts.  It is a fundamental reality of bankruptcy that a debtor often faces profound financial difficulties and challenges.  There can be no genuine dispute that Signature had the *right* to assume the Signature Rocawear License Agreement under the Bankruptcy Code as a matter of law, as an executory contract  in default, and as a matter of fact, there can be no genuine dispute that Christopher Laurita offered a cure that involved the Azraks' involvement in and "financing the business."  (Signature SF ¶ 63; Holloman Decl. Ex. 70.)   There plainly was an opportunity for Signature to at least make the attempt, or to solicit other bidders in a Section 365 sale that would have benefitted the estate.  As with the Post-Petition Transaction, the cure amount could have been compromised.

Both Defendants offer the testimony of Attorney Schwartz regarding the Signature Rocawear License Agreement's "unassigability" in bankruptcy (Iconix Opp. Mem. 20; Laurita Opp. Mem. 7, 25-26), but ignore Attorney Schwartz's testimony that he came to that conclusion on the basis of GC Tarshis's representations that the Agreement was *already* terminated, and that he had not reviewed the Agreement when he came to his conclusions about the Agreement's assignability and its value.  (Signature Response-UMF ¶ 42.)  On that basis, Attorney Schwartz did not inquire as to whether Iconix would allow Signature to assume and assign the Signature Rocawear License Agreement—including whether they would agree to an assumption and assignment to the ROC Defendants, which would have provided a benefit to the estate.

46

opinions of an expert who gave no consideration to the sale price established in the Post-Petition Transaction. The Iconix Defendants' reliance on an expert's testimony is fatal to its motion for summary judgment. *Zaremba v. Gen Motors Corp.*, 360 F.3d 355, 358-60 (2d Cir. 2004) (holding that expert testimony that was speculative and unreliable was properly not considered by the district court on summary judgment); *see also Melini v. 71st Lexington Corp.*, 07–CV– 0701, 2009 WL 413608, at *4 (S.D.N.Y. Feb. 13, 2009) (citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 589 (1993). "Specifically, expert opinion testimony must be (1) 'based upon sufficient facts or data,' (2) 'the product of reliable principles and methods,' and (3) 'the result of applying those principles and methods to the facts of the case in a reliable manner.'" *Melini,* 2009 WL 413608, at *4 (quoting Fed .R. Evid. 702). "The proponent of expert testimony must establish its admissibility by a preponderance of the evidence." *Id.* (citing *Astra Aktiebolag v. Andrx Pharm., Inc.,* 222 F. Supp. 2d 423, 487 (S.D.N.Y.2002) (citing Fed. R. Evid. 104(a))). Mr. Volkman's opinion admittedly is based on hypothetical scenarios based on his conclusion that Signature could only seek to sublicense the Signature Rocawear License Agreement, rather than assume and assign it in a judicial sale to the ROC Defendants. Mr. Volkman also assumed that the Iconix Defendants would have acted irrationally, and destroyed the Rocawear brand, by refusing to accept an assignment or any adjustment to the royalty rates and minimums set out in the Signature Rocawear License Agreement. The failure of Mr. Volkman to consider the Post-Petition Transaction, in which the Iconix Defendants accepted a reduced cure and lower royalty rates, renders his testimony too speculative and unreliable to support the Iconix Defendants' motion for summary judgment.

67.    Signature was profoundly damaged by the Post-Petition Transaction because it was deprived of the opportunity to have an orderly liquidation of its assets. The law in this

judicial district permits an award to Signature's estate in the value of the post-Petition

Transaction, worth $18,837,500.  Moreover, disgorgement is an appropriate remedy against both

the Iconix Defendants and Christopher Laurita, each of whom engaged in a self-dealing

transaction in disregard of their fiduciary duties to their respective beneficiaries (*see* Section II,

III. B).    Their engineering of and acquiescence to the wrongful post-Petition Termination

represents an illegal act, in violation of New York law (*see* Gen. Oblig. § 15-301(4)) and the

Bankruptcy Code (11 U.S.C. § 362).  All of the profits that the Iconix Defendants subsequently

derived, amounting to $13,552,648, flowed from that act and are subject to disgorgement.  With

respect to Christopher Laurita, there is no genuine dispute that he owed fiduciary duties to the

estate at all times, that he transitioned Signature's business to the ROC Defendants while

simultaneously performing as principal of Signature as the debtor, and that he received

$2,325,000 (Signature SF ¶ 104).  The entire amount that he received is subject to disgorgement.

*See In re Orchard Enterprises, Inc.*, CIV.A. 7840-VCL, 2014 WL 811579, at *28 (Del. Ch. Feb.

28, 2014)  ("In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property,

the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it

could have been in had the plaintiff or a faithful fiduciary exercised control over the property in

the interim *and* (ii) to force the defendant to disgorge profits that the defendant may have

achieved through the wrongful retention of the plaintiff's property.").  (emphasis added).

## V.      THE *WAGONER* RULE AND THE DOCTRINE OF *IN PARI DELICTO* DO NOT APPLY TO POST-PETITION CONDUCT.

68.     The Iconix Defendants[25] contend that, however innocent the Responsible Person

may be (Iconix Opp. Mem. 13), Signature's claims against them must fail because Signature

"participated in or had knowledge" of the breaches and frauds for which it seeks relief, and

---

[25] Christopher Laurita appears to generally join in this argument.

therefore that Signature either lacks standing to bring its claims pursuant to the so-called *Wagoner* rule, articulated in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991), or is subject to the defense of *in pari delicto* (Opp. Mem. 13-16).  However, the law is clear that, because the conduct underlying Signature's claims took place post-Petition, neither the *Wagoner* rule nor the defense of *in pari delicto* applies to Signature's claims or the Responsible Person.

69.    As this Court explained in *In re Food Management Group, LLC*, an estate representative is in no sense a wrongdoer (imputed or otherwise) when fraud is committed by the debtor's principals in connection with post-Petition activities.  380 B.R. 677, 694 (Bankr. S.D.N.Y. 2008) (Glenn, J.).  In that case, a Chapter 11 trustee brought an adversary proceeding, including for claims of fraudulent concealment, breach of fiduciary duty, negligence, conspiracy and fraud on the court, against the debtors' former attorneys for misconduct alleged to have been in concert with the estate's former principals, in connection with a post-petition auction and sale of certain of the debtors' assets.  The defendants then moved to dismiss the complaint based in part on the *Wagoner* rule and the defense of *in pari delicto*.  *Id*. at 677, 689-90.

70.    The Court explained that the *Wagoner* rule is a rule of standing that operates to confine a bankruptcy trustee to suits against third parties that are held by the bankrupt entity (as opposed to the entity's creditors), and that the *in pari delicto* doctrine provides an equitable defense "analogous to unclean hands" and reflecting the maxim that a plaintiff's recovery can be barred by her own wrongful conduct.  *In re Food Management Group*, 380 B.R. at 693.  The Court further explained that pre-petition claims, as property of the estate, are acquired subject to whatever infirmities that may have existed at the time the estate was created.  *Id*.  The court then held that the defendant attorneys would not be permitted to "absolve themselves from liability

for injury to the estate arising from their own alleged misconduct" by imputing the wrongful

conduct of the estate's former principals to the estate, and that "the post-petition acts of the

debtors' principals are not properly imputed to the Trustee so as to bar the assertion of her claims

for damages suffered by the estate." *Id*. at 694-695.

71.     Here, Signature's claims against the Defendants arise from their concerted post-

Petition conduct to wrongfully deem the Signature Rocawear License Agreement terminated, and

enrich themselves in the Post-Petition Transaction at the expense of the estate.  As the *Food*

*Management* court explained, the *Wagoner* rule is almost universally applied by courts in the

Second Circuit to bar claims by a trustee arising from the "pre-petition misconduct of the

debtor." *In re Food Management Group*, 380 B.R. at 697.  None of the cases cited by the

Defendants concern the application of the *Wagoner* rule to post-petition conduct.  (*See* Iconix

Opp. Mem.  13-16 (citing *Wagoner*, 944 F.2d at 115-117 (describing pre-petition scheme of

debtor's principal to fleece his fellow religious congregation members, with the alleged

assistance of his broker); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 83 (2d Cir. 2000)

(describing debtor's pre-petition fraudulent scheme to transfer money with the assistance of their

bankers and account custodians); *Kirchner v. Grant Thornton LLP*, No. 07 Civ. 11604 (GEL),

2009 WL 1286326, at *2-3 (S.D.N.Y. Apr. 14, 2009) (describing pre-petition conduct of debtor

and banking professionals and advisors in concealing debtor's uncollectible debts and

misappropriation of assets); *In re Bernard L. Madoff Investment Securities LLC*, 721 F.3d 54, 59-

62 (2d Cir. 2013) (describing pre-SIPA Ponzi scheme conducted by Madoff with the alleged

assistance of various banks); *In re Mediators, Inc.*, 105 F.3d 822, 824-825 (2d Cir. 1997)

(describing pre-petition transfer of art collection to debtor's principals); *Barnes v. Hirsch*, 215

A.D. 10, 10 (N.Y. App. Div. 1st Dep't 1925) (describing pre-petition "bucket shop" run by debtor that allegedly converted creditors' money and property).)[26]

72.     The *Food Management* court also explained that, for essentially the same reasons, the *in pari delicto* defense does not apply to the post-petition activities of a debtor's principals or its co-conspirators:

> If the trustee's conspiracy claims are based upon the post-petition activities of the conspirators, it does not matter whether or not the debtor is one of the conspirators.   The debtor's post-petition unclean hands do not impair the ability of the trustee in bankruptcy to pursue the debtor and the debtor's co-conspirators.

*In re Food Management*, 380 B.R. at 698 (quoting *In re Sia*, 349 B.R. 640, 655 (Bankr. D. Haw. 2006)).

73.     Even if the Court were to determine that the *Wagoner* rule or *in pari delicto* defense could be applied to the Defendants' wrongful post-Petition conduct, the adverse interest exception is applicable here.   The adverse interest exception "rebuts the usual presumption that the acts and knowledge of an agent acting within the scope of employment are imputed to the principal." *In re Mediators*, 105 F.3d at 827 (citing *Center v. Hampton Affiliates*, 66 N.Y.2d 782 (1985)).   The exception provides that "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation." *Wight*, 219 F.3d at 87.   The adverse interest exception requires the agent to have "totally abandoned the principal's interest." *Mediators*, 105 F.3d at 827.

74.     The Post-Petition Transaction provides ample evidence that the Laurita Brothers' "totally abandoned" Signature's interests in favor of their own purposes.   That Transaction

---

[26] The two other cases cited by the Iconix Defendants—*Cobalt Multifamily Investors, LLC v. Arden*, No. 06-CV-6172 (KMW/MHD), 2014 WL 4548552 (S.D.N.Y. Sept. 12, 2014) and *Kirschner v. KPMG LLP*, 15 N.Y.3d 446 (N.Y. 2010) respectively held that the *Wagoner* rule and *in pari delicto* defense did not bar the trustee's fraudulent transfer claims, and reviewed certified questions relating to the adverse interest exception to the *Wagoner* rule.

provided Christopher Laurita with a transitioning and consulting agreement worth $2,800,000. The Transaction allowed the Iconix Defendants to preserve outstanding royalties owed by Signature in the Post-Petition License, (Signature SF ¶ 60 (Cole Tr. 125:15-22)) and accelerate their payment, without having to comply with the bankruptcy claims reconciliation process. The estate received no benefit and no consideration in the Transaction. Even the Iconix Defendants' unsupported version of post-Petition events, if taken as true for the sake of argument (which it is not), also confirms that the Laurita Brothers "totally abandoned" Signature's interests and sought no benefits for the estate. At a minimum, the Laurita Brothers, in the exercise of their so-called "technical rights" over the Signature Rocawear License Agreement (Iconix Opening Mem. 3, 30) should have required the Iconix Defendants to drop their millions of dollars of claims against the estate in consideration for that alleged agreement, which would have provided value to the estate by reducing its total debts. In the Iconix Defendants' version of events, no concessions of any sort were sought by the Laurita Brothers or granted by the Iconix Defendants, further underscoring the Iconix Defendants' control in deeming the Signature Rocawear License Agreement terminated.

75.     The adverse interest exception is subject to the "sole actor" rule, which provides that the adverse interest exception is inapplicable where the wrongdoing agent is the corporation's sole shareholder, or where all of the corporation's management participated in the wrongdoing. *Mediators*, 105 F. 3d at 827. The Iconix Defendants argue that because the Laurita Brothers were Signature's sole officers, the adverse interest exception should not apply. (Iconix. Opp. Mem. 15 n.7.) The Iconix Defendants have not established that the Laurita Brothers were the only management of Signature, or that all of Signature's management participated in the wrongdoing. And even if they had, in the bankruptcy context, the presence of the bankruptcy

52

court in post-Petition proceedings requiring its approval, including a proceeding to seek relief from the automatic stay and proceed with a Section 363 sale, provides an "innocent decision maker that was deceived by the withholding of facts" sufficient to make the "sole actor" rule inapplicable. *In re Food Management Group*, 380 B.R. at 697.

76.     In sum, the *Wagoner* rule and the defense of *in pari delicto* do not apply to Signature's claims against Defendants, or to the Responsible Person.   Moreover, the Iconix Defendants' muddled anticipatory repudiation and breach argument does not change that result. Even assuming that there was a pre-Petition anticipatory breach and/or repudiation, as set forth in Section II. A-C, above, the Iconix Defendants continued to treat the Signature Rocawear License Agreement as valid and proceeded according to its terms.  The Iconix Defendants cannot have it both ways.

## VI.   SIGNATURE'S REMEDIES AGAINST DEFENDANTS ARE NOT LIMITED TO AVOIDANCE UNDER THE BANKRUPTCY CODE.

77.     Under the Plan, the Responsible Person is empowered to enforce and prosecute claims, interest, rights and privileges of Signature.  Case No. 09015378, Dkt. No. 109 at 6.1. The Iconix Defendants and Christopher Laurita argue that Signature cannot state claims against the Defendants under state law because Sections 549 and 362(k)(1) of the Bankruptcy Code provides the "exclusive" remedy and measure of damages, respectively, for Defendants' wrongful post-petition conduct (Iconix Opp. Mem. 5-7; Laurita Opp. Mem. 50-53.) These meritless arguments are not even supported by the cases cited by the Defendants, much less by the prevailing law in this judicial district.  Importantly, the Responsible Person is not seeking to "unscramble the eggs" and avoid the Post-Petition Transaction or render it *void ab initio*, but rather is looking to recover damages to the estate.

53

A.   **Section 549 of the Bankruptcy Code Does Not Provide the Exclusive Remedy for Post-Petition Misconduct Against the Defendants.**

78.   Neither of the cases cited by the Defendants stand for the proposition that the Responsible Person cannot seek damages for post-Petition misconduct based on state law claims, and is limited to only avoiding transfers or obligations and recovering property. *Thomas America Corporation v. Fitzgerald* does not remotely support the argument that Section 549 is the "exclusive remedy" (Iconix Opp. Mem. 5; Laurita Opp. Mem. 50) for the Responsible Person to deal with post-Petition misconduct by Signature's former principals and their co-conspirators. That case involved a declaratory judgment action for a patent infringement, during the pendency of which plaintiff declared bankruptcy pursuant to Chapter 7, and subsequently, plaintiff's counsel was authorized by the bankruptcy court to continue with the litigation. 968 F. Supp. 154, 155-156 (S.D.N.Y. 1997). After a bench trial, plaintiff's CEO admitted mischaracterizing a piece of evidence that the district court had relied upon in concluding that there was no binding settlement agreement between the parties. *Id.* In a subsequent motion for reconsideration, the district court considered and rejected the plaintiff's attempt to avoid the agreement by claiming that the agreement was non-binding because CEO lacked the authority, post-bankruptcy, to bind the corporation. *Id.* at 158. The district court explained its understanding that, once a Chapter 7 case is filed and the trustee takes over the estate, he is empowered by Section 549 to "ensure that the estate is not depleted by unauthorized transfers" and the "proper procedure"—as opposed to the "exclusive remedy" (Iconix Mem. 5; Laurita Opp. Mem. 50-51)—for the trustee (rather than the debtor) to avoid an estate's obligation was via Section 549. *Id.* at 158. Essentially, the district court held that plaintiff, already facing sanctions with respect to evidence concerning the agreement, could not ask the district court to use the bankruptcy code to "avoid" the obligations of the settlement agreement. *Id.*

79.     Similarly, in *Consolidated Partners Investment Company v. Lake*, the court did *not* hold that Section 549 is the "exclusive remedy for dealing with post-petition transfers," (Iconix Opp. Mem. 5; Laurita Opp. Mem. 51), as the Defendants claim.  In that case, which was an avoidance action brought by the trustee to recover real property, the court held that it would not toll the two-year statute of limitations where the defendant, who held outstanding notes payable against the debtor, openly recorded the transfers of real property exchanged with the debtor in satisfaction of the notes.  156 B.R. 982, 982-83 (Bankr. N.D. Ohio 1993).  Importantly, the court noted that the defendant made no attempt to conceal the transfers or commit fraudulent acts with respect to them, *id.* at 984, which is not the case here.  In an effort to escape the application of the statute of limitations, the *Consolidated Partners* trustee sought to avoid the transactions by amending his avoidance complaint to allege a violation of the automatic stay and render the conveyances *void ab inito*.  *Id.* at 984-985.  The court found that there was no violation of the automatic stay because the debtor made the transfers voluntarily those transfers provided value for the estate.  *Id.* at 985.  Because there was no automatic stay violation, the Court determined that Section 549 was the exclusive *means* to avoid the post-petition real property transfers and recover the estate's real property.  The court did not hold that Section 549 is a trustee's "exclusive remedy" for post-Petition misconduct (*see also* Laurita Opp. Mem. 51 (citing *In re Ampal-Am. Irs Corp.*, 502 B.R. 361 (Bankr. S.D.N.Y 2013) (granting trustee exclusive authority, not confining a trustee to an exclusive remedy)).

80.     Moreover, and by contrast, here, the Post-Petition Transaction did not involve the disposition of real property owned by the debtor that was sold to a creditor in exchange for a reduction in the estate's debts.  The Post-Petition Transaction involved the Iconix Defendants, with the Laurita Brothers' assistance, entering a contract that transferred Signature's property—

55

the Rocawear Rights—to the ROC Defendants, with no value for the estate. The Transaction was premised on a violation of the automatic stay and New York law, involving the oral termination of the estate's executory contract without application for relief or court supervision. The Transaction provided no consideration for Signature, and ample consideration for the Defendants. Christopher Laurita received a lucrative transitioning and consulting agreement with the ROC Defendants as the new licensee, and the Iconix Defendants both preserved past royalties owed by Signature in the agreement with the ROC Defendants and made a claim against the estate for those same royalties. Unlike the real property transfers in Consolidated Partners, the Post Petition Transaction provided no benefit for the estate by reducing the estate's outstanding debts. After the transaction, Defendants piled tens of millions of dollars in claims onto the estate (Iconix's subsidiaries have filed proofs of claim for in excess of $10,3000,000 (Claim No. 41) and $20,700,000 (Claim No. 42), and the Laurita Brothers have filed proofs of claims for $3,387,414 (Christopher Laurita, Claim No. 16) and $5,337,414 (Joseph Laurita, Claim No. 15)).

81.    A transaction that gave due consideration to Signature's estate and other creditors would have, at a minimum, required Iconix to waive all or at least some portion of its claims against the estate, and would not have permitted Christopher Laurita to exclusively pocket millions of dollars in transition fees. (*See also* Iconix Opp. Mem. 6 (citing *In re Anderson*, 511 B.R. 481, 496 (Bankr. S.D. Ohio 2013) (noting that broad interpretation of "voiding power" of automatic stay could in some circumstances overcome the two year statute of limitations governing Section 549 avoidance claims))).

B.    **The Court May Punish Defendants
for Violations of the Automatic Stay.**

82.    The Defendants argue that Signature cannot assert a separate cause of action for

violation of the automatic stay because Signature, as a corporate entity, is not an "individual" for

purposes of Section 362 of the Bankruptcy Code (Iconix Opp. Mem. 7; Laurita Opp. Mem. 52).

However, the Southern District of New York has permitted a bankruptcy trustee to be treated as

an individual for purposes of Section 362. *See Shimer v. Fugazy*, 124 B.R. 426, 431 (S.D.N.Y.

1991) ("the damage award of one-third of the Trustee's costs and attorney's fees relative to the

license litigation . . . reflect the expenses caused by William Fugazy's wrongful conduct"

violating the automatic stay). Accordingly, in the Court's discretion the Responsible Person

could be awarded actual damages for violations of the automatic stay.

83.    In all events, this Court is free to punish violations of the automatic stay through

contempt proceedings, if it finds that such violations occurred, in the absence of any party claim,

and including by the imposition of costs, attorneys fees and punitive damages. *See In re

Chateaugay*, 920 F.2d 183, 186-187 (2d Cir. 1990) (listing cases and citing *In re First

RepublicBank Corp.*, 113 B.R. 277, 279 (Bankr. N.D. Tex. 1989) for power of bankruptcy courts

under Section 105 of the Bankruptcy Code to impose contempt sanctions for violation of the

automatic stay). A creditor acts willfully in violating the automatic stay if it has knowledge of

the stay and the act that violates the stay is intentional. *Crysen/Montenay Energy Co. v. Esselen

Assoc., Inc.*, 902 F.2d 1098, 1104-05 (2d Cir. 1990). There is uncontested evidence here

showing that the Iconix Defendants acted willfully in issuing the Post-Petition License to the

ROC Defendants, with full knowledge that the Involuntary Petition had been filed. (Signature

SF ¶¶ 75-78).

57

84.     Finally, the Defendants argue that this Court will "need to address whether it has the judicial power to render a final decision" on Signature's claims, citing *Stern v. Marshall*, 131 S. Ct. 2594 (2011), *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012) and *BP RE, L.P. v. RML Waxahache Dodge, LLC*, 735 F.3d 279 (5th Cir. 2013) (Iconix Opp. Mem. 7 n.4; Laurita Opp. Mem. 52-53).   This simply ignores the Southern District of New York's instruction in the Amended Standing Order of Reference, dated January 31, 2012, which states that:

> Pursuant to 28 U.S.C. Section 157(a) any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 are referred to the bankruptcy judges for this district.
>
> If a bankruptcy judge or district judge determines that entry of a final order or judgment by a bankruptcy judge would not be consistent with Article III of the United States Constitution in a particular proceeding referred under this order and determined to be a core matter, the bankruptcy judge shall, unless otherwise ordered by the district court, hear the proceeding and submit proposed findings of fact and conclusions of law to the district court.   The district court may treat any order of the bankruptcy court as proposed findings of fact and conclusions of law in the event the district court concludes that the bankruptcy judge could not have entered a final order or judgment consistent with Article III of the United States Constitution.

*In re: Standing Order of Reference re: title 11,* 12 Misc. 00032.   "*Stern v. Marshall* has become the mantra of every litigant who, for strategic or tactical reasons, would rather litigate somewhere other than the bankruptcy court."   *In re Ambac Financial Group*, 457 B.R. 299, 308 (Bankr. S.D.N.Y. 2011) (J. Chapman); *see also In re Extended Stay*, 466 B.R. 188, 202 (S.D.N.Y. 2011) (J. Scheindlin) (holding that Stern does not require mandatory withdrawal of the reference); *In re Pali Holdings*, 488 B.R. 841, 848 (Bankr. S.D.N.Y. 2013) (J. Gerber) (same). Contrary to the Iconix Defendants' arguments, there is no barrier to this Court's competency to preside over this matter, and the Court's fact determinations are entitled to significant deference in any following review.   *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 988-89 (2d Cir. 1990), *cert.*

*denied*, 502 U.S. 808 (1991); *see also* Fed. R. Bankr. P. 8013 ("Findings of fact, whether based on oral or documentary evidence, shall not be set aside against clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses."). Further, this litigation presents core matters, including violations of the Bankruptcy Code and the automatic stay.

2840557-2

## CONCLUSION

WHEREFORE, for all of the foregoing reasons, Signature respectfully requests that the

Court deny Defendants' motion for summary judgment, award summary judgment to Signature,

and award Signature any such other and further relief as the Court deems just and proper.

Dated: New York, New York
      October 28, 2014

OLSHAN FROME WOLOSKY LLP


By:   */s/ Kyle C. Bisceglie*
     Kyle C. Bisceglie
     Ellen V. Holloman
     Renee M. Zaytsev
     *Attorneys for Plaintiff*
     Park Avenue Tower
     65 East 55th Street
     New York, New York 10022
     (212) 451-2300

2840557-2