Harris N. Cogan
Andrew T. Hambelton
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
(212) 885-5000
*Attorneys for Defendants Iconix Brand*
*Group, Inc. and Studio IP Holdings LLC*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>SIGNATURE APPAREL GROUP LLC,<br><br>               Debtor. | Chapter 11<br><br>Case No. 09-15378 (RG) |
| SIGNATURE APPAREL GROUP LLC,<br><br>               Plaintiff,<br><br>   v.<br><br>JOSEPH LAURITA, CHRISTOPHER LAURITA, NEW STAR GROUP, LLC, ROC FASHIONS, LLC, RVC ENTERPRISES, LLC, RUBEN AZRAK, VICTOR AZRAK AND CHARLES AZRAK, ICONIX BRAND GROUP, INC., STUDIO IP HOLDINGS, LLC<br><br>               Defendants. | Adv. Pro. No. 11-02800 (RG)<br><br><br>**DEFENDANTS ICONIX BRAND GROUP, INC.'S AND STUDIO IP HOLDINGS LLC'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** |
| ROC FASHIONS, LLC,<br><br>               Third- Party Plaintiff,<br><br>   v.<br><br>STUDIO IP HOLDINGS, LLC<br><br>               Third-Party Defendant. | |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT ...........................................................................................................................6

I.      THE RESPONSIBLE PERSON'S STATE LAW CLAIMS ARE AN IMPROPER
        END-RUN AROUND HIS INABILITY TO SEEK AVOIDANCE UNDER
        SECTION 549 OR TO RECOVER DAMAGES UNDER SECTION 362(K)(1) .............6

II.     THE RESPONSIBLE PERSON IS BOUND BY THE ACTIONS AND
        KNOWLEDGE OF SIGNATURE, AND HIS FRAUDULENT CONSPIRACY
        THEORIES ARE THEREFORE MERITLESS ................................................................7

III.    SIGNATURE WAS PERMITTED DURING THE GAP PERIOD, PURSUANT
        TO SECTION 303(F), TO AGREE TO THE TERMINATION OF THE
        SIGNATURE LICENSE AGREEMENT ..........................................................................8

IV.     THE SIGNATURE LICENSE AGREEMENT WAS A TRADEMARK
        LICENSE AGREEMENT THAT WAS NOT ASSIGNABLE WITHOUT
        STUDIO IP'S CONSENT ..............................................................................................11

V.      THE ICONIX DEFENDANTS ARE NOT ESTOPPED FROM ARGUING
        THAT SIGNATURE COULD NOT ASSUME OR ASSIGN THE SIGNATURE
        LICENSE AGREEMENT ..............................................................................................14

VI.     THE RESPONSIBLE PERSON HAS NOT AND CANNOT ESTABLISH THAT
        SIGNATURE SUFFERED ANY DAMAGES ..............................................................16

VII.    THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        ON THE RESPONSIBLE PERSON'S BREACH OF CONTRACT CLAIM
        (COUNT VI) BECAUSE THEY DID NOT IMPROPERLY TERMINATE THE
        SIGANTURE LICENSE AGREEMENT ........................................................................19

VIII.   THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        ON THE RESPONSIBLE PERSON'S FRAUD (COUNT I) AND NEGLIGENT
        MISREPRESENTATION (COUNT II) CAUSES OF ACTION ....................................22

IX.     THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        ON THE RESPONSIBLE PERSON'S TORTIOUS INTERFERENCE WITH
        CONTRACT CLAIM AGAINST ICONIX BRAND GROUP (COUNT VII) ................25

X.      THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
        ON THE RESPONSIBLE PERSON'S AIDING AND ABETTING BREACH OF
        FIDUCIARY DUTY CAUSE OF ACTION (COUNT IV)..............................................26

i

XI.    THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
       ON THE RESPONSIBLE PERSON'S CONVERSION (COUNT VIII) AND
       UNJUST ENRICHMENT (COUNT IX) CAUSES OF ACTION ....................................28

XII.   THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
       ON THE RESPONSIBLE PERSON'S CIVIL CONSPIRACY CAUSE OF
       ACTION (COUNT V) ........................................................................................................28

CONCLUSION ........................................................................................................................29

# TABLE OF AUTHORITIES

Page(s)

CASES

*Abacus Fed. Sav. Bank v Lim*,
   905 N.Y.S.2d 585 (1st Dep't 2010) ...................................................................28

*Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*,
   2014 U.S. Dist. LEXIS 109226 (S.D.N.Y. Aug. 5, 2014) ....................................12

*In re 48th Street Steakhouse, Inc.*,
   835 F.2d 427 (2d Cir. 1987)...................................................................................9

*In re 4Kids Entertainment, Inc*,
   Case Number 11-11607, DE 942 .........................................................................14

*In re Bernard L. Madoff Investment Secs. LLC v. JPMorgan Chase & Co.*,
   721 F.3d 54 (2d Cir. 2013)..............................................................................7, 8

*In re C.W. Mining Company*,
   2008 Bankr. LEXIS 4840 (Bankr. D. Utah Aug. 7, 2008) ...................................10

*In re Global Home Products LLC*,
   369 B.R. 770 (D. Del. 2007)................................................................................14
*In re Map Int'l, Inc.*,
   105 B.R. 5 (Bankr. E.D. Pa. 1989) ......................................................................24

*In re Mediators, Inc.*,
   105 F.3d 822 (2d Cir. 1997)...................................................................................7

*In re N.C.P. Mktg. Grp., Inc.*,
   337 B.R. 230 (Bankr. D. Nev. 2005) ..............................................................12, 13

*In re XMH Corp.*,
   647 F.3d 690 (7th Cir. 2011) .........................................................................12, 13

*K. Bell & Assocs., Inc. v. Lloyd's Underwriters*,
   827 F. Supp. 985 (S.D.N.Y. 1993) .......................................................................15

*Kamanou v. Exec. Secy. of the Comm'n of the Econ. Cmty*,
   2012 U.S. Dist. LEXIS 7647 (S.D.N.Y. Jan. 19, 2012)......................................26

*Kirschner v. KPMG LLP*,
   15 N.Y.3d 446 (2010) ............................................................................................8

iii

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*,
    734 F. Supp. 1071 (S.D.N.Y. 1990)..................................................................19

*Marvel Worldwide. Inc. v. Kirby*,
    777 F.Supp.2d 720 (S.D.N.Y. 2011)..............................................................11

*Matter of Fugazy Express, Inc.*,
    114 B.R. 865 (S.D.N.Y. 1990)........................................................................9

*Miller v. Glenn Miller Productions*,
    318 F. Supp. 2d 923 (C. D. Cal. 2004) ..........................................................12

*Rose v. Spa Realty Assocs.*,
    42 N.Y.2d 338 (1977) ....................................................................................20

*Schonfeld v. Hilliard*,
    218 F.3d 164 (2d Cir. 2000)......................................................................17, 18

*Shearson Lehman Hutton, Inc. v. Wagoner*,
    944 F.2d 114 (2d Cir. 1991)............................................................................7

*Signature Apparel Group LLC v. Joseph Laurita, et al.*,
    No. 10-ap-1047 (Bankr. S.D.N.Y.) ...............................................................17

*Stokes v. Lusker*,
    425 Fed. Appx. 18 (2d Cir. 2011) .................................................................28

*Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York), Inc.*,
    925 F. Supp. 212 (S.D.N.Y. 1996) ...........................................................12, 14

*White Plains Coast & Apron Co.*,
    8 N.Y.3d 422 (2007) ......................................................................................26

*Wight v. BankAmerica Corp.*,
    219 F.3d 79 (2d Cir. 2000)..............................................................................7

Statutes

11 U.S.C. § 303(f)..............................................................................1, 4, 8, 9, 10

11 U.S.C. § 362..............................................................................................6

11 U.S.C. § 363............................................................................................14

11 U.S.C. § 365............................................................................4, 11, 13, 14, 16

11 U.S.C. § 549..........................................................................................4, 6

N.Y. CPLR § 214(4) ...................................................................................................26

OTHER AUTHORITIES

*3 Collier on Bankruptcy ¶ 365.07(1)(c)*..........................................................................12

*McCarthy on Trademarks and Unfair Competition* § 18.14(2) (3d ed. 1996) .............................12

Defendants Iconix Brand Group, Inc. ("Iconix Brand Group") and Studio IP Holdings LLC ("Studio IP," and together with "Iconix Brand Group," the "Iconix Defendants") respectfully submit this reply memorandum of law in further support of their motion for summary judgment dismissing Signature Apparel Group LLC's ("Plaintiff" or "Signature") Amended Complaint as against them.

## PRELIMINARY STATEMENT

The Responsible Person has tried to paint a story of fraud, deception and conspiracy by the Iconix Defendants, Signature's principals and the Roc Fashions Defendants, with the knowledge and participation of each of their sophisticated law firms.  This tale of fiction bears no semblance to the truth.

The unassailable facts are that Signature: (i) was in dire financial distress; (ii) owed more than $7.4 million to Studio IP for past due royalties and fees; (iii) owed its manufacturers $2.5 million for merchandise; and (iv) advised the Iconix Defendants that it could not continue performance under its trademark license agreement.  For months, Signature unsuccessfully tried to find a partner or investor.  After Studio IP sent a notice of default, and the Petitioning Creditors filed an involuntary bankruptcy case, the interested parties, who were all represented by counsel, negotiated a global transaction whereby Signature agreed to the termination of the license, Roc Fashions was provided a new license with a longer term and lower royalties and fees and Roc Fashions agreed to pay the Petitioning Creditors for their inventory and to continue purchasing from them.  This transaction during the "gap period" was permitted under Section 303(f) of the Bankruptcy Code.  As part of this transaction, the parties contemplated a structured dismissal of the Involuntary Petition (which unfortunately did not occur).

The Responsible Person now claims that the Iconix Defendants unilaterally terminated the Signature License Agreement. But Signature's bankruptcy counsel, Joseph Schwartz, Esq. of Riker, Danzig, Scherer, Hyland & Perretti LLP, testified at deposition that the Lauritas told him of their decision to terminate the relationship. Signature, its counsel and its investment banker were obviously well aware that no notice of termination had been sent. Indeed, Riker Danzig attorneys noted that only a notice of default had recently been sent (*see* DE 142-6, Holloman Decl., Ex. 44). Mr. Schwartz testified that he decided not to pursue any assumption or assignment of the license because the Signature license could not be assigned without Studio IP's consent, and the license—which had above-market royalty and advertising fee requirements and only 15 months remaining on its term—had no value and could not be assigned without curing the $7.4 million default.

The Responsible Person, who stands in the shoes of Signature as a matter of law, and is imputed with its knowledge and actions, cannot second-guess Signature's business decision and claim fraud.

Nor has the Responsible Person pointed to any misrepresentation by the Iconix Defendants. Olshan got it right in its December 7, 2009 Objection filed on behalf of the Creditors' Committee by stating that "[w]hen it became clear that the Debtor could no longer perform its obligations under the Iconix licenses, the Debtor and Iconix *agreed* to terminate the licenses." (Am. Compl., DE 89, at ¶ 52 (citing December 7, 2009 objection filed by Olshan) (emphasis supplied); UMF 39.)

The Responsible Person now points to an e-mail from Andrew Eckstein, Esq. of Blank Rome LLP to claim that the Iconix Defendants misrepresented that the license was terminated pre-Involuntary Petition. But the e-mail makes no such representation—it simply confirms that

2

the license had been terminated.  (*See* DE 142-14, Holloman Decl., Ex. 98.)  The massive

discovery and briefing has not disclosed any misrepresentations by the Iconix Defendants.

The Responsible Person also has no evidence that the Iconix Defendants knew of—let

along substantially assisted in—the $2.5 million consulting agreement with New Star Group,

LLC ("New Star"), a company owned by Christopher Laurita.  The Responsible Person has, at

most, shown that the Iconix Defendants were advised in an earlier potential transaction that

never materialized that the Lauritas might have been retained as consultants, and that as a

condition for the Roc Fashions Defendants' settlement of all claims for $400,000 over time,

Charles Azrak provided an affidavit stating that the Iconix Defendants "strongly suggested" that

the Lauritas be part of the transaction.  But the consulting agreement was not part of the Roc

Fashions transaction—it was agreed to subsequently.  The Iconix Defendants were never told of

the New Star consulting agreement, and were never provided a copy or a draft.  They surely did

not substantially assist in the consulting arrangement.

But even if there could possibly be a claim against the Iconix Defendants, there were no

damages.  Had Signature been provided the opportunity to assume and assign the license—and

assuming Studio IP would have consented—there was no one willing to take it.  It was worthless

as it only had 15 months remaining on its term, provided for above-market royalties and fees and

required a cure of the $7.4 million arrears.  Signature was not able to find a partner or investor

despite months of searching.

In opposition, the Responsible Person does not even try to value the license.  He simply

states that the Iconix Defendants are estopped from proving what would have happened because

they were the only ones that knew the true status of the license, and because Studio IP entered

into a new license with Roc Fashions (which was experienced in the industry and already had a

3

relationship with the Petitioning Creditors), they would have consented to any assignment.  The

Responsible Person does not seek actual damages (because there are none), but instead claims

that the Iconix Defendants must pay all the royalties and fees set forth in the Roc Fashions

License Agreement—even though that license was for two plus years with four renewal terms

and Roc Fashions later defaulted.  That is simply not the law.[1]

Summary judgment should be granted to the Iconix Defendants for, *inter alia*, the

following reasons:

- The Responsible Person has not and cannot (as the statute of limitations has run)
  assert a claim under Section 549 of the Bankruptcy Code to avoid the post-
  petition transaction, and cannot assert state law causes of action that are in the
  nature of an avoidance claim;

- Pursuant to Section 365(c) of the Bankruptcy Code and under applicable
  trademark law, Signature was not permitted to assign the Signature License
  Agreement without Studio IP's consent, which could be withheld for any reason
  or no reason;

- Signature's and Studio IP's agreement to terminate the Signature License
  Agreement in contemplation of a structured dismissal did not violate the
  automatic stay because Signature was permitted under Section 303(f) of the

---

[1] Olshan does not take the same position with respect to the $2.5 million that was paid post-Involuntary Petition to the Petitioning Creditors.  The Petitioning Creditors were paid above-market rates by Roc Fashions for the Rocawear inventory.  (Holloman Decl., DE 142-19, Ex. B (R. Azrak Tr.) at 198:19-199:21.)  But Olshan did not sue them as part of the alleged conspiracy, obviously because they are Olshan's clients.  Olshan's excuse that the Petitioning Creditors would have been paid anyway does not work.  Under the Responsible Person's theory, an assignee may have decided to order from other manufacturers.  And if the Petitioning Creditors are not liable because they would have been paid anyway, so too Studio IP would have been paid anyway for licensing its intellectual property.

4

Bankruptcy Code to conduct its business, including the disposal of assets, during the gap period;

- The Responsible Person's fraudulent conspiracy claims have no merit because the Responsible Person, who stands in Signature's shoes and is imputed with Signature's knowledge and actions, is seeking to assert claims in which Signature participated;

- The Iconix Defendants did not misrepresent the status of the Signature License Agreement, and Signature and its bankruptcy counsel, Riker Danzig, were fully aware of the status of the license; and

- Under all circumstances, Signature has not suffered any damage because, as acknowledged by Signature's own expert in conducting a solvency analysis in a separate adversary proceeding, the Signature License Agreement that the Responsible Person claims the estate lost had no value as of September 15, 2009.

Accordingly, the Iconix Defendants are entitled to summary judgment dismissing the Amended Complaint in its entirety as against them.

## ARGUMENT

So as not to burden this Court with duplicative papers, the Iconix Defendants incorporate herein the arguments in their memorandum of law in opposition to Signature's motion for summary judgment (DE 160), which addresses many of the same legal and factual issues raised by Signature in its opposition to the Iconix Defendants' motion for summary judgment.

**I.      THE RESPONSIBLE PERSON'S STATE LAW CLAIMS ARE AN IMPROPER END-RUN AROUND HIS INABILITY TO SEEK AVOIDANCE UNDER SECTION 549 OR TO RECOVER DAMAGES UNDER SECTION 362(k)(1)**

The Responsible Person has acknowledged that its claims "arise from…the post-petition transfer of the rights under a license agreement." (Signature Opp. Br., DE 162, at ¶ 1.) But, as set forth in the Iconix Defendants' opposition brief, the Responsible Person has not asserted (and cannot since the 2-year statute of limitations has run) a cause of action under Section 549 of the Bankruptcy Code to avoid a post-petition transfer, which is the exclusive remedy for seeking avoidance of post-petition transfers. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 5-6.) Because the Responsible Person's state law causes of action are in the nature of an avoidance claim, the Amended Complaint should be dismissed for failure to state a cause of action.

In addition, while each of the Responsible Person's state law causes of action are premised upon an alleged violation of the automatic stay of Section 362 of the Bankruptcy Code, the Responsible Person does not dispute that it has not and cannot assert a cause of action for damages under Section 362(k)(1). (*See* Iconix Defendants Opp. Br., DE 160, at pp. 6-7.) Accordingly, any claim by the Responsible Person for damages from an alleged violation of the automatic stay also has no merit.

## II. THE RESPONSIBLE PERSON IS BOUND BY THE ACTIONS AND KNOWLEDGE OF SIGNATURE, AND HIS FRAUDULENT CONSPIRACY THEORIES ARE THEREFORE MERITLESS

There can be no dispute that the Responsible Person stands in the shoes of Signature. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 13-16.)  Because the Responsible Person stands in the shoes of Signature, Signature's actions and knowledge are imputed to the Responsible Person.  *See In re Bernard L. Madoff Investment Secs. LLC v. JPMorgan Chase & Co.*, 721 F.3d 54, 63 (2d Cir. 2013) ("debtor's misconduct is imputed to the trustee because, innocent as he may be, he acts as the debtor's representative."); *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (noting that liquidators appointed by foreign courts to wind up debtor's affairs and supervise the collection of its assets "like the trustees of a bankruptcy estate, [] stand in the shoes of the defunct corporation").

"[W]hen a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage."  *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 118 (2d Cir. 1991) (announcing the Wagoner rule that "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation.").  The reason is because "management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the Wagoner rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."  *Wight*, 219 F.3d at 87.  Therefore, as explained in the Iconix Defendants' opposition brief, the Responsible Person lacks standing to assert the claims in the Amended Complaint. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 13-14.)  *See also In re Mediators, Inc.*, 105 F.3d 822, 826 (2d Cir. 1997) (noting that under New York law, a claim for aiding and abetting breach of fiduciary duty "belong[s] to the creditors *qua* creditors" and a trustee may not bring such an

7

action because they are "deemed by New York courts to be the equivalent of an action based on

claims owned by third parties rather than the bankrupt estate").

Even if the Responsible Person had standing to assert its claims, each of Signature's

causes of action is further barred under the related doctrine of *in pari delicto*, which New York

courts have applied "to bar a debtor from suing third parties for a fraud in which he participated."

*In re Bernard L. Madoff Investment Secs. LLC*, 721 F.3d at 63 (internal citation omitted);

*Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (*in pari delicto* "mandates that the courts

will not intercede to resolve a dispute between two wrongdoers"). (*See* Iconix Defendants Opp.

Br., DE 160, at pp. 14-16.)

Because the Responsible Person is bound by Signature's actions and knowledge, the

Responsible Person cannot now be heard to complain that there was an improper termination of

the Signature License Agreement, which was a voluntary act of Signature. The Responsible

Person also cannot claim that he justifiably relied on any alleged misrepresentation concerning

the status of the Signature License Agreement because Signature, as the party that would have

received notices under the license, was aware of the status of the agreement. Indeed, Signature's

bankruptcy counsel knew that only a notice of default had recently been sent. (*See* DE 142-6,

Holloman Decl., Ex. 44.)

## III.    SIGNATURE WAS PERMITTED DURING THE GAP PERIOD, PURSUANT TO SECTION 303(f), TO AGREE TO THE TERMINATION OF THE SIGNATURE LICENSE AGREEMENT

The Iconix Defendants established in their moving and opposition papers that Signature

was permitted to conduct its business, including disposing of assets, during the gap period. (*See*

Iconix Defendants Moving Br., DE 140-1, at pp. 15-18; *see also* Iconix Defendants Opp. Br., DE

160, at pp. 7-12.)

The Responsible Person claims that the Iconix Defendants violated the automatic stay because they unilaterally terminated the Signature License Agreement. To the contrary, the evidence has shown that Signature repudiated the agreement and then agreed to its termination as part of a transaction also benefitting the Petitioning Creditors in contemplation of a structured dismissal of the Involuntary Petition. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 8-9.) The Responsible Person's reliance on *In re 48th Street Steakhouse, Inc.*, 835 F.2d 427 (2d Cir. 1987), and *Matter of Fugazy Express, Inc.*, 114 B.R. 865 (S.D.N.Y. 1990), is misplaced as both cases involved unilateral actions by a creditor during the gap period. (*See* Iconix Defendants Opp. Br., DE 160, at p. 10.)

The Responsible Person also argues that Signature could not agree to terminate the Signature License Agreement during the gap period "without court supervision." (Signature Opp. Br., DE 162, at p. 15.) But this ignores the plain language of Section 303(f), which provides that "the debtor may continue to use, acquire, or *dispose* of property as if an involuntary case concerning the debtor had not been commenced." 11 U.S.C. § 303(f) (emphasis supplied). The Responsible Person cites no authority limiting an involuntary debtor's ability to conduct its business, including the disposal of assets, under Section 303(f).

Instead, the Responsible Person argues that Section 303(f) does not allow debtors to consent to an action that would violate the automatic stay. (Signature Opp. Br., DE 162, at p. 15.) But that is not what happened here. Because the Signature License Agreement had no value and Signature could not meet its obligations going forward, Signature agreed with Studio IP that it would give up the license. This type of business decision by Signature is exactly what Section 303(f) contemplates. The cases that the Responsible Person relies on are inapposite because they do not involve a situation, like here, where the debtor is agreeing to dispose of a

9

worthless asset.  (*See* Signature Opp. Br., DE 162, at pp. 15-16.)  Rather, the cases involve

creditors seeking the consent of the debtors in order to take actions that undeniably violate the

automatic stay.[2]  (*See* Signature Opp. Br., DE 162, at pp. 15-16.)

The Responsible Person argues that Section 303(f) does not permit the disposal of the

Signature License Agreement because it was Signature's "only viable asset."  (Signature Opp.

Br., DE 162, at p. 15.)  Section 303(f) has no such limitation, and Signature cites no authority

supporting this argument.

But, in all events, even after the Involuntary Petition was filed, and the agreement with

Roc Fashions was reached, Signature continued to employ personnel and make sales.  In his

November 9, 2009 Declaration, Joseph Schwartz, Esq., Signature's bankruptcy counsel,

acknowledged that "[s]ince the Petition Date, the Debtor's current management has made

substantial efforts to continue selling merchandise to its customers."  (*See* Declaration of Joseph

Schwartz dated November 9, 2009, DE 22-2 in Case No. 09-15378, at ¶ 5.)  Olshan even

acknowledged in its December 7, 2009 limited objection to certain motions by Signature that

Signature anticipated "its total cash receipts through March will be approximately $5.1 million."

(Limited Objection of Olshan as counsel for Creditors' Committee, DE 48 in Case No. 09-

15378, at ¶ 12.)  And, Mr. Schwartz acknowledged that as late as November 2009, Signature still

had employees.  (*See* Debtor's Motion Authorizing Payment of Wages dated November 25,

2009, DE 39 in Case No. 09-15378, at ¶ 8.)

---

[2] The Responsible Person's attempt to distinguish *In re C.W. Mining Company,* 2008 Bankr. LEXIS 4840 (Bankr. D. Utah Aug. 7, 2008), because that case did not involve a "consent to an action prohibited by the automatic stay" misses the point.  (Signature Opp. Br., DE 162, at pp. 17.)  Here, there was no agreement between the Iconix Defendants and Signature to engage in activities in violation of the automatic stay.  To the contrary, as permitted by Section 303(f), Signature agreed to the termination because it reached the business decision that continuing with the license was a factual impossibility and it, therefore, elected to dispose of a worthless asset.

The Responsible Person also cites to e-mails between the Lauritas, Riker Danzig and

Anchin (Signature's investment banker) that allegedly report that the Iconix Defendants were

prepared to take the risk that the Signature License Agreement was not properly terminated.

(Signature Opp. Br., DE 162, at p. 6.)  But these e-mails are inadmissible hearsay.  A party does

not create an issue of material fact by interposing inadmissible evidence in opposition to a

motion for summary judgment.  *Marvel Worldwide. Inc. v. Kirby*, 777 F.Supp.2d 720, 730

(S.D.N.Y. 2011) ("In opposing a motion for summary judgment, the non-movant may not rely on

inadmissible evidence, such as hearsay, to create a disputed issue of fact.").  Nonetheless, as

explained in the Iconix Defendants' previous papers, the risk the Iconix Defendants were

prepared to take was that of a third party challenge to the validity of the new license with Roc

Fashions or to Studio IP's rights to license the "Rocawear" trademark.  (Cogan Decl., DE 140-4,

attaching Affidavit of Andrew Tarshis dated January 23, 2013, at ¶ 28.)  All parties agreed that

the Signature License Agreement had been terminated and all counsel determined that judicial

intervention was not necessary.

## IV.    THE SIGNATURE LICENSE AGREEMENT WAS A TRADEMARK LICENSE AGREEMENT THAT WAS NOT ASSIGNABLE WITHOUT STUDIO IP'S CONSENT

Contrary to the Responsible Person's argument that the law is unsettled as to whether a

trademark license is assignable in bankruptcy, as discussed in the Iconix Defendants' moving

and opposition papers, Section 365(c)(1)(A) of the Bankruptcy Code limits the ability of a debtor

to assign a contract if "applicable law" authorizes the non-debtor party to the contract to refuse to

accept performance from an assignee.  (*See* Iconix Defendants Moving Br., DE 140-1, at pp. 19-

22; *see also* Iconix Defendants Opp. Br., DE 160, at pp. 18-20.)  Because the Signature License

Agreement is a trademark license agreement, the "applicable law" governing whether the

11

contract is assignable is trademark law.  And trademark law is settled that an assignment requires consent of the licensor.  The Signature License Agreement prohibited assignments without Studio IP's consent.  (*See* Iconix Defendants Opp. Br., DE 160, at pp. 19-20.)

As courts in the Second Circuit have explained, "the general rule is that unless the license states otherwise, the licensee's right to use the licensed mark is personal and cannot be assigned to another."  *Tap Publ'ns, Inc. v. Chinese Yellow Pages (New York), Inc.*, 925 F. Supp. 212, 218 (S.D.N.Y. 1996) (citing 2 *McCarthy on Trademarks and Unfair Competition* § 18.14(2) (3d ed. 1996)); *see also Excelled Sheepskin & Leather Coat Corp. v. Or. Brewing Co.*, 2014 U.S. Dist. LEXIS 109226, at *43-*44 (S.D.N.Y. Aug. 5, 2014) ("A trademark licensee cannot sub-license the mark without express permission from the licensor"); 3 Collier on Bankruptcy ¶ 365.07(1)(c) ("Trademark licenses are not assignable in the absence of a clause expressly authorizing assignment") (citing *In re XMH Corp.*, 647 F.3d 690, 695 (7th Cir. 2011)).  The rationale for this rule is that a trademark owner must have control over who uses its mark because failure to exercise quality control puts the trademark owner at risk of losing its rights to the mark.  *In re XMH Corp.* 647 F.3d at 695-696.  Therefore, the Signature License Agreement could not be assigned unilaterally by Signature.

The Responsible Person's attempt to distinguish the cases that the Iconix Defendants rely upon misses the mark.  Signature's argument that *Miller v. Glenn Miller Productions*, 318 F. Supp. 2d 923, 937-40 (C. D. Cal. 2004), is not a bankruptcy case is irrelevant because trademark law controls in bankruptcy.  The *Miller* case squarely holds that a trademark license is not assignable without the licensor's consent.  *See Miller*, 318 F. Supp. 2d at 937-940.

The Responsible Person's attempt to distinguish *In re XMH Corp.*, 647 F.3d 690 (7th Cir. 2011) and *In re N.C.P. Mktg. Grp., Inc.*, 337 B.R. 230 (Bankr. D. Nev. 2005), *aff'd* 279 F. Appx.

12

561 (9th Cir. 2008), because they were "fully litigated following a process" also does not detract from the legal principle each stands for: that trademark license agreements are not assignable without the consent of the non-debtor party to the contract. The Responsible Person also argues that the Seventh Circuit's discussion of the assignability of trademark licenses in *In re XMH Corp.* is not persuasive because it is "ultimately dicta." (Signature Opp. Br., DE 162, at p. 24 fn. 17.) The Seventh Circuit's discussion is persuasive here because it discussed and endorsed the "universal rule" that "trademark licenses are not assignable in the absence of a provision authorizing assignment." *In re XMH Corp.*, 647 F.3d at 696.

The Responsible Person also tries to create the impression that there is a split of authority regarding the assignability of trademark licenses under Section 365 of the Bankruptcy Code by pointing to the Supreme Court's denial of a petition for writ of certiorari in the *In re N.C.P. Mktg. Grp., Inc.* case. (Signature Opp. Br., DE 162, at p. 24 fn. 17.) The issue of assignment of trademark licenses was not before the Supreme Court in that petition, and, therefore, the denial of the petition for a writ of certiorari is not relevant here. Specifically, that petition involved "the power of a debtor-in-possession to assume executory contracts held by the debtor before bankruptcy." *In re N.C.P. Mktg. Grp., Inc.*, 556 U.S. at 1146. In its denial, the Supreme Court noted the split in authority in determining when a debtor-in-possession may assume a pre-bankruptcy executory contract of the debtor. *Id.* The Supreme Court noted that some circuits are using a "hypothetical test," in which a debtor-in-possession may assume an executory contract only if hypothetically it might assign that contract to a third party, while others are using an "actual test", where a debtor-in-possession may only assume an executory contract provided it has no actual intent to assign that contract to a third party. *Id.* The Supreme Court denied the

13

petition because it determined this was not the right case to resolve this bankruptcy law issue.[3]

*Id*.

      Because the Signature License Agreement was a trademark license for the right to use the Rocawear trademark, "applicable law"—*i.e.* trademark law—prevents its assignment absent Studio IP's consent. *See, e.g., Tap Publ'ns, Inc.*, 925 F. Supp. at 218. Indeed, Signature's own bankruptcy counsel, Joseph Schwartz, Esq., recognized this when he concluded that the Signature License Agreement had no value to the estate because it was unassignable in bankruptcy. (UMF 42-44.)

## V.    THE ICONIX DEFENDANTS ARE NOT ESTOPPED FROM ARGUING THAT SIGNATURE COULD NOT ASSUME OR ASSIGN THE SIGNATURE LICENSE AGREEMENT

      The Responsible Person claims the Iconix Defendants are estopped from introducing evidence that the Signature License Agreement could not realistically be assumed and assigned. The estoppel theory is premised on the incorrect argument that "only the Defendants had knowledge of the complete circumstances surrounding the status of the Signature Rocawear License Agreement." (*See* Signature Opp. Br., DE 162, at p. 25.) As discussed in the Iconix Defendants' previous papers, Signature—and thus the Responsible Person who stands in its shoes—knew of the status of the Signature License Agreement. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 15-16.) Because Signature knew that only a notice of default had been sent,

---

[3] While the Responsible Person points in a footnote to the non-Second Circuit decision in *In re Global Home Products LLC*, 369 B.R. 770 (D. Del. 2007), as an example of a situation where a trademark license was assigned in bankruptcy, the issue of whether trademark licenses are assignable as a general matter was not discussed on the appeal before the district court because the court held that the appeal was moot under Section 363(m) of the Bankruptcy Code. The Responsible Person also cites to the disclosure statement in a case in which Olshan participated, *In re 4Kids Entertainment, Inc*, Case Number 11-11607, DE 942, as an example of a trademark license being assigned through an auction and sale under Sections 363 and 365 of the Bankruptcy Code. Putting aside that a disclosure statement is hardly binding authority on this Court, the issue before the court in that case was whether a trademark license was validly terminated pre-petition and thus whether the license was considered part of the debtor's estate.

the Responsible Person's estoppel argument fails.  *See K. Bell & Assocs., Inc. v. Lloyd's*

*Underwriters*, 827 F. Supp. 985, 989 (S.D.N.Y. 1993) (noting that party seeking protection under

doctrine of equitable estoppel must establish, among other things, a "lack of knowledge of the

true facts").[4]

Of course, under all circumstances, evidence of the months of unsuccessful attempts to

market the license and the viability of the license, cannot be excluded.  The Responsible Person

cannot have the Court blind itself to the facts.

The Responsible Person also argues that Studio IP never would have withheld its consent

to any proposed assignment because it would have "ruined" the Rocawear brand for which the

Iconix Defendants paid over $200 million.  (Signature Opp. Br., DE 162, at p. 40.)  This

speculation is nonsense.  The $207 million that Iconix Brand Group paid in 2007 was to acquire

all the rights to the Rocawear brand, not just the limited rights to the junior sportswear market

granted to Signature in the Signature License Agreement.  Indeed, as of September 2009, there

were 25 other active Rocawear licenses in addition to the Signature License Agreement.  (Cogan

Decl., DE 140-30, at Ex. 28 (Volkman's Expert Report), at Ex. 1.)  Clearly, the success of the

Rocawear brand did not rise and fall with this one license.

The Responsible Person also argues that because Studio IP consented to the new license

with Roc Fashions it would have consented to any assignment.  (Signature Opp. Br., DE 162, at

pp. 22.)  But this argument ignores that the Iconix Defendants only entered into a new license

with Roc Fashions because Roc Fashions had experience in the apparel industry as they were a

licensee of the Dereon brand.  (Charles Azrak Tr., DE 142-19, at 14:23-15:10; 31:14-22.)  And,

---

[4] None of the cases the Responsible Person cites in support of its estoppel argument involve a situation, like here, where the party seeking estoppel was imputed with the very knowledge it claims was fraudulently represented or omitted.

15

importantly, Roc Fashions already had relationships with the Petitioning Creditors that would allow them to get the Rocawear-branded merchandise out of the factories and into the stores. (Charles Azrak Tr., DE 142-19, at 77:15-81:14.) The Iconix Defendants were never prepared to and would not now give a license to just anyone. Consent to one not qualified to properly exploit the trademark would have hurt the brand more.

The Responsible Person's argument that it lost out on the opportunity to have a court supervised auction—which he implies would have resulted in another entity coming out of nowhere and expressing interest in the Rocawear brand—ignores the reality that despite Signature trying for months to find a new licensee or investor, no one was interested. Roc Fashions was the only viable option. (*See* Iconix Defendants Moving Br., DE 140-1, at pp. 6-7.)

Lastly, as explained in the Iconix Defendants' previous papers, the Responsible Person's argument that Signature could have assumed the Signature License Agreement and continued to exploit its rights for the 15 months remaining on its term is disingenuous and contradicted by the evidence that Signature was in a distressed financial condition and owed more than $7.4 million to Studio IP, which would have had to be paid under Bankruptcy Code Section 365. (*See* Iconix Defendants Opp. Br., DE 160, at pp. 17-18.) Indeed, Christopher Laurtia acknowledges in his opposition brief that Signature's "continued performance under the Licensing Agreement was a factual impossibility." (Christopher Laurita Opp. Br., DE 170-2, pp. 3-4.)

## VI.    THE RESPONSIBLE PERSON HAS NOT AND CANNOT ESTABLISH THAT SIGNATURE SUFFERED ANY DAMAGES

The Iconix Defendants demonstrated in their moving papers that the Responsible Person cannot establish damages because the Signature License Agreement had no value as of September 15, 2009. (*See* Iconix Defendants Moving Br., DE 140-1, at pp. 22-26.) The

Responsible Person does not dispute that the Signature License Agreement had no value, nor can

he since his own expert ascribed no value to the Signature License Agreement for the purposes

of Signature's solvency analysis in the related adversary proceeding captioned *Signature Apparel

Group LLC v. Joseph Laurita, et al.*, No. 10-ap-1047 (Bankr. S.D.N.Y.).[5]  (*See* Cogan Decl., DE

140-34, at Ex. 32 (Bonora's Solvency Report).)

The Responsible Person acknowledges that its damage theory is not based on the fair

market value of the Signature License Agreement.  Instead, the Responsible Person claims

Signature's damages are the amount of royalties and fees that Roc Fashions agreed to pay Studio

IP under its new and different license agreement.  The Responsible Person relies on *Schonfeld v.

Hilliard*, 218 F.3d 164 (2d Cir. 2000), but *Schonfeld* is distinguishable from the instant case.

In *Schonfeld*, the Second Circuit reversed the district court's finding that the plaintiff

failed to establish consequential damages, in that case the market value of an income producing

asset, for a breach of contract claim.  218 F.3d at 179-180.  The court reached this holding

because the plaintiff had introduced a sale contract showing an agreed upon price for *the exact

same* television programming rights, a 20-year license from the BBC to distribute its news and

information programming in a 24-hour format, that the plaintiff alleged it lost as a result of the

defendants' breach.  *Id*.  In reaching its holding, the court noted that in proving the consequential

---

[5] The Responsible Person claims that the fact that his expert ascribed no value to the Signature License Agreement in the solvency analysis is irrelevant in this case because the solvency analysis did not calculate economic damages, which "include[s] both the Roc Fashions License Agreement and various Signature assets…."  (Signature Opp. Br., DE 162, at p. 5 fn. 4.)  But the Responsible Person's damages calculation of $18,837,500 is only based on what Roc Fashions agreed to pay to Studio IP for the Rocawear brand and what Roc Fashions agreed to pay to New Star, Christopher Laurita's new entity, for consulting services.  There is no component of the Responsible Person's damages calculation for "various Signature assets."  Because Signature did not suffer any actual damages, the Responsible Person seeks to avoid an actual damages analysis by claiming that the damages, if any, should be quantified by adding up the potential future royalties and fees to be paid to Studio IP for its license to use the Rocawear brand.  This makes no sense.

damages, *i.e.*, the market value of an income producing asset, a recent sale price for the asset can be the "best evidence." *Id*. at 178-179.

Unlike in *Schonfeld*, however, the new license that Roc Fashions received was not the same license that Signature had. Indeed, the new license with Roc Fashions had a longer term and different royalty and advertising rates.

Here, Signature—even if it first cured the $7.4 million default—never had any rights beyond the 15 months remaining on its term. As explained in the Iconix Defendants' previous papers, the Responsible Person's damages theory incorrectly presumes that Signature would have been entitled to keep all the royalty payments made by Roc Fashions as if it were the owner of the Rocawear brand. (*See* Iconix Defendants Moving Br., DE 140-1, at pp. 26-28; *see also* Iconix Defendants Opp. Br., DE 160, at pp. 22-24.) That simply is not the case. At most, Signature would be entitled to damages for the lost opportunity of the remaining 15 months of its term, which as calculated by the Iconix Defendants' expert, James W. Volkman, had no value as of September 15, 2009, because there was a $7.4 million cure.[6] (Cogan Decl., DE 140-30, Ex. 28 (Volkman Expert Report) at p. 15.)

Because the Responsible Person fails to identify any actual damages suffered by Signature as a result of the Signature License Agreement's alleged improper termination, each of the Responsible Person's eight state law causes of action should be dismissed.[7]

---

[6] While the Responsible Person argues that Mr. Volkman's "opinion does not constitute anything remotely like an uncontested material fact" (Signature Opp. Br., DE 162, at p. 4), the Responsible Person cites no contrary evidence in the record valuing the fair market value of the Signature License Agreement. Indeed, as set forth in the Iconix Defendants' *Daubert* motion, the Responsible Person's expert admits that he did not calculate the fair market value of the Signature License Agreement. (DE 141-1 at p. 16.)

[7] As set forth in the Iconix Defendants' opposition to Signature's motion for summary judgment, because there was no breach of fiduciary duty by the Iconix Defendants, and the Responsible Person merely asserts ordinary tort causes of action, disgorgement is not an appropriate remedy. (Iconix Defendants Opp. Br., DE 160, at pp. 24-25.) Even assuming that disgorgement was an appropriate remedy (which it is not), the amount to be disgorged "must be

## VII.    THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S BREACH OF CONTRACT CLAIM (COUNT VI) BECAUSE THEY DID NOT IMPROPERLY TERMINATE THE SIGANTURE LICENSE AGREEMENT

The Responsible Person argues that the Iconix Defendants are not entitled to summary judgment on his breach of contract claim because no written notice of termination was sent and that "any oral or informal post-Petition 'agreement' to terminate the Signature Rocawear License Agreement…would be ineffective."  (Signature Opp. Br., DE 162, at pp. 11-12.)  As explained in the Iconix Defendants' opposition papers, the Responsible Person's arguments fail as a matter of law.

First, under Section 20(a) of the Signature License Agreement, termination by written notice was an *option* that Studio IP could pursue in the case of default by Signature, but did not preclude termination by agreement.  (*See* Iconix Defendants Opp. Br., DE 160, at p. 28.)

Second, because "Debtor's continued performance under the Licensing Agreement was a *factual impossibility*," Signature repudiated the Signature License Agreement and the Iconix Defendants were relieved from having to send a written notice of termination. [8]  (Christopher Laurita's Opp. Br., DE 170-2, at pp. 3-4, 12-15 (emphasis supplied); *see also* Iconix Defendants Opp. Br., DE 160, at pp. 29-30.)

---

casually connected to the violation."  *Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb, Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990).  Therefore, the Responsible Person would only be able to disgorge the ill-gotten gains that flowed from the Iconix Defendants' alleged actions taking the corporate opportunity from Signature to assume and assign the Signature License Agreement.  But because the license had no value, the Iconix Defendants did not derive any ill-gotten gains from any improper termination and taking of the valueless Signature License Agreement.

Because Signature did not suffer any actual damages, the Responsible Person's claim for disgorgement is nothing more than an improper attempt to hold the Iconix Defendants in contempt and to seek an award of punitive damages.

[8] All the cases cited by the Responsible Person in support of his argument that Studio IP breached the Signature License Agreement by not sending a written notice of termination are distinguishable from the facts here because each case involved a unilateral termination.  (*See* Signature Opp. Br., DE 162, at pp. 12-13.)  There is no evidence that Studio IP unilaterally took action to terminate the Signature License Agreement.

19

Third, because after Signature's repudiation both parties orally agreed that the Signature License Agreement should be terminated and acted accordingly, the parties' agreement is not made ineffectual by the no oral modification clause in the contract.[9] (*See* Iconix Defendants Opp. Br., DE 160, at pp. 30-32.)

Finally, the Responsible Person—who stands in the shoes of Signature and is bound by its prior actions—cannot argue that Studio IP should be held liable for breach of contract, when Signature itself repudiated the contract and consented to the arrangement with Roc Fashions. (*See* Iconix Defendants Opp. Br., DE 160, at p. 32 (discussing reliance as it relates to an oral modification).)

The Responsible Person attempts to create an issue of fact with respect to Signature's and Studio IP's agreement by arguing that the Lauritas testified that they did not agree to terminate the license, but "were told by 'attorneys' that the Agreement had been terminated." (Signature Opp. Br., DE 162, at p. 19.)  The testimony of Christopher Laurita and Joseph Laurita that the Responsible Person cites shows that they were uncertain who told them that the agreement had been terminated.  In particular, when asked if Signature's attorneys at Riker Danzig informed him that the license was terminated, Christopher Laurita testified "[t]hey may have told me, I

---

[9] The Responsible Person argues that any oral agreement is also proscribed by Section 15-301(4) of New York's General Obligation Law.  Section 15-301(4) provides that: "If a written agreement or other written instrument contains a provision for termination or discharge on written notice by one or either party, the requirement that such notice be in writing cannot be waived except by a writing signed by the party against whom enforcement of the waiver is sought or by his agent."  However, the Court of Appeals has stated that this Statute of Frauds only nullifies "'executory' oral modification.  Once executed, the oral modification may be proved."  *Rose v. Spa Realty Assocs.*, 42 N.Y.2d 338, 343 (1977).  Indeed, when "the oral agreement to modify has been acted upon to completion" or where there is partial performance of the oral modification that is "unequivocally referable to the oral modification" the requirements of a writing under section 15-301 may be avoided.  *Id.* at 343-344.  The Court of Appeals further noted that, if a party has induced another to rely upon an oral modification, that party may be estopped from invoking the statute to bar proof of that oral modification.  *Id*. at 344.  As discussed in the Iconix Defendants' opposition brief, Signature and Studio IP orally agreed to terminate the Signature License Agreement and acted to completion upon that oral agreement.  (*See* Iconix Defendants Opp. Br., DE 160, at pp. 30-32.)  And because Studio IP relied upon Signature's oral agreement to terminate when it entered into the new license with Roc Fashions, the Responsible Person, who stands in Signature's shoes, is estopped from arguing that Section 15-301(4) of the General Obligation Law voids the oral agreement.  (*See* Iconix Defendants Opp. Br., DE 160, at p. 32.)

don't remember." (Holloman Decl., DE 142-19, Ex F. (Christopher Laurita Tr.) at 407:13-18;
*see* also Holloman Decl., DE 142-19, Ex. H (Joseph Laurita Tr.) at 357:12-14 (stating that he did
not recall the basis for his understanding that the license had been terminated).)  The Responsible
Person's argument is also plainly contradicted by Joseph Schwartz's testimony in which he
recalled "having a number of conversations with the two Laurita brothers, Christopher and
Joseph.  They advised me that the license had been terminated." (Holloman Decl., DE 142-19,
Ex. I (Joseph Schwartz  Tr.) at 13:10-16.)

    The Responsible Person also attempts to create a fact issue by arguing that "the post-
Petition decision to proceed with the termination…began and ended with GC Tarshis on behalf
of the Iconix Defendants." (Signature Opp. Br., DE 162, at p. 19.)  Such an argument is also not
supported by the evidence the Responsible Person cites.  Mr. Schwartz only testified that he
recalled Iconix telling him that the Signature License Agreement had been terminated.
(Holloman Decl., DE 142-19, Ex. I (Joseph Schwartz  Tr.) at 123:7-124:3.)  Signature's own
bankruptcy counsel was fully aware of the status of written notices under the Signature License
Agreement, and noted in an e-mail that only a notice of default has recently been sent.  (*See*
Holloman Decl., DE 142-6, Ex. 44.)

    Finally, the Responsible Person's argument that the Lauritas' testimony contradicts the
Iconix Defendants' argument that Signature agreed to voluntarily give up the Signature License
Agreement is also not supported by the testimony cited.  In the cited portions of Christopher
Laurita's testimony, he does not state that Signature did not abandon the license.  Rather, he
responds to Olshan's questions by stating "I don't know what you're referring to or where you're
going with this, but I'm a little—I don't remember.  Or I don't know what you're talking about;
you're confusing me." (Holloman Decl., DE 142-19, Ex F. (Christopher Laurita Tr.) at 409:3-

15.)  Similarly, the referenced portion of Joseph Laurita's testimony in response to a question

about abandonment of the license merely states that he "doesn't understand the question."

Holloman Decl., DE 142-19, Ex. H (Joseph Laurita Tr.) at 350:12-25.)

The Responsible Person's mischaracterization of deposition testimony does not create an

issue of fact sufficient to deny the Iconix Defendants summary judgment.

## VIII.  THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S FRAUD (COUNT I) AND NEGLIGENT MISREPRESENTATION (COUNT II) CAUSES OF ACTION

The Responsible Person argues that the two December 2009 Objections filed by the

Creditors' Committee are false representations because each Objection states that the Signature

License Agreement was terminated by agreement of the parties "pre-Petition" when the

termination occurred after the Involuntary Petition was filed.  (Signature Opp. Br., DE 162, at

p. 32.)  The Responsible Person further argues that because the Objections were filed after

soliciting information from the Iconix Defendants' counsel, Blank Rome, that such statements

are attributable to the Iconix Defendants.  (Signature Opp. Br., DE 162, at p. 32.)  However, the

evidence cited by the Responsible Person, which is a December 4, 2009 e-mail from Andrew

Eckstein, Esq. of Blank Rome to Olshan (who at this point was representing the Creditors'

Committee), only states that the Signature License Agreement had been terminated—which it

had by agreement of the parties.  (*See* Holloman Decl., DE 142-14, Ex. 98.)  The Responsible

Person cites no evidence that Blank Rome or the Iconix Defendants ever represented that the

Signature License Agreement had been terminated pre-Petition.  There is also no evidence that

Olshan sought comments from or sent a draft of the Objections to anyone prior to filing them.

The Responsible Person then argues that the statement in the Disclosure Statement and

the Amended Disclosure Statement that "[p]rior to the Petition Date, and pursuant to the terms

22

[of the Signature License Agreement], Iconix terminated the [Signature License Agreement] with the Debtor" is a false statement by the Iconix Defendants.  The Responsible Person's argument is wrong for all of the following reasons:

- The Responsible Person does not deny that the Iconix Defendants did not draft or revise the Disclosure Statement or the Amended Disclosure Statement and that these documents were filed by Olshan along with the debtor's counsel.

- As explained in the Iconix Defendants' opposition papers, the "Petition Date" was defined in the Amended Plan (which accompanied the Amended Disclosure Statement) as "November 13, 2009, which is the date that the case was converted to a Chapter 11 case."  (*See* Iconix Defendants Opp. Br., DE 160, at pp. 33-34.) Accordingly, the Responsible Person's argument that Iconix Brand Group, as a member of the Creditors' Committee, made an affirmative misrepresentation based upon a definition of "Petition Date" that has different definitions falls short.

- The Responsible Person argues that Iconix Brand Group—and not Olshan who drafted the statements as counsel to the Creditors' Committee along with the debtor's counsel—is liable for any misstatements in the Disclosure Statement and the Amended Disclosure Statement under the principles of agency because Olshan, as the agent of the Creditors' Committee, was not aware that a written notice of termination had not been sent but was relying on information provided by Iconix Brand Group.  (Signature Opp. Br., DE 162, at p. 33.)  This argument has no merit because, as explained, the information provided to Olshan by Blank Rome on Iconix Brand Group's behalf was simply that the agreement had been terminated.  (*See* Holloman Decl., DE 142-14, Ex. 98.)  The Iconix Defendants

23

never represented that the Signature License Agreement was terminated pre-
Involuntary Petition or that a written notice of termination was sent.

The Responsible Person also argues that Iconix Brand Group, as a member of the
Creditors' Committee, owed a fiduciary duty to the creditors and was "forbidden from making or
countenancing material statements or omissions of facts and information that would tend to make
other statements, [sic] incorrect, misleading or false."  (Signature Opp. Br., DE 162, at p. 34.)
The sole case relied upon by the Responsible Person, *In re Map Int'l, Inc.*, 105 B.R. 5 (Bankr.
E.D. Pa. 1989), does not stand for the proposition that, as a member of the Creditors' Committee,
Iconix Brand Group had a duty to correct statements made by others in a disclosure statement.
That case only stands for the uncontested principle that a member of a creditors' committee may
not use its position on the committee to advance its own interests to the detriment of the other
creditors.  *Id*. at 6.

Accordingly, the Iconix Defendants are entitled to summary judgment on the Responsible
Person's fraud and negligent misrepresentation claims because: (i) the Iconix Defendants did not
make any affirmative false misrepresentation concerning the status of the Signature License
Agreement; (ii) as explained in the Iconix Defendants' previous papers, the Iconix Defendants
had no affirmative fiduciary duty to disclose any information to Signature or its estate; and
(iii) the Responsible Person could not have justifiably relied on any statement because he stands
in the shoes of Signature who knew the status of the license.  (*See* Iconix Defendants Opp. Br.,
DE 160, at pp. 32-37.)

24

## IX.   THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S TORTIOUS INTERFERENCE WITH CONTRACT CLAIM AGAINST ICONIX BRAND GROUP (COUNT VII)

As set forth in the Iconix Defendants' moving and opposition papers, the Responsible Person's tortious interference cause of action fails as a matter of law because the Responsible Person does not have a viable claim for breach of the Signature License Agreement.  (*See* Iconix Defendants Moving Br., DE 140-1, at pp. 34-35; *see also* Iconix Defendants Opp. Br., DE 160, at pp. 38-40.)

But even assuming that there was a breach of the Signature License Agreement, Iconix Brand Group is still entitled to summary judgment.  In its opposition, the Responsible Person raises the same arguments that he made in his motion for summary judgment:  that the Iconix Defendants were "'willing to take the risk that the license was terminated' without a written notice of termination, so that it could install ROC Fashions as a new licensee and ensure that there was no disruption to the Rocawear brand" and so as not to "ruin" the brand for which it had paid over $200 million to obtain in 2007.[10]  (Signature Opp. Br., DE 162, at pp. 40-41.)  The Responsible Person's speculation as to a possible motive why Iconix Brand Group may have wanted to terminate the contract is a far cry from admissible evidence showing that Iconix Brand Group intentionally procured Studio IP's breach of the Signature License Agreement.

Under all circumstances, as explained in the Iconix Defendants' opposition to Signature's motion for summary judgment (DE 160 at pp. 39-40), the Responsible Person's tortious interference cause of action fails because Iconix Brand Group's actions are protected by the economic interest defense, which is available where a defendant and a breaching party have a

---

[10] The Responsible Person's claim that Iconix Brand Group paid over $200 million for the Rocawear Rights is addressed above in Section V.  And the discussion concerning the Responsible Person's "take the risk" argument is addressed above in Section III and in the Iconix Defendants' previous papers.  (*See* Iconix Defendants Opp. Br., DE 160, at p. 39 fn. 15.)

parent-subsidiary relationship and the parent "acted to protect its own legal or financial stake in the breaching party's business." *See White Plains Coast & Apron Co.*, 8 N.Y.3d 422, 426 (2007).

Finally, the Responsible Person's tortious interference claim is barred by the 3-year statute of limitations governing such claims. *See Kamanou v. Exec. Secy. of the Comm'n of the Econ. Cmty*, 2012 U.S. Dist. LEXIS 7647, at *26 (S.D.N.Y. Jan. 19, 2012) (citing N.Y. CPLR 214(4) ("Under New York law, a claim for tortious interference with contract is governed by a three-year Statute of limitations, which begins when the contract in question has been breached."

## X.     THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S AIDING AND ABETTING BREACH OF FIDUCIARY DUTY CAUSE OF ACTION (COUNT IV)

The Responsible Person argues that the Iconix Defendants aided and abetted the Lauritas' breach of fiduciary duties to Signature. As set forth in Christopher Laurita's opposition brief, Christopher Laurita did not breach any fiduciary duty to Signature or its estate. (*See* Christopher Laurita's Opp. Br., DE 170-2, at pp. 16-29.) Because there was no breach of fiduciary duty by Signature's principal, the Responsible Person's aiding and abetting claim against the Iconix Defendants fails.

Even assuming *arguendo* that there was a breach of fiduciary duty by Signature's principals, the aiding and abetting claim still fails. To the extent that the Responsible Person bases his claim on the alleged breach of fiduciary duty by Christopher Laurita because he entered into a consulting agreement with Roc Fashions, the Iconix Defendants had no knowledge of such agreement. The Responsible Person relies on draft term sheets that were never agreed to. The drafts, which were copied to the Iconix Defendants, indicated that in a different structural transaction, the Lauritas were hoping to have a consulting relationship with the new licensee.

26

And, given the fact that this transaction never occurred, being copied on a memo falls far short of showing by admissible evidence that the Iconix Defendants *substantially assisted* in any breach of fiduciary duty.

Nor, as the Responsible Person claims, did the Iconix Defendants' insist that Christopher Laurita have a consulting relationship with Roc Fashions as part of its agreement to enter into a new license. The Responsible Person's sole "evidence" is an affidavit Charles Azrak gave as part of the Roc Defendants' settlement in this action. The affidavit merely states that the Iconix Defendants "strongly suggested to us that…it was important that we include Christopher Laurita in our Rocawear business." (Signature Moving Br., DE 142-21, at p. 57.) This is a far cry from the Iconix Defendants insisting that any deal with Roc Fashions required the inclusion of Christopher Laurita. There is no evidence that any drafts of any consulting agreement (or the final agreement) were ever sent to or their terms discussed with the Iconix Defendants. The fact is, Christopher Laurita's and Roc Fashions' consulting agreement was agreed to after the Roc Fashions License Agreement was entered into. Clearly, the Iconix Defendants could not have insisted that any new license deal required Christopher Laurita's involvement if the actual deal reached was closed without his involvement.[11]

Accordingly, the Iconix Defendants are entitled to summary judgment on the Responsible Person's aiding and abetting claim.

---

[11] The Responsible Person's additional arguments, that the Iconix Defendants were involved in the alleged post-Involuntary Petition termination of the Signature License Agreement and that as a member of the Creditors' Committee concealed the status of the Signature License Agreement, have no merit. As discussed in this memorandum, and in the Iconix Defendants' previous papers, there was no improper termination of the Signature License Agreement and the Iconix Defendants did not conceal that no written notice of termination had not been sent.

27

## XI.   THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S CONVERSION (COUNT VIII) AND UNJUST ENRICHMENT (COUNT IX) CAUSES OF ACTION

The Responsible Person argues that the Iconix Defendants "exercised unauthorized dominion over the Rocawear Rights, to the exclusion of Signature's rights and to [the] detriment of Signature's estate and its creditors." (Signature Opp. Br., DE 162, at p. 41.)  As set forth in the Iconix Defendants' moving brief, there was no taking in derogation of Signature's rights. (Iconix Defendants Moving Br., DE 140-1, at pp. 35-36)  Indeed, the evidence has shown that Signature repudiated and then voluntarily agreed to terminate the Signature License Agreement. The Responsible Person cannot ignore Signature's actions with respect to the Signature License Agreement, but must live with the consequences of Signature's decisions to repudiate the contract and to agree to its termination.

The Responsible Person's unjust enrichment and conversion claims fail for the additional reason that they are duplicative of the Responsible Person's breach of contract claim since they both seek recovery based upon the alleged improper termination of the Signature License Agreement.  (Iconix Defendants Opp. Br., DE 160, at pp. 42-45.)

## XII.   THE ICONIX DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE RESPONSIBLE PERSON'S CIVIL CONSPIRACY CAUSE OF ACTION (COUNT V)

The Responsible Person does not dispute that "New York does not recognize an independent cause of action for conspiracy to commit a civil tort." *Abacus Fed. Sav. Bank v Lim*, 905 N.Y.S.2d 585, 588 (1st Dep't 2010); *see also Stokes v. Lusker*, 425 Fed. Appx. 18, 22 (2d Cir. 2011) (affirming dismissal of civil conspiracy because "New York state law does not recognize an independent tort of conspiracy, and because no underlying primary tort supports plaintiff's claim").   Because the Responsible Person has failed to establish that the Iconix

28

Defendants are liable for any independent tort, the Iconix Defendants are entitled to summary

judgment as a matter of law dismissing the Responsible Person's civil conspiracy claim.

## <u>CONCLUSION</u>

For all the reasons set forth above, this Court should grant summary judgment in favor of

the Iconix Defendants and against Plaintiff dismissing the Amended Complaint in its entirety

against Iconix Brand Group and Studio IP, and grant any such other and further relief as this

Court deems just and proper.


Dated: October 28, 2014                    **BLANK ROME LLP**


                                           By: */s/ Harris N. Cogan*_____
                                                Harris N. Cogan
                                                Andrew T. Hambelton
                                           The Chrysler Building, 405 Lexington Avenue
                                           New York, NY 10174-028
                                           (212) 885.5000

                                           *Attorneys for Defendants Iconix Brand
                                           Group, Inc. and Studio IP Holdings LLC*


29