UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

*In re:*                                              :

                                                      :        Chapter 11

SIGNATURE APPAREL GROUP LLC,                          :

                                                      :        Case No. 09-15378 (RG)

        *Debtor*                                      :

------------------------------------------------------------------ x

SIGNATURE APPAREL GROUP LLC,                          :

                                                      :

        *Plaintiff*                                   :

                                                      :

*v.*                                                  :

                                                      :

JOSEPH LAURITA; CHRISTOPHER                           :
LAURITA; NEW STAR GROUP, LLC; ROC                     :
FASHIONS LLC; RVC ENTERPRISES, LLC;                   :
RUBEN AZRAK, VICTOR AZRAK, CHARLES                    :
AZRAK, ICONIX BRAND GROUP, INC., and                  :
STUDIO IP HOLDINGS LLC,                               :

                                                      :        Adversary No. 11-02800 (RG)

        *Defendants*                                  :

------------------------------------------------------------------ x

ROC FASHIONS LLC,                                     :

                                                      :

        *Third-Party Plaintiff*                       :

                                                      :

*v.*                                                  :

                                                      :

STUDIO IP HOLDINGS LLC,                               :

                                                      :

        *Third-Party Defendant*                       :

------------------------------------------------------------------ x

**MEMORANDUM OPINION (A) GRANTING IN PART AND
DENYING IN PART THE PARTIES' CROSS-MOTIONS FOR
SUMMARY JUDGMENT AND (B) DENYING THE DEFENDANTS'
*DAUBERT* MOTION**

<u>**A P P E A R A N C E S :**</u>

OLSHAN FROME WOLOSKY LLP
Park Avenue Tower
65 East 55th Street
New York, New York 10022
<u>By:</u>    Kyle C. Bisceglie, Esq.
        Ellen V. Hollomon, Esq.
        Renee M. Zaytsev, Esq.

*Attorneys for Signature Apparel Group LLC, by its Responsible Person, Anthony Labrosciano*

BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
<u>By:</u>    Harris N. Cogan, Esq.
        Andrew T. Hambelton, Esq.

*Attorneys for Defendants Iconix Brand Group, Inc. and Studio IP Holdings LLC*

SEIDMAN & PINCUS LLC
777 Terrace Avenue
Suite 508
Hasbrouck Heights, New Jersey 07604
<u>By:</u>    Mitchell B. Seidman, Esq.
        Andrew Pincus, Esq.
        Jeffrey A. Kramer, Esq.

*Attorneys for Defendants Christopher Laurita and New Star Group, LLC*

**The Honorable Robert E. Grossman**
**United States Bankruptcy Judge**

In September 2009, the Debtor was facing significant financial pressures. It owed more

than $7.4 million to its licensor under a license agreement to produce Rocawear-branded

sportswear apparel. Despite a months-long search, it had been unable to secure new capital for

the business. In the face of the mounting financial pressures and on the eve of the deadline to

cure the defaults under the license agreement, certain of the Debtor's suppliers filed an

involuntary bankruptcy petition, initiating this bankruptcy case. By the time an order for relief

was entered, the Debtor's license agreement had been terminated. This adversary proceeding

arises out of the parties' differing interpretations of the circumstances surrounding the

termination.

According to the Plaintiff, the licensor feared that, if the license was deemed to be

property of the Debtor's estate and was therefore administered as part of the Debtor's bankruptcy

proceeding, this could hurt the value of the Rocawear brand. Recognizing the license had not

been terminated and that the automatic stay would prevent the licensor from sending a written

notice of termination, the licensor conspired with the Debtor's insiders to deem the license

agreement terminated. The Defendants then attempted to conceal their scheme by falsely

misrepresenting that the license had been terminated before the involuntary petition was filed.

The Plaintiff argues that these actions had the effect  of depriving the Debtor of millions of

dollars in value for no consideration.

Unsurprisingly, the Defendants offer a very different interpretation of the relevant facts.

According to the Defendants, before the involuntary petition was filed, the Debtor's business

was hopelessly failing. The Debtor  was unable to cure its defaults under the license, and its

search for an investor had proved fruitless. As there was no longer any value in maintaining the

license, the Defendants contend that the Debtor voluntarily gave up its rights to the Rocawear

brand and repudiated the license agreement. All of the parties who had an interest in the

transaction were fully aware of what was occurring; consequently, no one was defrauded and no

one was harmed.

Before the Court are the following motions: (1) cross-motions for summary judgment

with respect to each of the nine of the causes of action set forth in the Plaintiff's complaint and,

to the extent summary judgment is not granted, (2) a motion for a determination that the

testimony of the Plaintiff's proposed damages expert is inadmissible under the Supreme Court's

decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). For the reasons

set forth herein, the motions for summary judgment are granted in part and denied in part. The

*Daubert* motion is denied.

### Jurisdiction

The United States District Court for the Southern District of New York has subject-

matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This Court

exercises authority over the proceeding pursuant to 28 U.S.C. § 157 and the amended standing

order of reference signed by Chief District Judge Loretta A. Preska on January 31, 2012. This

matter is a core proceeding. *See AHT Corp. v. Bioshield Technologies, Inc. (In re AHT Corp.)*,

265 B.R. 379, 386 (Bankr. S.D.N.Y. 2001) (causes of action based upon postpetition conduct are

"necessarily and by definition" core proceedings).

### Background[1]

**I.    Factual Background**

**a.    The License Agreement**

Prior to the petition date, Signature Apparel Group LLC (the "Debtor") was a Delaware

limited liability company engaged primarily in the business of designing, manufacturing, and

distributing branded apparel. During all relevant time periods, the Debtor was controlled by

Defendants Joseph and Christopher Laurita (collectively, "Laurita Brothers"), who were the

founders and sole members of the Debtor.

---

[1]    Except where otherwise noted, the following facts are taken from the admissible evidence submitted by the
parties in connection with the motions before the Court.

In 2004, the Debtor acquired the right to manufacture and distribute juniors sportswear apparel bearing the Rocawear trademark by entering into a trademark license agreement (the "Signature License") with Rocawear Licensing, LLC ("Rocawear Licensing"). Pursuant to the Signature License, the Debtor acquired:

> an exclusive license/right . . . to use the trademark "ROCAWEAR" . . . in connection with the manufacture, distribution, promotion and sale of junior sportswear apparel including, but not limited to, all fabrications; tops, dresses, pants, jeans, skirts, jumpsuits, sweaters, and outerwear to be sold as a collection and not to individual departments; but excluding leather, suede, and faux fur sportswear and outerwear.

Signature License ¶ 1(a). The license permitted the Debtor's exclusive use of the rights for an initial term ending on December 31, 2007.

In exchange for the right to use the Rocawear trademark, the Debtor agreed to pay royalties and fees to the licensor and to comply with certain minimum sales requirements. In the event of a default by the Debtor, the license provides:

> [I]f th[e] default is not cured within thirty (30) business days or ten (10) business days for a default in payment, after written notice from Licensor to Licensee specifying th[e] default, then Licensor may terminate this Agreement effective immediately upon giving Licensee a written notice of termination at any time before the default has been cured.

*Id.* ¶ 20(a)(i). By written amendment dated December 1, 2006,[2] the Debtor and the licensor adjusted the minimum sales requirements, royalty rates, and advertising fees and extended the term of the license through the end of 2010. Thereafter, in 2007, Defendant Studio IP Holdings LLC ("Studio IP") succeeded Rocawear Licensing as the owner of the Rocawear trademark and the licensor under the Signature License.

---

[2]  The Signature License can only be modified in writing. Signature License ¶ 27 ("No modification or waiver of this Agreement shall be effective unless it is in writing and signed by the parties hereto.").

b.    <u>**The Termination**</u>

By 2009, the Debtor was experiencing severe financial difficulties and had defaulted on

its financial obligations under the Signature License. In early 2009, after the Debtor had suffered

several million dollars in net operating losses, the Laurita Brothers informed Studio IP that the

Debtor would need a new investor in order to continue its operations. In April 2009, with the

consent of Studio IP and its parent company, Iconix Brand Group, Inc. ("Iconix," together with

Studio IP, the "Iconix Defendants"), the Laurita Brothers began a search for a potential investor

for the business that would allow them to continue exploiting the Rocawear trademark. By

August 2009, the Laurita Brothers were in active negotiations with Ruben Azrak (on behalf of

himself and certain affiliates, the "Azraks") and representatives of Li & Fung, Ltd. ("Li &

Fung") concerning a potential transaction.

On August 14, 2009, while the Laurita Brothers were in negotiations with the Azraks and

Li & Fung, Iconix's general counsel emailed Christopher Laurita regarding the Debtor's default

under the Signature License:

> Know you guys have a lot going on, but wanted to give you a quick heads-up that
> we will be sending you a notice later today regarding the past due AD[3] and
> Roc[awear] royalties. We aren't terminating the licenses, but need (for legal and
> accounting) to document that the royalties are owed. This won't have any impact
> on the various deals that you are working on . . . .

Holloman Decl. Ex. 36.[4] Later that day, the Iconix Defendants issued a notice to the Debtor of its

default under the Signature License:

---

[3]  In this context, "AD" refers to "Artful Dodger" and the Debtor's obligations under a separate license agreement
between the Debtor and Iconix for the Debtor to design, manufacture, market, and sell sportswear apparel bearing
the Artful Dodger trademark. That license is not at issue in this proceeding.

[4]  "Holloman Decl." refers to the *Declaration of Ellen V. Holloman in Support of Plaintiff Signature Apparel Group
LLC's Motion for Summary Judgment*, No. 11-02800, ECF No. 142-3.

> This letter is to advise you that [the Debtor] is in default of its obligation under the [Signature License] to pay Guaranteed Minimum Royalty and Guaranteed Minimum Advertising Fees in the amount of $7,462,500.00 (the "Payments"). Pursuant to Paragraph 20 of the License Agreement, if the Payments (plus interest as specified) are not received within 10 business days of the date of this letter, Studio IP Holdings will have the right to terminate the License Agreement upon further notice (with no right to cure).

*Id.* Ex. 38. The Iconix Defendants later agreed to extend the Debtor's deadline to cure the default until noon on September 4, 2009.

After receiving the notice of default, the Laurita Brothers continued to negotiate with the Azraks and Li & Fung regarding a potential transaction. Although negotiations continued, no deal had been finalized by the morning of September 4. At 11:38 a.m. that morning, exactly 22 minutes before the noon deadline for the Debtor to cure its defaults under the Signature License, certain of the Debtor's suppliers filed an involuntary bankruptcy petition against the Debtor, initiating the above-captioned bankruptcy case. As of the time the involuntary petition was filed, it is undisputed that the Iconix Defendants had not sent written notice of termination as required by the Signature License.

Despite the fact that no written notice had been sent, the Iconix Defendants began treating the Signature License as having been terminated. On September 15, 2009, during the involuntary gap period,[5] Studio IP and Roc Fashions, LLC ("Roc Fashions"), an entity owned by the Azraks, entered into a new license agreement (the "Roc Fashions License") granting Roc Fashions rights that largely overlapped with the rights exclusively granted to the Debtor in the Signature License. In connection with the new license, Studio IP represented that the Signature License "ha[d] been effectively terminated" and was "of no further force and effect." Roc

---

[5] The "gap period" refers to the time period between the filing of an involuntary petition and the entry of an order for relief. *In re Euro-Am. Lodging Corp.*, 357 B.R. 700, 726 n.20 (Bankr. S.D.N.Y. 2007).

Fashions License ¶ 26(c). Studio IP also agreed to indemnify the new licensee against "any claim or allegation that [the Signature License] was not properly and effectively terminated." *Id.* ¶ 21.2(iv).

After entering into the new license, Roc Fashions entered into a consulting agreement with Christopher Laurita and his company, New Star Group, LLC ("New Star"). From the time the involuntary petition was filed, Christopher Laurita, New Star, and the Iconix Defendants were paid a total of more than $15 million in connection with the Roc Fashions License. None of that money was ever paid to the Debtor or the estate.

c.    **The Alleged Cover-Up**

At various points throughout the bankruptcy case, certain of the Defendants purported to describe or characterize the termination of the Signature License. For example, on December 7, 2009, the Official Committee of Unsecured Creditors (the "Committee"), of which Iconix was a member, filed a limited objection to certain of the Debtor's first-day motions (the "First-Day Objection"). In reference to the termination of the Signature License, the First-Day Objection states: "When it became clear that the Debtor could no longer perform its obligations under the [Signature License], the Debtor and Iconix agreed to terminate the license[ ]." First-Day Obj. ¶ 2, No. 09-15378, ECF No. 48.

In another instance, on April 1, 2010, the Debtor and the Committee jointly proposed a plan of liquidation for the Debtor. In the disclosure statement and amended disclosure statement that were filed in support of the plan (collectively, the "Disclosure Statement"), the proponents state: "[P]rior to the Petition Date, and pursuant to the terms of the [Signature License] agreement, Iconix terminated the [Signature License] . . . ." Discl. Stmt. ¶ (III)(A), No. 09-15378, ECF No. 94; Am. Discl. Stmt. ¶ (III)(A), No. 09-15378, ECF No. 108. Christopher

Laurita's affidavit in support of confirmation of the plan (the "Confirmation Affidavit") describes the termination the same way: "[P]rior to the Petition Date, and pursuant to the terms of the [Signature License] agreement, Iconix terminated the [Signature License] . . . ." Confirm. Aff. ¶ 4, No. 09-15378, ECF No. 128.

On July 1, 2010, the Court entered an order confirming the plan and appointing Anthony Labrosciano as the Debtor's "Responsible Person." At the time he was appointed, the Responsible Person did not know all of the facts regarding the termination of the Signature License, including the fact that a written notice of termination had never been sent:

> At the time of my appointment, I had no knowledge that the [Signature License] had not been properly terminated . . . . To the contrary, I believed, based on representations made by Iconix and the Laurita Brothers in various filings that they had made with this Court, that the Agreement had been terminated prepetition (i.e., prior to the filing of the involuntary petition on September 4, 2009) and pursuant to its terms (i.e., with a written notice of termination), and was not an asset of the estate at any time before the Plan was confirmed.

Labrosciano Decl. ¶ 3.[6] It was not until nearly two years after he was appointed that the Responsible Person first learned that the license had not been formally terminated before the involuntary petition was filed. *Id.* ¶ 4.

## II.   **Procedural History**

On November 30, 2010, the Responsible Person filed a complaint against various members of the Laurita family, initiating the adversary proceeding captioned *Signature Apparel Group LLC v. Joseph Laurita, et al.*, No. 10-04027 (the "Laurita Adversary Proceeding"). On November 3, 2011, the Responsible Person filed a complaint against Roc Fashions; its parent company, RVC Enterprises, LLC; and certain of the Azraks (collectively, the "Roc Fashions

---

[6]   "Labrosciano Decl." refers to the *Declaration of Anthony Labrosciano in Support of Plaintiff Signature Apparel Group LLC's Motion for Summary Judgment*, No. 11-02800, ECF No. 142-2.

Defendants") initiating the above-captioned adversary proceeding. Although the Responsible

Person had not yet learned all of the circumstances surrounding the termination of the Signature

License, both adversary proceedings asserted claims arising out of the apparent transfer of the

Rocawear rights to Roc Fashions.

After the Responsible Person learned that the Signature License had not been formally

terminated before the involuntary petition was filed, he sought to amend the complaint in this

adversary proceeding to add Iconix and Studio IP as defendants and to assert new claims based on

the allegedly-wrongful termination. He also sought to combine certain claims from the Laurita

Adversary Proceeding with the claims asserted in this proceeding so that all of the Plaintiff's

claims concerning the termination of the Signature License and the transfer of the Rocawear

rights could be asserted in a single action.

By order dated July 3, 2013, the Court permitted the Responsible Person to file a first

amended complaint in this adversary proceeding (the "Amended Complaint"). As set forth in the

Amended Complaint, the Plaintiff alleges that the Laurita Brothers, the Roc Fashions Defendants,

the Iconix Defendants, and New Star (collectively, the "Defendants")[7] conspired to deem the

Signature License terminated without proper notice and in violation of the automatic stay and to

conceal the material facts surrounding the transaction from the Court and the Responsible Person.

As a result of the termination, the Defendants allegedly received millions of dollars in value to

which the Debtor was rightfully entitled. The Amended Complaint asserts the following causes of

action: (1) fraud; (2) negligent misrepresentation; (3) breach of fiduciary duty; (4) aiding and

---

[7]   The Plaintiff has settled with the Roc Fashions Defendants and Joseph Laurita, leaving Christopher Laurita, New
    Star, and the Iconix Defendants as the only active Defendants.

abetting breach of fiduciary duty; (5) conspiracy; (6) breach of contract; (7) tortious interference with contract; (8) conversion; and (9) unjust enrichment.

On September 4, 2014, the Iconix Defendants filed a motion for summary judgment, which Christopher Laurita and New Star later joined. According to the Defendants, there is no genuine dispute that, at the time the involuntary petition was filed:

> [T]he license had really been terminated in everybody's mind in the sense that the Lauritas had basically notified [the Iconix Defendants] that they were no longer fulfilling their obligations, or they were not in a position to fulfill their obligations under the license and they were looking to find a replacement.

Cogan Decl. Ex. 13.[8] Although no written notice of termination was provided, the termination was nevertheless effective based on the Debtor's prior, unequivocal repudiation of the agreement. In addition, since the termination occurred during the gap period, it did not violate the automatic stay as set forth in § 303(f) of the Bankruptcy Code.

Moreover, the Defendants argue that the Debtor's participation in the termination of the license bars the Responsible Person from asserting claims based on the termination as a matter of law under the *in pari delicto* doctrine and the Second Circuit's decision in *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991). With respect to the Plaintiff's specific causes of action, the Defendants argue that each of the claims fails as a matter of law on its own merits and that the Plaintiff could not have suffered any damages from the termination because the license had no value to the estate at the time it was terminated. In the alternative, to the extent the Court denies summary judgment, the Defendants request that the Court preclude the

---

[8]   "Cogan Decl." refers to the *Declaration of Harris N. Cogan, Esq., in Support of Motion for Summary Judgment and* Daubert *Motion to Exclude the Report and Any Testimony of Plaintiff's Expert Witness*, No. 11-02800, ECF No. 140-3.

Plaintiff's proposed damages expert from testifying at trial pursuant to the Supreme Court's decision in *Daubert*.

The Plaintiff cross-moved for summary judgment. According to the Plaintiff, there is no genuine dispute that the termination did not comply with the terms of the license agreement, occurred while the automatic stay was in effect, and was deliberately concealed from creditors and the Court. Contrary to the Defendants' arguments, the Plaintiff alleges that the license was never repudiated by the Debtor. The Laurita Brothers were negotiating for the Debtor to keep the license up until the time the involuntary petition was filed. At that point, although the license was still in effect, the Laurita Brothers simply "acquiesced" to its termination in order to negotiate lucrative consulting agreements for themselves with the new licensee.

The Plaintiff also argues that, despite § 303(f) of the Code, the termination of the license violated the automatic stay and that, since the termination occurred postpetition, the *in pari delicto* doctrine and *Wagoner* rule do not apply. According to the Plaintiff, it has demonstrated its entitlement to judgment as a matter of law on each of its nine causes of action. The Plaintiff's motion seeks damages either for the value of the Signature License or for disgorgement of the Defendants' ill-gotten gains. In the alternative, to the extent the Court denies summary judgment, the Plaintiff argues that the attacks on its proposed expert testimony go to the weight of the evidence and should be reserved for the time of trial.

The Court heard argument on the motions on November 4, 2014, after which the matters were taken under advisement. This memorandum opinion constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

**Discussion**[9]

I.      **Summary Judgment**

      a.      **Legal Standard**

A motion for summary judgment should be granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a factual dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* The party seeking summary judgment bears the burden of establishing that no genuine issue of fact exists. *Id.* at 256. In considering cross-motions for summary judgment, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

      b.      **The Automatic Stay**

The Court begins its analysis with the effect of the automatic stay on the postpetition termination of the Signature License. It is beyond dispute that the filing of an involuntary petition gives rise to the automatic stay. *In re Flores*, 291 B.R. 44, 55 (Bankr. S.D.N.Y. 2003) ("When an involuntary petition is filed, the automatic stay is triggered automatically upon the filing of the petition . . . ."); *In re Grossinger*, 268 B.R. 386, 387 (Bankr. S.D.N.Y. 2001) ("[T]he mere filing of an involuntary petition invokes the automatic stay."). The stay takes effect immediately,

---

[9]   The parties submitted extensive legal memoranda raising numerous arguments in support of their respective positions. Many of the arguments raised become relevant only to the extent the Court makes certain predicate holdings. For purposes of this opinion, the Court addresses solely those arguments necessary to dispose of the motions.

rendering subsequent actions of the kind specified in § 362(a) "void and without vitality."

*Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 527 (2d Cir. 1994). Since the stay is designed

to protect creditors as well as the debtor, the debtor cannot agree to waive its provisions. *Ostano*

*Commerzanstalt v. Telewide Sys., Inc.*, 790 F.2d 206, 207 (2d Cir. 1986).

Although the stay is in place during the gap period, § 303(f) permits an alleged debtor to

continue operating during that time as if no bankruptcy case had been filed:

> Notwithstanding section 363 of this title . . .  and until an order for relief in the
> case, any business of the debtor may continue to operate, and the debtor may
> continue to use, acquire, or dispose of property as if an involuntary case
> concerning the debtor had not been commenced.

11 U.S.C. § 303(f); *see In re DiLorenzo*, 161 B.R. 752, 754 (Bankr. S.D.N.Y. 1993) ("Pursuant

to § 303(f) . . . the alleged debtor is free to continue to operate his business and use, acquire and

dispose of his property free from the constraints imposed by § 363 . . . .").

According to the Defendants, § 303(f) permits an alleged debtor to voluntarily transfer its

property during the gap period notwithstanding the existence of the automatic stay. This position

has some support in the case law. *See, e.g.*, *Rathbone v. Lake (In re Consol. Partners Inv. Co.)*,

156 B.R. 982, 985 (Bankr. N.D. Ohio 1993) (holding that "there was no  violation of the

automatic stay" where transfers during the gap period "were made voluntarily by the Debtor").

By contrast, the Plaintiff argues that the automatic stay prohibits a debtor's voluntary gap period

transfers notwithstanding the existence of § 303(f). This position also has support in the case

law. *See, e.g.*, *Fleet Nat'l Bank v. Gray (In re BankVest Capital Corp.*, 2003 WL 1700978, at *6

(D. Mass. Mar. 28, 2003) (holding that an alleged debtor's voluntary transfers during the gap

period violated the stay and were not excused by § 303(f)).

At this juncture, the Court sees no need to determine which party has the better of the

argument. The Plaintiff has not asserted a cause of action or sought damages based on any

alleged stay violations. Each of the Plaintiff's state law claims asserts an independent wrong that does not rely on a violation of the stay as a predicate for liability. Since a determination of whether the Defendants' actions violated the automatic stay would therefore not provide a basis for the Court to grant summary judgment to either party, the Court will reserve ruling on this question until, if ever, it becomes necessary to resolve the dispute.

    c.    ***In Pari Delicto* and the *Wagoner* Rule***

    The Court next turns to the Defendants' argument that the *in pari delicto* doctrine and the *Wagoner* rule bar the Plaintiff from asserting claims based on the termination of the Signature License because the Debtor was aware of and participated in the termination. "The doctrine of *in pari delicto* bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *Rosenbach v. Diversified Grp., Inc.*, 85 A.D.3d 569, 570 (1st Dep't 2011). The doctrine "is an equitable defense based on agency principles which bars a plaintiff from recovering where the plaintiff itself is at fault." *Symbol Tech., Inc. v. Deloitte & Touche, LLP*, 69 A.D.3d 191, 196 (2d Dep't 2009).

    The *in pari delicto* doctrine must be analyzed with deference to the Second Circuit's decision in *Wagoner*. In that case, the court held that, "when a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage." *Wagoner*, 944 F.2d at 118; *see also Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) ("Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in."). According to the Plaintiff, the *in*

*pari delicto* doctrine, as applied in this circuit, is inapplicable to the Plaintiff's claims since the conduct at issue occurred entirely postpetition. The Court agrees.

When a cause of action accrues prior to the commencement of a bankruptcy case, it becomes property of the estate "subject to whatever infirmities" may have existed prepetition, including an *in pari delicto* defense. *Grubin v. Rattet (In re Food Mgmt. Grp., LLC)*, 380 B.R. 677, 693 (Bankr. S.D.N.Y. 2008). By contrast, when a debtor participates in wrongful conduct that occurs entirely postpetition, the *in pari delicto* doctrine does not bar the trustee from asserting claims against third parties arising out of that conduct. *Id.* at 698 ("The debtor's postpetition unclean hands do not impair the ability of the trustee in bankruptcy to pursue the debtor and the debtor's co-conspirators." (quoting *Giacometti v. Arton Bermuda Ltd. (In re Sia)*, 349 B.R. 640, 655 (Bankr. D. Haw. 2006)).

Like the trustee in *Food Management*, the Plaintiff here "is not suing based on a cause of action that belonged to the Debtor[ ] at the time the estate was created." *Id.* at 693. All of the Plaintiff's claims accrued postpetition. Those claims are therefore not barred by the Debtor's unclean hands. *Sia*, 349 B.R. at 655. The Defendants' motion for summary judgment under the *in pari delicto* doctrine is denied.

### d.      The Plaintiff's Causes of Action

The Court now turns to the merits of each of the nine causes of action set forth in the Amended Complaint.

### i.      Counts I and II: Fraud and Negligent Misrepresentation

The Plaintiff's first and second causes of action seek damages against Iconix and the Laurita Brothers for deliberately or, alternatively, negligently misrepresenting the status of the Signature License during the bankruptcy case. The Plaintiff's fraud claim requires proof of "a

misrepresentation of an existing fact, made with knowledge of the falsity, an intent to induce

reliance thereon, justifiable reliance upon the misrepresentation, and damages." *Introna v.

Huntington Learning Ctrs., Inc.*, 78 A.D.3d 896, 898 (2d Dep't 2010). The Plaintiff's negligent

misrepresentation claim requires it to demonstrate: "(1) the existence of a special or privity-like

relationship imposing a duty on the defendant to impart correct information to the plaintiff;

(2) that the information was incorrect; and (3) reasonable reliance on the information." *J.A.O.*

*Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007).

The Plaintiff points to three principal misrepresentations that allegedly give rise to

liability: (1) the First-Day Objections filed by the Committee, which recite that the Debtor and

Iconix "agreed" to terminate the Signature License; (2) the Disclosure Statement filed jointly by

the Debtor and the Committee, which states that Iconix terminated the license prepetition and

pursuant to its terms; and (3) the Confirmation Affidavit, in which Christopher Laurita also avers

that the license was terminated prepetition and pursuant to its terms.

As to the first alleged misrepresentation, the Court finds that the First-Day Objections do

not constitute fraud or negligent misrepresentation as a matter of law. In the objections, the

Committee states that the Debtor and Iconix "agreed" to terminate the Signature License. There

is no genuine dispute that such an agreement was made. The Plaintiff admits as much. *See* Pl.'s

Br. ¶ 2 ("To avoid losing out on lucrative opportunities, the Defendants conspired to deem the

license agreement 'terminated' . . . ."); *id.* ¶ 88 ("[I]n September 2009, [the Laurita Brothers]

conspired with Iconix, Studio IP, and the ROC Defendants to unlawfully terminate the

[Signature License] . . . .").[10] There is no false representation in stating that the parties agreed to

---

[10] "Pl.'s Br." refers to the *Memorandum of Law in Support of Plaintiff Signature Apparel Group LLC's Motion for Summary Judgment*, No. 11-02800, ECF No. 142-21.

terminate the license. The Plaintiff's argument that the agreement was wrongful does not make the statement false. Accordingly, summary judgment is granted in favor of the Defendants with respect to the First-Day Objections.

As to the second and third statements, the Court agrees with the Plaintiff that the statements are false. Both the Disclosure Statement and the Confirmation Affidavit allege that the Signature License was terminated "pursuant to [its] terms." Paragraph 20(a)(i) of the license requires that written notice of the termination be sent to the Debtor. Since it is undisputed that no notice of termination was sent, the Court agrees that the license could not have been terminated pursuant to its terms. However, although the statements are clearly false, there is a genuine issue of material fact as to whether the Plaintiff reasonably relied on the false statements. *See Orlando v. Kukielka*, 40 A.D.3d 829, 831  (2d Dep't 2007) (noting that reasonable reliance is an essential element of both fraud and negligent misrepresentation claims).

According to the Plaintiff, it had no choice but to rely on the Defendants' statements regarding the status of the Signature License since the truth surrounding the termination was peculiarly within the Defendants' knowledge. *See Mallis v. Bankers Trust Co.*, 615 F.2d 68, 80 (2d Cir. 1980) ("When matters are held to be peculiarly within defendant's knowledge . . . plaintiff may rely without prosecuting an investigation, as he has no independent means of ascertaining the truth."). By contrast, the Defendants argue that the matters were not peculiarly within their knowledge and that the Plaintiff could have discovered the truth about the termination through the exercise of ordinary diligence, as evidenced by the fact that the Responsible Person was able to learn the truth regarding the termination through discovery. *See Curran, Cooney, Penney, Inc. v. Young & Koomans, Inc.*, 183 A.D.2d 742, 743 (2d Dep't 1992) ("It is well settled that if the facts represented are not matters peculiarly within the party's

knowledge, and the other party has the means available to him of knowing, by the exercise of ordinary intelligence, the truth or the real quality of the subject of the representation, he must make use of those means, or he will not be heard to complain that he was induced . . . by the misrepresentations." (citation and internal quotation marks omitted)).

Whether a plaintiff reasonably relied on a misrepresentation is "generally one of fact" that is "not amenable to determination as a matter of law." *Braddock v. Braddock*, 60 A.D.3d 84, 88 (1st Dep't 2009); *see also Talansky v. Schulman*, 2 A.D.3d 355, 360-61 (1st Dep't 2003) (genuine issue of material fact as to plaintiff's reliance on misrepresentations precluded summary judgment on fraud claim). Since the parties dispute whether the facts surrounding the termination of the license were peculiarly within the Defendants' knowledge or otherwise discoverable by the Plaintiff, there is a genuine issue of material fact on the question of whether the Plaintiff's reliance on the false statements was reasonable. Summary judgment in favor of either party on the Plaintiff's fraud and misrepresentation causes of action is therefore inappropriate. Both parties' motions as to those counts are denied.

ii.    **Counts III and IV: Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty**

The Plaintiff's third and fourth causes of action assert that the Laurita Brothers, aided and abetted by the other Defendants, engaged in unfair, self-dealing transactions that violated their fiduciary duties to the Debtor. In order to hold a fiduciary liable for a breach of his duties, a plaintiff must show: "(1) that a fiduciary duty exists and (2) that the fiduciary breached that duty." *York Linings v. Roach*, 1999 WL 608850, at *2 (Del. Ch. July 28, 1999). "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that

plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003).[11]

By default, officers, directors, and members of a limited liability company owe traditional fiduciary duties of loyalty and care to the company. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 660 n.1 (Del. Ch. 2012) (collecting cases). The duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). The duty of care requires that a fiduciary "use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 749 (Del. Ch. 2005) (citations and internal quotation marks omitted).

For a limited liability company, the default fiduciary duties may be modified or eliminated pursuant to the company's operating agreement. *See* Del. Code Ann. tit. 6, § 18-1101(c) (2014) (stating that fiduciary duties "may be expanded or restricted or eliminated by provisions in the limited liability company agreement"); *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011) (noting that a limited liability company agreement may "expressly modify or eliminate" fiduciary duties). An operating agreement that purports to eliminate fiduciary duties must be "plain and unambiguous." *Bay Ctr. Apts. Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9 (Del. Ch. Apr. 20, 2009).

---

[11]  The parties agree that Delaware law applies to the Plaintiff's breach of fiduciary duty claim while New York law applies to the aiding and abetting claim. *See Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), *aff'd*, 163 F.3d 151 (2d Cir. 1998).

In this case, § 3.5 of the Debtor's operating agreement provides that members of the company "may engage or possess an interest in any other business venture of any kind, nature or description, independently or with others, regardless of the fact that such other venture may engage in a business which competes directly or indirectly with the business of the [Debtor]." Op. Agmt. § 3.5. This provision plainly eliminates the Laurita Brothers' duty of loyalty to the Debtor. *See Kahn v. Ichan*, 1998 WL 832629, at *2 (Del. Ch. Nov. 12, 1998) (provision in a partnership agreement stating that members "may compete, directly or indirectly, with the business of the Partnership" eliminated the duty of loyalty as a matter of law). As the Laurita Brothers had no duty of loyalty to the Debtor as a matter of law, the Defendants are entitled to summary judgment with respect to the Plaintiff's claim that the duty of loyalty was breached. *See id.* (dismissing duty of loyalty claim where usurpation of corporate opportunity was "permissible as a matter of law").[12]

Section 3.5, however, is silent about the duty of care. Indeed, the duty of care is expressly preserved in § 3.1(a) of the operating agreement, which provides that the members of the Debtor are required to act "in a manner which they believe in good faith to be in the best interest of the Company and with that degree of care an ordinarily prudent Person would use under similar circumstances." Op. Agmt. § 3.1(a). Similarly, § 3.2 limits the Laurita Brothers' liability for "relying in good faith upon information, opinions, reports or statements furnished by any Person as to matters [they] reasonably believe[ ] are within such other Person's professional and expert competence and who has been selected with reasonable care." *Id.* § 3.2. These sections recognize

---

[12] The Plaintiff's alternative argument that the Bankruptcy Code imposed a duty of loyalty during the gap period is unavailing. *See In re Roxy Roller Rink Joint Venture*, 73 B.R. 521, 527 (Bankr. S.D.N.Y. 1987) ("The freedom explicitly granted by Code § 303(f) to the debtor is plainly inconsistent with the fiduciary obligations imposed on a debtor by Code § 1107(a). It is unreasonable to assume that the Code intended to impose such fiduciary obligations on the unwilling involuntary debtor before the order for relief.").

a duty of care and, to a limited extent, limit monetary liability for a breach of that duty.[13] The

Court therefore finds that the duty of care was not eliminated by the Debtor's operating

agreement. *See Feeley*, 62 A.3d at 664 (fiduciary duties were not eliminated where exculpatory

provisions "recognize[d] their continuing existence").

Having determined that Christopher Laurita owed the Debtor a fiduciary duty of care, the

Court must determine whether that duty was breached by the termination of the Signature

License. In this regard, the Court finds that genuine issues of material fact preclude summary

judgment for either party. As set forth above, the duty of care requires that fiduciaries exercise

that amount of care that ordinarily careful and prudent men would use in similar circumstances,

considering all information reasonably available to them. *Walt Disney Co.*, 907 A.2d at 749.

Liability arising from the duty of care arises in two distinct contexts:

> First, such liability may be said to flow from a board decision that results in a loss
> because that decision was ill advised or "negligent." Second, liability to the
> corporation for a loss may be said to arise from an unconsidered failure of the
> board to act in circumstances in which due attention would, arguably, have
> prevented the loss.

*In re Caremark Intern. Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). Here, the Plaintiff

argues that Christopher Laurita breached his duty of care to the Debtor when, instead of

protecting the Signature License against improper termination by Studio IP, he simply

"acquiesced" to the termination when he was told of it by the Iconix Defendants. According to

the Plaintiff, had Christopher Laurita acted to preserve the Debtor's interest, he could have at

least negotiated a better deal for the Debtor including, for example, a reduction in Studio IP's

multimillion-dollar claim against the estate.

---

[13] Delaware law permits an operating agreement to preserve fiduciary duties while limiting monetary liability for
breaches of those duties. *Feeley*, 62 A.3d at 663 ("[T]he drafters of a limited liability company can leave the
default duties in place, but limit or eliminate monetary liability for breach of duty . . . .").

If the Plaintiff is correct, Christopher Laurita's acquiescence to the termination of the license upon being informed of it by the Iconix Defendants would have violated his duty of "providing active and direct oversight" and "becoming reasonably informed about the alternatives available to the company." *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 89 (Del. Ch. 2014). On the other hand, Christopher Laurita argues that the Debtor consented to the termination after thoroughly weighing the value of the license against the cost of litigating with Iconix. In determining whether the duty of care was breached, the question is not whether Christopher Laurita came to the correct decision; it is whether he engaged in an appropriate, good faith process in reaching that decision. *See Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Due care in the decisionmaking context is *process* due care only."); *Caremark*, 698 A.2d at 967 ("[W]hether a judge or jury . . . believes a decision substantively wrong, or degrees of wrong extending through 'stupid' to 'egregious' or 'irrational,' provides no ground for director liability, so long as the court determines that the process employed was either rational or employed in a *good faith* effort to advance corporate interests.").

Under the confines of a the summary judgment motion, the Court cannot resolve what is a disputed question of fact: whether Christopher Laurita exercised due care in agreeing to the termination of the Signature License. Accordingly, summary judgment as to the Plaintiff's breach of fiduciary duty claim is denied. *See Off. Comm. of Unsecured Creditors v. Baldwin (In re Lemington Home for the Aged)*, 659 F.3d 282, 290-91 (3d Cir. 2011) (genuine issue of material fact as to whether officers and directors exercised due care precluded summary judgment). Since a breach of fiduciary duty is an essential element of an aiding and abetting claim under New York law, *see Kaufman*, 307 A.D.2d at 125, summary judgment on that claim is denied as well.

### iii.    <u>Count V: Conspiracy</u>

The Plaintiff's fifth cause of action asserts that the Defendants conspired to unlawfully deprive the Debtor of the value of the Signature License. "[I]t is well-settled that New York does not recognize an independent civil tort of conspiracy." *Hoeffner v. Orrick, Herrington & Sutcliffe LLP*, 85 A.D.3d 457, 458 (1st Dep't 2011). "While a plaintiff may allege, in a claim of fraud or other tort, that parties conspired, the conspiracy to commit a fraud or tort is not, of itself, a cause of action." *Id.* "Allegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort." *Alexander & Alexander of New York, Inc. v. Fritzen*, 68 N.Y.2d 968, 969 (1986).

Accordingly, the Court grants summary judgment to the Defendants on the Plaintiff's fifth cause of action. That claim is dismissed. However, the dismissal of the conspiracy claim as a separate cause of action does not preclude the Plaintiff from using evidence of the alleged conspiracy at trial to connect the Defendants to an "underlying tort," *Litras v. Litras*, 254 A.D.2d 395, 396 (2d Dep't 1998), and to hold them jointly and severally liable for the damages resulting therefrom, *see Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law . . . exposes [the conspirators] to joint and several liability for the victim's losses.").

### iv.    <u>Counts VI and VII: Breach of Contract and Tortious Interference with Contract</u>

The Plaintiff's sixth and seventh causes of action assert that Studio IP, with the tortious assistance of Iconix and the Laurita Brothers, breached the Signature License by terminating the agreement without delivering the required written notice of termination. In order to establish a claim for breach of contract, a plaintiff must show "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual

obligations, and damages resulting from the breach." *Dee v. Rakower*, 112 A.D.3d 204, 208-09 (2d Dep't 2013). A claim for tortious interference with contract "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996).

New York enforces a "clear rule . . . requiring termination of a contract in accordance with its terms." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989); *see also Blumberg v. Florence*, 143 A.D.2d 380, 381 (2d Dep't 1988) ("Where the procedures for cancellation provided for by the contract specify conditions precedent to the right of termination, those procedures must be followed."). An attempt to terminate a contract that fails to follow the contractually-mandated termination procedure is ineffective. *See New Image Constr., Inc. v. TDR Enters. Inc.*, 74 A.D.3d 680, 681 (1st Dep't 2010) (purported termination ineffective where terminating party failed to comply with contractual notice provisions). This is true even where the parties agreed to the termination. *See Bank of New York v. Progressive Phone Sys., Inc.*, 71 A.D.2d 1010, 1011 (2d Dep't 1979) (parties' oral agreement to terminate a contract ineffective where agreement required termination to be in writing).

Here, Studio IP does not dispute that it failed to provide written notice of termination. According to the Responsible Person, this fact alone entitles the Plaintiff to summary judgment on its breach of contract claim. However, the Defendants have raised a genuine issue of material fact as to whether the license was repudiated or abandoned by the Debtor. "Under New York law, a terminating party's failure to afford contractually-required notice is excusable as futile

where the nonperforming party (1) expressly repudiates the parties' contract or (2) abandons performance under the contract." *Village Constr. Co. v. CED Constr. Partners, Ltd.*, 2004 WL 4975479, at *3 (S.D.N.Y. July 8, 2004); *see also Allbrand Discount Liquors, Inc. v. Times Square Stores Corp.*, 60 A.D.2d 568, 568 (2d Dep't 1977) ("Once it becomes clear that one party will not live up to the contract, the aggrieved party is relieved from the performance of futile acts, such as conditions precedent.").

In New York, repudiation of a contract may take one of two forms: (1) a statement by a party that he or she will commit a material breach of the contract; or (2) a voluntarily affirmative act which renders the party unable to perform. *Norcon Power Partners, L.P. v. Niagra Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998). In either case, the repudiating party must "indicate[ ] an unequivocal intent to forego performance of his obligations under [the] contract." *Rachmani Corp. v. 9 E. 96th St. Apt. Corp.*, 211 A.D.2d 262, 266 (1st Dep't 1995). Generally, whether repudiation occurred "is an issue of fact." *Bercow v. Damus*, 5 A.D.3d 711, 712 (2d Dep't 2004); *see also DiFolco v MSNBC Cable L.L.C.*, 622 F.3d 104, 112 (2d Cir. 2010) (repudiation is a question of fact "except[ ] . . . where the repudiation is in writing, in which case the court may resolve the issue of repudiation 'as a matter of law.'").

In this case, the Defendants argue that that the Debtor unequivocally indicated to the Iconix Defendants its intent to forego performance under the license and repudiate the agreement. By contrast, the Plaintiff argues that the Debtor did not affirmatively repudiate; rather, the Laurita Brothers merely "acquiesced" to the termination upon being informed by the Iconix Defendants that the license was being terminated. As there is no written repudiation of the license for the Court to consider, the Court cannot determine whether repudiation occurred as a matter of law. Summary judgment is therefore inappropriate. *See J. Petrocelli Constr., Inc. v.*

*Realm Elec. Constr., Inc.*, 15 A.D.3d 444, 446 (2d Dep't 2005) (genuine issue of material fact as to repudiation precluded summary judgment on breach of contract claim). Summary judgment on the Plaintiff's breach of contract claim is therefore denied. Since a breach of contract is an essential element of the Plaintiff's tortious interference claim, *see Jack L. Inselman & Co. v. FNB Fin. Co.*, 41 N.Y.2d 1078, 1080 (1977), summary judgment on the tortious interference claim is denied as well.

v.    **Count VIII: Conversion**

The Plaintiff's eighth cause of action asserts that the Defendants wrongfully converted the Debtor's rights under the Signature License. In New York, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. New York Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006). The tort consists of two key elements: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Id.* (citations omitted).

In this case, the Plaintiff's conversion claim fails as a matter of law for the simple reason that the Signature License is not tangible property. New York does not generally recognize a claim for conversion of intangible property. *Matzan v. Eastman Kodak Co.*, 134 A.D.2d 863, 863-64 (4th Dep't 1987) ("A claim for conversion does not lie for the withholding of indefinite, intangible, and incorporeal species of property."). Although the New York Court of Appeals has expanded the tort to include *certain* types of intangible property, *see Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 291-92 (2007), this does not include the right to use a trademark, *see Harris v. Coleman*, 863 F. Supp. 2d 336, 345 (S.D.N.Y. 2012) (claim for conversion of a

27

trademark fails as a matter of law); *Fin. Matters, Inc. v. Pepsico, Inc.*, 1993 WL 378844, at *4 (S.D.N.Y. Sept. 24, 1993) (same).

In a factually analogous case, District Judge Duffy granted summary judgment dismissing a claim for conversion of a trademark license. *See Spiegel v. Quality Bakers of Am. Co-op, Inc.*, 1992 WL 349799 (S.D.N.Y. Nov. 10, 1992). In that case, the Quality Bakers of America had licensed the "Sunbeam" trademark for use by the Mills Family Bakery pursuant to a trademark license agreement. *Id.* at *2. After the licensor terminated the agreement, the licensee sued for conversion, arguing that the termination was unlawful. *Id.* at *3. Calling the conversion claim "baseless," the court observed:

> [U]nder relevant case law, intangible property cannot be converted. The Sunbeam license, which merely gives its holder the right to use the [Sunbeam trademark], is intangible property. Thus, as a matter of law, [the defendants] could not have converted [the license].

*Id.* at *7 (citing, *inter alia*, *Matzan*, 134 A.D.2d at 863-64). The same rule applies here. As the Signature License constitutes intangible property, it cannot, as a matter of law, have been converted by the Defendants. The Court therefore grants summary judgment in favor of the Defendants on the Plaintiff's conversion claim. That claim is dismissed.

## vi.   <u>Count IX: Unjust Enrichment</u>

The Plaintiff's ninth cause of action asserts that the Defendants were unjustly enriched by receiving benefits that lawfully belonged to the Debtor under the Signature License. To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citations, alterations, and internal quotation marks omitted). The essential inquiry "is whether it is against equity and good conscience to permit the defendant to

retain what is sought to be recovered." *Paramount Film Distrib. Corp. v. State of New York*, 30

N.Y.2d 415, 421 (1972). As stated by the New York Court of Appeals:

> The basis of a claim for unjust enrichment is that the defendant has obtained a
> benefit which in equity and good conscience should be paid to the plaintiff. In a
> broad sense, this may be true in many cases, but unjust enrichment is not a
> catchall cause of action to be used when others fail. It is available only in unusual
> situations when, though the defendant has not breached a contract or committed a
> recognized tort, circumstances create an equitable obligation running from the
> defendant to the plaintiff. Typical cases are those in which the defendant, though
> guilty of no wrongdoing, has received money to which he or she is not entitled.
> An unjust enrichment claim is not available where it simply duplicates, or
> replaces, a conventional contract or tort claim.

*Corsello v. Verizon New York, Inc.*, 18 N.Y.3d 777, 790 (2012) (citations and internal quotation

marks omitted).

 As to all of the Defendants other than New Star, the Plaintiff's unjust enrichment claim

represents a duplicative, "catchall" cause of action asserted in case the Plaintiff's primary claims

fail. The Plaintiff principally alleges that Studio IP breached its contract with the Debtor by

terminating it without written notice; that the Laurita Brothers breached their fiduciary duties in

"acquiescing" to the termination; and that Iconix tortiously assisted Studio IP and the Laurita

Brothers in the foregoing conduct. To the extent the Plaintiff is successful on any of those

claims, it may not recover under a theory of unjust enrichment. *Id.* at 791. If, however, the

Plaintiff is unsuccessful on those claims, "an unjust enrichment claim cannot remedy the

defects." *Id.* Accordingly, summary judgment is granted in favor of the Defendants other than

New Star on the Plaintiff's ninth cause of action. As to those Defendants, the Plaintiff's unjust

enrichment claim is dismissed.

 By contrast, the Plaintiff properly asserts an unjust enrichment claim against New Star.

The Plaintiff does not assert that New Star breached a contract or a fiduciary duty or tortiously

assisted others in doing so. Instead, the Plaintiff's primary allegation against New Star is that it

received consulting fees to which it was not entitled. This is the essence of an unjust enrichment claim. However, at the summary judgment stage, it is unclear whether the payments that New Star received were made at New Star's direction or at the behest of Christopher Laurita. To the extent the payments made to New Star were made at the behest of another Defendant, the Plaintiff would be required to look to the other Defendant for satisfaction. *See Branch Servs., Inc. v. Cooper*, 102 A.D.3d 645, 647-48 (2d Dep't 2013) (declining to award summary judgment on unjust enrichment claim where it was unclear whether the benefit conferred was at the behest of a person other than the recipient). Accordingly, summary judgment on the Plaintiff's unjust enrichment claim against New Star is denied.

## II.   The *Daubert* Motion

Since the Court is denying the summary judgment motions in part, it will also address the Defendants' alternative arguments regarding the Plaintiff's proposed damages expert under *Daubert*. In the motion, the Defendants attack both the methodology used by the Plaintiff's proposed expert and the relevance of his conclusions. Where a party seeks to offers the testimony of an expert witness, the Court must exercise a "gatekeeping role" to ensure that "the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In determining whether expert testimony should be admitted, the Court is required to determine: "(1) whether the witness is qualified to be an expert; (2) whether the [expert's] opinion is based upon reliable data and methodology; and (3) whether the expert's testimony on a particular issue will assist the trier of fact." *Hollman v. Taser Intern. Inc.*, 928 F. Supp. 2d 657, 667 (E.D.N.Y. 2013) (citing *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005)). The purpose of the inquiry is to "make certain that an expert, whether basing testimony upon professional studies or professional experience, employs in the courtroom the same level of

intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

At this pretrial juncture, the Court sees no need to resolve the issues raised by the *Daubert* motion. As stated in *Tiffany (NJ) Inc. v. eBay, Inc.*:

> In the context of a bench trial where there is not a concern for juror confusion or potential prejudice, the court has considerable discretion in admitting the proffered testimony at the trial and then deciding after the evidence is presented whether it deserves to be credited by meeting the requirements of *Daubert* and its progeny.

576 F. Supp. 2d 457, 457 n.1 (S.D.N.Y. 2007); *see also Victoria's Secret Stores Brand Mgmt., Inc. v. Sexy Hair Concepts, LLC*, 2009 WL 959775, at *6 n.3 (S.D.N.Y. Apr. 8, 2009) ("[W]here a bench trial is in prospect, resolving *Daubert* questions at a pretrial stage is generally less efficient than simply hearing the evidence; if [objections to the evidence] are well-taken, the testimony will be disregarded in any event."). The Court will permit the Plaintiff's expert to testify in order to "have the benefit of live testimony and cross-examination to determine how much weight, if any, to give to [his] conclusions." *Joseph S. v. Hogan*, 2011 WL 2848330, at *2 (E.D.N.Y. July 15, 2011). The *Daubert* motion is therefore denied.

As the Court will allow the testimony of the parties' competing experts, the Court declines to grant summary judgment to any party on the issue of damages. *See Hudson Riverkeeper Fund, Inc. v. Atl. Richfield Co.*, 138 F. Supp. 2d 482, 488 (S.D.N.Y. 2001) ("[W]here . . . there are conflicting expert reports presented, courts are wary of granting summary judgment."); *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1420 (S.D.N.Y. 1986) (denying summary judgment as to damages despite the fact that no genuine issues of material fact existed with respect to liability). All questions of damages, including any questions as to the value of the Signature License, will be reserved for the time of trial.

### Conclusion

The summary judgment motions are granted in part and denied in part as set forth herein.

The *Daubert* motion is denied. The Court will enter an appropriate order.

Dated: New York, New York
        March 4, 2015

                            _s/ Robert E. Grossman_
                            Honorable Robert E. Grossman
                            United States Bankruptcy Judge