**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SIGNATURE APPAREL GROUP LLC,<br><br>        Debtor. | Chapter 11<br>Case No.  09-15378 (RG) |
| SIGNATURE APPAREL GROUP LLC,<br><br>        Plaintiff,<br><br>        vs.<br><br>JOSEPH LAURITA, CHRISTOPHER LAURITA, NEW STAR GROUP, LLC, ROC FASHIONS, LLC, RVC ENTERPRISES, LLC, RUBEN AZRAK, VICTOR AZRAK AND CHARLES AZRAK, ICONIX BRAND GROUP, INC., STUDIO IP HOLDINGS, LLC,<br><br>        Defendants. | Adv. Pro. No. 11-02800 (RG) |
| ROC FASHIONS, LLC,<br><br>        Third-Party Plaintiff,<br><br>        vs.<br><br>STUDIO IP HOLDINGS, LLC<br><br>        Third-Party Defendant. | **JOINT PRETRIAL**<br>**MEMORANDUM AND ORDER** |

Plaintiff Signature Apparel Group LLC ("Signature"), Defendants Christopher Laurita ("Laurita") and New Star Group, LLC ("New Star"; together with Laurita, the "Laurita Defendants"), Defendants Iconix Brand Group, Inc. ("Iconix Brand Group") and Studio IP Holdings, LLC ("Studio IP"; together with Iconix Brand Group, the "Iconix Defendants"), in

anticipation of the trial set to commence on April 21, 2015 (the "Trial"), in Courtroom 610 in the

United States Bankruptcy Court of the Southern District of New York, located at One Bowling

Green, New York, New York  10004, and in accordance with the pretrial procedures of the

Honorable Robert Grossman, United States Bankruptcy Judge for the Eastern District of New

York, sitting by designation in the United States District Court for the Southern District of New

York, hereby respectfully submit this Proposed Joint Pretrial Memorandum and Order.

**A.**
**WITNESSES TO BE PRESENTED BY LIVE TESTIMONY**

(1)     The following is a list of the name, address and telephone number of each

fact witness who Signature expects to call to testify in person at the Trial.

| Name of Witness | Address and Telephone Number |
|---|---|
| Anthony Labrosciano | c/o ACL Adjustments Associates, Inc. P.O. Box 442, 165 Central Avenue, Hasbrouck Heights, NJ 07604-0442 Telephone Number: 201-288-7144 |
| Christopher Laurita | c/o Mitchell B. Seidman,  Seidman & Pincus LLP 777 Terrace Avenue, Suite 508 Hasbrouck Heights, NJ Telephone Number: 201-473-0047 |
| Neil Cole | c/o Harris Cogan, Blank Rome LLP 405 Lexington Avenue, New York, NY Telephone Number: 212-885-5566 |
| Andrew Tarshis | c/o Tengram Capital Partners, LLC, 15 Riverside Avenue, First Floor, Westport, CT 06880 Telephone Number: 1-203-454-6999 |
| Andrew Stamelman | c/o Sherman Wells Sylvester & Stamelman LLP 805 Third Avenue, 10th Floor, New York, NY 10022 Telephone Number: 973-302-9714 |
| Joseph Schwartz | c/o Riker Danzig Scherer Hyland & Perretti LLP One Speedwell Avenue, Headquarters Plaza, Morristown, NJ 07962 Telephone Number: 973-451-8506 |
| Charles Azrak | c/o Thomas McNiff, 595 Madison Avenue, Suite 1101 New York, NY 10022 Telephone Number: 516-902-9065 |
| Andrew Eckstein | c/o Harris Cogan, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue New York, NY 10174  Telephone Number: 212-885-5000 |
| Yehuda Shmidman | c/o Jason Cyrulnik, Boises Schiller & Flexner LLP 333 Main Street, Armonk, New York 10504 Telephone Number: 914-749-8262 |
| Sol Lipshitz | c/o John E. Eickemeyer, Vedder Price 1633 Broadway, 47th Floor, New York, NY 10018 Telephone Number: 212-407-7760 |
| Jay Silverberg | c/o Jay Silverberg, FisherBroyles, LLP 445 Park Avenue, Ninth Floor, |

| | |
|---|---|
| | New York, NY 10022 Telephone Number: 212-730-1900 |
| Michael Goldsmith | c/o Sills Cummis & Gross PC 101 Park Avenue, 28th Floor, New York, NY 20289 Telephone Number: 212-500-1568 |

(2)     The following is a list of the name, address and telephone number of each

fact witness who Signature may call to testify at the Trial if the need arises.

| Name of Witness | Address and Telephone Number |
|---|---|
| Anthony Laurita | |
| Joseph Laurita | c/o Tracy L. Klestadt, Klestadt & Winters LLP 570 Seventh Avenue, 17th Floor, New York, NY 10018 Telephone Number: (212) 972-3000 |
| Jacqueline Laurita | c/o Mitchell B. Seidman,  Seidman & Pincus LLP 777 Terrace Avenue, Suite 508 Hasbrouck Heights, NJ Telephone Number: 201-473-0047 |
| Ruben Azrak | c/o Thomas McNiff, 595 Madison Avenue, Suite 1101 New York, NY 10022 Telephone Number: 516-902-9065 |
| Dana Kopet | 4 East Drive, Carmel, New York  10512 Telephone Number: 845-490-2066 |
| Cory Baker | 160 Riverside Blvd. Apt 15h, New York, NY 10069 Telephone Number: 212-721-0750 |
| *Custodian of Records American Express* | Jackie Vazquez, Subpoena Correspondent and Assistant to Custodian of Records, American Express, Subpoena Compliance 43 Butterfields Circle, El Paso, TX 79906 |
| *Custodian of Records Bank of America* | Rawle Holder, Bank Officer and/or Custodian of the Records Bank of America Legal Order Processing 5701 Horatio Street, Utica, NY 13502 |

(3)     The following is a list of the name, address and telephone number of each

fact witness who the Laurita Defendants expect to call to testify in person at

the Trial.

| Name of Witness | Address and Telephone Number |
|---|---|
| Christopher Laurita | c/o Mitchell B. Seidman,  Seidman & Pincus LLP 777 Terrace Avenue, Suite 508 Hasbrouck Heights, NJ Telephone Number: 201-473-0047 |
| Neil Cole | c/o Harris Cogan, Blank Rome LLP 405 Lexington Avenue, New York, NY Telephone Number: 212-885-5566 |
| Joseph Schwartz | c/o Riker Danzig Scherer Hyland & Perretti LLP One Speedwell Avenue, Headquarters Plaza, Morristown, NJ 07962 Telephone Number: 973-451-8506 |

3

(4)    The following is a list of the name, address and telephone number of each fact witness who the Laurita Defendants may call to testify at the Trial if the need arises.

| Name of Witness | Address and Telephone Number |
|---|---|
| Charles Azrak | c/o Thomas McNiff, 595 Madison Avenue, Suite 1101 New York, NY 10022 Telephone Number: 516-902-9065 |
| Ruben Azrak | c/o Thomas McNiff, 595 Madison Avenue, Suite 1101 New York, NY 10022 Telephone Number: 516-902-9065 |
| Victor Azrak | c/o Thomas McNiff, 595 Madison Avenue, Suite 1101 New York, NY 10022 Telephone Number: 516-902-9065 |
| Jacqueline Laurita | c/o Mitchell B. Seidman,  Seidman & Pincus LLP 777 Terrace Avenue, Suite 508 Hasbrouck Heights, NJ Telephone Number: 201-473-0047 |
| Anthony Laurita | |
| Joseph Laurita | c/o Tracy L. Klestadt, Klestadt & Winters LLP 570 Seventh Avenue, 17th Floor, New York, NY 10018 Telephone Number: (212) 972-3000 |

(5)    The following is a list of the name, address and telephone number of each fact witness who the Iconix Defendants expect to call to testify in person at the Trial.

| Name of Witness | Address and Telephone Number |
|---|---|
| Andrew Tarshis | c/o Tengram Capital Partners, LLC, 15 Riverside Avenue, First Floor, Westport, CT 06880; Telephone Number: 1-203-454-6999 |
| Yehuda Shmidman | c/o Jason Cyrulnik, Boises Schiller & Flexner LLP 333 Main Street, Armonk, New York 10504; Telephone Number: 914-749-8262 |
| Christopher Laurita | c/o Mitchell B. Seidman, Seidman & Pincus LLP 777 Terrace Avenue, Suite 508 Hasbrouck Heights, NJ; Telephone Number 201-473-0047 |
| Joseph Schwartz | c/o Riker Danzig Scherer Hyland & Perretti LLP One Speedwell Avenue, Headquarters Plaza, Morristown, NJ 07962; Telephone Number: 973-451-8506 |
| Anthony Labrosciano | c/o Kyle Bisceglie, Olshan Frome Wolosky LLP, 65 East 55th Street, New York, NY 10022; Telephone Number 212-451-2207 |

(6)    The following is a list of the name, address and telephone number of each fact witness who the Iconix Defendants may call to testify at the Trial if the need arises.

4

| Name of Witness | Address and Telephone Number |
|---|---|
| Michael Fox | c/o Kyle Bisceglie, Olshan Frome Wolosky LLP, 65 East 55th Street, New York, NY 10022; Telephone Number 212-451-2207 |
| Neil Cole | c/o Harris Cogan, Blank Rome LLP, The Chrysler Building, 405 Lexington Avenue, New York, NY 10174:  Telephone Number 212-885-5000 |

(7)     The parties reserve the right to call rebuttal witnesses not identified above as necessary.

## B.
### WITNESSES WHOSE TESTIMONY WILL BE OFFERED BY DEPOSITION

(1)     The following is a list of the fact witnesses whose testimony Signature expects to present at the Trial by means of a deposition.

Joseph Laurita
Anthony Laurita
Ruben Azrak
Charles Azrak
Dana Kopet
Jacqueline Laurita

**This is not a stipulation by any party that such depositions may be offered.

(2)     The following is a list of the fact witnesses whose testimony the Laurita Defendants expect to present at the Trial by means of a deposition.

None at this time.

**This is not a stipulation by any party that such depositions may be offered, or that the Laurita Defendants are permitted to offer such testimony at a later date.

(3)     The following is a list of the fact witnesses whose testimony the Iconix Defendants expect to present at the Trial by means of a deposition.

Ruben Azrak
Charles Azrak

5

Joseph Laurita
Andrew Stamelman
Michael Fox

**This is not a stipulation by any party that such depositions may be offered.

### C.
### EXPERT WITNESSES

(1)     Signature intends to call John M. Bonora to provide testimony on issues relating to damages.

(2)     The Iconix Defendants intend to call James W. Volkman to provide testimony on issues relating to damages.

### D.
### EXHIBITS

(1)     A list of exhibits stipulated to be admissible and offered jointly by the parties is attached to this Proposed Joint Pretrial Order as Exhibit A.

(2)     A list of exhibits to be offered by Signature is attached to this Proposed Joint Pretrial Order as Exhibit B, together with objections as to admissibility. Signature's list of exhibits does not include demonstrative exhibits.

(3)     A list of exhibits to be offered by the Laurita Defendants is attached to this Proposed Joint Pretrial Order as Exhibit C, together with objections as to admissibility.

(4)     A list of exhibits to be offered by the Iconix Defendants is attached to this Proposed Joint Pretrial Order as Exhibit D, together with objections as to admissibility. The Iconix Defendants' list of exhibits includes demonstrative exhibits.

6

**E.**
**D**EPOSITION **D**ESIGNATIONS

(1)    A list of deposition designations to be offered by Signature, together with

counter designations and objections as to admissibility, if any, is attached to

this Proposed Joint Pretrial Order as Exhibit E.

(2)    A list of deposition designations to be offered by the Iconix Defendants,

together with counter designations and objections as to admissibility, if any,

is attached to this Proposed Joint Pretrial Order as Exhibit F.

(3)    The Laurita Defendants do not intend to offer deposition designations at this

time but reserve their right to do so subject to counter designations and

objections as to admissibility by the other parties.

**F.**
**S**TATEMENT **C**ONFIRMING THE **E**XCHANGE OF **E**XHIBITS

Counsel for the parties confirms that copies of the exhibits and deposition designations

were exchanged between April 7, 2015 and April 14, 2015.

**G.**
**S**TATEMENT OF **A**DMITTED **F**ACTS

The following facts are jointly submitted by the parties, stipulated to be true, and require

no proof at the Trial.

(1)    The Plaintiff in this adversary proceeding is Signature Apparel Group LLC

("Signature"). Effective as of August 5, 2010, Anthony Labrosciano is

Signature's Responsible Person and sole officer and director.

(2)    Signature was a limited liability company organized under the laws of the

state of Delaware, with its principal place of business in New York.  Prior to

its bankruptcy, it was engaged in the business of designing, manufacturing, and distributing branded apparel worldwide.

(3)     As of January 15, 2007, Signature's sole members, managers, directors, and officers were defendants Joseph Laurita and Christopher Laurita (the "Laurita Brothers").  Joseph Laurita has entered into a settlement agreement with respect to this adversary proceeding.  Signature's offices were located at 1370 Broadway, New York City.

(4)     The members of Signature entered into a Restated Limited Liability Company Operating Agreement dated as of June 26, 2008 (the "Operating Agreement").

(5)     Defendant New Star Group, LLC ("New Star") is a limited liability company organized under the laws of Delaware, and is controlled by Christopher Laurita, who is a member of New Star.

(6)     Defendant Iconix Brand Group, Inc. ("Iconix Brand Group") is a publicly-traded company in the business of licensing and brand management.

(7)     Iconix Brand Group owns a diversified portfolio of fashion and home brands and trademarks, which it licenses to retailers, distributors and manufacturers.

(8)     Defendant Studio IP Holdings, LLC ("Studio IP") is a limited liability company organized under the laws of the State of Delaware.

(9)     Studio IP is a wholly owned subsidiary of Iconix Brand Group.

(10)    Studio IP is the successor-in-interest to Rocawear Licensing, LLC ("Rocawear Licensing").

3134248-1

(11)    At all times relevant to this adversary proceeding, Iconix Brand Group's Chief Executive Officer was Neil Cole ("CEO Cole"), and its General Counsel was Andrew Tarshis ("GC Tarshis").

(12)    Defendant ROC Fashions, LLC ("ROC Fashions") and its affiliate, Defendant RVC Enterprises, LLC ("RVC"), are limited liability companies organized under the laws of the state of New York.

(13)    The officers, employees, representatives, and agents of both ROC Fashions and RVC are Defendants Ruben Azrak, Victor Azrak, and Charles Azrak (collectively, the "Azraks," and together with ROC Fashions and RVC, the "ROC Defendants").  The ROC Defendants have entered into a settlement agreement with respect to this adversary proceeding.

(14)    The Rocawear brand was founded by entertainer Shawn "Jay-Z" Carter, among others, in 1999.

(15)    Signature and Rocawear Licensing entered into a License Agreement dated as of June 1, 2004 (the "Signature Rocawear License Agreement"), which "grant[ed] to [Signature] … an exclusive license/right … to use the trademark 'ROCAWEAR' … in connection with the manufacture, distribution, promotion and sale of junior sportswear apparel including, but not limited to, all fabrications; tops, dresses, pants, jeans, skirts, jumpsuits, sweaters, and outerwear to be sold as a collection and not to individual departments; but excluding leather, suede and faux fur sportswear and outerwear (faux fur and leather/suede can be used as trim but not complete

garments ("Outerwear")" within the United States and its territories and possessions and military installations throughout the world.

(16)     The initial term of the Signature Rocawear License Agreement was through December 31, 2007.  Pursuant to Section 2(b) and Schedule C, the Signature Rocawear License Agreement gave Signature "the option to extend the Signature Rocawear License Agreement for one (1) period of three (3) years" if Signature was not in default beyond any cure period and subject to the Guaranteed Minimum Royalty Fees, Guaranteed Minimum Advertising Fees and Guaranteed Minimum Net Sales set forth in Schedule C of the Signature Rocawear License Agreement.

(17)     Section 3 of the Signature Rocawear License Agreement provided that Signature would pay to Iconix royalty and advertising fees based upon its specified percentages of net sales of the licensed products.  Section 3 of the Signature Rocawear License Agreement also provided that Signature obtain certain specified Required Minimum Sales, and pay certain specified Guaranteed Minimum Royalty Fees and Guaranteed Minimum Advertising Fees.

(18)     On December 1, 2006, Signature and Rocawear Licensing entered into a written amendment of the Signature Rocawear License Agreement, titled "Amendment to June 1, 2004 ROCAWEAR License for Juniors Apparel and Outerwear," which, among other items, extended the term of the Signature Rocawear License Agreement to December 31, 2010.  The Amendment does not provide for renewal options.  The Amendment also

3134248-1

added additional categories of apparel (leather and faux fur outerwear, and plus sizes) and a new trademark (BELLA ROC), and reduced the minimum sales fees and increased the minimum advertising fees. The minimum royalty fees remained the same.

(19)    Section 20 of the Signature Rocawear License Agreement, titled "Events of Termination," provides, in relevant part:

> (a)(i) Except as otherwise provided in this Agreement, if Licensee at any time during the Term fails to perform any undertaking or obligation under this Agreement, and if that default is not cured within … ten (10) business days for a default in payment, after written notice from Licensor to Licensee specifying that default, then Licensor may terminate this Agreement effective immediately upon giving Licensee a written notice of termination at any time before the default has been cured;
>
> …
>
> (c) If pursuant to any bankruptcy law, a trustee of Licensee (hereinafter referred to as the "Trustee") or Licensee as debtor in possession is permitted to assume this Agreement and does so and, thereafter, desires to assign this Agreement to a third party, which assignment (i) satisfies the requirements of such bankruptcy law,(ii) is to a party that has established a reputation for producing products of the same type as the Licensed Products and of a quality that is at least equal to the quality of Licensed Products produced by Licensee and consistent with the standards set forth in this Agreement for Licensed Products, (iii) is to a party that can demonstrate its financial ability to perform the obligations of Licensee pursuant to this Agreement, and (iv) provides that any payments in excess of the amounts set forth hereunder be paid only to Licensor, then the Trustee, or Licensee, as the case may be, shall notify Licensor of the terms of such proposed assignment in writing. The giving of such notice shall be deemed to constitute an offer to Licensor to have this Agreement assigned to it or to its designee for the consideration, or its equivalent in money, and upon such terms, as are specified in the notice. The aforesaid offer may be accepted only by written notice given to the Trustee or Licensee, as the case

11

may be, by Licensor. Nothing contained herein shall be deemed to preclude or impair any rights that Licensor may have as a creditor in any proceeding or shall be deemed to be a consent to any assignment.

(20)    Paragraph 27 of the Signature Rocawear License Agreement provides that "No modification or waiver of this Agreement shall be effective unless it is in writing and signed by the parties hereto."

(21)    Paragraph 28 of the Signature Rocawear License Agreement provides that it is governed by and construed in accordance with the laws of the State of New York, without giving any effect to the conflict of laws and principles thereof.

(22)    Pre-Petition, Signature was in severe financial distress. It was operating at a multi-million dollar loss and owed million of dollars to its manufacturers, including the Petitioning Creditors (as defined herein). Studio IP contended that, as of August 14, 2009, Signature was in default of its obligation under the Signature Rocawear License Agreement to pay Guaranteed Minimum Royalty and Guaranteed Minimum Advertising Fees in the amount of $7,462,500.00.

(23)    Beginning in approximately April 2009, Signature began discussions with third-parties regarding possible investments or partnerships involving the Rocawear brand. Signature had discussions with the Azraks, Li & Fung Ltd. ("Li & Fung"), Roc Apparel Group, LLC, Jacques Moret and Endurance, LLC. Li & Fung is a Hong-Kong-headquartered multinational

3134248-1

group engaged in consumer goods design, development, sourcing and distribution.

(24)    Members of the Iconix Defendants' management in 2009 included CEO Cole, GC Tarshis, Executive Vice President Yehuda Shmidman ("EVP Shmidman"), Head of Strategic Development David Blumberg ("HSD Blumberg") and Chief Financial Officer Warren Clamen ("CFO Clamen"). These individuals had communications in 2009 (including with Signature or internally amongst themselves), regarding issues concerning the Rocawear brand.

(25)    There were discussions in August 2009, between Signature and the Azraks and Li & Fung about a potential transaction involving Signature and the Rocawear brand.

(26)    On August 14, 2009, GC Tarshis e-mailed Christopher Laurita:

> Know you guys have a lot going on, but wanted to give you a quick heads-up that we will be sending you a notice later today regarding the past due AD and Roc royalties. We aren't terminating the licenses, but need (for legal and accounting) to document that the royalties are owed. This won't have any impact on the various deals that you are working on. […]

(27)    Later on August 14, 2009, the Iconix Defendants issued a notice of default to Signature pursuant to paragraph 20 of the Signature Rocawear License Agreement.

(28)    While the ten day cure period provided in the Signature Rocawear License Agreement was in effect, Signature continued to negotiate a potential transaction involving the Rocawear brand. On August 14, 2009, Christopher

Laurita reported in an e-mail to CEO Cole that he had received a "Deal Point Memo" from Li & Fung.

(29)    On August 17, 2009, CEO Cole e-mailed Christopher Laurita that he had spoken with Li & Fung USA CEO Rick Darling "who seemed pretty sure a deal would get done. Definitely our first choice for many reasons."

(30)    On August 24, 2009, Christopher Laurita reported to CEO Cole that he had received an outline from Li & Fung on August 21, 2009 and was planning on responding by the end of the day.

(31)    On or about August 24, 2009, Signature engaged Andrew Stamelman of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP ("Riker Danzig") to assist with a potential transaction involving Signature and the Rocawear brand.

(32)    Signature also engaged Sol Lipshitz of Anchin Capital Advisors LLC ("ACA") in August 2009 to "provide consultation services … with respect to the proposed sale of certain assets of [Signature] and the liquidation of Signature," as well as advice on prospective mergers, sales and acquisitions. ACA also attempted to locate potential counterparties, other than Li & Fung and the Azraks, for a transaction with the Laurita Brothers involving the Rocawear brand and Signature's related business.

(33)    On August 25, 2009, Joseph Laurita advised Sol Lipshitz via email that he, Christopher Laurita and Anthony Laurita would "respond to the Li & Fung term sheet since it is not a deal that we feel is viable anyway.  After we meet

with Neil Cole today we will call you to set up a strategy meeting with attorney present on doing the deal with Ruby Azrak."

(34)    Ultimately, Li & Fung was not interested in doing a transaction with Signature concerning the Rocawear brand.  Li & Fung expressed this to Signature, Riker Danzig and ACA during a September 2009 meeting.

(35)    On August 26, 2009, Signature provided CEO Cole with its proposal entitled  "Rocawear Jrs Deal Outline" that proposed that "Newco will agree to pay the outstanding past due royalty debt due to Iconix owned by Signature Apparel which should not exceed $6M.  This money shall be paid by newco and deducted from Laurita's 50% equity in the new business going forward over the life of the new license agreement."  This proposal also proposed a term extending through 2021 and royalty rates of "8%/2%."  This proposal was never finalized prior to the Petition Date (as defined herein) or thereafter.

(36)    Also on August 26, 2009, Christopher Laurita e-mailed CEO Cole stating that "if the proposed outline sent in the prior e-mail is acceptable to you, we would need to extend the default letter dated August 14, 2009 to allow us enough time to properly conclude the deal with the Azraks."

(37)    GC Tarshis advised CEO Cole, HSD Blumberg and EVP Shmidman by email dated August 26, 2009 that, as of August 26, 2009, "we can terminate at any time upon notice (with no cure right)."

3134248-1

(38)    HSD Blumberg subsequently informed Christopher Laurita by e-mail on August 28, 2009 that Iconix would agree to extend the cure period to September 4, 2009:

> [S]o long as your discussions with CIT and Ruby Azrak or Li & Fung are continuing in good faith, Iconix agrees to extend the cure period (pursuant to the Notice of Default under the [Signature Rocawear License Agreement] with such Notice of Default dated August 20, 2009) to September 4, 2009 at noon EST.

(39)    On August 27, 2009, HSD Blumberg sent Christopher Laurita an e-mail concerning a proposed confidential Non-Binding License Term Sheet with respect to the Rocawear brand that set forth proposed terms for the potential deal with the Azraks. The proposed licensee was to be a new company co-owned by the Laurita Brothers and the Azraks.  The proposal included, among other things, the following: (i) the Category was to be "same as current;" (ii) the initial term was to be through December 31, 2013, with three renewal terms of three years each to end in 2022; (iii) the royalty rate was to be 8% of Net Sales; (iv) the advertising rate was to be 2% of Net Sales; (v) the Guaranteed Minimum Sales during the initial term were to be $23.5 million in Year 1 and then $40 million for the remaining years; (vi) the Guaranteed Minimum Sales was $45 million per year for Renewal Term 1, $50 million per year for Renewal Term 2 and $55 million per year for Renewal Term 3; (vii) the combined royalty and advertising fees for the initial term were $2.35 million for Year 1 and then $4 million for each remaining year; (viii) the combined royalty and advertising fees were $4.5 million per year for Renewal Term 1, $5 million per year for Renewal Term

16

2 and $5.5 million per year for Renewal Term 3; and (ix) at "Past-Due Reconciliation," that the "Lauritas shall repay Licensor its Past Due Obligation of $6,000,000" over a four year period and that this obligation would be secured by the Lauritas' 50% interest in Newco and personal guarantees from them. This proposal was not finalized prior to the Petition Date or thereafter.

(40)    HSD Blumberg noted in an e-mail dated August 27, 2009 that two of the "key points" of the deal were the "payment schedule of the $6 million and PGs [personal guarantees]."

(41)    On September 2, 2009, Signature scheduled meetings with Ruben Azrak and Li & Fung.

(42)    In advance of those meetings, Mr. Lipshitz on September 2, 2009 emailed, circulated two "Signature Apparel Proposed Structure" documents with respect to the Azraks and Li & Fung. The Iconix Defendants were not copied on these e-mails. Both proposals called for, as the "Initial start-up structure," that the "Iconix Rocawear license to be transferred to NEWCO in exchange for payment plan to be made by NEWCO on OLDCO liability on such license (amount to be agreed to)." It also provided that "NEWCO to sign new license agreement" with initial 4 year term and two 3 year automatic renewals if minimums are met. This proposal was not finalized prior to the Petition Date or thereafter.

(43)    On September 2, 2009, EVP Shmidman informed CEO Cole, HSD Blumberg, and GC Tarshis via email that:

Neil, Ruby urgently wants to talk if you're available tonight or tomorrow. His offer to us is that he's willing to sign the term sheet (8+2, 40m sales min) with RVC standing behind that minimum royalties and the 6m payout. He wants to pay the 6 m over 4 years. In even payments. Says he can't pay 2m this year because he's killing cash flow to "save the business". His new deal with Chris is that he would own Newco 100% and pay Chris a commission of 3-4% on sales, however he wants to take a share out of Chris' commission to help pay back the $6m. He wants to talk to you to see If you're on board with him taking over and to resolve these last two issues: (1) are we willing to get paid back the 6m over 4 years without 2m in 2009; and (2) he wants help convincing the Lauritas to reduce their commission to help pay us back the 6m.

(44)    HSD Blumberg questioned "if Ruby takes out our $1.5 million a year ($6mm divided by 4 years) from chris/joe, do they have any incentive to make this work?"

(45)    Christopher Laurita e-mailed CEO Cole on September 4, 2009, as follows:

My attorney Andrew Stamelman from Riker Danzig is calling Andy Tarshis today. Bottom line is Azrak will be financing the business. Nothing else would change. We will be staying here at 1370 Broadway on the 5th floor separate from their offices. They will not have offices here at all. Our entire Sales, Design & Product Development team will stay with Newco. Jay would still be working with the same people he has always worked with. Joe & I will have an office here and we will still be managing the business day to day. I will make sure the product and distribution doesn't change going forward. As a matter of fact, I think the business will grow. They have amazing relationships with 3 of our top 5 accounts. We have much better Dept store relationships than they do. I'm confident with the arrangement. One other very very important issue is they work with the same factories we do. I believe we will have goods in the air as early as next week so there shouldn't be much business interruption which protects our floor space as well as your royalty stream. Any other deal, I truly believe this would be a problem and possibly

18

> not having goods on the floor at all for 4th qtr. I'm
> still going to pursue L&F although I think it's a
> tough deal to make because of the creditors
> (Factories Especially). Too much has to happen for
> that deal to close and we are out of time.

CEO Cole forwarded the e-mail to GC Tarshis, HSD Blumberg, EVP Shmidman and Mr. Meneilly, but never responded to Christopher Laurita in writing.

(46)    On September 4, 2009 at 11:38 a.m. EST (the "Petition Date"), three of Signature's apparel agents and manufacturers – Harvestway (China) Limited, Talful Ltd., and Hitch and Trail, Inc. (collectively, the "Petitioning Creditors") – filed a petition in the United States Bankruptcy Court for the Southern District of New York against Signature pursuant to chapter 7 of the Code (the "Involuntary Petition").

(47)    The Involuntary Petition was filed prior to the expiration of the cure period under the Signature Rocawear License Agreement and the parties' subsequent agreement to extend the cure period.

(48)    The Iconix Defendants never sent a written notice of termination of the Signature Rocawear License Agreement to Signature.  .

(49)    Post-Petition, on September 5, 2009, CFO DeMichael forwarded a news report describing the Involuntary Petition to CEO Cole, who forwarded it to HSD Blumberg, GC Tarshis, EVP Shmidman and CFO Clamen. The next day, GC Tarshis forwarded the notice to Attorney Stamelman requesting his insight.

(50)    Joseph Schwartz of Riker Danzig provided bankruptcy advice to Signature.

(51)    On September 8, 2009 (the next business day after the Involuntary Petition was filed, with Labor Day falling on September 7), Joseph Laurita asked

Attorneys Schwartz and Stamelman to set up a call with himself, Christopher Laurita, Anthony Laurita, and Ruben Azrak. Attorney Stamelman later stated via e-mail that he, Attorney Schwartz, and Azrak counsel Michael Goldsmith of Sills Cummis & Gross P.C. ("Attorney Goldsmith") would call GC Tarshis.

(52)    The Azraks and the Iconix Defendants began negotiating a new and different license agreement for the Rocawear brand on or about September 8, 2009. On September 8, 2009, EVP Shmidman provided Ruben Azrak with a revised term sheet, which provided, among other things: (i) the initial term was to be through December 31, 2013, with three renewal terms extending through 2022; (ii) the royalty rate was to be 8%; (iii) the advertising royalty ranged from 0.75% to 2%; (iv) the minimum net sales ranged from $35 million per year to $55 million per year in 2020 through 2022; (v) the guaranteed minimum payments ranged from $2.975 million per year to $5.5 million per year; and (vi)the new licensee was "to pay Licensor past royalties due under the Signature license--$6,000,000…."

(53)    Between September 9, 2009 and September 15, 2009, the Iconix Defendants and the ROC defendants exchanged drafts of a license agreement relating to the Rocawear brand.

(54)    The initial drafts incorporated the ROC Defendants' agreement to pay $6,000,000 to the Iconix Defendants in a provision proposed by Iconix called "Additional Royalty" that stated:

In addition to its Royalties and Advertising Fees under this Agreement, in consideration for the assumption of this

license, Licensee agrees to make payments to Licensor in the amount of $6,000,000 as follows …

(55)   On September 10, 2009, Iconix in-house counsel Cory Baker invited Attorney Silverberg to "add additional indemnity language that you feel gives you the comfort you need and I will review."

(56)   A subsequent draft of the agreement included an indemnity provision drafted by the Azraks' counsel that called for Studio IP to "indemnify" and "defend, save and hold harmless" the ROC Defendants from, among other things, "any claim or allegation that [the Signature Rocawear License Agreement] was not effectively terminated." The draft also contained a representation that "Licensor represents and warrants that (i) the License Agreement by and between Licensor and Signature Apparel Group dated as of June 1, 2004, as amended [] has been effectively terminated by Licensor and is of no further force and effect … .".

(57)   On September 15, 2009, Studio IP entered into a license agreement with ROC Fashions concerning the Rocawear brand (the "ROC Fashions Rocawear License Agreement"). The ROC Fashions Rocawear License Agreement provided the ROC Defendants with "the exclusive right and license … to use the [Rocawear] Trademarks in connection with the design, manufacture, marketing, promotion, distribution, and sale of Licensed Products" (defined as "junior and plus sized sportswear in all fabrications to include but not be limited to: Tops, dresses, pants, jeans, skirts, jumpsuits, sweaters, and outerwear including, without limitation, leather, suede and faux leather, Junior's Activewear; and Plus Size Activewear") within the

21

United States and its territories and possessions and U.S. military installations throughout the world.

(58)    The final version of the ROC Fashion Rocawear License Agreement, includes an indemnification provision relating to "any claim or allegation that [Signature's] license agreement was not properly and effectively terminated" and includes a representation that the "License Agreement by and between Licensor and [Signature] dated as of June 1, 2004, as amended [] has been effectively terminated by Licensor and is of no further force and effect ….".

(59)    The "Additional Royalty" was later re-characterized as an "Additional Fee."

(60)    ROC Fashions hired over time 22 of the approximately 70 former Signature employees.  ROC Fashions' offices were located at 1384 Broadway, New York, NY 10018.  For a period of a few months, ROC Fashions rented space at 1370 Broadway where Signature had its offices from the landlord of that building, who was a personal friend of Charles Azraks'.   Roc Fashions rented this space because it was building a new space at the 1384 Broadway address.

(61)    On September 21, 2009, Attorney Stamelman informed Christopher Laurita by email that Riker Danzig would form a new entity called Changing Lanes, LLC ("Changing Lanes") in Delaware.

(62)    The certificate of formation for Changing Lanes was filed with the Secretary of State for the State of Delaware on October 13, 2009. Einbinder & Dunn subsequently worked on preparing a draft consulting agreement for the

22

Laurita Brothers, dated as of January 1, 2010, between Changing Lanes and ROC Fashions that provided, at "Description of Service," that Changing Lanes would "provide professional consulting and management services and other advice in connection with [ROC Fashions'] sale of clothing and accessories under the 'Rocawear Junior' brand." Counsel for the ROC Defendants and the Laurita Brothers exchanged various drafts of these agreements.

(63)    The draft consulting agreement between Changing Lanes and Roc Fashions was never executed.

(64)    Joseph Laurita subsequently moved to California while Christopher Laurita remained in the New York area.

(65)    On November 5, 2009, this Court entered an Order for Relief under Chapter 7.

(66)    On November 9, 2009, Signature filed a *Motion to Convert Case to a Case Under Chapter 11*, which was granted on November 12, 2009, and through which the Laurita Brothers remained in control of Signature as principals of a debtor in possession.

(67)    On December 8, 2009, the certificate of formation for New Star was filed with the Secretary of State for the State of Delaware. Thereafter, New Star consulted for ROC Fashions and RVC pursuant to an oral agreement.

(68)    On December 3, 2009, the United States Trustee noticed the appointment of the Official Committee of Unsecured Creditors (the "Creditors'

Committee"), and appointed Iconix, along with two of the three Petitioning

Creditors–Talful and Harvestway–to the Committee.

(69)    On December 4, 2009, counsel for Iconix Brand Group advised counsel for

the Creditors' Committee" "Responding to you [sic] inquiries regarding the

licenses:  1.  Both the Rocawear and Artful Dodger licenses have been

terminated."

(70)    On December 7, 2009, the Creditors' Committee, which was represented by

Olshan, filed limited objections to three separate motions made by

Signature, each stating:

> Pre-petition, the Debtor's sole business was to sell products
> produced as licensee for brands owned by Iconix Brand
> Group Inc. ("Iconix"). When it became clear that the
> Debtor could no longer perform its obligations under the
> Iconix licenses, the Debtor and Iconix agreed to terminate
> the licenses.

(71)    In the Court's Memorandum Opinion dated March 4, 2015, the Court found

that in the First Day Objections, "the Committee states that the Debtor and

Iconix 'agreed' to terminate the Signature License.  There is no genuine

dispute that such an agreement was made.  The Plaintiff admits as much."

(72)    On April 1, 2010 and May 12, 2010, Signature and the Creditors'

Committee jointly drafted and filed a Disclosure Statement and a First

Amended Disclosure Statement, each stating:

> In the months leading up to the Petition Date … the Debtor
> began having difficulty making payments to Iconix on
> account of the Rocawear License. As a result, prior to the
> Petition Date, and pursuant to the terms [of the] Rocawear
> License Agreement, Iconix terminated the Rocawear
> License with the Debtor. In addition, prior to the Petition
> Date, the Debtor had a licensing agreement to manufacture
> and distribute apparel bearing "Artful Dodger TM"

24

branding (the "Artful Dodger License"). Due to circumstances similar to those described above, prior to the Petition Date, the Artful Dodger License was also terminated by its owner.

At summary judgment, the Court concluded that these statements were false.

(73)   The First Amended Plan of Liquidation Proposed Jointly by the Debtor and the Official Committee of Unsecured Creditors, which was confirmed on July 1, 2010, provides in Section 13.10 under the heading "Exculpation" that "the Committee and its members (solely in their capacity as members of the Committee)" shall not "have or incur any liability…to any other party-in-interest…in connection with, relating to, or arising out of the Chapter 11 Case" or related to the Plan, "except for their criminal conduct, bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing, ultra vires acts or breach of fiduciary duty."

(74)   The Iconix Defendants did not prepare the initial draft of the Disclosure Statement or the Amended Disclosure Statement. A draft of the Disclosure Statement was first sent to the Iconix Brand Group, as a member of the Creditors' Committee, on March 29, 2010 for its review and comment. GC Tarshis signed the Disclosure Statement on behalf of the Creditors' Committee.

(75)   On June 24, 2010, Signature filed an AFFIDAVIT OF CHRISTOPHER LAURITA IN SUPPORT OF CONFIRMATION OF FIRST AMENDED PLAN OF LIQUIDATION PROPOSED JOINTLY BY THE DEBTOR AND THE OFFICIAL

3134248-1

COMMITTEE OF UNSECURED CREDITORS DATED MAY 12, 2010, on behalf of Signature and the Creditors' Committee, which stated:

> prior to the Petition Date, and pursuant to the terms [of the] [Signature] License Agreement, Iconix terminated the [Signature] License [Agreement] with the Debtor.

At summary judgment, the Court concluded that this statement was false.

(76)    On November 20, 2009, December 29, 2009 and February 23, 2010, Signature as the debtor-in-possession filed a Schedule G, an Amended Schedule G, and a further Amended Schedule G, respectively, setting forth all executory contracts and unexpired leases that did not include the Signature Rocawear License Agreement.

(77)    On July 1, 2010, the Plan was confirmed by this Court.

(78)    New Star received $100,000 from ROC Fashions on a monthly basis between January 2010 and August 2010, for a total of $800,000. The check remittances to New Star contain a note for "Advance 3% Commission."

(79)    New Star, ROC Fashions, and RVC executed a termination agreement on September 3, 2010.

(80)    The termination agreement provided that ROC Fashions and RVC would pay New Star an additional $2,000,000 in two installments. Check remittances and accounting notes from ROC Fashions records for a total of $1,000,000.00 paid to New Star state "Per Tem Agreement/1" and "Per Term Agreement/2."

(81)    Ruben Azrak subsequently paid Christopher Laurita an additional $250,000.00 and Jacqueline Laurita $275,000.00.

(82)    In total, New Star, Christopher Laurita, and/or Jacqueline Laurita received $2,325,000 from ROC Fashions and Ruben Azrak.

(83)    Studio IP received at least $13,552,648 from the ROC Defendants pursuant to the terms of the Roc Fashions License Agreements.

(84)    Anchin Capital Advisors produced certain documents on April 26, 2012 pursuant to a subpoena from the Responsible Person..

(85)    Iconix Brand Group and Studio IP produced certain documents on June 5, 2012 pursuant to a subpoena from the Responsible Person..

(86)    Riker Danzig produced certain documents on June 29, 2012 pursuant to a subpoena from the Responsible Person..

**H.**
**STATEMENT OF DISPUTED FACTS**

Signature submits that the following facts are in dispute and remain to be litigated at the Trial:

Disputed Facts Relevant to Fraud and Negligent Misrepresentation

(Counts I and II):

(1)    Whether Iconix Brand Group and Christopher Laurita were responsible for the false statements, in the Disclosure Statements and the Confirmation Affidavit of Christopher Laurita, respectively, regarding the occurrence of a pre-petition termination of the Signature Rocawear License Agreement that was pursuant to the terms of the Agreement?

(2)    Were Iconix Brand Group and Christopher Laurita aware that the statements were false at the time the statements were made?

3134248-1

(3)     Was Plaintiff's reliance on the false statements in the Disclosure Statements and Confirmation Affidavit reasonable?

Disputed Facts Relevant to Breach of Fiduciary Duty and Unjust Enrichment

(Counts III and IX):

(1)     Whether the exclusive license/right of the use of the trademark 'ROCAWEAR' set forth in the Signature Rocawear License Agreement, as amended (the "Rocawear Rights") involved the same/identical exclusive license/right to the use of the trademark "Rocawear" granted to ROC Fashions in the ROC Fashions Rocawear License Agreement.

(2)     Did Christopher Laurita breach his fiduciary duties of care and good faith in connection with the post-Petition, oral termination of the Signature Rocawear License Agreement, and by not exercising due care in the transition of the Rocawear Rights and related business from Signature to the released ROC Defendants?

(3)     Did Christopher Laurita breach his duty of loyalty in accepting $2,325,000.00, through New Star, for services related to the Rocawear Rights?

(4)     Whether Chris Laurita, New Star or some other defendant directed payment to New Star?

Disputed Facts Relevant to Aiding and Abetting Breach of Fiduciary Duty

(Count IV):

(1)     Whether the exclusive license/right of the use of the trademark 'ROCAWEAR' set forth in the Signature Rocawear License Agreement, as

3134248-1

amended (the "Rocawear Rights") involved the same/identical exclusive license/right to the use of the trademark "Rocawear" granted to ROC Fashions in the ROC Fashions Rocawear License Agreement.

(2)    Did Defendants conspire to deprive Signature of the value of the Rocawear Rights and exclude the estate from the post–Petition transactions involving the Rocawear Rights, through which the ROC Defendants agreed to pay a total of $18,837,500, comprised of (1) $6,000,000 to Iconix Brand Group and Studio IP as an "Additional Royalty/Additional Fee"; (2) $10,037,500 to Studio IP in guaranteed minimum royalties for 2009-2011 and (3) $2,800,000 to New Star for "consulting" services, and through which Christopher Laurita, Jacqueline Laurita and New Star received $2,325,000 and the Iconix Defendants received at least $13,552,648?

(3)    Did the Iconix Defendants assist Christopher Laurita in locating a party who would be interested in acquiring the Rocawear Rights, and if so, what assistance did the Iconix Defendants provide?

(4)    Were the Iconix Defendants aware that Christopher Laurita would be compensated, by either the released ROC Defendants or any other potential successor licensee for the Rocawear Rights, in connection with future business involving the Rocawear Rights or trademarks, or for transitioning Signature's Rocawear-related resources?

(5)    Were the Iconix Defendants aware that, in addition to the Rocawear Rights, the released ROC Defendants were acquiring employees, real estate and various other aspects of Signature's Rocawear-related business?

3134248-1

(6)     Whether the Iconix Defendants were aware that the Signature Rocawear License Agreement had not been terminated pursuant to its terms ~~or abandoned~~ at the time they entered into the Roc Fashions Rocawear License Agreement?

Disputed Facts Relevant to Termination, Repudiation and Abandonment:

(1)     Was the Signature Rocawear License Agreement repudiated? If so, on what date did the repudiation occurred and how it was communicated (by whom and to whom)?

(2)     Were the facts surrounding the termination of the license peculiarly within the Defendants' knowledge or were otherwise reasonably discoverable by the Plaintiff prior to Plaintiff's receipt of discovery from Iconix, Signature's former counsel (Riker Danzig) and the Roc Defendants in April through June of 2012?

(3)     What facts regarding termination were available for Plaintiff to discover in and around September 2009?

(4)     Did the terms of the ROC Fashions Rocawear License Agreement require confidentiality that precluded disclosure of the terms of the license?

(5)     Did the Iconix Defendants advise Riker Danzig, Signature's counsel, that it was willing to assume the risk associated the termination of the Signature Rocawear License Agreement, including risk associated with the fact that the Signature Rocawear License Agreement was not terminated prior to the filing of the Involuntary Petition on September 4, 2009.

3134248-1

(6)     Did the Iconix Defendants exercise improper control over the assets of Signature's estate by deeming the Signature Rocawear License Agreement terminated after the Involuntary Petition was filed, or by participating in an agreement to terminate the Signature Rocawear License Agreement?

(7)     Is the Iconix Defendants' grant of indemnification to the defendant ROC Fashions in the Roc Fashions Rocawear License Agreement against any claim or allegation that the Signature Rocawear License Agreement was not properly and effectively terminated evidence of Iconix's intent to violate the automatic stay.

The Iconix Defendants submit that the following facts are in dispute and remain to be litigated at the Trial:

(1)     Pursuant to Sections 20(c) and 24 of the Signature Rocawear License Agreement, any assignment required Studio IP's consent.

(1)     Prior to the August 14, 2009 Notice of Default being issued, Signature unequivocally advised the Iconix Defendants that it could not satisfy the more than $7.4 million in arrearages that it owed and that it was unable to continue with its obligations under the Signature Rocawear License Agreement.

(2)     As of September 15, 2009, the Signature Rocawear License Agreement had no value.

(3)     The Iconix Defendants were unaware of the terms of any consulting arrangement between Christopher Laurita and/or New Star and any of Roc Fashions Defendants.

(4)     The Iconix Defendants never required that a consulting arrangement between Christopher Laurita and/or New Star and any of Roc Fashions Defendants was a condition to the new license with Roc Fashions.

(5)     The Iconix Defendants were aware of Signature's efforts to find a third-party to negotiate a new license arrangement for the Rocawear brand.

(6)     Michael Fox of Olshan Frome Wolosky LLC, counsel for the Petitioning Creditors, had discussions with Li & Fung in which Li & Fung advised him that it was no interested in doing a transaction for the Rocawear brand.

(7)     The Azraks never agreed to any proposal in which Signature or the Lauritas would have any equity interest.

(8)     The Iconix Defendants never received a draft of or were advised of the terms of any consulting agreement.

(9)     At no time prior to confirmation of the First Amended Plan of Liquidation on July 1, 2010, did Olshan, in its capacity as counsel for the Creditors' Committee, ever request a copy of a written notice of termination.

3134248-1

The Laurita Defendants submit that the following facts are in dispute and remain to be litigated at the Trial:

(1)     As of September 15, 2009, the Signature Rocawear License Agreement had no value.

(2)     Christopher Laurita was not aware that statements in the Confirmation Affidavit regarding the termination of the Signature Rocawear License Agreement were false at the time the statements were made.

(3)     Christopher Laurita did not intend to deceive in making the statements in the Confirmation Affidavit regarding the termination of the Signature Rocawear License Agreement.

(4)     Christopher Laurita's reliance on bankruptcy counsel with respect to the statements set forth in the Confirmation Affidavit was reasonable.

(5)     Plaintiff did not rely on false statements in the Disclosure Statements and Confirmation Affidavit regarding the termination of the Signature Rocawear License Agreement.

(6)     To the extent Plaintiff did rely on false statements in the Disclosure Statements and Confirmation Affidavit regarding the termination of the Signature Rocawear License Agreement, such reliance was not to Plaintiff's detriment and/or was unreasonable.

(7)     Christopher Laurita did not breach his fiduciary duties of care and good faith to Signature in connection with the termination of the Signature Rocawear License Agreement or the purported transition of the Rocawear Rights and related business from Signature to the ROC Defendants.

(8)     Immediately prior to the filing of the involuntary petition in August and September 2009, the focus of Signature's management at that time was to preserve as much value as possible for the creditors, because Signature's business was, for all intents and purposes, completely defunct.

(9)     Shortly after the filing of the involuntary petition, and during the so-called "gap period," the Debtor, its management, and its counsel, considered their practical and legal options.  The question of preserving the license for the benefit of the estate was a critical inquiry, but that meant, initially, a legal battle with Iconix over the issue of termination which the Debtor simply could not afford.

(10)    Even a successful fight with Iconix over the issue of whether the license agreement had been terminated would have been a pyrrhic victory because the license agreement, as a personal service contract, could not be assigned under bankruptcy law.  This was the opinion and advice of Debtor's counsel at the time.

(11)    Even if the Debtor was successful in litigating the termination issue with Iconix, and the license could be assigned under bankruptcy law, its value was highly suspect because of the huge royalty obligation tied to it (in excess of $7 million), which would need to be cured in connection with any assumption and assignment pursuant to bankruptcy law.

(12)    The factual and legal circumstances facing Signature directly support a finding that the determination to deem the Licensing Agreement terminated comported with and is protected by the business judgment rule.

34

(13)    Signature entered into a valid agreement with Iconix to deem the Licensing Agreement terminated.

(14)    The Signature estate had no reasonable expectation of receiving consideration for a transfer of the Rocawear license.

(15)    Christopher Laurita did not transfer the Rocawear license to a new licensee or strip Signature of its right to do so and the opportunity to transfer of the rights to the Rocawear license was not within Signature's "line of business."

(16)    Christopher Laurita did not procure Studio IP's breach of the Signature Rocawear License Agreement.

(17)    As president and chief executive officer of Signature, Christopher Laurita could not be held liable for tortuously interfering with Signature's contract.

(18)    Christopher Laurita was not compensated by the ROC Defendants for transitioning Signature's Rocawear-related resources.

(19)    Christopher Laurita did not wrongfully employ the resources of Signature in conjunction with the consulting provided to ROC Fashions.

(20)    Christopher Laurita is entitled to the protections of the exculpation provision embodied in the Signature Operating Agreement.

(21)    The Signature Rocawear License Agreement was repudiated by the parties.

(22)    The facts surrounding the termination of the Signature Rocawear License Agreement were not peculiarly within the Defendants' knowledge or were otherwise reasonably discoverable by the Plaintiff prior to Plaintiff's receipt of discovery from Iconix, Signature's former counsel (Riker Danzig) and the Roc Defendants in April through June of 2012.

(23)    The facts regarding termination of the Signature Rocawear License Agreement were available for Plaintiff to discover in and around September 2009.

(24)    Prior to the August 14, 2009 Notice of Default being issued, Signature advised the Iconix Defendants that it could not satisfy the more than $7.4 million in arrearages that it owed and that it was unable to continue with its obligations under the Signature Rocawear License Agreement.

(25)    New Star was entitled to the consulting fees paid to it for services related to the Rocawear Rights.

(26)    The consulting fees paid to New Star were not paid at the expense of Plaintiff.

(27)    Plaintiff was not damaged by the payment of consulting fees to New Star for services related to the Rocawear Rights.

(28)    At summary judgment, the Court concluded that section 3.5 of Signature's Operating Agreement "plainly eliminates the Laurita Brothers' duty of loyalty to the Debtor."

(29)    At summary judgment, the Court concluded that the Bankruptcy Code did not impose a duty of loyalty on the Laurita Brothers during the gap period.

(30)    Plaintiff has appealed the Court's grant of summary judgment on Plaintiff's claims for (a) breach of fiduciary duty of loyalty against Christopher Laurita in Count III of the Complaint arising under federal law for his conduct as an officer and principal following the date of entry of the order of relief (November 5, 2009) and (b) aiding and abetting such breaches of duty of

loyalty in favor of Defendants New Star Group, LLC, Studio IP Holdings, LLC and Iconix Brand Group, Inc. in Count IV of the Complaint.

# I.
## ISSUES OF LAW TO BE DETERMINED

Signature submits that the following issues of law remain to be litigated at the Trial.

### Counts I&II: Fraud/Misrepresentation

(1)    Did the Iconix Defendants and/or Chris Laurita commit fraud by misrepresenting the status of the license?

(2)    Did the Iconix Defendants and/or Chris Laurita negligently misrepresent the status of the license?

(3)    Was there reasonable reliance on the false statements identified in the Court's decision and order on summary judgment?

(4)    What are the damages?

### Count III: Breach of Fiduciary Duty

(5)    Did Christopher Laurita owe Signature the obligation to avoid self-dealing while he controlled Signature as the principal of a debtor in possession?

(6)    Did Christopher Laurita breach his fiduciary duties by diverting opportunities and funds to New Star?

(7)    What are the damages?

### Count III: Breach of Fiduciary Duty

(8)    Did Christopher Laurita exercise due care and good faith in connection with a post-Petition, oral termination of Signature Rocawear License Agreement?

3134248-1

(9)    Did Christopher Laurita engage in self-dealing in connection with a post-Petition, oral termination of Signature Rocawear License Agreement?

(10)    Did Christopher Laurita act in good faith in connection with a post-Petition, oral termination of Signature Rocawear License Agreement?

(11)    What are the damages?

Count IV: Aiding and Abetting Breach of Fiduciary Duty

(1)    Did the Iconix Defendants and New Star knowingly induce or participate in a breach of fiduciary duties by Christopher Laurita?

(2)    What are the damages?

Court VI:  Breach of Contract

(3)    Was the Iconix Defendants' failure to terminate the license pre-petition excused by the Laurita Brothers' repudiation or abandonment of the Signature Rocawear License Agreement?

(4)    Could the Laurita Brothers and Iconix agree to termination of the Signature Rocawear License Agreement after the Involuntary Petition was filed?

(5)    What are the damages?

Count VII:  Tortious Interference with Contract

(6)    Was there a breach of the Signature Rocawear License Agreement?

(7)    Did Iconix intentionally procure the breach of the Signature Rocawear License Agreement?

(8)    What are the damages?

Count XI:  Unjust Enrichment

(9)     Did New Star receive consulting fees to which it was not entitled, as against equity and good conscience, to retain?

(10)    What is the amount of the unjust enrichment?

The Iconix Defendants submits that the following issues of law remain to be litigated at the Trial:

(1)     Whether Signature repudiated or abandoned the Signature Rocawear License Agreement thus making the sending of a written notice of termination of the Signature Rocawear License Agreement by Studio IP a futile act.

(2)     In the event that Studio IP is found liable for breach of contract:

   (a)     whether Iconix Brand Group procured Studio IP's breach of the Signature Rocawear License Agreement; and

   (b)     whether Iconix Brand Group can be held liable for tortious interference with the contract of its wholly owned subsidiary and whether the economic interest defense applies.

(3)     Whether the Iconix Defendants made a material misrepresentation of fact in the Disclosure Statement and the Amended Disclosure Statement.

(4)     Whether the Iconix Defendants had a duty to disclose additional information or correct the misstatements made by the drafters of the Disclosure Statement and Amended Disclosure Statement.

(5)     In the event that the Court found that the false statements in the Disclosure Statement and the Amended Disclosure Statement are attributable to the

3134248-1

Iconix Defendants, whether the Iconix Defendants made the false statement with an intent to deceive.

(6)    Whether the Responsible Person justifiably relied on the false statements in the Disclosure Statement and Amended Disclosure Statement to the detriment of Signature's Estate.

(7)    Whether the Responsible Person exercised ordinary diligence in ascertaining the status of the Signature Rocawear License Agreement.

(8)    Whether the Responsible Person's negligent misrepresentation claim against the Iconix Defendants is barred by the fact that the Iconix Defendants had no fiduciary or special relationship to Signature.

(9)    Whether the Responsible Person's negligent misrepresentation claim against the Iconix Defendants is barred by the First Amended Plan of Liquidation.

(10)    Whether the Iconix Defendants substantially assisted in the alleged breach of the fiduciary duty of care by Defendant Christopher Laurita.

(11)    Whether the Signature Rocawear License Agreement, a trademark license, agreement, was assumable and assignable in bankruptcy without Studio IP's consent.

(12)    Whether the Signature Rocawear License Agreement had any value as of September 15, 2009.

(13)    Whether the Responsible Person may seek the remedy of disgorgement for the tort claims.

3134248-1

The Laurita Defendants submit that following issues of law remain to be litigated at the Trial:

(1)     Does the Court have jurisdiction over Plaintiff's claims (a) against Christopher Laurita in Count III of the Complaint for a breach of fiduciary duty of loyalty arising under federal law for his conduct as an officer and principal following the date of entry of the order of relief (November 5, 2009) and (b) against Defendants New Star Group, LLC, Studio IP Holdings, LLC and Iconix Brand Group, Inc. in Count IV of the Complaint for aiding and abetting such alleged breaches of duty of loyalty

(2)     Does the Court have jurisdiction over Plaintiff's claims that Christopher Laurita owed Signature the obligation to avoid self-dealing as a principal of a debtor in possession?

(3)     Does the Court have jurisdiction over Plaintiff's claims that Christopher Laurita breached his fiduciary duties by diverting opportunities and funds to New Star?

(4)     Was the Signature Rocawear License Agreement, a trademark license agreement, assumable and assignable in bankruptcy without Studio IP's consent?

(5)     Did the Signature Rocawear License Agreement have any value as of September 15, 2009?

(6)     Can the Responsible Person seek the remedy of disgorgement for the tort claims?

3134248-1

Counts I & II: Fraud/Misrepresentation
(Iconix Defendants/Christopher Laurita)

(7)     Did the Iconix Defendants and/or Christopher Laurita make a material representation of fact in the Disclosure Statements and the Confirmation Affidavit of Christopher Laurita, respectively, regarding the termination of the Signature Rocawear License Agreement?

(8)     Did the Iconix Defendants and/or Christopher Laurita commit fraud by misrepresenting the status of the Signature Rocawear License in the Disclosure Statements and the Confirmation Affidavit of Christopher Laurita, respectively?

(9)     Did the Iconix Defendants and/or Christopher Laurita negligently misrepresent the status of the Signature Rocawear License in the Disclosure Statements and the Confirmation Affidavit of Christopher Laurita, respectively?

(10)    Did the Iconix Defendants have a duty to disclose additional information or correct the misstatements made by the drafters of the Disclosure Statement and Amended Disclosure Statement?

(11)    In the event that the Court finds that the false statements in the Disclosure Statement and the Amended Disclosure Statement are attributable to the Iconix Defendants, did the Iconix Defendants make the false statement with an intent to deceive?

3134248-1

(12)    In the event that the Court finds that the false statements in the Confirmation Affidavit of Christopher Laurita are attributable to Christopher Laurita, did Christopher Laurita make such false statements with an intent to deceive?

(13)    Was there reasonable reliance by Plaintiff on the false statements identified in the Court's decision and order on summary judgment?

(14)    Did the Responsible Person exercise ordinary diligence in ascertaining the status of the Signature Rocawear License Agreement?

(15)    Is the Responsible Person's negligent misrepresentation claim against the Iconix Defendants barred by the fact that the Iconix Defendants had no fiduciary or special relationship to Signature?

(16)    Is the Responsible Person's negligent misrepresentation claim against the Iconix Defendants or Christopher Laurita barred by the First Amended Plan of Liquidation?

(17)    Was Plaintiff's reliance on false statements identified in the Court's decision and order on summary judgment to Plaintiff's detriment?

(18)    Was Plaintiff damaged by its reliance on false statements identified in the Court's decision and order on summary judgment?

**Count III: Breach of Fiduciary Duty**
**(License Termination) (Christopher Laurita)**

(19)    What was the fiduciary duty of care owed by Christopher Laurita to Signature?

(20)    Did Christopher Laurita exercise due care and good faith in connection with the termination of Signature Rocawear License Agreement?

43

(21)   Did Christopher Laurita act in good faith in connection with the termination of Signature Rocawear License Agreement?

(22)   Did Christopher Laurita violate the fiduciary duty of care owed to Signature in connection with the termination of Signature Rocawear License Agreement?

(23)   Was Plaintiff damaged by Christopher Laurita's actions in connection with the termination of Signature Rocawear License Agreement?

Count IV: Aiding and Abetting Breach of Fiduciary Duty
(Iconix Defendants)

(24)   Did the Iconix Defendants substantially assist in the alleged breach of the fiduciary duty of care by Defendant Christopher Laurita?

Court VI: Breach of Contract
(Studio IP)

(25)   Was the Iconix Defendants' failure to terminate the license pre-petition excused by Signature's repudiation or abandonment of the Signature Rocawear License Agreement?

(26)   Did Signature's repudiation or abandonment of the Signature Rocawear License Agreement make the sending of a written notice of termination of the Signature Rocawear License Agreement by Studio IP a futile act?

(27)   Could Signature and Iconix agree to termination of the Signature Rocawear License Agreement after the Involuntary Petition was filed?

Count VII:  Tortious Interference with Contract
(Iconix)

(28)   Was there a breach of the Signature Rocawear License Agreement?

(29)   In the event that Studio IP is found liable for breach of contract, did Iconix intentionally procure the breach of the Signature Rocawear License Agreement?

(30)   In the event that Studio IP is found liable for breach of contract, can Iconix Brand Group be held liable for tortious interference with the contract of its wholly owned subsidiary and whether the economic interest defense applies?

Count XI:  Unjust Enrichment
(New Star)

(31)   Did New Star receive consulting fees to which it was not entitled, as against equity and good conscience, to retain?

(32)   Did Christopher Laurita, New Star or some other defendant direct that payment of consulting fees for services related to the Rocawear Rights be made to New Star?

(33)   Was New Star entitled to the consulting fees paid to it for services related to the Rocawear Rights?

(34)   Was the payment of consulting fees to New Star for services related to the Rocawear Rights at the expense of Plaintiff?

(35)   Was Plaintiff damaged by the payment of consulting fees to New Star for services related to the Rocawear Rights?

(36)   What is the amount of the unjust enrichment?

Dated: New York, New York
      April 14, 2015

                OLSHAN FROME WOLOSKY LLP


By:    */s/ Kyle C. Bisceglie*
        Kyle C. Bisceglie
        Ellen V. Holloman
        *Attorneys for Plaintiff Signature*
        *Apparel Group LLC*
        Park Avenue Tower
        65 East 55th Street
        New York, New York 10022
        (212) 451-2300


Dated: New York, New York
      April 14, 2015

                BLANK ROME LLP


By:    */s/ Harris N. Cogan*
        Harris N. Cogan
        Andrew T. Hambelton
        *Attorneys for Defendants Iconix Brand*
        *Group, Inc. and Studio IP Holdings LLC*
        The Chrysler Building
        405 Lexington Avenue
        New York, New York 10174
        (212) 885-5000

3134248-1

Dated: New York, New York
      April 14, 2015

SEIDMAN & PINCUS, LLC


By:   */s/ Mitchell B. Seidman*
     Mitchell B. Seidman
     Andrew Pincus
     Jeffrey A. Kramer
     *Attorneys for Defendants Christopher*
     *Laurita and New Star Group LLC*
     777 Terrance Avenue, Suite 508
     Hasbrouck Heights, New Jersey 07604
     (201) 473-0047


**SO ORDERED:**

Dated: New York, New York
      April 20, 2015


     *s/ Robert E. Grossman*
The Honorable Robert E. Grossman
United States Bankruptcy Judge

47