UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

In re:

SIGNATURE APPAREL GROUP LLC,

     *Debtor*

------------------------------------------------------------ x

SIGNATURE APPAREL GROUP LLC,

     *Plaintiff,*

*v.*

JOSEPH LAURITA, CHRISTOPHER
LAURITA, NEW STAR GROUP, LLC, ROC
FASHIONS LLC, RVC ENTERPRISES, LLC,
RUBEN AZRAK, VICTOR AZRAK, CHARLES
AZRAK, ICONIX BRAND GROUP, INC., and
STUDIO IP HOLDINGS LLC,

     *Defendants.*

------------------------------------------------------------ x

ROC FASHIONS LLC,

     *Third-Party Plaintiff,*

*v.*

STUDIO IP HOLDINGS LLC,

     *Third-Party Defendant.*

------------------------------------------------------------ x

Chapter 11

Case No. 09-15378 (REG)

Adversary No. 11-02800 (REG)

**MEMORANDUM DECISION**

### 1. Introduction

Anthony Labrosciano (the "Plaintiff"), the Chapter 11 Responsible Person of the estate of

Signature Apparel Group LLC (the "Debtor"), appointed pursuant to a confirmed liquidation plan,

commenced this adversary proceeding under the Bankruptcy Code, New York and Delaware law asserting a variety of claims arising from the Debtor's exclusive license agreement to manufacture and distribute juniors sportswear apparel bearing the Rocawear trademark. The defendants remaining in this adversary proceeding are Christopher Laurita, New Star Group, LLC ("New Star"), Iconix Brand Group, Inc. ("Iconix") and Studio IP Holdings, LLC  ("Studio IP") (collectively, the "Defendants").

The Debtor's precarious financial positon made an injection of capital into the company critical in order to meet its obligations under the exclusive Rocawear license. The principals of the Debtor and Iconix, the parent company of Studio IP, which was the licensor, commenced negotiations to transfer the Rocawear license granted to the Debtor to a viable new entity in a manner designed to reduce any disruption in the flow of merchandise to retailers and to mitigate significant potential losses to Studio IP and Iconix. Iconix, had recently purchased the entire Rocawear brand and the Debtor had an exclusive license to manufacture and merchandise a portion of the Rocawear brand.

The commencement of the involuntary bankruptcy proceeding under Chapter 7 by three of the Debtor's largest suppliers exacerbated the situation and the negotiations assumed a new urgency. Negotiations to dismiss the involuntary proceeding failed, and the parties quickly entered into a plan designed to grant the exclusive right to manufacture and distribute this segment of Rocawear apparel to a third party, despite the risk that such grant would violate the automatic stay and constitute a breach of the exclusive license agreement between the Debtor and Studio IP. Understanding that time was critical, the parties believed that seeking the approval of the Bankruptcy Court was antithetical to their objectives. Therefore, the parties embarked on a plan which was based on a false premise, that the license which was the Debtor's single most valuable

asset was not property of the estate, having been terminated prior to the commencement of the involuntary petition. The Defendants, along with certain of the professionals, were well aware that this was false, and yet continued to submit documents to the Court stating the Rocwear license had been terminated prepetition. In fact, the Rocawear license was not terminated as of the date of entry of the order for relief, and remained an asset of the Debtor's estate after the order for relief was entered. As a result of certain activities which took place during the time period between the filling of the involuntary petition and entry of the order for relief, and the concealment of these activities through confirmation of a liquidating plan, the Debtor lost the benefit of its most valuable asset for no compensation. No steps were taken in this case to formally abandon the license agreement, or to seek permission from the Court to terminate the license agreement. In fact, the Debtor never pursued a breach of contract claim against Studio IP for its conduct during the early stages of the bankruptcy proceeding. To do so would have exposed the fact that Christopher Laurita failed to disclose that the license agreement was not terminated prepetition, and that with the assistance of Iconix and others, a third party was reaping the benefits of the exclusive rights under the license agreement. The Defendants acknowledged the risks of proceeding with this course of conduct in their communications at the time, yet continued despite these risks.

The Debtor's principals and the parent company of the licensor, with the full knowledge of certain of the professionals in this case, hid the true facts from the Court and the creditors of the Debtor throughout the entire Chapter 11 proceeding. A plan of liquidation was confirmed by the Court on the false premise that the exclusive license agreement was not property of the Debtor's estate, and that Studio IP did not breach the contract post-petition. A review of the record in this case reveals a consistent failure to comply with the most basic requirements of the Debtor to provide full and complete disclosure to the Court and the creditors of the Debtor. The ultimate

result of this scheme was to confer financial gain upon the Defendants and the subsequent licensee, at the expense of the Debtor. Among the many defenses raised by the various defendants to this adversary proceeding, one was consistent: The asset was inconsequential and had no value to the Debtor because the Debtor could not fulfill the requirements under the terms of the license agreement. Because it had no value to the Debtor, the failure to disclose the existence of the license agreement did not result in any damages. This argument fails to recognize that the Debtor was the only party vested with the exclusive right to manufacture and sell junior apparel under the Rocawear license as of the date of entry of the order for relief in this case. Therefore, under the various causes of action set forth, damages may be significant.

Based on the conduct of the parties involved, the Court finds that Christopher Laurita and Iconix are liable for fraud, negligent misrepresentation and tortious interference with contractual relations. Christopher Laurita is liable for breach of his fiduciary duty to the Debtor and Iconix is liable for aiding and abetting Christopher Laurita's breach of his fiduciary duty. Studio IP is liable for breach of contract, and New Star is liable for unjust enrichment.

This adversary proceeding has been before the Court for several years, there was extensive discovery, many trial days, thousands of pages of testimony and hundreds of exhibits. All of this was necessitated by the Defendants' desire to transfer the economic benefits of the Rocawear license to third parties, to the detriment of the Debtor's creditors. To achieve these objectives, the parties, with the knowledge of certain of the professionals, embarked on a course of conduct that failed to honor and comply with the most basic rules set forth in the Bankruptcy Code. The Bankruptcy laws and procedures, developed to protect the rights of creditors and interested parties, are designed to avoid exactly what happened in this case. The Bankruptcy Court is meant to be an honest forum through which the assets of a debtor can be allocated according to the law. Principals

4

of the debtor do not get to enrich themselves to the detriment of creditors.  Powerful creditors do not get to manipulate the debtor for their own particular benefit.  That is precisely what happened in this case.  The Defendants, along with their enablers, turned a blind eye to what they knew was right and in doing so committed a fraud on not only the creditors, but on the Court itself.  While liability under the causes of action is determined, after reviewing the record in its entirety, the Court finds that the evidence and testimony is insufficient to determine damages on each cause of action except for the ninth cause of action for unjust enrichment against New Star.  Therefore, an additional hearing shall be held in order to fix damages.

**Relevant Facts**

### a.  Events Leading Up to the Petition

The Debtor was formed in 2003 by, *inter alia*, Joseph Laurita and Christopher Laurita (collectively, the "Laurita Brothers"), for the purposes of designing, manufacturing and distributing branded apparel. Joint Pretrial Order, ¶ 2.  As of January 15, 2007, the Laurita Brothers were the sole members, managers, directors and officers of the Debtor.  Joint Pretrial Order, ¶ 3.  In 2004, the Debtor acquired the right to manufacture and distribute junior sportswear apparel bearing the Rocawear trademark by entering into a license agreement ("Signature License Agreement") with Rocawear Licensing, LLC.[1]  The Rocawear brand, along with the Artful Dodger brand, were initially developed by Shawn Carter, more commonly known as Jay-Z.  Under the management of the Debtor, the Rocawear brand became quite successful, and grew in sales from

---

[1] In addition to the Signature License Agreement, Signature also held the exclusive right to the Artful Dodger brand, which it licensed from Artful Holding LLC, another subsidiary of Iconix (the "Artful Dodger License Agreement"). Just like the Signature License Agreement, Signature was also in default of its payment obligations under the Artful Dodger License Agreement and received the Notice of Default but not the Notice of Termination.  Signature, however, does not assert a claim relating to the Artful Dodger License Agreement.

approximately $30 million in 2004 to between $70 million and $80 million in 2007.  4/22/15 Trial

Tr. 138-139 (Laurita).  Under the Signature License Agreement, Signature was obligated to pay to

the licensor certain fees, including a royalty fee on sales and advertising fees. T-3 at § 1(a).  The

Debtor was also obligated to pay guaranteed minimum royalties and guaranteed minimum

advertising fees for each year.  By letter amendment dated December 1, 2006, the Debtor and

Rocawear Licensing amended the Signature License Agreement (the "Amendment").  T-4. Under

the Amendment, the term of the Signature License Agreement was extended for three years until

December 31, 2010, the minimum net sales were reduced by $2 million to $7 million for the year

2007, and the minimum fees payable by the Debtor were restructured.

In 2007, Iconix, a large company that owned many license brands, acquired the Rocawear

brand in a transaction valued at over $200 million.  T-176.  Studio IP then succeeded Rocawear

Licensing, LLC as the owner of the Rocawear trademark and the licensor under the Signature

License Agreement.   The Signature License Agreement contained the following relevant

provisions regarding default and termination, and modification:

Section 20:

> [I]f Licensee at any time during the Term fails to perform any
> undertaking or obligation under this Agreement, and if that default
> is not cured within . . . ten (10) business days for a default in
> payment, after *written* notice from Licensor to Licensee specifying
> the default ("Notice of Default"), then Licensor may terminate this
> Agreement effective immediately upon giving Licensee a *written*
> notice of termination ("Notice of Termination") at any time before
> the default has been cured.

Section 27:

> No modification or waiver of this Agreement shall be effective
> unless it is in writing and signed by the parties hereto.

T-3 at ¶ ¶ 20, 27 (emphasis added).

The Signature License Agreement also contains restrictions on assignment by the licensee, conditioned upon the prior consent of the licensor. *See* T-3 at ¶ 25.

Despite the expectation that the Rocawear brand would generate a significant return on Iconix's investment, the Debtor began experiencing financial trouble and defaulted on royalties and advertising fees owed under the Signature License Agreement. The Debtor also owed money to its suppliers with respect to ordered inventory and loans from its manufacturers. Beginning in 2009, the CEO of Iconix Neil Cole ("CEO Cole") commenced discussions with Executive Vice President Yehuda Shmidman, Head of Strategic Development David Blumberg, and CFO Warren Clamen regarding the problems with the Signature License Agreement. With the consent of Iconix and Studio IP (collectively, the "Iconix Defendants"), the Laurita Brothers actively sought a new investor to inject capital into the Debtor so the Debtor could meet its obligations under the licensing agreement. The Rocawear brand was important to Iconix, and the Debtor's viability was of concern to Iconix. By August 2009, the Laurita Brothers were actively negotiating with Ruben Azrak, Victor Azrak and/or Charles Azrak (collectively, the "Azraks") and Li & Fung, Ltd. ("Li & Fung") concerning a potential transaction involving the Rocawear brand. Between April 2009 and August 14, 2009, there were over twenty-five emails between CEO Cole and Christopher Laurita regarding the Debtor's business, and Iconix was kept aware of the Debtor's efforts to find a solution.

Meanwhile, on August 14, 2009, Andrew Tarshis, General Counsel of Iconix ("General Counsel Tarshis"), issued a written Notice of Default ("Rocawear Notice of Default") on behalf of Studio IP, asserting that the Debtor was in default of its obligations in the amount of $7,462,500, and that if the default was not cured within ten business days, the licensor would have the right to terminate the Agreement "upon further notice." *See* T-32. When Iconix issued the Rocawear

Notice of Default, General Counsel Tarshis assured that it was simply a formality and that no termination was intended. T-30. Subsequently, CEO Cole informed Christopher Laurita that he had spoken with Li & Fung "who seemed pretty sure a deal would get done. Definitely our first choice for many reasons." T-35.

On August 24, 2009, which was the day the cure period expired, Christopher Laurita reported to CEO Cole that he had received a deal outline from Li & Fung. T-37. To assist with a potential transaction involving the Rocawear trademark, the Debtor hired a workout attorney named Andrew Stamelman and an M&A advisor named Sol Lipshitz. Quickly thereafter, the Debtor advised Sol Lipshitz that the Li & Fung deal was no longer viable, and that they would set up a meeting with Iconix to discuss a potential transaction with the Azraks. T-40.

The Azraks' proposal envisioned the formation of a new company to acquire the license for the Rocawear brand. The new company would be funded by the Azraks. The strategy was for the new company to assume Signature's obligation to Iconix in an amount not exceeding $6 million dollars and to step into the Debtor's role as licensee, with reduced minimum guarantees and royalty rates. *See* T-42. The Laurita Brothers provided CEO Cole with a proposed deal outline which was not finalized prior to the date the involuntary petition was filed. *See* T-43.

Christopher Laurita advised CEO Cole that "[i]f the proposed outline . . . is acceptable to you, we would need to extend the default letter dated August 14, 2009 to allow us enough time to properly conclude the deal with the Azraks." T-45. General Counsel Tarshis reported to CEO Cole that "as it stands now, we can terminate at anytime upon notice (with no cure right)." T-45. CEO Cole extended the cure period to September 4, 2009 at noon. *See* T-52.

According to the Defendants, the extension was critical to preserving the ability of the Debtor to find an investor. A break in the shipment of merchandise to the retailers could be

devastating to the value of the brand, to Iconix and to subsequent licensees because once the delivery of branded product to a retailer ceases, the retailer has little choice but to fill the vacant "shelf space" and "hanger space" with the product of another vendor. *See* 11/17/15 Trial Tr. 46-50 (Cole). The Debtor was motivated to reduce its obligations to manufacturers who were producing the clothing and to Iconix. *See* 04/21/15 Trial. Tr. 187-188 (Laurita). Iconix was motivated to do this because it ensured continuity of the Rocawear brand, thus preserving the value of its license. *See* 11/17/15 Trial Tr. 59-61 (Cole).

According to CEO Cole, the Azraks and Li & Fung were willing to help Iconix recoup some of the amounts owed by the Debtor under the Signature License Agreement, but offered no explanation as to why they agreed to such terms. 11/17/15 Trial Tr. 59-60 (Cole). At trial, CEO Cole admitted that the Signature License Agreement was not terminated earlier because Iconix wanted to ensure that the monies due by the Debtor would be paid by a subsequent licensee in any deal going forward. 11/17/15 Trial Tr. 59-60. In an email from CEO Cole to David Blumberg and Yehuda Shmidman at Iconix, CEO Cole refers to having "more leverage" if Christopher Laurita put the deal together than if Iconix dealt directly with new potential licensees. T-24. When questioned at trial regarding the reference to "more leverage," CEO Cole indicated that it was a reference to getting paid what the Debtor owed Iconix, regardless of whether it was from Christopher Laurita or a new licensee. 11/17/15 Trial Tr. 60. Recouping the losses from the Signature License Agreement was clearly a driving factor in arranging a new license agreement, which kept Christopher Laurita in the negotiations.

On September 2, 2009, the Azraks offered to close the deal. *See* T-57. The Azraks informed Iconix that they would not form a new company with the Laurita Brothers but rather work with them on a commissions-based arrangement and pay Iconix up to $6 million dollars for

the right to license the Rocawear brand. The Azraks would also provide the financing to purchase the inventory and the Rocawear work in progress inventory ("WIP") from the manufacturers in China. T-57, T-58. Under the proposed terms, Christopher Laurita would be paid a commission of three to four percent on sales of Rocawear. The $6 million would be paid over four years by taking a share out of Christopher Laurita's commission. *See* T-57. On the same day, Lipshitz reported to Stamelman that the meeting with the Azraks "went amazingly well. . . . Chris will try to help them on this tomorrow but also be a buffer for them with Neil as last meeting with Neil and Ruby Azrak did not go well between the two of them." T-61.

At trial, Christopher Laurita testified that he had reservations about the proposed deal since the Azraks did not have a reputation for producing quality apparel. *See* 04/22/15 Trial Tr. 153 (Laurita). Nonetheless, the Azrak proposal presented a far better marriage because they had a good relationship with the Chinese factories that the Debtor worked with and were willing to pay for the WIP. *See* 11/19/15 Trial Tr. 176 (Azrak); 04/22/15 Trial Tr. 152-153 (Laurita). Charles Azrak testified that Iconix demanded that the Azraks pay the outstanding obligations of the Debtor as part of the deal, and that it was the "key money" to get into the Rocawear business. *See* 11/19/15 Trial Tr. 107-108 (Azrak). This corroborates CEO Cole's testimony that receiving repayment of a portion of the outstanding obligations of the Debtor was a significant factor in structuring any subsequent licensing deal.

On September 4, 2009, before any deal with the Azraks was finalized, and approximately twenty-two minutes *before* the cure period expired, three of the Debtor's apparel agents and manufacturers—Harvestway (China) Limited, Talful Ltd., and Hitch and Trail, Inc. (collectively, the "Petitioning Creditors")—filed an involuntary bankruptcy petition ("Involuntary Petition")

against the Debtor.    Michael Fox represented the Petitioning Creditors, and Joseph Schwartz represented the Debtor.

At the time of the filing, the estimated total liability of the Debtor was about $30 million, including CIT's secured debt in the amount of $6.3 million,[2] Iconix's debt in the approximate amount of $7 million, and the Petitioning Creditors' debt in the approximate amount of $13 million. *See* 04/23/15 Trial Tr. 21 (Laurita).  The Signature License Agreement had fifteen months remaining on its terms and the Debtor was more than $7 million in arrears.  *See* 04/22/15 Trial Tr. 129-132 (Laurita); 11/17/15 Trial Tr. 109-110 (Cole).  It is undisputed that Iconix never issued the Rocawear Notice of Termination as required under Paragraph 20 of the Signature License Agreement.

### b.  Events during the Gap Period

There were approximately sixty days between the filing of the Involuntary Petition on September 4, 2009 and the entry of the Order for Relief in this case on November 5, 2009 (the "Gap Period").  During this relatively short time period, a flurry of activity took place between Christopher Laurita, Iconix, the Azraks, ROC Fashions, LLC ("Roc Fashions") and the Petitioning Creditors.  Iconix entered into an exclusive license agreement with Roc Fashions ("ROC Fashions License Agreement") for the right to manufacture and sell the Rocawear juniors brand. T-90. Changing Lanes, LLC ("Changing Lanes"), which was to be owned by Christopher Laurita and Joseph Laurita equally, was formed and incorporated in Delaware.  T-147, T-149; 4/22/15 Trial Tr. 55 (Laurita).  A draft consulting agreement between Changing Lanes and the Azraks was

---

[2] *See* pg. 3 of the Debtor's Emergency Motion Modifying Automatic Stay to Factor Account Receivable and Obtain Post-Petition Financing from CIT Group/Commercial Services, Inc. dated September 28th, 2009 [Docket #5].  As of the date of this motion, the Debtor owed CIT approximately $6,364,000 secured by substantially all of its assets the value of which exceeded $14,000,000, including $6.6 million in accounts receivable and $7.4 million in inventory. *See id*.  This motion was granted and CIT was paid in full.

11

prepared.    T-150.    ROC Fashions purchased the WIP directly from the factory manufacturers, purchased some clothing from the Debtor, and sold the clothing to department stores and other retailers.    4/23/15 Trial Tr. 53-54 (Laurita).    ROC Fashions also hired approximately twenty employees of Signature within one week of executing the license agreement with Iconix. 11/19/15 Trial Tr. 120 (Azrak).    In addition, ROC Fashions acquired certain office equipment from the Debtor, and took over one of the Debtor's offices at 1372 Broadway, New York.  11/19/15 Trial Tr. 121-123.[3]    After these transactions, the Debtor was left with very few employees, very little inventory, and reduced office space.    ROC Fashions was now acting as the exclusive licensee for the Rocawear juniors brand, despite the fact that the Signature License Agreement had never been terminated according to its terms.    None of these facts are disputed, but how and why these transactions took place, and whether these acts result in any liability against Christopher Laurita, New Star and/or the Iconix Defendants, are the subject of this Memorandum Decision.

Immediately after the Involuntary Petition was filed, Iconix appeared to be ironing out the terms of a deal between Christopher Laurita and the Azraks to ensure that the exclusive license rights held by the Debtor under the Signature License Agreement would be taken over by the Azraks.    Christopher Laurita would be employed as a consultant by a company owned by the Azraks.    In an email dated approximately two hours after the involuntary petition was filed, Stamelman, the Debtor's workout attorney, advised Lipshitz, the Debtor's M&A advisor, that General Counsel Tarshis was on board in general with the "transfer" of the license rights:

> And called [Chris Laurita] to pass on what [General Counsel Tarshis] said.  He is comfortable with our plan to affiliate with azrak on a consulting basis and documenting the license termination and transition agreement associated with sale of inventory/open orders being filled by new licensee. Tarshis said iconix not comfortable

---

[3] It does not appear that the Debtor ever received payment for the furniture and equipment.  *See* T-114. According to the docket of this case, no order was entered authorizing the sale of the Debtor's office equipment and furniture to a third party.

> with azrak financials to agree yet to full release, but assume they'll
> get there. It was a good call.

T-69.

It does not appear that the Iconix Defendants knew of the Involuntary Petition until September 5, 2009. The Involuntary Petition was filed on the Friday before Labor Day weekend, and over the long weekend, the parties had a chance to digest the implications of the Involuntary Petition. Instead of taking a step back from the negotiations with the Azraks, Iconix proceeded, emailing to the Azraks a revised license term sheet on September 8, 2009. T-75. Included in the proposed term sheet was a $6 million payment by RVC Enterprises, LLC to Iconix for "past royalties due under the Signature license." T-75.

The filing of the Involuntary Petition did not immediately cause the general terms of the transaction to be modified, but the parties did consider whether it would be more advantageous to have the Involuntary Petition dismissed, or to stay in bankruptcy. Based on a series of emails dated September 10, 2009, it appears that dismissal was the first option, but only two of the three Petitioning Creditors would consent to dismissal. As a result, the parties considered proceeding with the bankruptcy. Based on the exchange of emails, it appears that Iconix was prepared to deem the Signature License Agreement terminated by the Notice of Default and to enter into a new license with the Azraks. On September 10th, 2009, Stamelman, the Debtor's workout attorney, sent an email to the Laurita Brothers and Schwartz, the Debtor's bankruptcy attorney, under the heading "Important," that summarized a phone conversation Stamelman had with General Counsel Tarshis:

> [G]ot a call from tarshis at iconix. Apparently, chris reported to him
> that 2 of the 3 factories would be willing to withdraw the filing—
> third is a holdout, iconix is prepared to take the position/risk that the
> license has been terminated by the prior notice; and would like plan
> to be able to get a new license to azrak; and to immediately go to

13

> court to get ok to fill open orders by azrak, buy inventory from
> signature as needed; and would be willing to release the claim
> against signature. question: would it be easier to stay in bankruptcy
> to accomplish this?

T-82.

Stamelman contemplated how the transactions would take place in light of the Involuntary

Petition, and he queried Lipshitz, the Debtor's M&A advisor as follows:

> [W]ould a customer take goods from azrak's fulfilling open order to
> signature, if iconix takes position (which it is) that license was
> terminated and enters new license with azrak.  This assumes that
> goods are at the factories (not inventory of signature), and that azrak
> will pay for the goods to fill the orders.  Joe [Laurita] is participating
> on a call with iconix bkrptcy atty, andy tarshis, and michael
> goldsmith later this morning and they are going to discuss
> options/alternatives.  Tarshis also told me that they are ready to
> proceed with azrak and are looking to mitigate damages.

T-158.

Schwartz then reported to the Laurita Brothers and Stamelman as follows:

> I spoke with Andy Tarshis and Iconix's bankruptcy counsel a few
> minutes ago.  A structured dismissal of the bankruptcy with the
> consent of all 3 petitioning creditors is the best scenario, but if we
> cannot do that, I am advised that Iconix and Azrak are willing to
> take the risk that the license was terminated, a new license can be
> issued and the orders for merchandise that Signature has not paid for
> that are sitting in the warehouses in China can be purchased by
> Azrak.[4]

T-83.

At trial, Christopher Laurita testified that he was advised by CEO Cole that the Signature

License Agreement was terminated prepetition.  04/22/15 Trial Tr. 106 (Laurita).  He also stated

that he was aware of a documentation problem in connection with the termination of the Signature

License Agreement and with treating the Notice of Default as a termination letter:

---

[4] As indicated in the above emails, the WIP inventory was still in the factories in China.  *See* 03/07/16 Trial. Tr. 38:16-23 (Laurita).  The monetary value of the WIP is unclear; however, according to the Debtor's Schedule B, the inventory at "various" locations is listed as $6.6 million dollars.  T-139.

>THE COURT: We're willing to take the risk that the license was terminated?
>
>MR. LAURITA: Right
>
>THE COURT: Does that mean there was a risk? It wasn't terminated.
>
>MR. LAURITA: Well, again, I think it's because it wasn't documented properly. And that was the risk.
>
>THE COURT: So a group of lawyers were telling you on September 10th that there was a risk, the license, as to whether the license was terminated. Is that right?
>
>MR. LAURITA: Yes.

04/23/15 Trial Tr. 67–70 (Laurita). According to Laurita, hearing someone say "the license is terminated" was tantamount to a formal termination of the Signature License Agreement. 05/22/15 Trial Tr. 101.

In contrast to the documentary evidence presented in the emails during this time period, Schwartz, who was the Debtor's bankruptcy attorney, testified that he was advised by the Debtor and Iconix that the Signature License Agreement had been terminated prior to the filing of the Involuntary Petition. 3/07/16 Trial Tr. 46 (Schwartz). Schwartz claims he took their word for it and analyzed the possible scenarios based on this information. According to Schwartz, the Debtor was no longer viable as an operating entity, so the focus of the Debtor and the Petitioning Creditors shifted to maximizing value for creditors through a liquidation of existing inventory and accounts receivable. See 03/07/16 Trial Tr. 26 (Schwartz). Specifically, the receivables could be liquidated to satisfy the secured claim of CIT. See 03/07/16 Trial Tr. 60 (Schwartz); 04/28/15 Trial Tr. 36-40 (Schwartz). The Azraks would be offered a new license and pay for the products held by Signature's manufacturing creditors in China, thereby satisfying a large portion of the Debtor's unsecured claims. See 04/28/15 Trial Tr. 43-44 (Schwartz); 04/22/15 Trial Tr. 175-177 (Laurita).

Lastly, Iconix would release its unpaid royalty claim against Signature since it would be able to recoup much of those losses through a new license with the Azraks.  *See* 04/28/15 Trial Tr. 36-44 (Schwartz); 03/07/16 Trial Tr. 59-62 (Schwartz); 04/22/15 Trial Tr. 175-177 (Laurita).  Because all of these items could be accomplished without the administrative expense of a bankruptcy proceeding, the Debtor's attorney claims he attempted to convince counsel to the Petitioning Creditors that a withdrawal of the Involuntary Petition or a structural dismissal was the best way to proceed.

General Counsel Tarshis testified at trial that he had little or no recollection of the conversations referred to in the above emails.  He also testified that his concern as counsel to Iconix was not about the effect of the automatic stay, but in getting the Petitioning Creditors paid so the goods could continue to flow to a new licensee ready to "take the license."  11/18/15 Trial Tr. 65 (Tarshis).

Although there was an attempt to reach a global settlement whereby the Azraks would enter into a Rocawear license agreement with Iconix, the Petitioning Creditors would receive payment from the Azraks for the clothing at their factories and waiting to be shipped, and the Azraks would pay $6 million to Iconix in addition to royalty fees, a settlement was never finalized.  T-155.  The case remained as an involuntary case through September and October, 2009.

While the various parties were weighing dismissal of the Involuntary Petition against proceeding with the bankruptcy, the Iconix Defendants and the ROC Defendants continued to exchange drafts of a license agreement relating to the Rocawear brand.  Studio IP and ROC Fashions executed a new license agreement dated as of September 15, 2009 in which the ROC Defendants purportedly were granted the exclusive right to manufacture and sell the Rocawear juniors and plus size sportswear brand by Iconix. ("ROC Fashions License Agreement").  The Roc

16

Fashions License Agreement includes a representation that the "License Agreement by and between Licensor and [Signature] dated as of June 1, 2004 as amended [] has been effectively terminated by Licensor and is of no further force and effect."  T-90 at ¶ 26(c).   The Roc Fashions License Agreement contains an indemnification clause relating to "any claim or allegation that [Signature's] license agreement was not properly and effectively terminated."  ("Indemnification Clause").  T-90 at ¶ 21.2(iv).  The Azraks' counsel, Goldsmith, testified at trial that he requested a written notice of termination as part of his due diligence in determining whether Iconix could lawfully give a license to the Azraks, and when the Iconix Defendants told him it could not give him one, he added the Indemnification Clause.  *See* 03/08/16 Trial Tr. 18-19 (Goldsmith); T-85.

The ROC Fashions License Agreement also contains an additional fee provision which requires Roc Fashions to make a $6 million payment to Iconix.   The $6 million payment is characterized as an "Additional Fee."   This provision corresponds to the $6 million Iconix was seeking to help cover the losses it incurred resulting from the Debtor's failure to pay royalties under the Signature License Agreement.

At trial, Charles Azrak testified that it was strongly implied to him that he had to hire Christopher Laurita in order to obtain the license for the Rocawear Juniors line.   The day he signed the Roc Fashions License Agreement, he fully expected to be working with Christopher Laurita. *See* 03/19/15 Trial Tr. 112-115 (Azrak); 03/08/16 Trial Tr. 228 (Azrak).

At or around the same time period, Christopher Laurita began taking the steps to continue his involvement in the Rocawear business with ROC Fashions, initially through Changing Lanes. T-147.  On October 19, 2009, Changing Lanes was incorporated in Delaware.  T-148, T-149.  At trial, Christopher Laurita acknowledged that Changing Lanes was formed in order to perform consulting services for ROC Fashions.   04/22/15 Trial Tr. 58 (Laurita). While draft sales

representative and consulting agreements were prepared by Einbeinder & Dunn, which represented Christopher Laurita, they were never executed. T-150.  The draft consulting agreement provided that Changing Lanes would perform consulting and management services in connection with the Azraks' sale of clothing and accessories under the Rocawear brand.  T-150.

According to Christopher Laurita's testimony at trial, he does not recall how he discovered the existence of the Roc Fashions License Agreement.  He does recall being surprised and angry about the deal between Iconix and the Azraks, but claims he took no steps to stop the process, nor did he discuss this with his attorneys.  04/22/15 Trial Tr. 79-83.  His sole response appears to have been to form Changing Lanes and to circulate draft consulting and sales agreements for the benefit of Changing Lanes.  On November 5, 2009, this Court entered an order for relief under Chapter 7. By this point in time, the Debtor, despite the fact the Signature License Agreement had never been legally terminated and remained an asset of the Debtor's estate, raised no objection to Iconix's issuance of a new license to ROC Fashions and permitted its office space at 1370 Broadway to be taken over by ROC Fashions. ROC Fashions hired approximately twenty-two employees of the Debtor, and was using some of the Debtor's computers, servers and other equipment.  The Court was unaware of these occurrences, and the creditors received no notice of these events.   As a result, neither the Court nor the creditors had an opportunity to review or consider these events that took place during the Gap Period, and to take any action against this conduct.

### c.  Omissions and False Statements during the Post Gap Period

Eight days after entry of the order for relief under Chapter 7, the Court entered an order converting the case to Chapter 11 pursuant to a motion by the Debtor.  Although the Chapter 7 trustee and the Petitioning Creditors opposed the motion to convert based on their belief that the Signature License Agreement was terminated prepetition, and the Debtor no longer had many

18

employees or viable business operations, the case was converted to Chapter 11.  As a result, the Laurita Brothers remained in control as principals of the Debtor.

On November 20, the Debtor filed its schedules, including Schedule G, which was amended twice during the case.  Schedule G, wherein all executory contracts and unexpired leases are disclosed, did not include the Signature License Agreement.  There was no mention of the Signature License Agreement in the Statement of Financial Affairs.  Furthermore, Signature and the Creditors' Committee jointly filed a Disclosure Statement and a First Amended Disclosure Statement, signed by General Counsel Tarshis on behalf of the Creditors' Committee, and Joseph Laurita on behalf of the Debtor, each stating that "[p]rior to the petition date, and pursuant to the terms [of the Signature License Agreement], Iconix terminated the [Signature License Agreement] with the Debtor."  In the Memorandum Opinion (A) Granting in Part and Denying in Part the Partites' Cross-Motions for Summary Judgment and (B) Denying the Defendants' Daubert Motion ("Summary Judgment Decision") [dkt 186], this Court concluded that these statements were false.

On December 3, 2009, the United States Trustee noticed the appointment of the Creditors' Committee, and appointed Iconix, along with two of the three Petitioning Creditors—Talful and Harvestway—as its members.  On December 4, 2009, counsel for Iconix advised counsel for the Creditors' Committee: "Responding to you [sic] inquiries regarding the licenses: 1. Both the Rocawear and Artful Dodger licenses have been terminated."  T-104.  On April 1, 2010 and May 12, 2010, the Debtor and Iconix caused the Debtor and the Creditors' Committee, respectively, to jointly file a Disclosure Statement and a First Amended Disclosure Statement.  Each document contained representations that Iconix terminated the Signature License Agreement prepetition. The Disclosure Statement was sent to Iconix as a member of the Creditors' Committee on March 29, 2010 for its review and comment prior to filing.  General Counsel Tarshis signed the Disclosure

Statement on behalf of the Creditors' Committee.  In the Summary Judgment Decision, the Court concluded that the statements regarding the prepetition termination of the Signature License Agreement were false.  The Disclosure Statement and First Amended Disclosure Statement were filed with the Court and disseminated to the creditors of the Debtor for the purposes of providing the correct facts regarding, *inter alia*, the Debtor's assets and liabilities as of the date the Involuntary Petition was filed.  However, these documents contained the false representation regarding the alleged termination of the Debtor's most valuable asset

In support of the First Amended Plan of Liquidation ("Liquidation Plan"), Christopher Laurita submitted an affidavit ("Confirmation Affidavit") stating that the Signature License Agreement was terminated prepetition pursuant to its terms.  In the Summary Judgment Decision, the Court concluded that this statement was also false.  The Liquidation Plan was disseminated to parties entitled to vote and the United States Trustee, and it was the document upon which parties which were entitled to vote were advised to review.

The Liquidation Plan, which was confirmed on July 1, 2010, contains an exculpation clause that "the Committee and its members (solely in their capacity as members of the Committee)" shall not "have or incur any liability . . . to any other party-in-interest . . . in connection with, relating to, or arising out of the Chapter 11 Case" or related to the Plan, "except for their criminal conduct, bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing, ultra vires acts or breach of fiduciary duty."  Joint Pretrial Mem. ¶ G-73.

Other than first day orders, retention and fee applications, an order approving a settlement with the landlord, orders ensuring that CIT was repaid, and  authorizing CIT to provide DIP financing, remarkably little took place in the Debtor's case from the date of conversion to Chapter 11 through confirmation of the Liquidation Plan.  However, during this time period, Christopher

Laurita engaged in additional activity related to Rocawear that was not disclosed to the Court or the creditors of the Debtor.[5]  In December 2009, New Star was incorporated, with Christopher Laurita as its sole member.  04/22/15 Trial Tr. 89 (Laurita).  According to Christopher Laurita's trial testimony, there was no written agreement between New Star and ROC Fashions, but New Star provided consulting services to ROC Fashions.  04/55/15 Trial Tr. 89.  Between January 2010 and August 2010, New Star received $100,000 per month from ROC Fashions for consulting services, for a total of $800,000.  By letter dated September 10, 2009, ROC Fashions terminated the oral sales representation and consulting arrangement with New Star, and agreed to pay New Star an additional $2 million for its services.  T-152.  The termination letter was dated within one month of the effective date of the Liquidation Plan.  Check remittances and accounting notes from ROC Fashions reflect a total of $1 million paid to New Star state "Per Term Agreement/1" and "Per Term Agreement/2."  T-151.  Thereafter, Ruben Azrak paid Christopher Laurita an additional $250,000 and Jacqueline Laurita $275,000.[6]  In total, New Star and Christopher Laurita received $2,050,000 from ROC Fashions and Ruben Azrak.

### d.  Post Confirmation Events

Pursuant to the Liquidation Plan, Anthony Labrosciano was appointed as the Responsible Person for the Debtor.  When the Responsible Person discovered that Christopher Laurita, through New Star, had received millions of dollars from the ROC Fashions License Agreement, he initiated this adversary proceeding against the Defendants.  Upon further review of documents that were produced during discovery, the Responsible Person raised the issues germane to this adversary

---

[5] According to Christopher Laurita's trial testimony, "everyone" was informed of New Star, including Riker Danzig. 14/22/15 Trial Tr. 96 (Laurita).  However, the Court's docket contains no such disclosure.

[6] Jacqueline Laurita is not a defendant in this adversary proceeding. She is a named defendant in Adv. Pro. No. 10-4207, which is currently pending and is based on, *inter alia*, alleged fraudulent transfers made to her by the Debtor prepetition.

proceeding.  According to the Plaintiffs, the Iconix Defendants received $13,552,648 in royalties from ROC Fashions pursuant to the ROC Fashions License Agreement.  *See* T-133; T-141.  The profits generated by ROC Fashions under the ROC Fashions License Agreement are not part of this record.

### 2.   Motion by the Iconix Defendants to Dismiss Counts IV and VII, and Motion by Christopher Laurita to Dismiss Counts III and VII

The Iconix Defendants and Christopher Laurita both filed motions to dismiss certain counts of the Amended Complaint pursuant to Fed. R. Civ. P. 52, made applicable in this adversary proceeding pursuant to Fed. R. Bankr. P. 7052.[7]  The sole basis for the Laurita Motion to Dismiss and the Iconix Defendants Motion to Dismiss is the assertion that the identified causes of action are barred by the applicable statutes of limitations.  For the reasons set forth below, the Laurita Motion to Dismiss and the Iconix Defendants Motion to Dismiss are both denied.

### a.   Did the Iconix Defendants and Christopher Laurita Waive a Statute of Limitations Defense?

Before reaching the merits of each motion to dismiss, the Plaintiff raises a threshold issue: Did the Iconix Defendants and/or Christopher Laurita waive the statute of limitations defense in this adversary proceeding?   Pursuant to Fed. R. Civ. P. 8(c), applicable to these proceedings by Bankruptcy Rule 7008, the statute of limitations defense must be set forth in a responsive pleading.  The statute of limitations must also be affirmatively stated or it is waived as a defense.  *John R.*

---

[7] 11 U.S.C. § 52 (c) provides:

> (c) Judgment on Partial Findings.  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

*Sand & Gravel Co. v. U.S.*, 552 U.S. 130, 133 (2008).  In general, the "[f]ailure to plead an affirmative defense in the answer results in the waiver of that defense and its exclusion from the case." *Satchell v. Dilworth,* 745 F.2d 781, 784 (2d Cir. 1984) (internal quotation marks omitted); *see also Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co.*, 762 F.3d 165, 176-77 (2d Cir. 2014); *Litton Industries, Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 967 F.2d 742, 751-752 (2d Cir. 1992); *United States v. Landau*, 155 F.3d 93, 107 (2d Cir. 1998).

In addition, Christopher Laurita and the Iconix Defendants failed to seek leave pursuant to Rule 15 to amend their answers to interpose the statute of limitations defense.  Pursuant to Fed. R. Civ. P. 15(a), a party must move to amend their answer to add a defense.  *Wade v. Orange County Sheriff's Office*, 844 F.2d 951, 955 (2d Cir. 1988).

Despite these procedural restrictions, courts in this Circuit have been willing to consider affirmative defenses raised after the answer has been filed under certain circumstances.  A "'court may . . . entertain [unpleaded] affirmative defenses at the summary judgment stage in the absence of undue prejudice to the plaintiff, bad faith or dilatory motive on the part of the defendant, futility or undue delay of the proceedings." *Rose v. AmSouth Bank of Fla*., 391 F.3d 63, 65 (2d Cir. 2004) (citing *Saks v. Franklin Covey Co.*, 316 F.3d 337, 350 (2d Cir. 2003)); *see also In re Livent, Inc. Noteholders Sec. Liti*g., 355 F. Supp. 2d 722, 727 (S.D.N.Y. 2005) (*citing Astor Holdings Inc. v. Roski,* 325 F. Supp. 2d 251, 260-61 (S.D.N.Y. 2003)); *Kelly v. Al Tech.,* 2010 U.S. Dist. LEXIS 37807, 09 Civ. 962, at *57-58 (S.D.N.Y. Apr. 8, 2010); *Palmer v. Garuti*, 2009 WL 413129, *7-8, 2009 U.S. Dist. LEXIS 11432, 3:06–CV–795, at *23 (D. Conn. Feb. 17, 2009) (allowing affirmative defense of good faith not raised in answer where both parties had opportunity to brief the issue and address it in oral argument, precluding any prejudice to the party opposing the defense).  The Second Circuit has also cautioned that "the longer the period of unexplained delay,

the less will be required of the nonmoving party in terms of a showing of prejudice." *Evans v. Syracuse City School District*, 704 F.2d 44, 47 (2d Cir. 1983). The courts in this Circuit permitting affirmative defenses not included in the answer usually consider them prior to trial, within a motion for summary judgment, and not after trial. The only Second Circuit decision this Court is aware of involving such a motion made after trial, as in our case, is *Wade v. Orange County Sheriff's Office*, 844 F.2d at 955. In *Wade,* the jury had returned a verdict in favor of the plaintiff, and the defendants filed a motion for a new trial based in part that certain claims were barred by the statute of limitations. The Second Circuit recognized that the defendants failed to raise this as an affirmative defense in their answer. Because they failed to do so and because they never moved to amend their answers to add this as a defense, the court held that the defendants waived their right to assert the defense. *Id.* The only other case this Court is aware of within this Circuit that shares somewhat similar facts is *Funk v. F&K Supply, Inc.,* 43 F. Supp. 2d 205 (N.D.N.Y. 1999)*.* In *Funk v. F&K Supply, Inc*., the court refused to consider a statute of limitations defense raised in pretrial submissions and in a post-trial motion. *Id.* The Court noted that raising the defense of the statute of limitations approximately two and one half years after the case was commenced could not be considered raised "at the earliest possible moment" and opined that "[c]ontrary to defendants' belief, simply raising the argument on the eve of trial in their pre-trial submissions does not satisfy any of the settled procedures for amending a pleading to interpose such a defense." *Id*. at 221 (other citations omitted).

In this case, prior to the trial, neither Christopher Laurita nor the Iconix Defendants asserted the statute of limitations as an affirmative defense in their respective Answers to the First Amended Complaint, in the pretrial order, or by way of motions for affirmative relief. In addition, neither Christopher Laurita nor the Iconix Defendants sought permission from the Court to amend their

pleadings pursuant to Rule 15 to add the statute of limitations as an affirmative defense.  The earliest the defense was raised was on October 21, 2014, by counsel to Christopher Laurita in his Memorandum of Law in Opposition to the Plaintiff's Motion for Summary Judgment.  The defense was mentioned in a few sentences, but counsel to Christopher Laurita did not seek to have any claims dismissed on this basis.  The statute of limitations defense was raised again at oral argument on November 4, 2014, and on April 21, 2015, in Christopher Laurita's opening argument at trial. The Motions to Dismiss were filed on April 22, 2016, more than two and one-half years after the Amended Complaint was filed on July 10, 2013, and after the trial was concluded.  The law firm of Seidman and Pincus, LLC, counsel to Christopher Laurita, claims that the delay in raising the statute of limitations defense was caused by Christopher Laurita's prior counsel, and Christopher Laurita's current counsel raised the defense shortly after having its appearance noted in the case. Counsel to the Iconix Defendants offer no excuse for their delay in raising the statute of limitations defense and do not dispute that this defense is being raised for the first time on behalf of the Iconix Defendants. Christopher Laurita and the Iconix Defendants both allege that there is no prejudice in allowing them to assert the statute of limitations defense at this late date because the Plaintiff has had a sufficient opportunity to brief the issue.

It is undisputed that Christopher Laurita and Iconix failed to plead the statute of limitations as an affirmative defense in their answers, nor can they claim they plead this affirmative defense at the earliest moment.  It is not clear why the Iconix Defendants failed to raise the defense earlier, and Christopher Laurita's excuse that his prior counsel failed to act at the earliest juncture is not persuasive.  The facts are inapposite to case of *Sompo Japan Ins. Co. of America v. Norfolk Southern Ry. Co*., 762 F.3d 165, 176-77 (2d Cir. 2014), where the Second Circuit considered an affirmative defense at the summary judgment stage due to a subsequent change in the state of the

law.  There appears to be no understandable reason why this affirmative defense was not raised in a motion to amend the answer or even in a motion prior to trial.  The prejudice to the Plaintiff is evident in that the Plaintiff has incurred the expense of trying the claims at issue, but the Court recognizes that this is minimized by the fact that the Counts III (breach of fiduciary duty by Christopher Laurita), IV (aiding and abetting breach of fiduciary duty by Iconix) overlap with some of the remaining causes of action that the Plaintiff had to establish at trial (*inter alia*, fraud and negligent misrepresentation).  Count VII (tortious interference with contract against Christopher Laurita and Iconix) overlaps with Count VI (breach of contract against Studio IP), but Iconix was not named as a defendant in Count VI.  Finally, despite the delay, the facts do not support a finding that Christopher Laurita and Iconix acted with bad faith or dilatory motives.

Nevertheless, and based on all of these considerations, the Court finds that both Christopher Laurita and Iconix waived the right to assert the statute of limitations as an affirmative defense. The general rule in this Circuit finding waiver if an affirmative defense is not raised in a pleading at the earliest possible moment applies in this case.  *See Davis v. Bryan*, 810 F.2d 42, 44 (2d Cir. 1987).  There was no reason for Iconix and Christopher Laurita to omit this affirmative defense from their answers.  Iconix failed to raise this as a defense until its Motion to Dismiss was filed, which was over two and one half years after the Amended Complaint was filed, and after motions for summary judgment had been decided and a lengthy trial was held.  Christopher Laurita's proffered excuse that his current counsel raised the issue shortly after appearing in the case is not a viable excuse.  Even after Christopher Laurita's current counsel was retained, counsel did not file a motion to amend the answer and only raised the issue in opposition to the Plaintiff's motion for summary judgment, filed on October 21, 2014.  This affirmative defense was not asserted in a motion until after the trial was held, and neither Christopher Laurita nor the Iconix Defendants

ever sought leave to file an amended answer pursuant to Fed. R. Civ. P. 15.  While the Plaintiff

has been given the opportunity to respond to the merits of the Motions to Dismiss, the Plaintiff has

already incurred the costs and burdens of a trial on these causes of action.  There was some overlap

with the other causes of action that were not the subject of the Motions to Dismiss, but the prejudice

to the Plaintiff need not be great given the significant length of time since the Amended Complaint

was first filed.  Given all of these factors, the Court finds that the request to add this affirmative

defense is untimely and shall be denied.

### b.  Merits of Motions to Dismiss

Even if the Court were to consider the statute of limitations defense raised by Christopher

Laurita on the basis that he at least raised the defense prior to trial, the Court would find that Count

III was timely filed.  As the Court analyzes below, a six year statute of limitations applies to Counts

III and IV.  The Amended Complaint was filed on July 10, 2013, which was well before the causes

of action accrued in 2009.

### i.  Count III

In Count III, the Plaintiff seeks recovery from Christopher Laurita based on breach of his

fiduciary duty to the Debtor arising from allegedly facilitating the "transfer" of the Debtor's license

rights under the Signature License Agreement to ROC Fashions, and concealment of the Debtor's

Rocawear license rights.  Under New York law, there is no single limitations period for breach of

fiduciary duty claims.  *Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 741 (S.D.N.Y.

1997).  The applicable statute of limitations for breach of fiduciary duty claims depends upon the

substantive remedy sought.  *Id.* (*citing Loengard v. Santa Fe Indust., Inc.*, 70 N.Y.2d 262, 267

(1987)).  A six year statute of limitations applies to breach of fiduciary claims where a party seeks

equitable relief or where the cause of action is based on actual fraud, and a three year statute of limitations applies where the party seeks only monetary damages as the action asserts injury to property. *Kaufman v. Cohen*, 307 A.D.2d 113, 760 N.Y.S.2d 157, 164 (N.Y. Ct. App. 2003) (citing, *inter alia*, *Goldberg v Schuman,* 289 A.D.2d 8 (1st Dep't 2001) (claims for fraud and breach of fiduciary duty governed by six-year limitations period in CPLR 213); *Unibell Anesthesia v Guardian Life Ins. Co.,* 239 A.D.2d 248, 658 N.Y.S.2d 14 (1st Dep't 1997) (court applied six-year limitations period to breach of fiduciary duty claim where the complaint also made out a claim for fraud by insurer); *Heffernan v Marine Midland Bank*, 283 A.D.2d 337, 338, 727 N.Y.S.2d 60 (1st Dep't 2001) (breach of fiduciary duty claim seeking damages from a defalcating fiduciary that does not involve allegations of actual fraud, is governed by three-year limitations period)). The sole exception to applying the fraud statute of limitations where fraud is alleged is where the allegation of fraud is incidental to the claim being asserted, in an effort to make an end-run around the anticipated defense of statute of limitations. *Kaufman v. Cohen*, 307 A.D.2d 113, 119 (N.Y. Ct. App. 2003) (citing *Powers Mercantile Corp. v. Feinberg*, 109 A.D.2d 117, 120 (1st Dep't 1985), *aff'd*, 67 N.Y.2d 981 (1986)). The parties agree that if the six year statute of limitations applies to Count III and Count IV, then these causes of action are timely.

In this case, the allegations of fraud by Christopher Laurita permeate the complaint and dominated the issues at trial. Fraud was not an afterthought in the breach of fiduciary duty claim. When the causes of action are reduced to their essence, the fraudulent concealment of the existence of the Signature License Agreement and the usurpation of these exclusive license rights by a third party, along with the failure to disclose a breach of contract claim are central elements to this entire case. As a result, the six year statute of limitations applies to Count III. The statute of limitations for aiding and abetting a breach of fiduciary duty depends on the underlying breach. If the

underlying breach is predicated on fraud, which is intrinsic to the primary cause of action, then the

six years statute of limitations applies. *Balta v. Ayco Company, LP*, 626 F. Supp. 2d 347, 356

(W.D.N.Y. 2009) (citing *Williams v. Sidley Austin Brown & Wood, L.L.P.*, 15 Misc.3d 1125(A),

841 N.Y.S.2d 222 (N.Y. Sup. Ct. 2007)).  Because the breach of fiduciary claim in this case carries

the six years statute of limitations, so does the aiding and abetting claim set forth in Count IV.

Therefore, even if the Court were to consider the merits, Count IV would not be dismissed based

on a statute of limitations defense.

### ii.  Count VII

The parties agree that a three year statute of limitations applies to tortious interference with

a plaintiff's contractual rights with a third party. N.Y. C.P.L.R. 214(4).  *Kronos Inc. v. AVX Corp.*,

81 N.Y.2d 90, 94, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993).  With respect to Count VII, the

Court would have to resolve whether the three year period ran prior to the date the Amended

Complaint was filed, and then whether there was a basis to apply equitable tolling or equitable

estoppel to extend the three year period.

Where a tort is involved, as in this case, the cause of action accrues when there is a legal

right to relief, as all elements of the tort must be present.  *Kronos, Inc. v. AVX Corp.*, 81 N.Y. 2d

at 94.  The elements of tortious interference include, a) the existence of a valid contract, b)

knowledge of the contract by a third party, c) intentional and improper acts by the third party to

procure breach of the contract, and e) damages to the plaintiff.  *Albert v. Loksen*, 239 F.3d 256,

274 (2d Cir. 2001).  Damages must have accrued before the statute of limitations begins to run on

this cause of action.  *Kronos, Inc. v. AVX Corp.*, 81 N.Y. 2d at 94.  In this case, the damages

accrued as of September 15, 2009, when Iconix purportedly granted ROC Fashions the exclusive

license.  The motion for leave to file an amended complaint was filed on November 26, 2012,

which is several weeks after the three year period commenced. The First Amended Complaint was filed on July 10, 2013, which is well beyond the three year statute of limitations.

Because the motion for leave to file an amended complaint was filed outside the three year period, this claim could only be timely if equitable tolling applied to toll the limitations period, or if equitable estoppel precluded Christopher Laurita from asserting a statute of limitations defense. The burden would be on the Plaintiff to establish that it was entitled to assert equitable tolling or equitable estoppel. *Simcuski v. Saeli*, 44 N.Y.2d 442, 449, 406 N.Y.S. 2d 259, 377 N.E.2d 713 (1978). Equitable tolling occurs "where the defendant conceals from the plaintiff the fact that he has a cause of action." *St. John's University, New York v. Bolton*, 757 F. Supp.2d 144, 186, n. 24 (E.D.N.Y. 2010). Under the concept of equitable estoppel, "[a] defendant may be estopped from pleading the Statute of Limitations where, *inter alia*, a plaintiff was induced by fraud, misrepresentation or deception to refrain from timely commencing an action." *Gleason v. Spota*, 194 A.D.2d 764, 765, 599 N.Y.S.2d 297 (2d Dep't 1993). While both concepts share some characteristics and some courts have used them interchangeably, other courts have recognized that "the effect of each is different. Equitable estoppel addresses itself to circumstances in which a statute of limitations defense would be inapplicable as a whole. Equitable tolling concerns itself only with when the statute of limitations period begins to run." *Dep't of Economic Development v. Arthur Andersen & Co.*, 747 F. Supp. 922, 943 (S.D.N.Y. 1993) (other citations omitted).

Christopher Laurita claims that neither equitable tolling or nor equitable estoppel apply because the conduct alleged to give rise to the tolling is the same conduct identified as the basis for the claim of tortious interference with contractual relations. Christopher Laurita further claims that even if equitable estoppel were applicable, the Plaintiff could not rely on it because the Plaintiff possessed knowledge of sufficient facts to place the Debtor on inquiry notice as of

December 3, 2009, when the Committee was formed. From that starting point the Amended Complaint would still be untimely by one day.

The Plaintiff asserts that equitable tolling applies to toll the statute of limitations until the Responsible Person acquired actual knowledge, or should have acquired actual knowledge through the exercise of reasonable diligence, after being apprised of sufficient facts to be put on notice. The Plaintiff also relies on fraudulent concealment, and equitable estoppel to argue that the soonest the Plaintiff could have known of the facts underlying this claim was June 29, 2012, when the Plaintiff filed a letter with the Court regarding discovery of the true facts surrounding the Signature License Agreement.

First, while equitable tolling has been uniformly applied to federal causes of action, not all courts agree that equitable tolling applies to state law claims, such as tortious interference with contractual relations. *See Dep't of Economic Development v. Arthur Andersen & Co.*, 747 F. Supp. at 943 (federal equitable tolling doctrine does not apply to common law negligence claim); *Van Hoffman v. Prudential Ins. Co. of America*, 202 F. Supp. 2d 252, 264 (S.D.N.Y. 2002) (Equitable tolling inapplicable to state law claims for negligence and violation of the New York insurance laws); *Ingenito v. Bermec Corp.*, 441 F. Supp. 525, 553 n. 26 (S.D.N.Y. 1977) (Equitable tolling applies to solely to federally created causes of action). At least one court has applied equitable tolling to state law claims. *See St. John's University, New York v. Bolton*, 757 F. Supp. 2d 144, 186 (E.D.N.Y. 2010) (court applies, without discussion, equitable tolling to tortious interference with contractual relations). Notwithstanding the fact that equitable tolling may not apply to this state-law claim, equitable estoppel would apply, and appears to cover the type of conduct engaged in by Christopher Laurita. The Court of Appeals for the Second Circuit has recognized that

equitable estoppel can be used in several situations to preclude a defendant from asserting a statute of limitations defense:

> New York appears to use the label 'equitable estoppel' to cover both the circumstances 'where the defendant conceals from the plaintiff the fact that he has a cause of action [and] where the plaintiff is aware of his cause of action, but the defendant induces him to forego suit until after the period of limitations has expired.'

*Pearl v. City of Long Beach*, 296 F.3d 76, 82 (other citations omitted).

If equitable estoppel as interpreted by the Second Circuit in *Pearl* is applicable to Count VII, the Court must determine whether this would place the claim within the three year statute of limitations. The elements of this cause of action existed as of September 15, 2009. Accordingly, absent equitable estoppel, the three year statute of limitations expired on September 15, 2012. The Creditors' Committee was appointed on December 3, 2009, which Christopher Laurita concedes is the date the Committee or the Debtor's estate was aware or should have been aware that the Signature License Agreement was never terminated according to its terms. The Court agrees and declines to find that the Debtor had sufficient knowledge of the true facts surrounding the Signature License Agreement on September 15, 2009. As set forth in the Memorandum Decision, counsel to the Debtor was provided with false information from Christopher Laurita and Iconix regarding whether the Signature License Agreement was terminated prepetition. Therefore, the earliest possible date that the Creditors' Committee could have brought this claim was December 3, 2009. While the claims would have lapsed three years later on December 3, 2012, the limitations period was effectively tolled on November 26, 2012, when the Debtor filed its motion for leave to file an amended complaint. Under New York law, the filing of a motion to amend also tolls the statute of limitations until the date of entry of the order granting leave to amend. *Long v. Sowande*, 27 A.D.3d 247, 248 (1st Dep't 2006). As of November 26, 2012, when the statute of limitations was

tolled, the Debtor had only seven days remaining under the applicable statute of limitation.  The motion to amend was granted and the order was entered on July 3, 2013.  The Debtor had seven days from that date to file its amended complaint on a timely basis.

Under New York law, which both parties agree governs, the courts do not count the date the order is entered granting leave to sue.  *See Vasquez v. Motor Vehicle Add. Indemnification Corp.*, 272 A.D.2d 275 (1st Dep't 2000); *see also Trepel v. Motor Veh. Acc. Indem. Corp.*, 267 A.D.2d 228, 699 N.Y.S.2d 469 (2d Dep't 1999) (Court calculated the time remaining after entry of an order authorizing suit against the MVAIC, which had tolled the two year statute of limitations, to exclude the date of entry of the order. Therefore, the eight days remaining prior to the tolling was reinstated after entry of the order authorizing the suit).  Once July 3, 2013 is excluded, the seventh day expired on July 10, 2013, which is the date the Amended Complaint was filed.  Therefore, if equitable estoppel is applicable to tortious interference with contractual relations, the Amended Complaint was filed within the three year statute of limitations applicable to this claim.

Given the Court's ruling that Christopher Laurita and the Iconix Defendants waived the statute of limitations defense, and that even if Christopher Laurita retained the right to assert this defense, equitable estoppel would preclude him from succeeding on this defense, the Court will not address whether the Amended Complaint relates back to the date the Laurita Adversary Proceeding was filed.  Therefore, the Laurita Motion to Dismiss and the Iconix Defendants Motion to Dismiss are denied.

### 3.   The Automatic Stay

In the Summary Judgment Decision, the Court deferred on determining whether the automatic stay in place during the Gap Period applied to the conduct by the parties regarding the Signature License Agreement.   Based on the record in this case, a discussion of the automatic stay is necessary, despite the fact that the Plaintiff does not seek any remedy for such conduct.   On the one hand, Bankruptcy Code § 303(f), which allows the debtor to "continue to operate" and to "continue to use, acquire, or dispose of property" during the gap period does exempt certain conduct by the Debtor from the automatic stay.   If the Debtor had terminated the Signature License Agreement, then perhaps the conduct of Iconix and Christopher Laurita during the Gap Period could have been considered part and parcel of the benign acts of the Debtor, which was free to carry on its business, including acts related to the Signature License Agreement.   On the other hand, if the Iconix Defendants' negotiations with the Azraks and the ultimate execution of the ROC Fashions License Agreement during the Gap Period falls outside the conduct permitted under § 303(f), the conduct of the Iconix Defendants violated the automatic stay.   While each of the Plaintiff's claims in the complaint assert an independent wrong that does not rely on a violation of the automatic stay as a predicate for liability, certain consequences flow from acts done in violation of the automatic stay, as discussed below.

Upon the filing of an involuntary petition in bankruptcy, section 303(f) of the Bankruptcy Code permits a debtor to continue to operate its business during the gap period:

> Notwithstanding section 363 of this title, except to the extent that the court orders otherwise, and until an order for relief in this case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced.

11 U.S.C. § 303(f).

If the debtor transfers property during the gap period while operating its business, the property

may be recovered for the benefit of the estate pursuant to § 549 under certain circumstances.

Section 549 provides as follows:

> (a) Except as provided in subsection (b) or (c) of this section, the trustee
> may avoid a transfer of property of the estate –
>> (1) That occurs after the commencement of the case; and
>> (2)
>>> (A) that is authorized only under section 303(f) or 542(c)
>>> of this title; or
>>> (B) that is not authorized under this title or by the court.
> (b) In an involuntary case, the trustee may not avoid under subsection
> (a) of this section a transfer made after the commencement of such
> case but before the order for relief to the extent any value . . . is given
> after the commencement of the case in exchange for such transfer,
> notwithstanding any notice or knowledge of the case that the
> transferee has.

11 U.S.C. § 549.

A § 549 claim has a statute of limitations of two years from the date of the transfer or two

years from the date the case is closed or dismissed, whichever is earlier.  11 U.S.C. § 549(d).  As

Iconix and Christopher Laurita correctly point out, section 549 is the exclusive remedy by which

post- petition transfers of estate property may be avoided.  *In re Brooklyn Overall Co., Inc*., 57

B.R. 999, 1002 (Bankr. E.D.N.Y. 1986).  Iconix and Christopher Laurita argue that either the

causes of action set forth in the Complaint are derivations of claims under § 549 and are thus time

barred, or that the Plaintiff is restricted to bringing only claims under § 549, which it has failed to

do.  In essence, Iconix and Christopher Laurita claim that the Plaintiff is confined to bringing

claims under § 549 against them and since such causes of action would be time barred, the

Complaint should be dismissed.

The analysis proffered by Christopher Laurita and Iconix is based on a mischaracterization

of the events that took place during the Gap Period.  The Debtor did not transfer rights under the

Signature License Agreement, in addition to WIP and other assets.  Rather, the Debtor, through

Christopher Laurita, acquiesced to the improper characterization and treatment of the Signature

License Agreement by Iconix as terminated.  The Debtor also acquiesced to the actions by the

ROC Defendants to take over part of the Debtor's premises, retain its employees and acquire the

WIP from the Petitioning Creditors.  The Iconix Defendants breached the Signature License

Agreement during the Gap Period.  The majority of these acts violated the automatic stay.  The

causes of action set forth in the complaint concern *inter alia*, Christopher Laurita's alleged breach

of his duties to the Debtor, and the concealment of the true status of the Signature License

Agreement during the pendency of the bankruptcy case.  They are not based on the violation of

the automatic stay so much as incidental to the decision to treat the Signature License Agreement

as terminated during the Gap Period, without seeking leave of the Court to take the proper action.

The automatic stay comes into effect instantly when an involuntary petition is filed. *In re*

*C.W. Mining Co.*, 422 B.R. 746, 748 (10th Cir. B.A.P. 2010).  While an involuntary debtor may

operate its business, the debtor may not waive the protections afforded to property of the estate by

the automatic stay.  *In re E.D. Wilkins Grain Co.*, 235 B.R. 647, 650 (Bankr. E.D. Ca. 1999).  The

involuntary Chapter 7 gap debtor does not have the rights and powers of a trustee even after an

order for relief is entered, and cannot be compared to a debtor in possession, which has certain

vested rights.  As one bankruptcy court has noted:

> Because there is no one who can agree on behalf of the estate, relief
> from the automatic stay must be requested by an appropriate motion
> pursuant to 11 U.S.C. § 362(d). . . . The court will also require that
> the motion be served upon the United States Trustee, the petitioning
> creditors and their attorney, and any other party in interest
> requesting special notice.  In the absence of a trustee and excluding
> the debtor, these persons are the most likely to have the inclination
> and the incentive to oppose the motion if opposition is in the best
> interests of the estate.

*Id.* at 651.

Section 303(f) of the Bankruptcy Code cannot be used to absolve a creditor from liability
for violating the automatic stay where it takes action against property of the estate after an
involuntary petition is filed.  *In re Omni Graphics, Inc.*, 119 B.R. 641 (Bankr. E.D. Wis. 1990).
In *In re Omni Graphics, Inc.*, the debtor corporation, the bank and the guarantors entered into an
agreement to surrender all of the debtor's assets, which had been pledged by the debtor, to the
bank.  Other creditors filed an involuntary petition against the debtor, and the public sale of the
debtor's assets took place during the gap period without court approval.  The Court held that the
bank violated the stay and explained why § 303(f) gave the bank no cover for its actions:

> [Section] 303(f) is intended to enable a debtor involved in an
> involuntary petition to continue doing business during the so-called
> 'gap period' before the entry of an order for relief.  It is not intended
> as a shelter for the Bank. Here the sale of the assets was conducted
> by the Bank, not by the debtor, and in no manner enabled the debtor
> to carry on its business operations.  Quite to the contrary, the
> surrender agreement contemplated the debtor not engaging in
> business and was geared to a complete liquidation of all of the
> debtor's assets.  Because § 303(f) does not apply, it is unnecessary
> to delve further and consider the impact of § 549, which permits a
> trustee to avoid post-petition transfers of property authorized under
> § 303(f) except to the extent of any post-petition value furnished by
> transferees.  Moreover, the Bank was not a "transferee" within the
> meaning of § 549(b) since it did not furnish any post-petition value.

*Id.* at 643.

Similarly, the continued negotiations between the Iconix Defendants and the ROC
Defendants while the Debtor held the exclusive license for the Rocawear juniors brand, and the
execution of the ROC Fashions License Agreement, along with the ROC Defendants'
appropriation of certain assets of the Debtor constituted a violation of the stay, not transfers by the
Debtor under § 303(f).  Under no circumstances can the events be deemed to have enabled the
Debtor to carry on its business operations. Quite the contrary, by the time the order for relief was

37

entered, the Debtor was left without the benefit of valuable assets it owned as of the date of the Involuntary Petition.

Actions taken in violation of the automatic stay are void.  *In re Schwartz*, 954 F.2d 569, 574 (9th Cir. 1992); *In re Rothenberg*, 173 B.R. 4, 14 (D.D.C. 1994) (Acts taken in violation of the automatic stay are void *ab initio* according to the Second Circuit, as well as First, Third, Ninth, Tenth and Eleventh).  In addition, section 362(k) provides that individuals injured by a willful violation of the state are entitled to recover actual damages and may seek punitive damages.  However, the Plaintiff does seek any recovery based on a violation of the automatic stay.

4.  **Counts I and II:  Fraud and Negligent Misrepresentation –**

a.  **Fraud (Against Christopher Laurita and Iconix)**

In the Summary Judgment Decision, the Court set forth the legal standard for proving fraud, and found that the Disclosure Statement and the Confirmation Affidavit contained false information.  As the Court stated in the Summary Judgment Decision, a claim of fraud requires proof of "a misrepresentation of an existing fact, made with knowledge of the falsity, an intent to induce reliance thereon, justifiable reliance upon the misrepresentation, and damages."  *J.A.O. Acquisition Corp. v. Stavistsky*, 8 N.Y.3d 144, 148 (2007).  Fraud must be established by clear and convincing evidence.  *Banque Franco-Hellenique De Commerce Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 25 n. 2 (2d Cir. 1997).  The Disclosure Statement, the Amended Disclosure Statement, and the Confirmation Affidavit signed by Christopher Laurita contained false representations that the Signature License Agreement was terminated "pursuant to [its] terms."  In the Summary Judgment Decision, the Court left for an evidentiary hearing the issues regarding fraudulent intent, whether the Plaintiff justifiably relied on the false statements, and whether damages resulted from the false statements and omissions.  In addition to the false

statements contained in the Disclosure Statement, the Amended Disclosure Statement and the Confirmation Affidavit, the License Agreement was not disclosed in Schedule G or in the Statement of Financial Affairs. Finally, the existence of a breach of contract claim against Studio IP was never disclosed in the Disclosure Statement, the Amended Disclosure Statement and the Confirmation Affidavit.

Before discussing the remaining elements, an analysis of the false statements and omissions by Iconix and the extent to which Iconix had a duty to disclose information or correct misstatements shall be undertaken. Iconix did not draft any of the documents at issue in this cause of action, and its role in connection with this cause of action was limited to reviewing the contents of the Disclosure Statement and the Amended Disclosure Statement, and signing them before they were filed with the Court. While these documents contained false statements, Iconix urges the Court to conclude that because Iconix did not draft the documents, it cannot be responsible for misrepresentations contained therein. Iconix claims that its conduct is limited to its failure to correct statements in the documents. The Court believes that Iconix, as a signatory to the Disclosure Statement and the Amended Disclosure Statement, is responsible for the false statements. However, even if Iconix's conduct is limited to its failure to disclose or correct the misstatements, then it must be under a duty to disclose in the first place, or else the conduct is not actionable. *Whitney Holdings, Ltd. v. Givotovsky,* 968 F. Supp. 732, 749 (S.D.N.Y. 1997); *Standish-Parkin v. Lorillard Tobacco Co*., 12 A.D.3d 301, 303, 786 N.Y.S.2d 13 (1st Dep't 2004). Iconix asserts that because it was involved in an arm's length transaction with the Debtor pursuant to the Signature License Agreement, no fiduciary relationship existed between itself and the Debtor. Iconix also claims that it had no fiduciary relationship with the Debtor in its role as a member of the Creditors' Committee. According to Iconix, if there was no duty to disclose this

information, Iconix cannot be liable.  While these statements are accurate, Iconix owed a fiduciary

duty to the unsecured creditors of the Debtor as a member of the Creditors' Committee.  *See In re*

*Refco Inc.*, 336 B.R. 187 (Bankr. S.D.N.Y. 2006) ("It is well recognized that, to fulfill these roles

[set forth in section 1103], the members of an official committee owe a fiduciary duty to the

constituents – in the case of an official creditors' committee, to all of the debtor's unsecured

creditors."); *In re Rickel & Associates, Inc.*, 272 B.R. 74, 99-100 (Bankr. S.D.N.Y. 2002); and *In*

*re Map Int'l, Inc.*, 105 B.R. 5, 6 (Bankr. E.D. Pa. 1989).  Because of this fiduciary relationship

with the unsecured class of creditors, Iconix was obligated to be "honest, loyal, trustworthy and

without conflicts of interest."  *In re Rickel & Associates, Inc.*, 272 B.R. at 99 (citing *In re Johns-*

*Manville Corp.*, 26 B.R. 919, 925 (Bankr. S.D.N.Y. 1963)).  Therefore, Iconix had a duty to the

unsecured creditors to disclose the true status of the Signature License Agreement, and a failure to

disclose is actionable under fraud and fraudulent misrepresentation.

### i.   Intent

"To establish scienter [the] plaintiff must show an intentional or reckless misstatement

made with the intent that [the] plaintiff rely upon it."  *Brown v. Stinson*, 821 F. Supp. 910, 914

(S.D.N.Y. 1993) (citing *Revlon, Inc. v. Carson Products Co.*, 602 F. Supp. 1071, 1101 (S.D.N.Y.

1985), *aff'd*, 803 F.2d 676 (2d Cir. 1986), *cert. denied*, 479 U.S. 1018 (1986)).  "Even if an

affirmative intent to deceive cannot be established, the scienter element may be proven if there

was gross negligence in making the misrepresentation."  *Revlon, Inc. v. Carson Products Co.*, 602

F. Supp. at 1101.  The plaintiff must establish that fraudulent intent existed in the mind of the

defendant.  *Encore Credit Corp. v. Lamattina*, No. CV-05-5442 (CPS), 2006 WL 148909, at \*3

(E.D.N.Y. Jan 18, 2006).  Iconix claims that it did not make any false representations in the

Disclosure Statement and Amended Disclosure Statement because it had no role in drafting the

40

documents.  Iconix further states that General Counsel Tarshis' acts of signing the Disclosure Statement and Amended Disclosure Statement on behalf of Iconix in its capacity as a member of the Creditors' Committee does not establish an intent to deceive by clear and convincing evidence. Finally, to the extent that Iconix is bound by the acts of its counsel, Iconix claims that it had no duty to disclose additional information or correct the misstatements made by counsel to the Debtor or counsel to the Creditors' Committee, which prepared the Disclosure Statement and the Amended Disclosure Statement.  As for Christopher Laurita, he claims he did not sign the Schedules, the Statement of Financial Affairs, the Amended Disclosure Statement or the Amended Disclosure Statement.  With respect to the Confirmation Affidavit, Christopher Laurita claims that he relied on his counsel, who advised him that the Signature License Agreement was terminated prepetition.

Dealing with Iconix's arguments first, the Court finds that Iconix's role in the Disclosure Statement and Amended Disclosure Statement was significant.  Although Iconix did not have a hand in drafting the documents, General Counsel Tarshis signed the documents on behalf of the Creditors' Committee.  As a member of the Creditors' Committee and a signatory to the Disclosure Statement and Amended Disclosure Statement, Iconix is bound by the representations made therein.  Any excuse by bankruptcy counsel for Iconix that he did not fully review the documents and assumed that someone else confirmed whether the statements pertaining to the status of the Signature License Agreement were correct does not absolve Iconix.

As for Christopher Laurita, he cannot assert a lack of intent because he claims to have relied on advice of counsel.  Under New York law, a principal/agent relationship exists between an attorney and the client he or she represents.  *Veal v. Geraci*, 23 F.3d 722, 725 (2d Cir. 1994). Contrary to Christopher Laurita's claim of reliance on his counsel, Joseph Schwartz, the Debtor's

bankruptcy attorney, testified that he was told in no uncertain terms by Christopher Laurita and General Counsel Tarshis that the Signature License Agreement was terminated prepetition. (03/07/16 Trial Tr. 41 (Schwartz)).  Under New York agency law, "[i]f a principal knows facts which are unknown to the agent [the Debtor's bankruptcy attorneys] . . . and if, because of his or her justifiable ignorance, that agent makes a material misrepresentation of fact, the principal is subject to liability for an intentional misrepresentation."  2A N.Y. Jur. 2d, Agency and Independent Contractors § 304.

A review of the record supports a finding that Iconix and Christopher Laurita attempted to keep the true status of the Signature License Agreement a secret by misrepresenting to the Court and the creditors of the Debtor that it was terminated prepetition.  Furthermore, both Iconix and Christopher Laurita had motives to make the false representations that the Signature License Agreement was terminated prepetition.  If the asset was disclosed as property of the Debtor's estate, any transaction related to the Signature License Agreement would be scrutinized by the Court and the creditors, and any benefit to the Debtor's estate would be examined.  If the Signature License Agreement was hidden from the Court and the creditors, any collateral benefit to Christopher Laurita resulting from a resolution with Iconix would evade judicial review, as would any benefit flowing to the licensor, which was a prepetition creditor of the Debtor.   The lack of any benefit running to the Debtor's estate would be glaring, and would require a full explanation on the record.   In short, the record reflects that the misrepresentations regarding the Signature License Agreement were not the result of inadvertence on the part of Iconix or Christopher Laurita. In fact, listing the Signature License Agreement would have destroyed the plan to confer the benefits of the exclusive Rocawear license to ROC Fashions.

Iconix and Christopher Laurita both were fully aware of the issues surrounding the status of the Signature License Agreement, as well as the risk of treating the Signature License Agreement as expired. On September 10, 2009, Schwartz emailed Christopher Laurita and advised that he spoke with bankruptcy counsel and general counsel to Iconix, who advised that "Iconix and Azrak are willing to take the risk that the license was terminated, a new license can be issued and the orders for merchandise that Signature had not paid for that are sitting in the warehouses in China can be purchased by Azrak." T-83. At trial, Christopher Laurita admitted that there was a risk that the Signature License Agreement was not terminated as of the date of the involuntary petition. In commenting on the email by his bankruptcy attorney, Christopher Laurita explained the email as follows:

> The Court: What risk are they talking about?
>
> Mr. Laurita: Well, I guess at the time, the risk they were referring to was the document that is in here somewhere, but that shows the default notice and not having everything, I guess documented as far as the termination goes.
>
> The Court: We're willing to take the risk that the license was terminated:
>
> Mr. Laurita: Right.
>
> The Court: Does that mean there was a risk? It [the Signature License Agreement] wasn't terminated.
>
> Mr. Laurita: Well, again, I think it's because it wasn't documented properly. And that was the risk.
>
> The Court: So a group of lawyers were telling you on September 10th that there was a risk, the license, as to whether the license was terminated. Is that right?
>
> Mr. Laurita: Yes.

04/23/15 Trial Tr. 68-69 (Laurita).

An understanding of the risks involved in treating the Signature License Agreement as expired was also reflected in the terms of the ROC Fashions License Agreement. The Indemnification Clause in the ROC Fashions License Agreement indemnifies ROC Fashions against any claim or allegation that the Signature License Agreement was not properly and effectively terminated. T-90. Clearly, Iconix was aware of the risk it was taking regarding the continued existence of the Signature License Agreement after the Involuntary Petition was filed, and that fact that two entities could not hold the exclusive license at the same time. Iconix was willing to bear the responsibility of these risks with respect to ROC Fashions.

The conduct of Iconix and Christopher Laurita reflected a willingness to provide inaccurate information with the intent of presenting a false account of the Debtor's assets as of the date the Involuntary Petition was filed. They knew the Signature License Agreement had not been properly terminated, and sought to hide this fact by consistently presenting the termination as a fait accompli. The only records which reflect the actual status of the Signature License Agreement are in the emails between the parties and the ROC Fashions License Agreement, which were not made known to the Court or the creditors of the Debtors. In addition, Christopher Laurita did not disclose or pursue Studio IP for breach of contract, which occurred when Studio IP issued an exclusive license to ROC Fashions in violation of the Signature License Agreement.

Finally, the exculpation provisions contained in the Liquidation Plan do not save Christopher Laurita or Iconix from liability under this cause of action. The exculpation clause does not provide protection from liability for "bad faith, willful malfeasance, reckless disregard of duty, gross negligence, willful fraud, willful misconduct, self-dealing, or breach of fiduciary duty." [dkt. 93, p.28]. The conduct of Christopher Laurita and Iconix reflected bad faith, disregard of duty, willful fraud and misconduct, as well as self-dealing.

### ii.    Materiality

New York courts have not given a precise definition of the term "materiality" in relation to fraud, except to suggest that when a misrepresentation or omission is so trifling that it is legally consequential, it cannot be deemed material. *Gaidon v. Guardian Life Ins. Co. of America,* 94 N.Y.2d 330, 704 N.Y.S.2d 177, 725 N.E.2d 598 (1999). Before it can be determined that a deceived party was justified in his or her belief that the misrepresentation is true, the materiality of the misrepresentation must be established. *Robitzek v. Reliance Intercontinental Corp.,* 7 A.D.2d 407, 183 N.Y.S.2d 870 (1st Dep't 1959), *aff'd,* 7 N.Y.2d 1041, 200 N.Y.S.2d 424, 167 N.E.2d 74 (1960). The Signature License Agreement was the single most valuable asset of the Debtor, and whether it was property of the estate was a material fact by any calculation. Christopher Laurita and Iconix spent significant amounts of time trying to ensure that the bundle of rights associated with the Signature License Agreement was effectively transferred to a third party. These efforts did not abate once the Involuntary Petition was filed, and in fact, they intensified. The false representations in the Disclosure Statement, the Amended Disclosure Statement, and the Confirmation Affidavit resulted in the concealment of the Debtor's most valuable asset, as well as a claim against Studio IP for breach of contract, and were material to the case.

### iii.    Reliance

The Plaintiff has established by clear and convincing evidence that the Debtor, along with the creditors of the Debtor and the Court, justifiably relied on the omissions in Schedule G and the Statement of Financial Affairs, the Disclosure Statement, the Amended Disclosure Statement, and the Confirmation Affidavit. At no time prior to confirmation of the Debtor's plan was the Debtor aware that the Signature License Agreement had not been properly terminated, and the true state

45

of affairs was peculiarly within the possession of Iconix and Christopher Laurita.  The law is clear that if "the misrepresentations relate to matters peculiarly within the other party's knowledge . . . the wronged party may rely on them without further investigation."  *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc*., 500 F.3d 171, 181 (2d Cir. 2007).  In this case, Iconix and Christopher Laurita went to great lengths to ensure that the true status of the Signature License Agreement was not revealed, and never sought redress for Studio IP's breach of the Signature License Agreement. To claim, as Iconix does, that the Debtor could have inquired as to the circumstances surrounding the alleged prepetition termination of the Signature License Agreement is a fallacy.  Christopher Laurita, along with his brother, controlled the flow of information and were responsible for properly disclosing the Signature License Agreement on Schedule G.  The Debtor's bankruptcy counsel was equally in the dark regarding the status of the Signature License Agreement, and he testified at trial that had he known the truth, he would have advised that the Signature License Agreement be included in Schedule G.  3/7/10 Trial Tr. 30 (Schwartz).

Iconix, as the parent company of Studio IP (the licensor), also knew the true status of the Signature License Agreement.  There is no evidence in the record to establish that counsel to the Creditors' Committee had knowledge of the true facts, and in fact, counsel to Iconix advised counsel to the Creditors' Committee that the Signature License Agreement had been terminated. 11/19/15 Tr. at 56 (Eckstein).  Counsel to the Creditors' Committee had a right to rely on this representation when preparing the Disclosure Statement and Amended Disclosure Statement with the Debtor's counsel.  The creditors of the Debtor, along with the Court reasonably relied on the statements regarding the status of the Signature License Agreement, including the Confirmation Affidavit submitted by Christopher Laurita.

iv.    **Damages**

46

The damages sought by the Plaintiff for the fraud claims are equitable in nature, in the form of disgorgement. The Plaintiff relies on the premise that bankruptcy courts are essentially courts of equity, and the equitable powers of the Bankruptcy Court should be invoked to ensure that technical considerations do not prevent substantial justice from being done. In support of its argument, the Plaintiff cites to, *inter alia*, *Pepper v. Litton*, 308 U.S. 295, 304-305 (1939), and *Local Loan Co. v. Hunt*, 292 U.S. 234, 240 (1934). In contrast, Christopher Laurita argues that the Debtor did not incur any damages as a result of any false statement because the alleged false statements occurred in November 2009 or later. By that time, the Roc Fashion License Agreement had been in existence for at least one month. All the Creditors' Committee could have done in November 2009 was bring the instant adversary proceeding, which is no different from what ultimately occurred. Iconix argues that the Plaintiff has failed to establish damages because the Signature License Agreement could only be assigned with the consent of Studio IP, rendering the Signature License Agreement worthless, and even if it could have been assigned, the Signature License Agreement had no value. Iconix claims that it had no value because any claimed hold-up value would be purely speculative. In addition, Iconix argues that the remedy of disgorgement is reserved for damages in connection with claims of self-dealing and divided loyalty. Because the Signature License Agreement was an arm's length transaction, Iconix did not owe a fiduciary duty to the Debtor and disgorgement is not available as a remedy.

The Court finds that none of these arguments are persuasive. It is accurate to state that under New York law, a plaintiff must prove that any injury it incurred was a direct result of the fraud, and the measure of damages for fraud is "limited to the actual pecuniary loss, excluding profits, sustained as a result of the fraud." *Ostano Commerzanstalt v. Telewide Systems, Inc.*, 794 F.2d 763, 766 (2d Cir. 1986). Actual pecuniary loss may include both out-of-pocket losses and

consequential damages incurred as a result of reliance on the fraudulent misrepresentations.

*Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc.*, 88 A.D.2d 461, 467-68 (2d Dep't 1982).    Under the out-of-pocket rule, any recovery is limited to that which is necessary to restore a party to the position it occupied before commission of the fraud. While the plaintiff has the burden of establishing the amount of damages, the role of the wrongdoer plays a part in how exacting the evidence must be.    Under New York law, the "wrongdoer rule" may excuse the plaintiff from establishing the measure of damages with absolute certainty:

> As the Supreme Court explained, 'while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate.  The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise.'  *Story Parchment Co.*, 282 U.S. at 563, 51 S. Ct. at 250-51.  Thus, while it is true that [the defendants] will bear the risk of the uncertainty, [the plaintiff] is nevertheless required to show, at the very least, a reasonable inference of damages. *See Matter of Rothko's Estate*, 43 N.Y.2d 305, 323, 372 N.E.2d 291, 298 (1977) (holding that where it is impossible to appraise damages with certainty, the Surrogate 'had the right to resort to reasonable conjectures and probable estimates and to make the best approximation possible through the exercise of good judgment and common sense in arriving at that amount'). . . .  [The plaintiff] is therefore required to 'make the best approximation [of damages] possible through the exercise of good judgment.' *Id. See also Novelty Textile Mills, Inc. v. C.T. E., Inc.*, 743 F. Supp. 212, 220 (S.D.N.Y. 1990) ('The ascertainment of damages ... is not an exact science, and where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: It is *enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.*') (emphasis added) (internal quotation marks and citations omitted). This approximation will then be used as an "upper limit," which [the defendants] will have an opportunity to disprove, and any uncertainty in the amount will be construed against defendants, to the extent defendants cannot prove a lower amount of damages through competent evidence. *See Gratz v. Claughton*, 187 F.2d 46, 51-52 (2d Cir. 1951) (L. Hand, J) ('when damages are at some

> unascertainable amount below an upper limit and when the
> uncertainty arises from the defendant's wrong, the upper limit will
> be taken as the proper amount.').

*Federal Insurance Co. v. Mertz*, 12-cv-1597-NSR-JCM, 2016 WL 164618, at *4 (S.D.N.Y. Jan.

12, 2016).

The fraud in this case was a fraudulent scheme to conceal the existence of the Signature

License Agreement as an asset of the Debtor's estate, with the intent of transferring the rights

thereunder to a third party without compensating the Debtor for the asset.  The Debtor's right to

hold the exclusive license to manufacture the Rocawear juniors brand for sale had value.  In

addition to this right, the Debtor lost its interest in the profits from sales of the WIP, its employees,

and office equipment, all of which ended up in the hands of ROC Fashions without any

compensation to the Debtor.  There was no formal abandonment by the Debtor of these assets.

Instead, the Defendants affirmatively misrepresented to the Court and the creditors of the Debtor

that the crown jewel of the Debtor—the Signature License Agreement—was terminated

prepetition.  The rights under the Signature License Agreement had value, but its value is difficult

to determine.  This does not mean that the Debtor did not suffer an actual pecuniary loss, or that

the damages are too speculative.  There are no apparent intervening factors which caused the

damage as well, such as a generally declining stock market when valuing stock, or other factors

that could have caused a plaintiff to make certain decisions.  This was the fraudulent concealment

of the Debtor's assets based on the conduct of identifiable parties.

While the assets themselves can be identified, valuing them is difficult.  However, the

difficulty in fixing a value for the bundle of rights encompassed in the Signature License

Agreement is not a bar to awarding damages for fraud.  To find otherwise would reward the

wrongdoer at the expense of the defrauded party.  The damages for fraud in this case equals the

49

value of the rights under the Signature License Agreement, along with the office equipment and profits from the WIP, for which the Debtor received no compensation. In order to determine the proper value of these assets, the Court will conduct a separate hearing, using the guidelines set forth in the damages section on the breach of contract claim, *infra*.

### v.    Punitive Damages

The Plaintiff seeks punitive damages equal to three times the damages caused to the Debtor, or in another amount as the Court may determine. Punitive damages may be awarded in a tort action arising from the parties' contractual relationship if the plaintiff demonstrates 1) that the defendant's conduct is actionable as an independent tort, 2) the tortious conduct is of an egregious nature, 3) the egregious conduct is directed towards the plaintiff, and 4) the defendant's conduct is part of a pattern directed at the public generally. *Conocophillips* v. 261 E. Merrick Rd. Corp., 428 F. Supp. 2d 111, 129 (E.D.N.Y. 2006) (*citing Day Spring Enterprises, Inc. v. LMC Int'l, Inc.*, No. 98-CV-0658A(F), 2004 WL 2191568, at *30 (W.D.N.Y. Sept. 24, 2004)). While fraudulent conduct may give rise to punitive damages; mere fraud will not support a claim for punitive damages. *Solutia Inc. v. FMC Corp.*, 456 F. Supp. 2d 429, 453 (S.D.N.Y. 2006) (other citations omitted). A defendant must act "with evil and reprehensible motives." *Id*.  In this case, the conduct of Iconix and Christopher Laurita did not rise to the level of moral culpability required to justify an award of punitive damages. *See Ostano Commerzanstalt v. Telewide Systems, Inc*., 794 F.2d 763, 767 (2d Cir. 1986) (fabrication of evidence to mislead the court may justify the imposition of sanctions, but not punitive damages). The Court concludes that the conduct of Iconix and Christopher Laurita was not sufficiently egregious to warrant the imposition of punitive damages. Therefore, no punitive damages will be awarded.

### b.   Negligent Misrepresentation (Against Christopher Laurita and Iconix)

A claim for negligent misrepresentation requires the plaintiff to establish i) the defendant had a duty, as a result of a special relationship, to give correct information, ii) the defendant made a false representation that he should have known was incorrect, iii) the defendant knew that the information was desired by the plaintiff for a serious purpose, iv) the plaintiff intended to rely and act upon it, and v) the plaintiff reasonably relied on the information to his or her detriment. *Hydro Investors, Inc. v. Trafalgar Power, Inc*, 227 F.3d 8, 20 (2d Cir. 2000) (other citations omitted). The Plaintiff has already proven the elements of fraud as to Iconix and Christopher Laurita, and has refuted all of the infirmities raised by these defendants with respect to this cause of action. For example, the Court has already concluded that Iconix made false statements, that Iconix owed a fiduciary duty to the creditors of the Debtor, and that there was justifiable reliance on the false statements. The same is true for Christopher Laurita, who, as the Debtor's principal and a fiduciary to the Debtor, had a duty to properly disclose the existence of the Signature License Agreement. In addition, neither Iconix nor Christopher Laurita can rely on the exculpation clause in the Liquidation Plan, as it does not extend protection from liability for reckless disregard of duty, self-dealing or negligence. Dkt. 93, p.28.

The damages for negligent misrepresentation are the same for the fraud claim, and the Court shall hold a hearing as set forth *infra*.

5.  **Counts III and IV: Breach of Fiduciary Duty and Aiding and Abetting Breach of Fiduciary Duty**

    a.  **Breach of Fiduciary Duty (Against Christopher Laurita)**

The Plaintiff's third and fourth causes of action assert that Christopher Laurita, aided and abetted by the other Defendants, engaged in unfair, self-dealing transactions that violated his fiduciary duties to the Debtor.

A claim of breach of fiduciary duty requires proof of existence of a fiduciary duty, breach

of that duty, and resulting damages. *See York Lining v. Roach*, 1999 WL 608850, at *2 (Del. Ch.

July 28, 1999). The Bankruptcy Code imposes fiduciary duties on principals of a debtor in

possession. *See* 11 U.S.C. § 323 (a); 11 U.S.C. § 1107(a); Fed. R. Bankr. P. 9001(5); *see also*

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985). A claim for aiding

and abetting a breach of fiduciary duty requires proof of breach by a fiduciary of obligations to

another, that a defendant knowingly induced or participated in the breach, and that the plaintiff

suffered damages as a result of the breach. *See Kaufman v. Cohen*, 307 A.D. 2d 113, 125 (1st

Dep't 2003). The parties agree that Delaware law applies to the Plaintiff's breach of fiduciary

duty claim, while New York law applies to the aiding and abetting claim. Before the Court

addresses the merits of these two counts, the Court shall rule on the Plaintiff's motion seeking

relief from the Summary Judgment Decision.

### i.   Plaintiff's Motion to Reconsider Partial Summary Judgment

In the Summary Judgment Decision, the Court granted partial summary judgment

dismissing the Plaintiff's claims for breach of fiduciary duty of loyalty against Christopher Laurita,

aided and abetted by the Iconix Defendants, holding that the terms of Signature's operating

agreement eliminated Christopher Laurita's duty of loyalty to the Debtor. Approximately two

weeks later, on March 17, 2015, the Plaintiff filed a notice of appeal of this portion of the Summary

Judgment Decision with the United States District Court for the Southern District of New York,

pursuant to Fed. R. Bankr. P. 8009. The issue on appeal was whether Christopher Laurita owed a

fiduciary duty of loyalty arising under federal law as an officer and principal of the debtor in

possession following entry of the order for relief, *i.e.*, during the Post-Gap Period. *See* dkt. 189,

192. On the same day, the Plaintiff docketed a letter with this Court seeking clarification on that

issue.  During a pretrial conference call held on March 31, 2015, the Court instructed[8] the parties

to submit evidence at trial regarding Christopher Laurita's duty of loyalty during the Post-Gap

Period in order to build its record for appeal.  *See* the Iconix Defendants' Objection to the

Plaintiff's 9024 Motion at 7.  On July 10, 2015, the Plaintiff entered into a stipulation with

Christopher Laurita and the Iconix Defendants, voluntarily dismissing their appeal without

prejudice pursuant to Fed. R. Bankr. P. 8023.  *See* dkt. 204.  On February 5, 2016, approximately

eleven months after entry of the order ("Partial Summary Judgment Order") memorializing the

Summary Judgment Decision, the Plaintiff filed a motion with this Court seeking relief from the

Summary Judgment Decision and Partial Summary Judgment Order pursuant to Fed. R. Civ. P.

60, made applicable to bankruptcy matters under Fed. R. Bankr. P. 9024 ("9024 Motion").

For the following reasons, the Court will exercise its discretion to reconsider its prior

decision, and concludes that Christopher Laurita owed a fiduciary duty of loyalty arising under

federal law as a principal of the Debtor in possession during the Post-Gap Period.

As an initial matter, the Court finds that the 9024 Motion cannot be granted based on Fed.

R. Civ. P. 60.  A motion under Fed. R. Civ. P. 60(a) is used to correct a clerical mistake arising

from oversight or omission.  Entry of judgment entails two actions: one judicial and the other

ministerial.  *See Dudley ex rel. Estate of Patton v. Penn-America Ins. Co.*, 313 F.3d 662, 668

(2002).  "Judicial" means that a court enters a "final, appealable judgment."  *Id.*  "Ministerial"

means "that judgment must be set out in a separate document and entered on the court docket."

*Id.*  It is the latter situation that a Rule 60(a) motion is designed to address.  *See id.* at 671.  ("A

Rule 60(a) motion is directed to errors or omissions in the essentially ministerial act of transcribing

---

[8] Although there is no official transcript of this conversation, the parties acknowledged in their briefs for the 9024 Motion that such conversation took place on a conference call.

the court's rendered judgment into writing; it cannot serve to correct errors or omissions in the judicial act of rendering that judgment.").

Relief under Rule 60(b) is appropriate to modify a final judgment due to, among many other reasons, mistake or inadvertence by a court. The mistake sought to be corrected by the Plaintiff is not one of inadvertence in transcribing a judgment or a something similar. Another impediment to utilizing Rule 60(b) as a vehicle in this matter is that the Summary Judgment Decision is not a final order but an interlocutory order. Rule 60(b) is limited to providing relief from a "final judgment, order or proceeding." *See Luv n' Care, Ltd. v. Regent Baby Products Corp.*, 986 F. Supp. 2d 400, 411 (S.D.N.Y. 2013) (denying motion for reconsideration under Rule 60(b) because partial summary judgment is interlocutory in nature). The Plaintiff cannot rely on Rule 59(e) either. A Rule 59(e) motion to alter or amend a judgment, which is made applicable to bankruptcy cases by Bankruptcy Rule 9023, must be filed no later than fourteen days after entry of the judgment. The 9024 Motion was filed approximately eleven months after entry of the Summary Judgment Decision and Partial Summary Judgment Order.

The Court, however, has discretion to reconsider interlocutory orders prior to entry of final judgment, pursuant to 54(b), made applicable to this adversary proceeding pursuant to Bankruptcy Rule 7054. Rule 54(b) provides that until a court directs entry of final judgment, an order that resolves fewer than all of the claims among all of the parties "is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties." Fed. R. Civ. P. 54(b). This applies to any order granting partial summary judgment. *In re Chateaugay Corp.*, 922 F.2d 86, 90 (2d Cir. 1990) (citing *Liberty Mutual Ins. Co. v. Wetzel*, 424 U.S. 737, 742-43 (1976)). "[W]hether or not [a motion for summary judgment] is renewed, a trial court has discretion to reconsider an interlocutory ruling." *Warner Bros. Inc. v. American*

*Broadcasting Companies, Inc*., 720 F.2d 231, 245-46 (2d Cir. 1983). Furthermore, a bankruptcy court has the power to reconsider its previous orders when equity so requires so long as no intervening rights have become vested in reliance on the orders. *See In re N.Y. Racing Ass'n Inc*., No. 06-12618 (JLG), 2016 WL 6081087, at *8 (Bankr. S.D.N.Y. Oct. 17, 2016) (granting reargument on whether protective order was justified under 59(e) and 60(b)(1) although the order was interlocutory in nature); *In re Lenox*, 902 F.2d 737, 739-740 (9th Cir. 1990) (remanding bankruptcy case to decide whether Chapter 11 was confirmable based on a stipulation that bankruptcy court failed to consider).

The parties were instructed by the Court and have submitted evidence at trial regarding Christopher Laurita's duty of loyalty during the Post-Gap Period. *See* the Iconix Defendants' Objection to the Plaintiff's 9024 Motion at 7. There was neither prejudice to any of the Defendants nor intervening rights vested in reliance on the Partial Summary Judgment Order.

Having found that the Court has discretion to reconsider interlocutory orders prior to entry of final judgment, the Court will now consider whether Christopher Laurita owed a fiduciary duty of loyalty arising under federal law as a principal of the Debtor in possession during the Post-Gap Period.

Once the Debtor, with Christopher Laurita as its President and CEO, moved to convert the case to Chapter 11, he took on additional fiduciary duties as a debtor in possession. *See In re Albion Disposal, Inc*., 152 B.R. 794, 801-02 (Bankr. W.D.N.Y. 1993). The fiduciary duty of a debtor in possession "is not just that of a corporate officer or director, it is the duty of high trust imposed on the 'representative of the estate' pursuant to 11 U.S.C. § 323(a), 11 U.S.C. § 1107(a), and Rule 9001(5) of the Rules of Bankruptcy Procedure." *In re Albion Disposal Inc*., 152 B.R. at 801-02; *see also* S. REP. NO. 95-116, at 116 (1978) (referring to 11 U.S.C. § 1107(a): "This section

places a debtor in possession in the shoes of a trustee in every way.  The debtor is given the rights and powers of a chapter 11 trustee.  He is required to perform the functions and duties of a chapter 11 trustee."); *In re Centennial Textiles, Inc*., 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998) ("A debtor in possession owes the same fiduciary duty as a trustee to the creditors and the estate.  The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor in possession's affairs.").  The fiduciary obligations of a debtor in possession "include, among others, the duty of loyalty," which "includes an obligation to refrain from self-dealing, to avoid conflicts of interests and the appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the estate." *In re Adelphia Commc'ns Corp*., 336 B.R. 610, 670 (Bankr. S.D.N.Y. 2006), *aff'd*, 342 B.R. 122(S.D.N.Y. 2006) (citation omitted).  For those reasons, the Court will exercise its discretion to revise its Partial Summary Judgment Order, finding that Christopher Laurita owed a fiduciary duty of loyalty arising under federal law as a principal of the debtor in possession during the Post-Gap Period.

### ii.    Parties' Contentions

Turning to the merits of its claims, the Plaintiff argues that Christopher Laurita, aided and abetted by the Iconix Defendants, engaged in unfair, self-dealing transactions that violated (1) his duty of care applicable during the Gap Period, and (2) his duty of loyalty applicable during the Post-Gap Period.

According to Christopher Laurita, the Plaintiff's claim for breach of duty of care fails because he exercised good faith in his decision to acquiesce to the treatment of the Signature License Agreement.   Likewise, the Plaintiff's claim for breach of loyalty also fails because (1) his conduct giving rise to breach of duty of loyalty occurred before the order for relief was entered, (2) he did not violate the corporate opportunity doctrine, and (3) his consulting agreement is not

related to any alleged misconduct related to the Signature License Agreement or the ROC Fashions License Agreement.

### iii.    Christopher Laurita's Fiduciary Duty of Care

A duty of care requires that a fiduciary "use that amount of care which ordinarily careful and prudent men would use in similar circumstances and consider all material information reasonably available in making business decisions." *In re Walt Disney Co. Deriv. Litig.,* 907 A.2d 693, 749 (Del. Ch. 2005) (citations and internal quotation marks omitted).   In determining whether a duty of care was breached, the question is not whether Christopher Laurita came to the correct decision; it is whether he engaged in an appropriate, *good faith* process in reaching that decision. *See Brehm v. Eisner*, 746 A.2d 244, 264 (Del. 2000) ("Due care in the decisionmaking context is *process* due care only.") (emphasis added).

Liability arising from the duty of care arises in two distinct contexts:

> First, such liability may be said to follow from a board decision that results in a loss because that decision was ill advised or "negligent." Second, liability to the corporation for a loss may be said to arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss.

*In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996).

The first class of cases is subject to review under the business judgment rule.[9]  *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).  To invoke the rule's protections in the context of duty of

---

[9] The business judgment rule provides  "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984), *overruled in part on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).  The presumption initially attaches to a director-approved transaction within a board's conferred or apparent authority in the absence of "fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment."  *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988); *see also Aronson v. Lewis*, 473 A.2d at 813 ("[The

care, "directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 367 (Del.1993). Thus, if the "directors individually and the board collectively" fail to inform themselves "fully and in a deliberate manner," then they "lose the protection of the business judgment rule" and the court is "required to scrutinize the challenged transaction under an entire fairness standard of review." *Id*. at 368. In this regard, the Delaware Supreme Court has held that gross negligence is the proper standard for determining whether a business decision reached by a board of directors was an informed one. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985). As for the second class of cases, where a loss results from inaction by a director, the protections of the business judgment rule do not apply. *Disney*, 907 A.2d at 748. Under those circumstances, a "sustained or systematic failure" of a director to exercise reasonable oversight constitutes a breach of the director's duty of care. *Id*. at 750 (citing *Caremark*, 698 A.2d at 971).

According to the Plaintiff, Christopher Laurita's conduct falls within the first class of cases, but he is not entitled to the protections of the business judgment rule. The Plaintiff alleges that Christopher Laurita breached his duty of care applicable during the Gap Period when, instead of preserving the Debtor's rights under the Signature License Agreement, he simply acquiesced to the wishes of the Iconix Defendants. Had Christopher Laurita acted to preserve the Debtor's

---

business judgment rule] has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act.").

To obtain the protections of the business-judgment rule, an officer or a director must diligently and reasonably inform herself of all relevant facts and cannot passively approve important transactions without undertaking any examination of the facts. *Smith v. Van Gorkom*, 488 A.2d 858, 873 (Del. 1985), *overruled on other grounds, Gantler v. Stephans*, 965 A.2d 695 (Del. 2009).

To rebut this rule, a plaintiff must allege sufficient facts to support a reasonable inference that the directors, in reaching their challenged decision, breached any one of the "triads of [their] fiduciary duty—good faith, loyalty or due care." *Cede & Co. v. Technicolor, In*c., 634 A.2d 345, 361 (Del. 1993). If the rule is rebutted, the burden shifts to a defendant to prove the "entire fairness" of a transaction. *Id*.

interest and pursue the Debtor's rights, he could have achieved a better outcome for the Debtor, including, *e.g.*, a reduction in Studio IP's multimillion dollar claim against the estate. In response, Christopher Laurita points to his prepetition conduct and argues that he exercised good faith in his ultimate decision to acquiesce to the treatment of the Signature License Agreement as terminated. For example, he attempted to find an investor who could infuse capital into the Debtor's business. However, that effort failed because the terms of the Signature License Agreement were above prevailing market rates. Christopher Laurita also attempted to find a partner who would obtain a new license from Iconix and satisfy some of the debt Signature owed, such as Li & Fung and the Azraks. He then caused the Debtor to retain professionals to assist with the specifics of any deal with these parties. In essence, Christopher Laurita argues that by employing an appropriate, good faith process in reaching his decision, his conduct is protected by the business judgment rule. The Court disagrees.

Christopher Laurita's post-petition conduct is relevant to this inquiry. During the Gap Period, Christopher Laurita breached his duty of care by acquiescing in the concealment of the true status of the Signature License Agreement and/or willfully turning a blind eye to Studio IP's breach of the Signature License Agreement. Knowing that there was a documentation problem with the termination of the Signature License Agreement and with treating the Notice of Default as a termination letter, *see* 04/23/15 Trial Tr. 67–70 (Laurita), Christopher Laurita neither sought legal advice on the termination of the Signature License Agreement nor disputed the purported post-petition oral termination of the Signature License Agreement. He simply went along with the Iconix Defendants and began to treat the Signature License Agreement as terminated after the Involuntary Petition was filed. Mere acquiescence to a creditor's demands does not constitute the exercise of sound business judgment or the prudent exercise of one's fiduciary duties. *In re Penn*

*Traffic Co*., 524 F.3d 373, 383 (2d Cir. 2008) ("The Bankruptcy Code places the option of assuming or rejecting executory contracts with the debtor, not with its business partners. To disturb this mechanism would unbalance the Code's overriding policy favoring debtor reorganization and rehabilitation.").

Furthermore, courts have generally applied the business judgment rule to protect debtors in connection with their decisions to dispose of property of the estate when affirmatively seeking court approval for those transactions, such as to assume or reject an executory contract or to enter into a transaction outside of the ordinary course of business.[10] Here, not only did Christopher Laurita fail to seek Court approval for any of his conduct related to the Signature License Agreement, he also concealed his commission-based agreement with ROC Fashions by making false statements to the Court. Because there are sufficient facts to support a reasonable inference that Christopher Laurita breached his fiduciary duties to the Debtor, the presumption of the business judgment rule has been overcome. As a result, the proper standard of review is the entire fairness standard.

### a. Entire Fairness Doctrine

---

[10] *In re Orion Pictures Corp*., 4 F.3d 1095 (2d Cir. 1993) (motion made to assume contract); *In re Old Carco, LLC*, 406 B.R. 180 (Bankr. S.D.N.Y. 2009) (court authorization sought to reject executory contract); *In re Global Crossing Ltd*., 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (court approval sought for sale of assets outside of the ordinary course of debtor's business; court noted that "'good business reason' is not established where the only reason advanced is Creditors Committee's insistence on" a transaction); *In re Genco Shipping & Trading, Ltd*., 509 B.R. 455, 462 (Bankr. S.D.N.Y. 2014) (granting debtor's motion for leave to assume restructuring prepack can cut down the duration of a bankruptcy case and therefore, the incredible cost associated with a long, drawn out bankruptcy process"); *In re The Brooklyn Hospital Center*, 341 B.R. 405 (Bankr. E.D.N.Y. 2006) (debtor sought permission from court for out of the ordinary course transaction); *In re Texas Rangers Baseball Partners*, 434 B.R. 393, 405 (Bankr. N.D. Tex. 2010) (ordering general partners to manage gap debtor's affairs in a manner consistent with the fiduciary responsibilities of debtors-in-possession where debtor sought confirmation of prepackaged plan of reorganization); *see also In re Lionel Corp*., 722 F.2d 1063, 1071 (2d Cir. 1983) (creditors committee's "insistence" on asset sale is insufficient as a matter of fact because it is not a sound business reason and insufficient as a matter of law because it ignores the equity interests to be weighed and considered under chapter 11).

"Entire fairness [is] Delaware's most onerous standard." *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 44 (Del. Ch. 2013) (citation omitted). Under the entire fairness standard, a defendant must establish that a transaction was a product of both fair dealing and fair price. *Cede & Co.*, 634 A.2d at 361. "Fair dealing involves analyzing how the transaction was structured, the timing, disclosures, and approvals. Fair price relates to the economic and financial considerations of the transaction." *William Penn Partnership v. Saliba*, 13 A.3d 749, 756-57 (Del. 2011). While fair dealing and fair price are distinct concepts, the burden to establish them does not require a bifurcated analysis. *Id.* at 757. Rather, a court must evaluate a transaction as a whole to determine if a defendant has met his burden of establishing entire fairness. *See id.* Furthermore, the "entire fairness" analysis requires that "the transaction itself . . . be objectively fair, independent of the [fiduciary's] beliefs." *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006). Thus, "[n]ot even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness." *Id.*

Here, Christopher Laurita intentionally misrepresented the true status of the Signature License Agreement and failed to disclose the breach of the Signature License Agreement by Iconix. Rather than formally abandon the asset or seek a judicially sanctioned sale or transfer of the exclusive license rights from the Debtor to ROC Fashions, Christopher Laurita took no affirmative steps to protect the Debtor. Instead, he entered into an oral commission based agreement to earn millions of dollars with ROC Fashions, while the Debtor received nothing in exchange. At the same time, ROC Fashions agreed to pay the Iconix Defendants $6 million which they applied against the Debtor's past royalty obligations. A transaction for no benefit cannot be deemed "fair," as no reasonable seller would have accepted these terms. *See Reis v. Hazelett Strip–*

*Casting Corp.,* 28 A.3d 442, 466 (Del. Ch. 2011).  Even if Christopher Laurita truly believed the exclusive license had no value to the Debtor, this belief did not excuse his conduct.

Christopher Laurita failed to exercise good faith in his conduct regarding the Signature License Agreement during the Gap Period.  At trial, Christopher Laurita testified that the deals he was negotiating for were on his own behalf, not the Debtor's, and that he used the Debtor's assets—the Rocawear rights—as part of those negotiations.  *See* 04/22/15 Trial Tr. 37:20-41:9 (Laurita); *see also* T-58.  He did not inquire about, much less attempt to protect, the Debtor's rights pursuant to the Bankruptcy Code or the terms of the Signature License Agreement.  Christopher Laurita intentionally acted for the purpose of advancing his own financial interests rather than the best interests of the Debtor and its creditors.  *See Walt Disney*, 90 A.2d at 66-67.

The record reflects that Christopher Laurita's misconduct was intentional.  He was aware of the termination provision in the Signature License Agreement (T-3 § 20(a); T-45; T-52), knew that the Involuntary Petition had been filed (T-74), and at trial conceded that he was aware of a "documentation problem" in connection with the termination of the Signature License Agreement.  *See* 04/23/16 Trial Tr. 68:8-69:3 (Laurita); *see also* T-82, T-83.  He willfully turned a blind eye to conduct of the Iconix Defendants which violated the automatic stay and breached the plain terms of the Signature License Agreement.  He then concealed his wrongdoing by making false representations that the Signature License Agreement was terminated prepetition pursuant to its terms.  *See Ryan v. Gifford*, 918 A.2d 341, 357-58 (Del. Ch. 2007) (defendants' "fraudulent disclosures . . . constitute conduct that is disloyal to the corporation and is therefore an act in bad faith.").

Because neither the process nor the price was fair, the Court finds that Christopher Laurita breached his duty of care to the Debtor applicable during the Gap Period under the entire fairness standard.

### iv.    Christopher Laurita's Fiduciary Duty of Loyalty

In addition to the duty of care owed to the Debtor during the Gap Period, Christopher Laurita owed a duty of loyalty as a principal of the debtor in possession during the Post-Gap Period. For the following reasons, the Court finds that Christopher Laurita violated his duty of loyalty by wrongfully taking for himself a corporate opportunity of the Debtor.

A duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the shareholders generally." *Cede & Co. v. Technicolor, Inc*., 634 A.2d 345, 361 (Del. 1993). Most "breach-of-loyalty" cases involve claims that a director's conflict of interest[11] led the company to enter into a contract that benefited the director, rather than the company. *See ,e.g*., *Cede & Co*., 634 A.2d at 361. "[A] director is considered interested where he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993).

---

[11] Claims for breach of the duty of loyalty are not limited to cases of conflict of interest. Delaware courts have held that:

> [T]he fiduciary duty of loyalty is not limited to cases involving a financial or other cognizable fiduciary conflict of interest. It also encompasses cases where the fiduciary fails to act in good faith . . . . Where directors fail to act in the face of a known duty to act, thereby demonstrating a conscious disregard for their responsibilities, they breach their duty of loyalty by failing to discharge that fiduciary obligation in good faith.

*Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006). To hold a disinterested director liable for a breach of loyalty under Delaware law, the plaintiff must make a strong showing of misconduct. *In re Lear Corp. S'holder Litig*., 967 A.2d 640 (Del. Ch. 2008).

According to the Plaintiff, Christopher Laurita, aided and abetted by the Iconix Defendants, breached his Post-Gap period duty of loyalty by (1) engaging in self-dealing, (2) engaging in corporate waste, (3) accepting a lucrative consulting arrangement in exchange for acquiescing to the misconduct of the Iconix Defendants, and (4) failing to disclose to the Court the existence of an opportunity to exploit the license rights granted to ROC Fashions, thereby violating the corporate opportunity doctrine.

In response, Christopher Laurita argues that (1) his conduct allegedly giving rise to a breach of his duty of loyalty occurred before the order for relief was entered,[12] (2) he did not violate the corporate opportunity doctrine, and (3) his consulting agreement was not related to his participation in the post-petition treatment of the Signature License Agreement or the grant of the exclusive license rights to ROC Fashions in violation of the Signature License Agreement.

As for his first argument, the Court finds that some of Christopher Laurita's conduct giving rise to his breach of his duty of loyalty occurred *after* the order for relief was entered.  The order for relief was entered on November 5, 2009.  On November 12, 2009, the Debtor's motion to convert the case to a case under Chapter 11 was granted, which allowed the Laurita Brothers to remain in control of the Debtor as principals of a debtor in possession.  Since then, on November 20, 2009, December 29, 2009, and February 23, 2010, the Debtor filed a Schedule G, an Amended Schedule G, and a further Amended Schedule G, respectively, setting forth all executory contracts

---

[12] Christopher Laurita also argues that the Azraks and Iconix entered into a new license agreement in the period between September 4, 2009 and September 15, 2009 without any assistance by him whatsoever, behind his back.  *See* Chris Laurita's post-trial brief at pg. 55.  This argument is not persuasive because he was aware that the Azraks needed his assistance to get into the Rocawear business.  Charles Azrak testified that it was very strongly implied to him that he had to hire Christopher Laurita in order to get the business, that he thought hiring him made sense in any event, and that the day he signed a new license agreement with Studio IP on behalf of ROC Fashions, he fully expected to be working with Laurita.  *See* 03/19/15 Trial Tr. 112:16-115:3 (Azrak); 03/08/16 Trial Tr. 224:1-228:14 (Azrak).  On 09/02/16, Lipshitz reported to Stamelman that the meeting with the Azraks "went amazingly well. . . . Chris will try to help them on this tomorrow but also be a buffer for them with Neil as last meeting with Neil and Ruby Azrak did not go well between the two of them."  T-61.

and unexpired leases which did not include the Signature License Agreement. On April 1, 2010, and May 12, 2010, the Debtor and the Creditors' Committee filed a joint disclosure statement and an amended joint disclosure statement, each stating that "[p]rior to the petition date, and pursuant to the terms [of the Signature License Agreement], Iconix terminated the [Signature License Agreement] with the Debtor." On June 24, 2010, the Debtor filed the Confirmation Affidavit, wherein Christopher Laurita stated that the Iconix Defendants terminated the Signature License Agreement pursuant to its terms. This conduct post-dates the Gap Period, and subjects Christopher Laurita to liability.

### a. Corporate Opportunity Doctrine

As to his second argument, the Court finds that Christopher Laurita made false statements for the purpose of usurping a corporate opportunity of the Debtor. The corporate opportunity doctrine is borne of a fiduciary's duty of loyalty, and it exists to prevent officers or directors of a corporation—or, as in this case, a principal of the debtor—from personally benefiting from opportunities belonging to the corporation. *Grove v. Brown*, No. 6793–VCG, 2013 WL 4041495, at *8 (Del. Ch. Aug. 8, 2013). A corporate officer or director may not take a business opportunity for his own if:

> (1) The corporation is financially able to exploit the opportunity; (2) the opportunity is within the corporation's line of business; (3) the corporation has an interest or expectancy in the opportunity; and (4) by taking the opportunity for his own, the corporate fiduciary will thereby be placed in a position inimicable to his duties to the corporation.

*Broz v. Cellular Info. Sys., Inc*., 673 A.2d 148, 155 (Del. 1996) (citing *Guth v. Loft*, 5 A.2d 503, 509 (Del. 1939)).

Conversely, a corporate officer or director may take the corporate opportunity if:

65

> (1) the opportunity is presented to the director or officer in his
> individual capacity and not in his corporate capacity; (2) the
> opportunity is not essential to the corporation; (3) the corporation
> holds no interest or expectancy in the opportunity; and (4) the
> director of officer has not wrongfully employed the resources of the
> corporation in pursuing or exploiting the opportunity.

*Id.* Whether a corporate opportunity exists is a question of fact which must be determined

objectively based on the facts and circumstances existing at the time the opportunity arises. *See*

*Johnston*, 121 A.2d 919, 923 (Del. 1956) (quoting *Guth*, 5 A.2d at 513).  The burden is on a

fiduciary to show that he or she did not seize a corporate opportunity because either a corporation

was presented the opportunity and rejected it, or because the corporation was not in a position to

take advantage of the opportunity.  *See Field v. Allyn*, 457 A.2d 1089, 1099 (Del. Ch. 1996).

In his opposition to the 9024 Motion, Christopher Laurita argues that the right to transfer

the Rocawear rights was not a corporate opportunity that belonged to the Debtor because (1) the

Debtor did not have a "tangible expectancy," meaning "something much less tenable than

ownership, but, on the other hand, more certain than a desire or a hope[,]" *Pure Power Boot Camp,*

*Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 523-24 (S.D.N.Y. 2011) (citing

*Alexander & Alexander, Inc. v. Fritzen*, 147 A.D. 2d 241, 247-48, 542 N.Y.S.2d 530, 534 (1989));

(2) the Debtor was not financially able to exploit an opportunity to transfer the exclusive license

rights and related assets from the Debtor to ROC Fashions; (3) the Rocawear rights were

transferred by Iconix, not himself, and the opportunity to do so was not within the Debtor's "line

of business," and (4) the consulting agreement provided compensation for services rendered to the

new licensee who obtained a license prior to the entry of the order for relief.  The Court disagrees.

As an initial matter, whether expectancy is "tangible" derives from New York law; there

is no decision defining "tangible" expectancy under Delaware law.  Here, the parties agree that

Delaware law applies to the breach of fiduciary duty claim.  Nevertheless, under New York law,

whether an expectancy is "tangible" becomes relevant only if a principal has first made full disclosure of the opportunity to corporate creditors. *In re Albion Disposal, Inc.*, 152 B.R. 794 (Bankr. W.D.N.Y. 1993); *see also Owen v. Hamilton*, 44 A.D.3d 452, 843 N.Y.S.2d 298 (1st Dep't 2007) (notwithstanding "the corporation's inability or refusal to act it is entitled to the [director's] undivided loyalty."); *In re Gordon Car & Truck Rental, Inc.*, 65 B.R. 371, 375-76 (Bankr. N.D.N.Y. 1986) ("[T]he corporate opportunity doctrine is a rule of disclosure requiring the fiduciary to pass along information to his corporation where appropriate.").  Here, Christopher Laurita as a principal of the debtor in possession owed a duty to fully disclose to the creditors and the Court all facts and circumstances regarding his dealings and intentions in connection with a corporate opportunity. *Albion*, 152 B.R. at 794.  Christopher Laurita not only breached that duty by failing to disclose the existence of his commission-based agreement with ROC Fashions, and the circumstances that led up to that arrangement, *see Albion*, 152 B.R. at 800, he also concealed the fact that the Iconix Defendants breached the Signature License Agreement by entering into the ROC Fashions License Agreement.  *See id.* at 820 (debtors' principals usurped a corporate opportunity when they "conveyed a leasehold for their own benefit without giving creditors an opportunity to meet their terms or to question the bona fides of their asserted interests."); *In re Hampton Hotel Investors, L.P.*, 270 B.R. 346, 355-57 (Bankr. S.D.N.Y. 2001) (principal of a debtor in possession breached his fiduciary duties to the estate by, *inter alia*, "making agreements with ostensible third parties with respect to bidding on the main asset of the estate, and taking an undisclosed interest in the asset to be acquired," where "this agreement was never disclosed to the Court, nor to anyone else."); *In re Chief Executive Officers Clubs, Inc.*, 359 B.R. 527, 540 (Bankr. S.D.N.Y. 2007) ("the debtor in possession and the managers breach their fiduciary duties when they violate § 549 by making unauthorized postpetition transfers.").

Furthermore, the Debtor had potential investors for the business that would allow it to continue exploiting the Rocawear trademark.  In August 2009, Christopher Laurita was in active discussions with the Azraks and Li & Fung about the transfer of the Rocawear rights to one of those parties.  In his deposition, Joseph Laurita testified as follows:

> A: There was an attempt to have Li & Fung buy our company.
>
> Q: Were you involved in that attempt?
>
> A: Occasionally
>
> Q: What was your role in?
>
> A: I really had no role.  Just really attended one or two meetings.
>
> Q: Who was principally involved, from Signature's perspective?
>
> A: Chris

J. Laurita Dep. Tr. 295:230-296:21.

At trial, Tarshis testified that:

> Q: Were you aware of any discussions with Li & Fung about the Rocawear business in 2009?
>
> A: I was aware that Signature was speaking to Li & Fung about potential to becoming their licensee for the brand afterwards.
>
> Q: Did you have any discussions with anyone at Li & Fung about that?
>
> A: No.
>
> Q: Do you know who at Li & Fung was involved?
>
> A: No.
>
> Q: Do you know remember anything about discussions with Li & Fung sitting here today?
>
> A: Just that Li & Fung was a party that Signature was speaking to.
>
> Q: Were you also aware in 2009, that Signature was speaking to the Azraks or one of the entities associated with the Azraks about the Rocawear brand?
>
> A: Yes.
>
> Q: Do you recall anything about what you were hearing about those discussions?

> A: Again, just that they were a potential party that would have interest in taking the
> license.

11/18/15 Trial Tr. 14:23-15:10 (Tarshis).

On August 17, 2009, CEO Cole emailed Chris Laurita that he had spoken with Li & Fung USA

CEO Rick Darling "who seemed pretty sure a deal would get done."  The Debtor was, therefore,

potentially capable of exploiting an opportunity to sell or assign or transfer the exclusive license

rights under the Signature License Agreement to another investor other than the Azraks.

It is also worth noting that a corporation's lack of financial ability to exploit an opportunity

is viewed reluctantly by courts as a defense.  *See Albion*, 152 B.R. at 819.  The *Albion* court stated

that:

> If directors were permitted to so justify their conduct, "there will be
> a temptation to refrain from exerting their strongest efforts on behalf
> of the corporation, since, if it does not meet the obligations, an
> opportunity of profit will be open to them personally . . . [One must
> question] whether a stronger effort might not have been made on the
> part of the management to procure for [the corporation] the
> necessary funds or credit."

*Id*. at 821 (quoting *Irving Trust Company v. Deutsch*, 73 F.2d 121, 124 (2d Cir. 1934)); *see also*

*In re Mobilactive Media, LLC*, 2013 WL 297950, at *23 (Del. Ch. Jan. 15 2013).

A corporate opportunity to transfer the exclusive license rights under the Signature License

Agreement to a new licensee was valuable and was directly within the Debtor's line of business.

In *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 270 (1939), the Delaware Supreme Court explained that an

opportunity is within a company's "line of business" where the opportunity:

> Embrac[es] an activity as to which [the company] has fundamental
> knowledge, practical experience and ability to pursue, [and] which,
> logically and naturally, is adaptable to its business having regard for
> its financial position, and is one that is consonant with its reasonable
> needs and aspirations for expansion.

*Id.* at 279.  Here, the Debtor had been exploiting the Rocawear rights, pursuant to the Signature License Agreement, for over five years.  Its business operations were built around the Rocawear brand.

The Debtor also had an interest or expectancy in the corporate opportunity.  "For the corporation to have an actual or expectant interest in any specific property, there must be some tie between that property and the nature of the corporate business."  *Mobilactive*, 2013 WL 297950, at *22 (citation omitted).  "When determining whether a corporation has an interest in a line of business, the nature of the corporation's business should be broadly interpreted."  *Id.* (citation omitted).  Here, there is a clear tie between the Debtor's business, which included the exploitation of the Rocawear rights, and the corporate opportunity, *i.e.*, the transition of those rights to a new licensee.

By usurping a corporate opportunity of the Debtor, Christopher Laurita stood in a position inamicable to his duties to the Debtor, its estate, and its creditors, because he "serve[d] his own self-interest" when he "exploited those opportunities on [his] own behalf rather than sharing the benefits with [the Debtor]."  *Mobilactive*, 2013 WL 297950, at *23.  It was "inamicable" to his fiduciary duties to consult with the new owners of the Rocawear rights, once he took the affirmative step to convert the case from Chapter 7 to Chapter 11, which would ensure that the Laurita Brothers, rather than an independent trustee, would remain in control of Signature.

Lastly, Christopher Laurita's consulting agreement was related to his participation in the usurpation by ROC Fashions of the exclusive license rights and related assets of  the Debtor in violation of the automatic stay and the plain terms of the Signature License Agreement.  The evidence shows that the ROC Fashions would not have obtained the Rocawear rights had Christopher Laurita not acquiesced in the purported oral termination of the Signature License

Agreement, and that his participation in an undisclosed oral consulting agreement with ROC

Fashions was inconsistent with his fiduciary duties as a principal of the Debtor in possession.

Charles Azrak testified that he believed he had a deal with Christopher Laurita the day that he

signed the ROC Fashions License Agreement with the Iconix Defendants.  Azrak testified as

follows:

> Q: My question was on September 15th, what was your expectation
> with regard to Chris Laurita's role in the Roc Fashion business?
>
> A: I fully believed that he would be the brand manager for the brand.

03/08/16 Trial Tr. 228:9-13 (Azrak).

Similarly, Ruben Azrak testified in his deposition that, far from going behind Christopher

Laurita's back, he always understood and expected that Christopher Laurita was going to be his

Head of Sales.  (R. Azrak Dep. Tr. 141:9-25).  Immediately after the effective date of the ROC

Fashions License Agreement, on September 21, 2009, Christopher Laurita gave instructions to

have a new LLC formed.  *See* T-147.  In October 2009, Christopher Laurita exchanged draft

consulting agreements with the ROC Defendants, which were dated to commerce as of January

01, 2010, concerning consulting services for the Rocawear brand.  *See* T-150.

By the time Christopher Laurita formed New Star in December 2009, which allegedly

provided consulting services for the ROC Defendants, the Debtor was a debtor in possession with

fiduciary duties running to the Debtor's estate and creditors.  These duties included the duty of

loyalty and "obligations to refrain from self-dealing, to avoid conflicts of interests and the

appearance of impropriety, to treat all parties to the case fairly, and to maximize the value of the

estate."  *In re Adelphia Commc'ns Corp.*, 336 B.R. 610, 669-70 (S.D.N.Y. 2006) (quoting *In re

Hampton Hotel Investors, L.P.*, 270 B.R. 346, 362 (Bankr. S.D.N.Y. 2001)).  In that role,

Christopher Laurita was not free to engage in an undisclosed oral consulting agreement with the

new licensee for the Rocawear rights. New Star, through Christopher Laurita, then collected commissions from ROC Fashions at the rate of one hundred thousand dollars per month, *see* T-142, while Christopher Laurita was serving as a principal of the Debtor in possession. After confirmation of the Liquidation Plan, New Star received additional millions thereafter as severance pay. *See* T-142. Meanwhile, the Debtor's estate and creditors received nothing.

By attempting to privately convey the Rocawear rights out of the estate, Christopher Laurita and the Iconix Defendants prevented the Debtor from conducting an orderly liquidation, which would have maximized the value of the Debtor's estate for all of its creditors, not just a select few. *See* 11 U.S.C. § 362 (Legislative History, section 362: "The purpose of this provision is to prevent dismemberment of the estate. Liquidation must proceed in an orderly fashion."). For the reasons set forth above, the Court finds that Christopher Laurita engaged in unfair, self-dealing transactions that violated his fiduciary duties to the Debtor. The Court will now turn to whether the Iconix Defendants are liable for aiding and abetting Christopher Laurita's breach of fiduciary duties.

### b. Aiding and Abetting Breach of Fiduciary Duty (Against the Iconix Defendants)

Under New York law, a claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by fiduciary of obligations to another, (2) a defendant knowingly induced or participated in the breach, and (3) a plaintiff suffered damage as a result thereof. *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dep't 2003). As to the second element, the standards that courts use vary from constructive knowledge to actual knowledge; however, actual knowledge is the prevailing standard under New York law. *Kaufman*, 307 A.D.2d at 125; *see also Baron v. Galasso*, 83 A.D. 3d 626, 629 (2d Dep't 2011) ("an allegation that the defendant 'knew or should have known' about the breach of [fiduciary duty]" does not constitute actual knowledge). A defendant

knowingly participates in a breach of fiduciary duty only when the defendant provides substantial

assistance to the primary actor.  *See Kaufman*, 307 A.D.2d at 126.

> Substantial assistance occurs when a defendant affirmatively assists,
> helps conceal or fails to act when required to do so, thereby enabling
> the breach to occur.  However, the mere inaction of an alleged aider
> and abettor constitutes substantial assistance only if the defendant
> owes a fiduciary duty directly to the plaintiff.

*Id*. (citations omitted).

The Iconix Defendants did not owe a fiduciary duty to the Plaintiff.  Instead, Iconix, as a

member of the Creditors' Committee, had duties to be scrupulously honest, accurate and complete

in its disclosures, and to avoid self-dealing and enrichment at the expense of the Debtor's creditors.

*In re Caldor, Inc. NY*, 193 B.R. 165 (Bankr. S.D.N.Y. 1996).  For the following reasons, the Court

finds that the Iconix Defendants affirmatively assisted and helped conceal the true status of the

Signature License Agreement and breached the Signature License Agreement, thereby enabling

Christopher Laurita to breach his fiduciary duties to the Debtor.

Iconix attempted to keep its dealings with Christopher Laurita and the ROC Defendants a

secret by misrepresenting to the Court that the Signature License Agreement was terminated

prepetition pursuant to its terms.  Not only were the Iconix Defendants aware of a documentation

problem in connection with the termination of the Signature License Agreement, they were also

"willing to take the risk that the license was terminated" and made no attempt to amend their false

statements under oath.  T-83.  The Azraks' counsel, Goldsmith, testified at trial that he requested

a written notice of termination as part of his due diligence determination of whether Iconix could

lawfully grant an exclusive license to the Azraks.  When the Iconix Defendants told him it could

not produce one, he requested and obtained the Indemnification Clause.  *See* 03/08/16 Trial Tr.

18-19 (Goldsmith); T-85.  Then, after discovery commenced in this case, Ellen Holloman from

73

Olshan made two separate inquiries to General Counsel Tarshis regarding the "status of our document requests—termination letters/notifications and communications with the Azraks, ROC Fashions, RVC, etc."  Knowing that the Notice of Termination did not exist, Tarshis replied to Ellen Holloman on several occasions that "[w]e are working on this today and tomorrow and will have something to you this week."  T-178; T-179.  It took three subpoenas by the Responsible Person spanning fourteen months before the Debtor's bankruptcy attorneys finally turned over its complete files, which reflected that a notice of termination was never issued.

For those reasons, the Court finds the Iconix Defendants affirmatively assisted and helped conceal the transfer of the exclusive license rights from the Debtor to ROC Fashions, thereby enabling Christopher Laurita to breach his fiduciary duties to the Debtor.

### c. Damages for Breach of Fiduciary Duty (Against Christopher Laurita) and Aiding and Abetting Breach of Fiduciary Duty (Against the Iconix Defendants)

The damages requested by the Plaintiff fall under three distinct categories: (1) quasi-appraisal damages, (2) rescissory damages, and (3) disgorgement.

Under Delaware law, the court "has broad latitude to exercise its equitable powers to craft a remedy" for breach of fiduciary duty.  *Grove v. Brown*, No. 6793–VCG, 2013 WL 4041495, at *10 (Del. Ch. Aug. 8, 2013) (citation omitted).

> [D]amages resulting from a breach of fiduciary duty are liberally calculated.  As long as there is a basis for an estimate damages, and the plaintiff has suffered harm, 'mathematical certainty is not required.'  In addition to an actual award of monetary relief, this Court has the authority to grant pre-and post-judgment interest, and to determine the form of that interest.

*In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 814 (Del. Ch. 2011) (citation omitted).

One appropriate remedy for a breach of a duty of loyalty is "quasi-appraisal," which "is a form of compensatory or 'out-of-pocket' damages, which are generally measured by the harm inflicted on the plaintiff at the time of the wrong." *Id.* at 42. "An award of rescissory damages is [another] form of relief that could be imposed if the [transaction] is found not to be entirely fair *and* if one or more of the defendants are found to have violated their fiduciary duty of loyalty." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 41 (Del. Ch. 2014).

As recently explained by the Delaware Chancery Court in *In re Orchard Enters., Inc.;*

> The remedy is available for an adjudicated breach of the duty of loyalty, such as cases involving self dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary. In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property, the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim *and* (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property.

*Id.*, 88 A3d at 38 (emphasis added) (citations omitted).

Finally, in addition to quasi-appraisal and/or rescissory damages, the Plaintiff is also entitled to the remedy of disgorgement. As explained by the Delaware Supreme Court:

> If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth*, 23 Del. Ch. at 270; *see also Valeant Pharm, Int'l v. Jerney*, 921 A.2d 732, 752 (Del. Ch. 2007) (director failed to show that approval of cash bonus was entirely fair, and thus had to disgorge full amount of bonus); *In re Mobilactive Media,* LLC, 2013 WL 297950, at *23 ("In cases where the defendant breaches the duty of loyalty, the infringing party must disgorge all profits and equity from the usurpation."); *In re Louis Frey Co., Inc.*, 2006 WL 2090083, at *16 (Bankr. S.D.N.Y. July 28, 2006) (the purpose of an action for breach of fiduciary duty is more than simply to compensate for damages incurred, it is also to prevent the breach, "by removing from [fiduciaries] all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates." As a result, "the aggrieved party is entitled to recover the amount of the ill-gotten gains realized as a result of the breach [in addition to consequential damages].") (citations omitted)

Here, Christopher Laurita, aided and abetted by the Iconix Defendants, breached his fiduciary duties to the Debtor, making them jointly liable for damages, including all benefits received as a result of Christopher Laurita's breach of fiduciary duties. In addition to the value of the Rocawear rights, which will be determined after the Court holds another hearing, the Court directs that Christopher Laurita disgorge $2,050,000 that he received from the ROC Defendants. A separate hearing shall be held to determine the dollar amount of damages to be awarded in favor of the Plaintiff and against the Iconix Defendants.

6. **Counts VI and VII:  Breach of Contract and Tortious Interference with Contract**

The sixth and seventh causes of action assert that Studio IP, with the tortious assistance of Iconix and Christopher Laurita, breached the Signature License Agreement by terminating it without delivering the required written notice of termination. In the Summary Judgment

Decision, the Court held that there were outstanding issues of fact precluding a determination on these claims, including whether the Debtor repudiated or abandoned the Signature License Agreement.

### a. Breach of Contract (against Studio IP)

#### i. The Signature License Agreement was not repudiated by the Debtor, nor was it abandoned.

The sixth cause of action seeks damages from Studio IP for its breach of the Signature License Agreement, based on its failure to abide by the notice requirements under the Signature License Agreement. In the Summary Judgment Decision, the Court set forth the elements the Plaintiff must prove in order to establish this claim: "a plaintiff must show 'the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of his or her contractual obligations, and damages resulting from the breach.'" Summary Judgment Decision, citing *Dee v. Rakower*, 112 A.D.3d 204, 208-09 (2d Dep't 2013). This Court recognized that a contract must be terminated in accordance with its express terms. Summary Judgment Decision, citing *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp.*, 865 F.2d 513, 519 (2d Cir. 1989) (other citations omitted). Studio IP conceded that it failed to provide written notice of termination, but claimed that the Debtor either repudiated or abandoned the Signature License Agreement. As a result, Studio IP was excused from having to provide written notice of termination as required pursuant to the Signature License Agreement.

Under New York law, repudiation of a contract requires either 1) a statement by a party that he will commit a material breach of the contract, or 2) a voluntary, affirmative act which renders the party unable to perform. *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998). In either case, the repudiating party must demonstrate a clear

intent to forego performance of his or her obligations under the contract. *Rachmani Corp. v. 9 E. 96th St. Apt. Corp*., 211 A.D.2d 262, 266 (1st Dep't 1995). "[T]here must be a definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action." *Id.* at 266-67. "For a statement to constitute an anticipatory breach, 'the announcement of an intention not to perform [must be] positive and unequivocal.'" *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.*, No. 96 Civ. 1967 (MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996) (quoting *Tenavision, Inc. v. Neuman*, 45 N.Y.2d 145 (1978)), *aff'd*, 141 F.3d 1151 (2d Cir. 1998).

In this case, there was no "definite and final communication" of an intent by the Debtor not to perform with respect to the Signature License Agreement. The Debtor and the Iconix Defendants continued to treat the agreement as valid and in effect after the Involuntary Petition was filed. At trial, CEO Cole testified that Iconix did not view the Signature License as "over" until the ROC Fashions License Agreement was executed. 11/17/15 Trial Tr. 53-55 (Cole); Cole Dep. Tr. 160. The Debtor's M&A advisor, Sol Lipshitz, testified that based on his communications with Christopher Laurita, he believed that the Signature License Agreement was not terminated prepetition. 04/27/15 Trial Tr. 156-157, 165, 166 (Lipshitz). Christopher Laurita acknowledged that the Debtor received the Rocawear Notice of Default, but he also received an email from General Counsel Tarshis advising that termination of the Signature License Agreement was not going to occur, and Christopher Laurita acknowledged this by thanking General Counsel Tarshis for the "heads-up." (T-30). Shortly thereafter, Christopher Laurita took steps consistent with an understanding that the Signature License Agreement was not terminated. Christopher Laurita hired attorneys and advisors, met with Li & Fung, drafted and exchanged term sheets and proposals with the Iconix Defendants, the Azraks and Li & Fung, and presented another proposal to CEO

Cole that was based on a collaboration with the Azraks. The term sheets and proposals were all based on the rights under the Rocawear license, which were licensed exclusively to the Debtor. These events evinced an attempt by Christopher Laurita to stay in business and find a solution to address the debts of the Debtor and obligations under the Signature License Agreement. In sum, there is no voluntary act indicating a clear intent not to perform under the Signature License Agreement.

The Signature License Agreement was not abandoned by the Debtor. Iconix argues that the Debtor relinquished its rights in the Signature License Agreement as part of a global resolution with all of the parties during the Gap Period. However, the Court concluded *supra* that Iconix violated the automatic stay when it improperly treated the Signature License Agreement as terminated pursuant its terms. There was no abandonment by the Debtor that could be "blessed" by Section 303(f) of the Bankruptcy Code. The Debtor's bankruptcy counsel, Mr. Schwartz, testified to this effect:

> Ms. Holoman: If the [Signature License Agreement] were abandoned any time after the involuntary petition was filed up until the order for relief was entered, would this have been – would that have been described differently here in the Disclosure Statement?
>
> Mr. Schwartz: My knowledge of the Bankruptcy Code is that a debtor can operate in the normal course of business under, I think Section 303(h) [sic] during the gap period. I don't know that abandoning a license is normal course of business. If I were representing a debtor and the debtor was abandoning an asset that had value, I don't think that that necessarily is normal course and I think you'd need a motion and I think you'd certainly need a motion in the post-petition after the order was entered. I was under the impression that the license had been terminated prior to the bankruptcy. That's my knowledge.

4/28/15 Trial Tr. 101-102 (Schwartz).

No steps were taken to obtain relief from the Court by motion during the Gap Period, and the Court has already concluded that the Debtor could not dispose of its most valuable asset and claim it was merely conducting its business pursuant to Section 303(f).

### ii. Damages

Under New York law, damages for breach of contract are measured by the "amount necessary to put the plaintiff in the same economic position he would have been in had the defendant fulfilled his contract." *Indu-Craft, Inc. v. Bank of Baroda*, 47 F.3d 490, 495 (2d Cir. 1993) (other citations omitted). The Plaintiff urges the Court to find that the Plaintiff is entitled to a judgment in the value of the Rocawear rights, and at trial, the Plaintiff introduced expert testimony by John Bonora, who gave his opinion of the consequential damages flowing from the breach of contract by Studio IP. According to Bonora, the Debtor is entitled to $14,461,526 which is the present value of $18,837,500. T-188. The $18,837,500 is comprised of the $6 million "additional fee" in the Rocawear License Agreement to be paid to Iconix, the unpaid annual guaranteed minimum of $4 million in the Rocawear License Agreement, $6,037,500 for the 2010 and 2011 minimum royalties, paid quarterly, and $2.8 million to be paid to NewStar/Christopher Laurita. T-188. According to Mr. Bonora, these numbers represent the "investment value" of what the Azraks were willing to pay to obtain the right to an exclusive license for the Rocawear line. 03/09/2016 Trial Tr. 83 (Bonora). Bonora explained the compulsion factor he ascribed to the parties to the transaction as follows:

> [H]ere you have real people who were facing pressures to do something quickly. Iconix had a license and . . . . [it] didn't want the license to go dead, to go dormant because that would degrade the value of the license. Iconix had also issued a new series of stock early in July [2009] and they were coming up on a third quarter reporting period and they had a license that was in arrears and there's some correspondence about accounting and legal issues,

> Iconix is taking the pressure not to take a big write-off on the license
> because it would cause them to have a negative EPS [earnings per
> share] trend reported in the third quarter. Iconix's expert used FMV
> [fair market value] very narrowly and only valued the license.
> Because of compulsion this expert did not use FMV. FMV did not
> "account for possible synergies that the buyer expects to realize. So
> if the [acquirer] is coming in like the Azraks in a similar business
> and has the potential to realize synergies by combining the
> businesses, that will translate in that buyer being moved to offer
> more than the hypothetical buyer in a fair market value scenario.

03/09/2016 Trial Tr. 83, 88 (Bonora).

As Charles Azrak testified, the Rocawear rights had value and he was willing to pay $6

million to Iconix plus "whatever it costs" to obtain the Rocawear license, which had value, and he

looked at the $6 million plus the royalty structure as the cost of getting this business. 11/19/2015

Trial Tr. 116 (Azrak). Where the money went was of no concern to Charles Azrak, who would

have paid it however it was structured. Id. As the transaction was ultimately structured, the

Debtor's estate was bypassed, and the Plaintiff asserts that $14,461,526 represents what should

have flowed to the Debtor's estate if Iconix did not terminate the Signature License Agreement in

violation of both its terms and the automatic stay.

Iconix claims that there were so many impediments to effectuating a transfer of the rights

under the Signature License Agreement to a third party that the rights were worthless. Iconix points

to the fact that the Debtor would have to cure more than $7.4 million in defaults under the Signature

License Agreement, which was an impossible task. In addition, Studio IP had the right to withhold

its consent to any assignment of the Signature License Agreement, which it would have done in

this case. Even if the Debtor had the funds to cure the defaults and Studio IP consented to an

assignment of the Signature License Agreement, Iconix asserts that no entity was willing to take

over the terms of the existing Signature License Agreement. The Signature License Agreement

was set to expire in approximately fifteen months, and the terms were more onerous than what any

licensee was willing to accept.  James Volkman, the expert witness for Iconix, determined that the fair market value of the trademark license rights under the Signature License Agreement ranged from $0 to $243,000, without taking in to consideration the amount due to Studio IP under the Signature License Agreement.  Factors contributing to his valuation were that the minimum sales requirements and royalty rates contained in the Signature License Agreement were above the industry standard, and there were less than sixteen months remaining on the contract.  T-91.

The Court does not give much weight to the Volkman Report, as it is based on several improper assumptions.  The first is that the only avenue for the Debtor to realize value from the Signature License Agreement was to sublicense.  This is belied by the fact that the assets under the Signature License Agreement were ultimately exploited by a third party without the consent of the Bankruptcy Court.  In addition, while it is true that the Signature License Agreement had to be assumed by the Debtor prior to assigning the rights in the bankruptcy case this is not dispositive.  Mr. Volkman ignored the fact that the Rocawear license was purportedly granted to a third party, along with other tangible and intangible assets of the Debtor, and that ROC Fashions did hire many former Debtor personnel, and continued to work with almost all of the same factories, resulting a significant economic benefit to ROC Fashions and others. The Volkman Report also ignores the fact that the transaction that took place provided compensation to Iconix for the Debtor's arrears, provided future compensation to Christopher Laurita through New Star, in exchange for a transfer of the Debtor's assets in violation of the automatic stay.   The fact that the actual terms of the Signature License Agreement were more onerous than others in this market is not relevant to this analysis.

The Court finds *Schonfeld v. Hilliard*, 218 F.3d 164 (2d Cir. 2000) instructive regarding fixing damages flowing from the breach of contract claim.  In *Schonfeld*, the Second Circuit

recognized that where a defendant's breach of contract deprives the plaintiff of an asset, which is the case before the Court, "the courts look to compensate the plaintiff for the 'market value' of the asset 'in contradistinction to any peculiar value the object in question may have had to the owner.'" *Id*. at 178 (other citations omitted). Where the market value is unique or involves intangible assets, the hypothetical market standard applies, according to the *Schonfeld* Court. As the *Schonfeld* Court correctly noted, the hypothetical market value could be established by prior sales history, by expert testimony or through sales of comparable assets. *Id*. The *Schonfeld* Court also recognized that the "wrongdoer rule" applied to breach of contract claims, where "'the existence of damage is certain, and the only uncertainty is as to its amount . . . the burden of uncertainty as to the amount of damage is upon the wrongdoer.'" *Id*. at 182 (citing *Contemporary Mission, Inc. v. Famous Music Corp.*, 557 F.2d 918, 926 (2d Cir. 1977). As noted by the Supreme Court, "the law will make the best appraisal that I can, summoning to its service whatever aids it can commend." *Sinclair Rfg. Co. v. Jenkins Co.*, 289 U.S. 689, 697 (1933). In addition, because an exclusive license is involved, there may be additional factors to consider when fixing damages.

Based on the guidance provided in *Schonfeld* and other applicable case law, it is appropriate to hold a hearing to determine damages. A hearing is necessary because the record before the Court is insufficient to determine the damage components to each cause of action.

### b. Tortious Interference with Contract (against Christopher Laurita and Iconix)

A claim for tortious interference with contract "requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." *Cohen v. Davis*, 926 F. Supp. 399, 402 (S.D.N.Y. 1996); *Cerveceria Modelo, S.A. De C.V. v. USPA Accessories LLC*, No. 07 Civ. 7998,

83

2008 WL 1710910, at *3 (S.D.N.Y. Apr. 10, 2008).   The Court has already determined that there was a valid contract between the Debtor and Studio IP, and that Studio IP breached the contract, causing damages to the Debtor.  It is undisputed that Iconix and Christopher Laurita had knowledge of the Signature License Agreement, inclusive of its exclusivity provisions and its termination requirements. The remaining issue is whether Iconix and Christopher Laurita intentionally procured the breach of the Signature License Agreement without justification.

Once the Involuntary Petition was filed, the Signature License Agreement became property of the Debtor's estate, and the automatic stay prevented Studio IP from terminating the Signature License Agreement without permission from the Court.  Christopher Laurita acted in concert with Iconix to intentionally procure Studio IP's breach of the Agreement.  Once the Involuntary Petition was filed, Christopher Laurita had the means under the Bankruptcy Code to preserve this asset for the benefit of the estate. Christopher Laurita could have insisted that Studio IP seek permission from the Bankruptcy Court, as termination of the Signature License Agreement was a prerequisite to transferring the exclusive license rights from the Debtor to ROC Fashions.  Christopher Laurita could have had the Debtor file its own motion to abandon the Signature License Agreement if he believed it had no value to the estate.  Once Studio IP and Iconix treated the Signature License Agreement as terminated, Christopher Laurita could have sought relief from the Court to enforce the Signature License Agreement.  Instead, Christopher Laurita did nothing to preserve the estate's interests, and participated in a series of events which led to the losses sustained by the Debtor. Christopher Laurita intentionally interfered with the Debtor's performance under the Signature License Agreement when he failed to disclose the existence of the contract to the Bankruptcy Court, and failed to take the proper steps to ensure that the Debtor's rights under the contract were preserved during the Gap Period.  But for his conduct, the scheme to grant the exclusive license

rights to ROC Fashions in breach of the Signature License Agreement could not have occurred. This scheme required a conscious decision by Christopher Laurita to treat the Signature License Agreement as if it was terminated prepetition, and Christopher Laurita's participation in the scheme was instrumental.

Likewise, based on the exchange of emails between Iconix the Azraks and counsel to the Debtor, Iconix was prepared to deem the Signature License terminated by the Notice of Default and to enter into a new license with the ROC Fashions. ROC Fashions was offered a new license and paid for the products held by the Debtor's manufacturing creditors in China, *see* 04/28/15 Trial Tr. 43-44 (Schwartz); 04/22/15 Trial Tr. 175-177 (Laurita). In return, Iconix released its unpaid royalty claim against the Debtor. *See* 04/28/15 Trial Tr. 36-44 (Schwartz); 03/07/16 Trial Tr. 59-62 (Schwartz); 04/22/15 Trial Tr. 175-177 (Laurita). In sum, Iconix was pivotal in causing Studio IP to breach the Signature License Agreement.

Iconix's sole defense to this claim is that it is barred by the economic interest defense. The Court disagrees. Under New York law, a defendant that "acted to protect its own legal or financial stake in the breaching party's business" may raise the economic interest defense. *See White Plains Coast & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007). This defense is available where a defendant and a breaching party have a parent-subsidiary relationship. *Id.* If such a defense is raised, a claim for tortious interference "requires a showing of either malice on the one hand, or fraudulent or illegal means on the other." *Kargo, Inc. v. Pegaso PCS, S.A. de C.V.*, 2008 WL 2930546, at *10 (S.D.N.Y. July 29, 2008); *see also MDC Corp., Inc. v. John H. Harland Co.*, 228 F. Supp. 2d 387, 397 (S.D.N.Y. 2002) (sustaining claim for tortious interference against breaching party's parent; although "parent company . . . has an economic interest in interfering with [its

subsidiary's] contractual relations . . . [plaintiff] has pleaded that, in procuring [the subsidiary's]

alleged breached of contract, [the parent] acted maliciously and used fraudulent or illegal means.").

The record reflects that Iconix acted intentionally and with improper motives. Without

regard for the plain terms of the Signature License Agreement, and to avoid any delay, uncertainty

or scrutiny that could be occasioned by complying with applicable bankruptcy law, Iconix

improperly treated the Signature License Agreement as terminated and entered into the ROC

Fashions License Agreement unlawfully. The Iconix Defendants then hid their unlawful and

improper conduct by providing false, misleading and incomplete information to the creditors and

the Court. Furthermore, by negotiating for and accepting ROC Fashions' agreement to pay $6

million of the $7.8 million owed by Signature, Iconix also obtained a priority for its unsecured

claim over all of Signature's other unsecured creditors. For those reasons, the economic interest

defense is not available to Iconix. Iconix lost that defense once it used fraudulent means to

accomplish and conceal the true and complete circumstances regarding the Signature License

Agreement and the execution of the ROC Fashions License Agreement.

To the extent that Christopher Laurita seeks to rely on the "economic interest" defense as

well, this defense is not applicable. Christopher Laurita acted fraudulently in his failure to disclose

the existence of the Signature License Agreement as well as his oral agreement to benefit from

commissions on future sales of Rocawear-branded apparel.

Under New York law, the damages for tortious interference with a contract are equal to the

full amount of the monetary loss of the benefits of the contract, plus the consequential damages.

*International Minerals and Resources, S.A. v. Pappas*, 96 F.3d 586, 597 (2d Cir. 1996). The

liability is joint and several between Christopher Laurita and Iconix. *Hornstein v. Podwitz*, 254

N.Y. 443, 449 (1930). The dollar amount of the damages shall be fixed after a further hearing.

### 7.  Count IX:  Unjust Enrichment (Against New Star)

In the Summary Judgment Decision, the Court granted summary judgment in favor of the Defendants other than New Star on the Plaintiff's unjust enrichment claim, holding that the claim is a duplicative catchall cause of action in case the primary claims fail.  To the extent that the primary claims succeed, the unjust enrichment claim would be duplicative as to all of the claims against the Defendants other than New Star.  *See Corsello v. Verizon New York, Inc*., 18 N.Y.3d 777, 791 (2012).

To prevail on an unjust enrichment claim, a plaintiff must show that a defendant benefited at the plaintiff's expense and that equity and good conscience require restitution.  *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d. 173, 182 (2011).  An unjust enrichment claim "is undoubtedly equitable and depends upon the broad considerations of equity and justice." *Paramount Film Distrib. Corp. v. State of New York*, 30 N.Y. 2d 415, 421 (1972), *cert denied* 414 U.S. 829 (1973). Although privity is not required to assert an unjust enrichment claim, a relationship must exist between the parties that is not "too attenuated."  *See Georgia Malone & Co., Inc. v. Rieder*, 19 N.Y.3d 511, 516 (2012).  New York courts have not given a precise definition of what type of relationship meets this requirement.  However, courts have clarified that this requirement can be met in several ways, *e.g*., a defendant which is aware of the wrongfulness of a third party's action, *see Trade Expo Inc. v. Sterling Bankcorp*., 2014 N.Y. Slip Op. 32408(U), 2014 WL 4634989, at *2 (Sup. Ct, N.Y. County 2014) (defendant accepted payments from a third party for the sale of goods, knowing that the third party did not have any legal right to possess or sell the goods), services which are performed at the defendant's behest, *see Ehrlich v. Froehlich*, 72 A.D.3d 1010, 1011, 903 N.Y.S.2d 400 (2d Dep't 2010), or where there is a relationship between the parties that could have caused reliance or inducement, *see Georgia Malone*, 19 N.Y.3d at 518;

*Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011).  Damages are calculated based

on the reasonable value of the benefit conferred on the defendant by the plaintiff.  *Giordano v.*

*Thomson*, 564 F.3d 163, 170 (2d Cir. 2009); *see also In re Allou Distributors, Inc.*, 446 B.R. 32,

76 (E.D.N.Y. 2011) ("In situations where the defendant receives a benefit, but the plaintiff's loss

is difficult to measure, proper restitution is the amount by which the defendant is enriched.")

(citations omitted).

Here, certain payments were made out of Roc Fashions to New Star after the ROC Fashions

License Agreement was executed.  Commencing in January 2010, one month prior to the date New

Star was formed, through August 2010, New Star received $100,000 per month from ROC

Fashions for consulting services, for a total of $800,000.  T-151.  By letter dated September 10,

2009, ROC Fashions terminated the oral sales representation and consulting agreements with New

Star, and agreed to pay New Star an additional $2 million for its services.  T-151; T-152.  Check

remittances and accounting notes from ROC Fashions reflect a total of $1 million paid to New Star

state "Per Term Agreement/1" and "Per Term Agreement/2."  T-151.  Thereafter, Ruben Azrak

paid Christopher Laurita an additional $250,000 and Jacqueline Laurita $275,000.  Those

payments were deposited into a joint bank account held by Christopher Laurita and Jacqueline

Laurita as opposed to New Star's account.  *See* 03/07/16 Trial Tr. 12:12-14:25 (Laurita). In total,

New Star received $1,800,000 from ROC Fashions.

At trial, Christopher Laurita testified that those payments were directly related to his

commission of three percent on sales of Rocawear clothing by Roc Fashions pursuant to a

commissions-based arrangement with the Azraks.

> MS. HOLLOMAN: Do you recall having been asked the following
> questions and giving the following answers at your deposition on
> December 5th, 2013, and beginning at page 450, (indiscernible)?

Question, "This was previously marked as exhibit 69. Take a look . . . What are these documents?" Answer, "It looks like pay stubs." Question, "Are those pay stubs for New Star Group?" Answer, "Yes." Question, "Did you receive the checks associated with these pay stubs?" Answer, "I don't have my books and records with me, but I am assuming I did." . . . ["] Do you see up in the top left hand corner [of the check], there's a notation, 'Advance three percent commission,' end quote?" Answer, "Right." Question, "Does that refer to an advance you were receiving with respect to three percent commission?" Answer, "My deal was three percent of sales and that was in advance, yes." Question, "And is three percent sales on Rocawear branded goods?" Answer, "Yes." "Was it three percent of anything else?" Answer, "This represented ROC."

MR. LAURITA: Okay. I'm just stating what it says on this (indiscernible), that's all.

MS. HOLLOMAN: So it's correct that the percentage here [on the checks] refers to Rocawear?

MR. LAURITA: Yeah.

04/22/15 Trial Tr. 92:23-94:02 (Laurita); T-151

THE COURT: Azrak's financing, Iconix agreement with the licensing with Azrak, all of that allowed [the stores to continue to sell Rocawear products on an uninterrupted basis] to happen.

MR. LAURITA: Yes.

THE COURT: But Signature had no money.

MR. LAURITA: Right.

THE COURT: Those sales, you then got a commission on?

MR. LAURITA: Not until their first collection came out.

THE COURT: Okay.

MR. LAURITA: So—

THE COURT: When they collect, you got paid?

MR. LAURITA: 2010, yeah.

THE COURT: And that – those funds were paid to New Star or you?

MR. LAURITA: To New Star.

THE COURT: And about how much was that, in total?

MR. LAURITA: A little over $2 million, $2 point – what was it – $2 point – I think at the end of the day it wound up being $2.3 or something like that.

THE COURT: And that represented then, three percent of whatever the calculation was?

MR. LAURITA: Right.

THE COURT: All right.

MR. SEIDMAN: Was the number $2.8 million?

MR. LAURITA: You know, there was – I know that there was an agreement, a separation agreement that we had, but I also remember taking a haircut at some point.  So I don't remember exactly what the last file number was.

04/23/15 Trial Tr. 112:07-113:11 (Laurita); T-151.

Under the particular circumstances of this case and in view of Christopher Laurita's testimony, equity and good conscience require that New Star make restitution of $1.8 million as the payments were received as a result of the Defendants' improper conduct regarding the Signature License Agreement.  Christopher Laurita, as a principal of the Debtor and the sole member of New Star, created New Star as a vehicle to receive his three-percent commission on sales pursuant to a commissions-based arrangement with the Azraks.  Christopher Laurita's knowledge and participation in the overall scheme is imputed to New Star.  New Star, through Christopher Laurita, was aware of the wrongful acts against the Debtor and of its essential role in the wrongful scheme.

The facts of this case are similar to *Philips Intern. Investments, LLC. v. Pektor*, 982 N.Y.S.2d 98 (1st Dep't. 2014). The court in *Philips* was called on to determine whether the then-recent decision, *Georgia Malone & Co., Inc. v. Rieder,* changed the law on just enrichment in New York. In *Philips*, the plaintiff investment company entered into a joint venture with two individuals to purchase certain commercial properties from a third party. The deal with the joint venture and the third party was not consummated. It was later discovered that the two individuals had formed other partnerships to act as vehicles to purchase the property, effectively cutting the original joint venture out of the transaction. The partnerships formed to purchase the properties were sued by the plaintiff for unjust enrichment. The court denied the defendant's motion to dismiss the unjust enrichment claim, and the partnership defendants moved to renew after *Georgia Malone & Co., Inc. v. Rieder* was decided. The court denied the motion again, holding that *Georgia Malone & Co., Inc. v. Rieder* merely clarified existing law on this issue. *Philips Intern. Investments, LLC. v. Pektor,* 982 N.Y.S.2d at 100. There was a sufficient relationship between the plaintiff and the partnership defendants because the joint venturers:

> [C]reated the partnership defendants as vehicles to appropriate the venture's business opportunity of buying the viable properties. All of the [joint venturers'] knowledge and scheming is, under this theory, imputable to the partnership defendants…. [H]ere, the partnerships, through the [joint venturers], knew of the alleged wrong being done to plaintiff and of their essential role in the allegedly wrongful scheme.

*Id*. at 103.

For the same reasons, the knowledge of Christopher Laurita is imputed to New Star, which was created for the purposes of furthering the scheme to deprive the Debtor of the value of its asset. New Star cannot be considered a stranger to the transaction, lacking knowledge of the wrongful conduct of Christopher Laurita. New Star was incorporated by Christopher Laurita, who acted against the best interests of the Debtor's estate in this case. The fact that the payments to

New Star were based on a percentage of sales of Rocawear clothing supports a finding that the payments were part and parcel of the overall scheme. These payments had no bearing on any work allegedly performed by New Star, which had no written contract with ROC Fashions. Rather, it represents a portion of what the Azraks were willing to pay to obtain the Rocawear license. Furthermore, the payments continued even after New Star's alleged contract was terminated by ROC Fashions. New Star benefitted at the expense of the Debtor because these payments should have been paid to the Debtor as compensation for the exclusive license. For these reasons, the Court finds that New Star is liable to the Plaintiff for unjust enrichment in the amount of $1.8 million. The $1.8 million is the total amount New Star received from ROC Fashions.

### 8. Apportionment of Damages

Prior to the trial of this adversary proceeding, the Plaintiff reached settlements with Joseph Laurita and Adeline Laurita for $1 million, and with the ROC Defendants for $400,000. Both settlements included releases in favor of these defendants. *See* dkt 114, 154. Under New York General Obligations Law Section 15-108, a settlement with one tortfeasor reduces any liability of a non-settling defendant to the injured party by the greater of the settlement amount or the settling tortfeasor's equitable share of the damages. Section 15-108 provides:

> When a release or a covenant not to sue or not to enforce a judgment is given to one of two or more persons liable or claimed to be liable in tort for the same injury … it reduces the claim of the releaser against the other tortfeasors to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, or in the amount of the released tortfeasor's equitable share of the damages under article fourteen of the civil practice law and rules, whichever is greatest.

N.Y. Gen. Oblig. Law § 15-108.

A tortfeasor's equitable share is determined in accordance with the torfeasor's relative culpability. N.Y. C.P.L.R. 1402, *see Brunetti v. Musallam*, 59 A.D.3d 220, 221 [1st Dep't 2009]. Taking the ROC Defendants first, the Court notes that they settled for $400,000, which is reflective of their relative involvement in the wrongdoing. The testimony provided by the Azraks highlights that they owed no duty to the Debtor, and their conduct did not rise to the level of Iconix or Christopher Laurita on the tortious interference claim, or to the level of Iconix on the aiding and abetting claim. It is clear from the record that they were the least knowledgeable of the true facts as among the Defendants, and they should be responsible for no more than $400,000 on the judgment emanating from Counts 4 or 7. Therefore, the judgment on each count may be reduced by a total of $400,000. As for Joseph and Adeline Laurita, they entered into a settlement in the amount of $1 million. Joseph Laurita did not testify at trial, and it is impossible to determine his degree of culpability for the claims of fraud, negligent misrepresentation, breach of fiduciary duty, or tortious interference with contractual relations. Christopher Laurita asks the Court to apportion the $1 million settlement between this action and the clawback action to follow, to determine the proportionate liability of the defendants in this action, and reduce their liability to account for the settlement amounts paid by Joseph Laurita and his wife. Because the clawback action has not been heard or decided, the Court cannot determine how much to apportion between each action. Instead, the $1 million will be applied to reduce the total amount of the judgment in this case. As for counts 1 and 2, the Court finds that Iconix and Christopher Laurita are equally liable. For count 7, the Court also finds Iconix and Christopher Laurita equally liable. Therefore, the amounts awarded under each of these counts shall be reduced by $333,333.00, which shall be used to reduce the judgments against Iconix and Christopher Laurita equally.

## 9. Conclusion

For the reasons set forth above, an order shall be entered denying the Laurita Motion to Dismiss and the Iconix Defendants Motion to Dismiss, and granting the 9024 Motion on alternate grounds.  A judgment shall be entered in favor of the Plaintiff as follows:

Count 1: Christopher Laurita and Iconix are jointly and severally liable for fraud.

Count 2: Christopher Laurita and Iconix are jointly and severally liable for negligent misrepresentation that damaged the Debtor.

Counts 3 and 4: Christopher Laurita is liable for his breach of his fiduciary duties that damaged the Debtor, and Iconix and Studio IP are liable for aiding and abetting such breaches of fiduciary duty that damaged the Debtor.  Christopher Laurita, Iconix and Studio IP are jointly and severally liable for the damage to the Debtor.

Counts 6 and 7: Studio IP is liable for breach of the Signature License Agreement, and Christopher Laurita and Iconix are liable for tortious interference with the Signature License Agreement, causing damage to the Debtor in an amount to be determined.

Count 9: New Star was unjustly enriched in the amount of $1,800,000, which should be returned to the Debtor.

A hearing shall be held at a date to be determined to fix the remainder of the damages.

Dated: August 24, 2017
       New York, New York



Robert E. Grossman
United States Bankruptcy Judge